**<u>Exhibit 2</u>**

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2              FOR THE NORTHERN DISTRICT OF OHIO

3

4                    ~~~~~~~~~~~~~~~~~~~~

5

         STATE OF OHIO,

6        ex rel. DAVID P. JOYCE,

7                    Plaintiff,

8

             vs.        Civil Action No.  1:11-cv-02474

9

10       MERSCORP, INC., et al.,

11                   Defendants.

12                   ~~~~~~~~~~~~~~~~~~~~

13                   Deposition of

14                   SHARON GINGERICH

15                   VOLUME I

16

                     APRIL 24, 2012

17                   9:00 a.m.

18

19                   Taken at:

20               Baker & Hostetler, LLP

21           1900 East Ninth Street, Suite 3200

22                   Cleveland, Ohio

23

24

25       Todd L. Persson, Notary Public

Page 2

1  APPEARANCES:
2
3      On behalf of the Plaintiff:
4          Bernstein Liebhard, LLP, by
5          CHRISTIAN SIEBOTT, ESQ.
6          SARA GOODMAN, ESQ.
7          10 East 40th Street
8          New York, NY 10016
9          (212) 779-1414
10         siebott@bernlieb.com
11
12     On behalf of the Defendants:
13         Goodwin Procter, LLP, by
14         JOSEPH F. YENOUSKAS, ESQ.
15         901 New York Avenue, NW
16         Washington DC 20001
17         (202) 346-4000
18         jyenouskas@goodwinproctor.com
19
20
21
22
23
24
25

Page 3

1  APPEARANCES, Continued:
2
3      On Behalf of the Defendants, Huntington
4      National Bank, Fifth Third Bank and
5      KeyBank National Association:
6          Baker & Hostetler, LLP, by
7          BRETT A. WALL, ESQ.
8          LISA M. GHANNOUM, ESQ.
9          1900 East 9th Street
10         Suite 3200
11         Cleveland, OH 44114
12         (216) 861-7597
13         bwall@bakerlaw.com
14         lghannoum@bakerlaw.com
15
16     On Behalf of the Defendants, Corelogic,
17     Suntrust:
18         McGlinchey Stafford, PLLC, by
19         JAMES S. WERTHEIM, ESQ.
20         CANDICE L. MUSIEK, ESQ.
21         BARBARA FRIEDMAN YAKSIC, ESQ.
22         25550 Chagrin Boulevard, Suite 406
23         Cleveland, OH 44122
24         (216) 378-9905
25

Page 4

1  APPEARANCES, Continued:
2
3      On Behalf of the Defendants, Nationwide
4      Advantage Mortgage Company:
5          Carpenter, Lipps & Leland, LLP, by
6          MICHAEL H. CARPENTER, ESQ.
7          280 Plaza, Suite 1300
8          280 North High Street
9          Columbus, OH 43215
10         (614) 365-4100
11         carpenter@carpenterlipps.com
12
13     On Behalf of the Defendants, MERSCORP,
14     MERS:
15         Morgan, Lewis & Bockius, LLP, by
16         ROBERT M. BROCHIN, ESQ.
17         200 South Biscayne Boulevard
18         Suite 5300
19         Miami, FL 33131
20         (305) 415-3546
21         rbrochin@morganlewis.com
22
23
24
25

Page 5

1  APPEARANCES, Continued:
2
3      On Behalf of the Defendant, Corinthian
4      Mortgage Corporation, by
5          Vorys, Sater, Seymour and Pease,
6          LLP, by
7          MARCEL C. DUHAMEL, ESQ.
8          2100 One Cleveland Center
9          1375 East Ninth Street
10         Cleveland, OH 44114
11         (216) 479-6112
12         mcduhamel@vorys.com
13
14     On Behalf of the Defendant, MGIC Investor
15     Services Corp.:
16         Mansour, Gavin, Gerlack & Manos Co.,
17         LPA, by
18         MICHAEL P. QUINLAN, ESQ.
19         55 Public Square
20         Suite 2150
21         Cleveland, OH 44113
22         (216) 523-1500
23         mquinlan@mgginlpa.com
24
25

2 (Pages 2 - 5)

Page 6

1  APPEARANCES, Continued:
2
3      On Behalf of the Defendant, Wells Fargo
4      Bank, N.A.:
5          Thompson Hine, LLP, by
6          TERRY W. POSEY, ESQ.
7          Austin Landing I
8          10050 Innovation Drive
9          Suite 400
10         Dayton, OH 45342
11         (937) 443-6857
12         terry.posey@thompsonhine.com
13
14     On Behalf of the Defendant, Deutsch Bank
15     National Trust Company:
16         Porter, Wright, Morris & Arthur,
17         LLP, by
18         MARGARET M. KOESEL, ESQ.
19         925 Euclid Avenue
20         Suite 1700
21         Cleveland, OH 44115
22         (216) 443-2530
23         mkoesel@porterwright.com
24
25

Page 8

1  APPEARANCES, Continued:
2
3      On Behalf of the Defendant, Home Savings:
4          Thrasher, Dinsmore & Dolan, by
5          TODD C. HICKS, ESQ.
6          100 7th Avenue, Suite 150
7          Chardon, OH 44024
8          (440) 285-2242
9          thicks@tddlaw.com
10
11     On Behalf of the Defendant, Goldman Sachs
12     Mortgage Company, 65 Mortgage Securities
13     Corporation:
14         K&L Gates, LLP, by
15         R. BRUCE ALLENSWORTH, ESQ.
16         State Street Financial Center
17         One Lincoln Street
18         Boston, MA 02111
19         (617) 261-3119
20         bruce.allensworth@klgates.com
21
22
23
24
25

Page 7

1  APPEARANCES, Continued:
2
3      On Behalf of the Defendants, GMAC
4      Mortgage, LLC and US Bank, N.A.:
5          Locke Lord, LLP, by
6          THOMAS J. CUNNINGHAM, ESQ.
7          111 South Wacker Drive
8          Chicago, IL 60606
9          (312) 443-1731
10         tcunningham@lockelord.com
11
12     On Behalf of the Defendant, Chase:
13         Bricker & Eckler, LLP, by
14         CHRISTOPHER M. ERNST, ESQ.
15         1001 Lakeside Avenue East
16         Suite 1350
17         Cleveland, OH 44114
18         (216) 523-5405
19         cernst@bricker.com
20
21
22
23
24
25

Page 9

1  APPEARANCES, Continued:
2
3      On Behalf of the Defendant, HSB Bank USA,
4      N.A.:
5          Ulmer Berne, LLP, by
6          MATTHEW T. WHOLEY, ESQ.
7          1660 West 2nd Street
8          Suite 1100
9          Cleveland, OH 44113
10         (216) 583-7000
11         mwholey@ulmer.com
12
13     On Behalf of the Defendant, CitiMortgage,
14     Inc., Citigroup, Inc., and Citibank,
15     N.A.:
16         Mayer Brown, LLP, by
17         DAVID D. POPE, ESQ.
18         71 South Wacker Drive
19         Chicago, IL 60606
20         (312) 701-8733
21         dpope@mayerbrown.com
22
23
24
25

3 (Pages 6 - 9)

Page 10

1    APPEARANCES, Continued:

2

3        On Behalf of the Defendant, United

4    Guaranty Corporation, via teleconference:

5        Fennemore Craig, P.C., by

6        TODD S. KARTCHNER, ESQ.

7        3003 North Central Avenue

8        Suite 2600

9        Phoenix, AZ 85012

10       (602) 916-5461

11       tkartchn@fclaw.com

12

13       On Behalf of the Defendant, Deutsche Bank

14   National Trust Company, via

15   teleconference:

16       Morgan, Lewis & Bockius, LLP, by

17       BRENDAN E. RADKE, ESQ.

18       One Market

19       Spear Street Tower

20       San Francisco, CA 94105

21       (415) 442-1213

22       bradke@morganlewis.com

23

24       ~ ~ ~ ~ ~

25

Page 11

1        TRANSCRIPT INDEX

2

3    APPEARANCES............................... 2

4

5    INDEX OF EXHIBITS ........................ 12

6

7    EXAMINATION OF SHARON GINGERICH:

8    By Mr. Yenouskas........................... 17

9    By Mr. Brochin............................. 212

10   By Ms. Yaksic.............................. 249

11   By Mr. Duhamel............................. 251

12

13   REPORTER'S CERTIFICATE................... 277

14

15   EXHIBIT CUSTODY

16   EXHIBITS RETAINED BY COURT REPORTER

17

18

19

20

21

22

23

24

25

Page 12

1        INDEX OF EXHIBITS

2    NUMBER        DESCRIPTION        MARKED

3    Exhibit 1  A Subpoena.................. 18

4    Exhibit 2  A Subpoena.................. 18

5    Exhibit 3  A Document Bates Stamped .... 29
         GCR-002159

6

     Exhibit 4  A Printout of Fees and ....... 32
7        Charges

8    Exhibit 5  A Document Bates Stamped .... 34
         GCR-001281

9

     Exhibit 6  A Document Entitled "Chapter . 37
10       5301: Conveyances;
         Encumbrances"

11

     Exhibit 7  A Document Bates Stamped .... 40
12       GCR-002789, GCR-002785 and
         GCR-002716

13

     Exhibit 8  A Document Bates Stamped .... 42
14       GCR-003181 and GCR-003182

15   Exhibit 9  A Document Bates Stamped .... 43
         GCR-000452 Through
16       GCR-000459

17   Exhibit 10  A Document Bates Stamped ..... 45
         GCR-001833 Through
18       GCR-001837

19   Exhibit 11  A Document Bates Stamped .... 59
         GCR-002827, GCR-002823,
20       GCR-002824, GCR-002795,
         GCR-002794, GCR-002790,
21       GCR-002791

22   Exhibit 12  An Online Newsletter........... 62

23   Exhibit 13  A Document Bates Stamped .... 65
         GCR-000946

24

25   Exhibit 14  A Document Bates Stamped .... 67
         GCR-000974

Page 13

1    Exhibit 15  A Document Bates Stamped ..... 68
         GCR-002870

2

3    Exhibit 16  A Document Bates Stamped ..... 69
         GCR-002

4    Exhibit 17  A Document Entitled "Annual .. 76
         Appropriation Resolution"

5

6    Exhibit 18  A Document Entitled "Burton .. 79
         Blog"

7    Exhibit 19  A Geauga County Website ....... 81
         Document

8

9    Exhibit 20  A Document Bates Stamped ..... 82
         GCR-00247 and GCR-002479

10   Exhibit 21  A Document Bates Stamped ..... 83
         GCR-000938 Through
11       GCR-000941

12   Exhibit 22  A Document Bates Stamped ..... 84
         GCR-000876 Through
13       GCR-000894

14   Exhibit 23  A Document Bates Stamped ..... 87
         GCR-001156 Through
15       GCR-001161

16   Exhibit 24  A Document Bates Stamped ..... 88
         GCR-000947 Through
17       GCR-000973

18   Exhibit 25  A Document Bates Stamped ..... 90
         GCR-000915 Through
19       GCR-000932

20   Exhibit 26  A Document Bates Stamped ..... 91
         GCR-000942 Through
21       GCR-000945

22   Exhibit 27  A Document Bates Stamped ..... 98
         GCR-000041, GCR-000044 and
23       GCR-000046

24   Exhibit 28  A Document Bates Stamped ..... 101
         GCR-001284

25   Exhibit 29  A Document Bates Stamped ..... 103

Page 14

1    GCR-002427 Through ...........
      GCR-002431
2
      Exhibit 30  A Document Bates Stamped ...... 110
3      GCR-002244 Through
      GCR-002245
4
      Exhibit 31  A Mortgage.................... 116
5
      Exhibit 32  An Article From "Maple Leaf".. 132
6
      Exhibit 33  A Document Entitled "Chapter . 140
7      317: Recorder"
8    Exhibit 34  A Document Bates Stamped ...... 156
      GCR-1286
9
      Exhibit 35  A Document Bates Stamped ...... 163
10     GCR-001294
11   Exhibit 36  A Document Bates Stamped ORA . 167
      00147 Through ORA 00150
12
      Exhibit 37  An Article From the .......... 172
13     Cleveland Business Website,
      Dated October 24, 2011
14
15   Exhibit 38  A Document Bates Stamped ORA . 174
      00656 Through ORA 00662
16   Exhibit 39  A Document Bates Stamped ORA . 179
      00921 Through ORA 00923
17
18   Exhibit 40  A Document Bates Stamped ORA . 180
      00792
19   Exhibit 41  A Document Bates Stamped ORA . 182
      00115
20
21   Exhibit 42  A Document Bates Stamped ORA . 183
      00979 and ORA 00965
22   Exhibit 43  A Document Bates Stamped ORA . 184
      00100 Through ORA 00104
23
24   Exhibit 44  A Document Bates Stamped ...... 187
      GCO-000003 Through
      GCO-000005
25
      Exhibit 45  A Document Bates Stamped ORA . 188

Page 15

1    01062 Through ORA 01063.......
2    Exhibit 46  A Document Bates Stamped ...... 190
      HP00132
3
      Exhibit 47  A Document Bates Stamped ...... 193
4      HP00184
5    Exhibit 48  A Document Bates Stamped ...... 194
      GCR-001306 Through
6      GCR-001307
7    Exhibit 49  A Document Bates Stamped ...... 198
      GCR-001518 Through
8      GCR-001520
9    Exhibit 50  A Document Bates Stamped ...... 199
      GCR-001910
10
11   Exhibit 51  A Document Bates Stamped ...... 201
      GCR-003077
12   Exhibit 52  A Document Bates Stamped ...... 203
      GCR-001877 Through
13     GCR-001878
14   Exhibit 53  A Document Bates Stamped ...... 205
      GCR-002411 Through
15     GCR-002417
16   Exhibit 54  A Document Bates Stamped ...... 208
      GCR-003107 Through
17     GCR-003108, and GCR-003049
      Through GCR-003053
18
19   Exhibit 55  A Document Bates Stamped ...... 210
      GCR-001521 Through
      GCR-001522, GCR-001524,
20     GCR-001508 Through
      GCR-001520, and GCR-001479,
21     GCR-001467, GCR-001449 and
      GCR-001450
22
23   Exhibit 56  A Document Entitled "Amended . 254
      Class Action Complaint"
24   Exhibit 57  A Mortgage.................... 256
25   Exhibit 58  A Mortgage.................... 257

Page 16

1    Exhibit 59  A Document Bates Stamped ..... 263
      GCR-003192 Through
2      GCR-003219
3    Exhibit 60  A Mortgage.................... 265
4    Exhibit 61  An Assignment of Mortgage..... 266
5    Exhibit 62  A Mortgage.................... 271
6    Exhibit 63  A Certificate of ............. 272
      Satisfaction
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 17

1         SHARON GINGERICH, of lawful age, called
2    for examination, as provided by the Federal
3    Rules of Civil Procedure, being by me first
4    duly sworn, as hereinafter certified, deposed
5    and said as follows:
6         EXAMINATION OF SHARON GINGERICH
7    BY MR. YENOUSKAS:
8         Q.  Good morning, Ms. Gingerich.
9         A.  Good morning.
10        Q.  My name is Joe Yenouskas.  I
11   represent several defendants in this matter.  I
12   will be asking you questions at your deposition
13   today.  If you don't understand a question,
14   just let me know, and I will try to rephrase it
15   for you.  And if you don't hear a question, let
16   me know, and I'll restate it.  Does that make
17   sense?
18        A.  Yes.
19        Q.  Could you state your full name for
20   the record, please?
21        A.  Sharon Kathleen Gingerich.
22        Q.  What is your home address?
23        A.  13799 Carlton Street, Burton.
24        Q.  Zip code?
25        A.  44021.

Page 18

1    Q.   You are here today, Ms. Gingerich,
2 pursuant to two subpoenas that you received in
3 February?
4    A.   Yes.
5    Q.   Just for purposes of the record, I
6 want to introduce those subpoenas.
7         - - - -
8         (Thereupon, Deposition Exhibit 1, A
9         Subpoena, was marked for purposes of
10        identification.)
11        - - - -
12        (Thereupon, Deposition Exhibit 2, A
13        Subpoena, was marked for purposes of
14        identification.)
15        - - - -
16   Q.   Ms. Gingerich, the reporter has
17 handed you what's been marked as Defendants'
18 Exhibits 1 and 2. Do you have those documents?
19   A.   I do.
20   Q.   And those are the subpoenas that
21 you received?
22   A.   I'm sure they are.
23   Q.   And I just want to ask you as to
24 Exhibit 1, are you here to -- prepared to
25 testify about the topics that are identified in

Page 19

1 Exhibit Number 1? If you look at --
2    A.   Yes. Yes.
3    Q.   You are. Okay. Thank you.
4         Now, you are the Recorder of Geauga
5 County, Ohio?
6    A.   Yes.
7    Q.   When did you become Recorder of
8 Geauga County?
9    A.   2009.
10   Q.   You are an elected official?
11   A.   Yes.
12   Q.   And you were elected by the
13 citizens of Geauga County?
14   A.   Yes.
15   Q.   You owe your allegiances to them as
16 an elected official?
17   A.   Yes.
18   Q.   Do you owe your allegiances to any
19 other Ohio county?
20   A.   No.
21   Q.   And you have a duty to place the
22 interests of the citizens of Geauga County
23 above any other interest; isn't that correct?
24   A.   Correct.
25   Q.   Is there a limit on the number of

Page 20

1 terms that you can serve?
2    A.   No.
3    Q.   And this is a full-time position?
4    A.   Yes.
5         MR. YENOUSKAS:  Let's go off the
6 record. Going off the record at 9:05.
7         (Thereupon, a recess was taken.)
8         MR. YENOUSKAS:  Back on the record
9 at 9:39.
10   Q.   Thank you for your patience, Ms.
11 Gingerich. Can you tell me if you know David
12 Joyce?
13   A.   Yes.
14   Q.   Who is he?
15   A.   Our prosecutor.
16   Q.   And by "our", you mean Geauga
17 County?
18   A.   Geauga County.
19   Q.   Is he an elected official as well?
20   A.   Yes.
21   Q.   How long have you known him?
22   A.   I don't know.
23   Q.   Roughly.
24   A.   I don't know. Four, five, six,
25 seven, years -- eight, maybe.

Page 21

1    Q.   And have you supported his campaign
2 for office?
3    A.   How?
4    Q.   You tell me. Have you supported it
5 financially?
6    A.   No.
7    Q.   Has he supported your campaigns?
8    A.   Yes.
9    Q.   And as the prosecuting attorney,
10 Mr. Joyce, I assume, provides legal advice to
11 your office on matters that you might request?
12   A.   Yes.
13   Q.   And you seek him out for advice
14 from time to time?
15   A.   Yes.
16   Q.   I'm not going to ask you about any
17 advice. I just wanted to establish that.
18        Could you give me a brief rundown
19 of your work experience before becoming the
20 Recorder of Geauga County?
21   A.   I was in management. I was in
22 clerical and legal.
23   Q.   Could you tell me which companies?
24   A.   Barry Bender, Red Maple Inn,
25 American Society For Metals, Geauga Link.

6 (Pages 18 - 21)

Page 22

1    Q.   I'm sorry?
2    A.   Geauga Link.
3    Q.   What is that?
4    A.   Input, data input.  Northeast Ohio
5  Operating.  That's all I can think of right
6  now.
7    Q.   Okay.  Have you ever worked for a
8  lender?  A lender, a mortgage lender?
9    A.   No.
10   Q.   Have you ever worked for MERS?
11   A.   No.
12   Q.   Have you ever worked for a title
13  company?
14   A.   No.
15   Q.   Have you ever worked for a bank?
16   A.   No.
17   Q.   Now, getting back to the Geauga
18  County Recorder's Office, it is a position
19  established by statute, correct?
20   A.   Correct.
21   Q.   And the powers and duties that you
22  exercise are only those conferred by the
23  statute, correct?
24   A.   Correct.
25   Q.   The Ohio legislature sets policy

Page 23

1  with respect to recording of documents in
2  Geauga County?
3    A.   Correct.
4    Q.   They specify the types of documents
5  that can be filed?
6    A.   Correct.
7    Q.   And they set the fees for recording
8  those documents?
9    A.   Correct.
10   Q.   Those policies are not set by
11  Geauga County?
12   A.   Correct.
13   Q.   Or by any other Ohio county?
14   A.   Correct.
15   Q.   And as the Recorder -- strike that.
16  When was your office founded?
17   A.   Explain.
18   Q.   When was it first created, I should
19  say?
20   A.   200 and some years ago.
21   Q.   And can you just give me an
22  overview of the functions that the office
23  performs?
24   A.   We make sure that your chain of
25  title is correct.  We record in a logical

Page 24

1  manner.
2    Q.   So you record documents that are
3  presented to the office?
4    A.   Correct.
5    Q.   Any other functions or tasks, other
6  than recording the documents that are
7  presented?
8    A.   No.
9    Q.   I want to just -- I'm going to be
10  using some terminology today, so I just wanted
11  to start by making sure we're on the same sheet
12  of music in getting your understanding of those
13  terms.  What is a mortgage, as you understand
14  it?
15   A.   It's a loan.
16   Q.   Do you understand that there's a
17  document called a "note" in addition to a
18  mortgage?
19   A.   Yes.
20   Q.   So there's two separate documents;
21  there's a note, which the borrower signs to
22  agree to repay the mortgage, correct, repay the
23  loan?  And then there's a separate document
24  called a "mortgage", which gives the lender the
25  right to foreclose if the loan isn't paid back?

Page 25

1    A.   Okay.
2    Q.   So you understand, I want to
3  establish you understand they're two separate
4  things.
5    A.   I didn't really, but I do now.
6    Q.   Okay.  And what is an assignment?
7    A.   That's when something is assigned
8  from one person to someone else, or entity.
9    Q.   And that is a separate document
10  typically from the mortgage or the note?
11   A.   Correct.
12   Q.   And does Geauga County accept
13  mortgages for filing?
14   A.   Correct.  Yes.
15   Q.   Does it accept notes for filing?
16   A.   I don't think so.  I would have to
17  look on the list.
18   Q.   Does it accept assignments for
19  recording?
20   A.   Yes.
21   Q.   How many employees are in your
22  office currently?
23   A.   Three full, one part.
24   Q.   I would like you to tell me each of
25  the employees and what they do, and the names.

7 (Pages 22 - 25)

1    A.  Celesta Mullins.

2    Q.  I'm sorry?

3    A.  Celesta Mullins.

4    Q.  What does she do?

5    A.  She is my deputy, my chief deputy.

6    Q.  Okay.

7    A.  Jared Spring is my office manager.

8 Mike Risko is a front desk clerk. And Beth

9 Jeckering is a part-time clerk.

10    Q.  I didn't get the last name on Beth.

11    A.  Jeckering.

12    Q.  Can you spell it?

13    A.  J-E-C-K-E-R-I-N-G.

14    Q.  And what does she do again?

15    A.  She's a part-time clerk.

16    Q.  Can you tell me what each person in

17 the office does, starting with Celesta?

18    A.  She does the finances. She does

19 the -- she's my assistant. She's my assistant.

20    Q.  Anything you need her to do?

21    A.  Yeah.

22    Q.  How long has she been there,

23 roughly?

24    A.  12 years.

25    Q.  And what about Jared Spring?

1    A.  He manages the office.

2    Q.  What does that entail?

3    A.  He's -- he's the office manager. I

4 mean, he --

5    Q.  Well, I don't work there, so I

6 don't know what he does on a day-to-day basis.

7    A.  He's the leader out front. I mean,

8 he's the manager out front.

9    Q.  And what does it mean to be the

10 "manager out front"?

11    A.  Employees go to him with questions.

12 He -- he's the one that I communicate with when

13 I need things done out front.

14    Q.  And when you say "out front," I

15 assume you have some desk -- let me finish my

16 question before you answer. That's another

17 rule I forgot to tell you.

18    I assume that there's a front desk

19 at your office, a public desk?

20    A.  Yes.

21    Q.  And when members of the public come

22 to your office to do something, that's what

23 you're referring to as "out front"?

24    A.  Yes.

25    Q.  And so you will communicate to

1 Mr. Spring things that you want to happen out

2 front, and he'll carry out those duties for

3 you?

4    A.  Correct.

5    Q.  What about Mike Risko?

6    A.  He's a clerk.

7    Q.  And what does a clerk do?

8    A.  Takes in documents.

9    Q.  Anything else?

10    A.  No.

11    Q.  So he's out front, I assume?

12    A.  Correct.

13    Q.  And that's his exclusive function?

14    A.  Correct.

15    Q.  What about Beth Jeckering?

16    A.  She does scanning, and she works

17 the front desk during lunch. Takes in

18 documents.

19    Q.  So when Mike Risko goes to lunch,

20 she's out front, so to speak. So Beth and Mike

21 are the two folks that will interface with the

22 public in terms of receiving documents?

23    A.  And Jared.

24    Q.  Jared as well. Okay.

25    - - - - -

1    (Thereupon, Deposition Exhibit 3, A

2    Document Bates Stamped GCR-002159,

3    was marked for purposes of

4    identification.)

5    - - - - -

6    Q.  Ms. Gingerich, I'm handing you what

7 the court reporter has marked as Exhibit Number

8 3. And for the record, it is Bates numbered

9 GCR-2159. Is that an accurate depiction of

10 your office currently?

11    A.  Yes.

12    Q.  How has that organization changed

13 since you became Recorder in, I think it was

14 2009, if at all?

15    A.  You mean employee-wise?

16    Q.  Yeah. Has that changed at all over

17 the three-and-a-half years or so?

18    A.  Yes.

19    Q.  Okay. Tell me about that.

20    A.  There's a new part-timer.

21    Q.  Okay. And is that Elizabeth?

22    A.  Yes.

23    Q.  Who was in her position before

24 Elizabeth? When I came there, there was a lady

25    A.  When I came there, there was a lady

1 named Jan Vondrasek. And then Don Welker, and
2 now her.
3     Q.  I see. So the part-time position
4 has changed over time?
5     A.  Yes.
6     Q.  And the other folks had been there
7 as the dates indicate?
8     A.  Right. But -- yeah. But another
9 one left, too.
10     Q.  Someone before Mike Risko?
11     A.  Yes. The office manager.
12     Q.  Who would that have been?
13     A.  Kathy Dash.
14     Q.  Does these folks all live in Geauga
15 County?
16     A.  No.
17     Q.  Who does not live in Geauga County?
18     A.  Jared.
19     Q.  Where does he live?
20     A.  Lake.
21     Q.  Thank you. Now, we talked earlier
22 about some of the different kinds of documents
23 that can be recorded at your office. We talked
24 about mortgages being recorded, and we talked
25 about assignments being recorded. Do you

1 recall that?
2     A.  Yes.
3     Q.  What are some of the other kinds of
4 documents that the members of the public can
5 record?
6     A.  Deeds, powers of attorney,
7 partnerships, leases.
8     Q.  I'm sorry?
9     A.  Leases.
10     Q.  And does Geauga County Recorder's
11 Office charge a fee for every document that's
12 presented for recording?
13     A.  Yes.
14     Q.  Has the amount of those fees and
15 charges changed over time?
16     A.  Yes.
17     Q.  And is that a result of changes by
18 the legislature?
19     A.  Yes.
20     Q.  And I assume they've generally gone
21 up?
22     A.  Yes. Yes.
23     Q.  Where could I find a listing of the
24 fees and charges that Geauga County assesses
25 for recording documents?

1     A.  On my website.
2         - - - - -
3         (Thereupon, Deposition Exhibit 4, A
4     Printout of Fees and Charges, was
5     marked for purposes of
6     identification.)
7         - - - - -
8     Q.  Ms. Gingerich, I'm handing you a
9 printout. It doesn't have any Bates numbers on
10 it. It's approximately 13 pages. But is that
11 a printout from your website of the fees and
12 charges that Geauga County will assess for
13 recording documents?
14     A.  Yes.
15     Q.  And is that accurate, as far as you
16 know, currently?
17     A.  Yes.
18     Q.  Now, as we discussed earlier,
19 Geauga County is a public agency?
20     A.  Yes.
21     Q.  It renders service to the public
22 when it records documents?
23     A.  Yes.
24     Q.  And if it doesn't record a
25 document, it's not entitled to receive a fee

1 for not performing services, correct?
2     A.  Correct.
3     Q.  Could you tell me the different
4 ways in which a document may be sent to you for
5 recording? I assume there are different ways
6 that could be done?
7     A.  Mail.
8     Q.  Mail is one way?
9     A.  Yeah.
10     Q.  And we talked about a person coming
11 in to the front desk?
12     A.  Right.
13     Q.  So that's the second way?
14     A.  Yes. I'm sorry.
15     Q.  You have to answer audibly. That's
16 another rule I forgot to mention. Audible
17 answers are required.
18         And you also -- or do you have
19 e-recording?
20     A.  No.
21     Q.  You do not?
22     A.  I do not.
23     Q.  Do you want to have e-recording?
24     A.  Yes.
25     Q.  Why hasn't that become a reality in

9 (Pages 30 - 33)

Page 34

1  Geauga County?
2      A.   The IT department was unable to
3  make it work.
4      Q.   Why was that?
5      A.   I don't know.
6      Q.   An IT problem?
7      A.   Yeah.
8      Q.   Do other counties around the
9  country have e-recording?
10     A.   Yes.
11     Q.   Do other counties in Ohio have
12 e-recording?
13     A.   Yes.
14     Q.   It varies by county?
15     A.   Yes.
16         - - - - -
17     (Thereupon, Deposition Exhibit 5, A
18     Document Bates Stamped GCR-001281,
19     was marked for purposes of
20     identification.)
21         - - - - -
22     Q.   Here's one more document about
23 fees. I'm handing you what's been marked as
24 Exhibit Number 5. And for the record, it's
25 Bates number GCR-1281. Can you identify this

Page 35

1  document?
2      A.   This is a schedule of fees for UCCs
3  and liens.
4      Q.   And I assume -- is this something
5  that's posted in your office for the public to
6  see?
7      A.   Yes.
8      Q.   And would it be probably
9  duplicative of the website we just saw in some
10 respects?
11     A.   Yes.
12     Q.   Please wait for me to finish.
13     A.   I'm sorry.
14     Q.   That's okay. You just know what my
15 question is going to be, and you want to give
16 the answer.
17         Now, I would like to talk a little
18 bit about recording of assignments. I assume
19 that a person can record an assignment by
20 presenting a written document to you that is an
21 assignment?
22     A.   Yes.
23     Q.   And you will record that document?
24     A.   Yes.
25     Q.   Can a mortgagee assign a mortgage

Page 36

1  in other ways?
2      A.   I'm -- I don't know what you mean.
3      Q.   Can a mortgagee hand write on a
4  mortgage that the mortgage has been assigned to
5  someone else? Does Geauga County allow
6  handwriting on mortgages?
7      A.   No.
8      Q.   Have you ever --
9      A.   Once it's been recorded?
10     Q.   Handwriting on the actual mortgage,
11 correct.
12     A.   No.
13     Q.   Have you ever seen that done?
14     A.   No.
15     Q.   Do you know whether that's done in
16 other Ohio counties?
17     A.   I don't know.
18     Q.   Do you know whether the code allows
19 handwriting on mortgages?
20     A.   I don't know.
21     Q.   Can a person assign a mortgage by a
22 notation on the marginal record with respect to
23 that mortgage?
24     A.   I would have to look. I mean, I
25 would have to look at -- I don't know.

Page 37

1         - - - - -
2      (Thereupon, Deposition Exhibit 6, A
3      Document Entitled "Chapter 5301:
4      Conveyances; Encumbrances", was
5      marked for purposes of
6      identification.)
7         - - - - -
8      Q.   Ms. Gingerich, I'm handing you what
9  has been marked as Defendants' Exhibit 6. And
10 it is a printout of -- well, first of all,
11 you're aware of the Ohio Code, as we talked
12 earlier, regulates what Recorders can and
13 cannot do?
14     A.   Yes.
15     Q.   Have you ever looked at the code
16 before?
17     A.   Yes.
18     Q.   You're aware that Chapter 5301 is
19 one of the provisions of the code that applies
20 to recording of documents?
21     A.   Yes.
22     Q.   This is Chapter 5301; do you agree?
23     A.   Yes.
24     Q.   Turn over to 5301.31. It's on page
25 22 of 53. If you look at the upper right-hand

10 (Pages 34 - 37)

1  corner, there's a page number. Why don't you
2  just read that over for a second.
3      Ms. Gingerich, do you see where it
4  says in the second line; "A mortgage may be
5  assigned or partially released by the holder of
6  the mortgage by writing 'assignment' or
7  'partial lease' on the original mortgage"?
8      A.  Yes.
9      Q.  "Or upon margin of the record of
10  the original mortgage and signing it"?
11      A.  Yes.
12      Q.  Do you agree with me the code
13  appears to allow for those methods of
14  assignment?
15      A.  Yes.
16      Q.  Thank you. What is the required
17  charge for a written assignment, if you recall?
18  You can look at the document, if you want.
19      MR. SIEBOTT:  Which document do you
20  want her to look at?
21      MR. YENOUSKAS:  The fee schedule.
22      A.  Assignments, subordinations, waiver
23  priorities, $16 for the first two pages, $4 for
24  each additional page.
25      Q.  If a person assigned -- if a person

1  assigned a mortgage by writing on it, what
2  would you charge them?
3      A.  You know, you would have to ask
4  staff. I -- I don't know.
5      Q.  Who on your staff would best know
6  that?
7      A.  Everyone.
8      Q.  Do you know what the charge is for
9  a marginal notation for an assignment?
10      A.  $4.
11      Q.  Now, Ms. Gingerich, I wanted to
12  talk about the scenario where a person has
13  placed in the land records more than one
14  mortgage. So, for example, they have 10
15  mortgages on file in Geauga County. If that
16  person wants to assign its interest in those 10
17  mortgages, does it need to make 10 separate
18  written assignments?
19      A.  Say that again.
20      Q.  A person owns 10 mortgages, and it
21  wants to assign its interest in those 10
22  mortgages. Does it need to do 10 separate
23  assignments, or may it record one document that
24  references the 10 mortgages?
25      A.  I would have to see the document.

1  I don't know.
2      Q.  You don't know.
3      MR. SIEBOTT:  Can we take a brief
4  break?
5      MR. YENOUSKAS:  Sure.
6      (Thereupon, a recess was taken.)
7      MR. YENOUSKAS:  We are back on the
8  record at 10:11, having broken at 10:02.
9      Q.  Ms. Gingerich, we were just talking
10  about whether a person who owns more than one
11  mortgage can assign his or her interest in that
12  mortgage by one instrument rather than by
13  separate instruments. Do you recall that
14  discussion?
15      A.  Yes.
16      Q.  And you have testified you don't
17  recall whether that was possible?
18      A.  Correct.
19      - - - - -
20      (Thereupon, Deposition Exhibit 7, A
21      Document Bates Stamped GCR-002789,
22      GCR-002785 and GCR-002716, was
23      marked for purposes of
24      identification.)
25      - - - - -

1      Q.  Ms. Gingerich, I'm handing you a
2  document which the reporter has marked as
3  Defendants' Exhibit Number 7. It's several
4  e-mails that your office produced in response
5  to those subpoenas that we talked about
6  earlier. For the record, it's Bates number
7  GCR-2789, 2785 and 2716.
8      Do these documents help refresh
9  your recollection about whether a person can
10  assign their interest in multiple mortgages
11  through a single document?
12      A.  No.
13      Q.  It doesn't help you recall.
14      Did you read these documents at the
15  time they were sent around?
16      A.  I don't remember.
17      Q.  You don't remember.
18      And what is -- the first document
19  talks about "OhioRecordersTechniserve.com".
20  What is that, at the very top?
21      A.  That's this ListServe, where they
22  send questions.
23      Q.  What is a ListServe?
24      A.  Somebody sends a question, and it
25  goes to everybody.

11 (Pages 38 - 41)

1   Q.   And when you say "everybody" --
2   A.   Recorders.
3   Q.   All of the Ohio Recorders have
4   access to that ListServe?
5   A.   Yes.
6        - - - - -
7        (Thereupon, Deposition Exhibit 8, A
8        Document Bates Stamped GCR-003181
9        and GCR-003182, was marked for
10       purposes of identification.)
11       - - - - -
12   Q.   Ms. Gingerich, I'm handing you
13  what's been marked as Exhibit Number 8.  For
14  the record, it's GCR-3181 and 3182.  If you
15  could read that e-mail at the top, and tell me
16  if that helps refresh your recollection about
17  the issue we're talking about?
18   A.   I -- that was in 2008, so --
19   Q.   Prior to your time.  But you had
20  it -- I assume to produce it it was somehow in
21  your records, available to you at Geauga
22  County?
23   A.   Yes.
24   Q.   That's information that was
25  available to you?

1   A.   Yes.
2        - - - - -
3        (Thereupon, Deposition Exhibit 9, A
4        Document Bates Stamped GCR-000452
5        Through  GCR-000459, was marked for
6        purposes of identification.)
7        - - - - -
8   Q.   Ms. Gingerich, I'm handing you
9   what's been marked as Exhibit Number 9.  Again,
10  it was produced by you and in response to our
11  subpoena.  It's GCR-452 through 459.  What is
12  this document?
13   A.   An opinion.
14   Q.   I'm sorry?
15   A.   It's an opinion.
16   Q.   And who issued the opinion?
17   A.   Betty Montgomery.
18   Q.   Who is she?
19   A.   She was the Attorney General.
20   Q.   Does your office maintain a file of
21  Attorney General opinions that relate to
22  recording issues?
23   A.   Yes.
24   Q.   Have you read this opinion before
25  today?

1   A.   No.
2   Q.   You have not.  Turn to page 4 of
3   the document, if you would.  And there's the
4   first full paragraph there that starts with the
5   words "the language."  And then if you go down
6   to the last sentence of that paragraph, it
7   says; "A County Recorder has no authority under
8   these specific provisions, however, to limit
9   the number of satisfactions, cancellations,
10  assignments, partial releases or waivers of
11  priority may be executed and recorded by means
12  of a single instrument."  Do you see that
13  language?
14   A.   I do.
15   Q.   Does that help refresh your
16  recollection about the issue we're talking
17  about?
18   A.   No.
19   Q.   Have you read that language before?
20   A.   Probably -- I don't recall.
21   Q.   Have you discussed this issue with
22  anyone previously --
23   A.   No.
24   Q.   -- before today, this issue of
25  multiple assignments by virtue of a single

1   instrument?
2   A.   No.
3   Q.   Never?
4   A.   Not that I recall.
5   Q.   Okay.
6        - - - - -
7        (Thereupon, Deposition Exhibit 10, A
8        Document Bates Stamped GCR-001833
9        Through  GCR-001837, was marked for
10       purposes of identification.)
11       - - - - -
12   Q.   Ms. Gingerich, I'm handing you
13  what's been marked Exhibit Number 10.  And for
14  the record, it's GCR-1833 through 1837.
15       Have you seen this document before?
16   A.   Yes.
17   Q.   Thank you.  We're in the right time
18  frame of March 2012.  What is this document?
19   A.   It is a list of the questions and
20  the answers from ListServe.
21   Q.   Did you write this document?
22   A.   I did.
23   Q.   What was the purpose of writing
24  this document?
25   A.   I am the moderator for the Q&A at

Page 46

1  the Recorders Association.
2      Q.  And what does the moderator do?
3      A.  Cuts and pastes, prints it out and
4  hands it to everybody.
5      Q.  It's a glorified title.
6          And so this was used at a March
7  12th meeting, I take it?
8      A.  Yes.
9      Q.  And take a look down at the bottom
10  of the first page. There's some bullet points.
11  Do you agree with me that seems to relate to
12  the issue we're talking about here today,
13  specifically the last two bullet points from
14  the bottom?
15      MR. SIEBOTT: Objection. Could you
16  specify the issue that you mean right now?
17      Q.  Sure. The issue of whether a
18  person can assign multiple mortgages for a
19  single instrument. Take a look at the third
20  bullet point. "We cannot limit any number of
21  cited marginal references on a document. Sad
22  but true. They can have a million cited on one
23  filing and we cannot refuse it." Do you see
24  that, the third bullet point?
25      A.  One, two, three -- if they refuse

Page 47

1  the original document?
2      Q.  No. I'm sorry. The fourth bullet
3  point. I'm causing some confusion. Right in
4  the middle of that bullet point, it says; "We
5  cannot limit any number of sited marginal
6  references on a document. Sad but true. They
7  can have a million cited on one filing and we
8  could not refuse it. AG opinion by Betty
9  Montgomery. If memory serves me correctly, oil
10  and gas got the no limit inserted into our
11  standards bill." Do you see that?
12      A.  Yes.
13      Q.  Do you recall discussion around
14  that issue?
15      A.  No. They're probably wasn't any.
16      Q.  You put it in this document because
17  someone had asked a question about it?
18      A.  Yeah.
19      Q.  Okay. That's fine.
20          Now, if a person records a mortgage
21  in the Geauga County Recorder's Office, do you
22  have any way of knowing whether that mortgage
23  has been assigned if an assignment has not been
24  recorded?
25      A.  No.

Page 48

1      Q.  You would need to ask the person
2  that recorded the document whether they had
3  assigned their interest?
4      A.  No.
5      Q.  How would you -- if you can't tell
6  from your records, the only person who could
7  tell who assigned the document would be the
8  person who put the document on file in the
9  first place, correct?
10      A.  We just record. We don't --
11      Q.  I understand that. But if you
12  wanted to figure out whether that mortgage had
13  been assigned, how would you do it?
14      A.  Well, we would look to see if there
15  was an assignment for it.
16      Q.  And if there was not, then what
17  would you do?
18      A.  Nothing.
19      Q.  But if you were asked to find out
20  if it had been assigned, how could you do that?
21  You could talk to the person that recorded the
22  mortgage, correct?
23      A.  We could. But we wouldn't.
24      Q.  And does Geauga County know the
25  number of times a mortgage may or may not have

Page 49

1  been assigned if there are no written
2  assignments on file?
3      A.  No.
4      Q.  Again, that would depend on the
5  specific files as to each mortgage with the
6  people that put them on file?
7      A.  Correct.
8      Q.  One of my co-counsel pointed out to
9  me on the break that I had asked you about the
10  functions of the various folks in your office
11  but not your function. Can you tell me what
12  you do as the Recorder?
13      A.  Everything.
14      Q.  What does "everything" entail?
15      A.  I input. I index. I back-scan. I
16  answer correspondence. I assist the public. I
17  back-scan documents, negotiate contracts.
18      Q.  That's helpful. Thank you.
19          Does everyone in the office also
20  get involved in indexing and back-scanning?
21      A.  No.
22      Q.  Who does the indexing and
23  back-scanning in addition to yourself?
24      A.  Jared, Mike and Beth.
25      Q.  So it sounds like Celesta is a true

13 (Pages 46 - 49)

Page 50

1 administrative assistant?
2   A.   Correct.
3   Q.   Now, help me out on some really
4 technical stuff. Once a document is presented
5 for recording, what happens next at your
6 office?
7   A.   It's scanned, put into the system,
8 indexed and returned. The original is
9 returned.
10   Q.   Now, when you say it's scanned, who
11 does the scanning?
12   A.   The person who takes in the
13 document.
14   Q.   And how do they actually physically
15 scan the document? Is there a machine?
16   A.   Yes.
17   Q.   And does that make a PDF image of
18 the document?
19   A.   Yes.
20   Q.   And indexing, what does that
21 involve?
22   A.   You take the legal, and you write
23 it into the allotted boxes, the volume and page
24 of -- I'm trying to picture it in my mind. You
25 just fill in the blanks.

Page 51

1   Q.   So when you say you "fill in the
2 blanks", what are you filling in? Is there a
3 form that you have?
4   A.   Grantor, grantee, acreage, legal
5 description, mortgage. If it's a mortgage,
6 value, if it's a mortgage.
7   Q.   And I understand you're describing
8 to me the types of data that you index. What
9 does the actual index look like physically? Is
10 that someone trained as well?
11   A.   Yes.
12   Q.   So if a member of the public wanted
13 to see documents about a certain property they
14 could search at a public terminal there at the
15 office?
16   A.   Correct.
17   Q.   And how long does that process --
18 then you return the document?
19   A.   Correct.
20   Q.   If the person is there in-person,
21 you give it right back to them while they're
22 waiting?
23   A.   No.
24   Q.   What do you do?
25   A.   We scan it. We want to make sure

Page 52

1 that it's correct. So we don't give it back
2 right away.
3   Q.   So it might be the next day that
4 it's mailed back?
5   A.   It's always the next day.
6   Q.   So within one day this process
7 would be completed?
8   A.   Correct.
9   Q.   And at what point in the process
10 does the document become a public record?
11   A.   As soon as it's scanned and
12 verified.
13   Q.   And what is "verified"? That
14 sounds like a new term.
15   A.   Make sure it's straight. You make
16 sure it's not off to the side or that side, or
17 up too far, down too high. Make sure it's not
18 blurry.
19   Q.   So it meets all the requirements
20 set out in the code for being an acceptable
21 document to be recorded?
22   A.   Yes.
23   Q.   And you have to accept those
24 documents for filing, but you could charge an
25 additional fee if they're nonconforming; isn't

Page 53

1 that correct?
2   A.   Correct.
3   Q.   How long has Geauga County, if you
4 know, been scanning the documents that are
5 presented to the Recorder?
6   A.   I do not know.
7   Q.   How far back does the index go in
8 time?
9   A.   I believe we're in the 1980s.
10   Q.   And if someone wanted to research
11 information about a mortgage prior to the
12 1980s, how would they do that?
13   A.   They would go to the book.
14   Q.   Go ahead.
15   A.   There's an index paper. They would
16 have to use paper.
17   Q.   So there's a paper record before
18 the computer system started?
19   A.   Yes.
20   Q.   And those are maintained at your
21 office?
22   A.   Yes.
23   Q.   The public can look at those?
24   A.   Yes.
25   Q.   How far back do those go?

14 (Pages 50 - 53)

1     A.   Supposedly the 1700s.

2     Q.   Thank you. Now, I assume that

3 accuracy is important for your job in terms of,

4 in your office, in terms of making sure the

5 records are correctly indexed?

6     A.   Yes.

7     Q.   How does your office seek to ensure

8 that there are accurate indexes of documents?

9 Do you perform audits?

10     A.   Okay --

11     Q.   How do you make sure the data has

12 been entered correctly as to a particular

13 transaction?

14     A.   When I told you we take the

15 documents in, one person takes them in, the

16 second person looks it over. Often the office

17 manager will look again.

18     Q.   Thank you. And separate and apart

19 from that process that goes on each day, do you

20 do any random audits to check the information

21 entered?

22     A.   No.

23     Q.   No other checks?

24     A.   No.

25     Q.   Do you know if every Ohio county

1 scans documents?

2     A.   I do not know.

3     Q.   Some may not?

4     A.   I do not know.

5     Q.   I believe you use a vendor called

6 ACS for doing those scanning functions, the

7 computerized functions?

8     A.   Correct.

9     Q.   How long have you been using ACS?

10     A.   Since I've been there.

11     Q.   And tell me what services they

12 provide -- tell me what services they provide

13 to Geauga County.

14     A.   They -- it's their software and

15 their equipment.

16     Q.   And how many computers, roughly, do

17 they provide?

18     A.   We have nine public terminals and

19 three office -- three employees.

20     Q.   And you have a contract with ACS?

21     A.   Yes.

22     Q.   Is it an annual contract?

23     A.   No. Five years.

24     Q.   Is it a flat charge for the five

25 years, or do they charge a per recording charge

1 as well? How do they charge you?

2     A.   Per document.

3     Q.   Per document. What's the charge

4 per document?

5     A.   I don't -- ballpark?

6     Q.   Yeah. That's fine. Whatever you

7 can remember.

8     A.   Two dollars -- over two dollars.

9     Q.   And there's no other charge then

10 other than that two dollars for document

11 charge, so your yearly charge would be two

12 dollars times the number of documents you

13 record from ACS?

14     A.   Which question?

15     Q.   I'm just trying to figure out what

16 Geauga County has to pay ACS every year. Is it

17 just two dollars times the number of recorded

18 instruments, or is there something else you pay

19 them as well in addition to that?

20     A.   Yes.

21     Q.   You pay them something in addition?

22     A.   No. You asked two questions.

23 That's why I say -- ask me one question.

24     Q.   Why don't you explain to me what

25 you pay them every year.

1     A.   Document charge.

2     Q.   Okay. Thank you. Do you know if

3 other Ohio counties use ACS?

4     A.   Yes.

5     Q.   Do they all?

6     A.   No.

7     Q.   Some do not?

8     A.   Correct.

9     Q.   Do you know the names of any other

10 vendors that provide these services?

11     A.   Cott.

12     Q.   How do you spell that.

13     A.   C-O-T-T. And there are others.

14     Q.   Do you happen to know what they

15 charge per recording?

16     A.   I do not.

17     Q.   Is there any limit under the ACS

18 contract of what you would need to pay them if

19 you had an increase in recordings?

20     A.   I don't know.

21     Q.   Now, so far we've been talking

22 about Geauga County primarily, but there are

23 other counties in Ohio that have Recorder's

24 Offices as well; correct?

25     A.   Yes.

15 (Pages 54 - 57)

Page 58

1    Q.   And most of them do, in fact?

2    A.   Correct.

3    Q.   And each of those offices has an

4 elected Recorder?

5    A.   No.

6    Q.   They don't.  Some of them are

7 appointed?

8    A.   Correct.

9    Q.   And they -- and you talk to them

10 frequently, I take it?

11    A.   Yes.

12    Q.   They have their own county

13 prosecutors to advise them on various issues

14 about recording documents that may come up?

15    A.   Yes.

16    Q.   Each of those office has their own

17 employees?

18    A.   Yes.

19    Q.   They have their own policies and

20 procedures?

21    A.   I don't know.

22    Q.   Do they use your policies and

23 procedures?

24    A.   No.

25    Q.   And they have their own ways of

Page 59

1 handling issues that might come up about

2 recording?

3    A.   Yes.

4    - - - - -

5    (Thereupon, Deposition Exhibit 11, A

6    Document Bates Stamped GCR-002827,

7    GCR-002823, GCR-002824, GCR-002795,

8    GCR-002794, GCR-002790, GCR-002791,

9    was marked for purposes of

10    identification.)

11    - - - - -

12    Q.   Ms. Gingerich, I'm handing you a

13 document that's been marked as Defendants'

14 Exhibit Number 11.  It's, again, some e-mails

15 that you produced in response to the subpoena.

16 For the record, it's GCR-2827, 2823, 2824,

17 2795, 2794, 2790, 2791.

18    Do you see those documents?

19    A.   Yes.

20    Q.   I just want to go through these

21 briefly as examples of maybe some situations

22 where the Recorders will do things in a

23 different manner, okay?  Take a look at the

24 third page, page 2824.  And there's a question

25 posed, looks like to your ListServe; "Does a

Page 60

1 TOD designation affidavit need to go to the

2 Auditor's Office before being recorded?  I

3 think not, since there's not a transfer of

4 property."

5    What's a "TOD designation

6 affidavit"?

7    A.   Transfer on death.

8    Q.   And so this person, Diana Trumbull,

9 who is she?

10    A.   Diana Marchese, Trumbull County

11 Recorder.

12    Q.   Okay.  Sorry.  She put "Diana,

13 Trumbull", so I thought that was her last name.

14 Thank you.

15    And then there's a response by

16 Nikki Beltz on page 2823, which says; "In

17 Hancock the auditor will check the legal on the

18 TOD designation."  Do you see that?

19    A.   Yes.

20    Q.   And then if you go to the top of

21 page 2823, there's a response by Brian, who

22 says in the second paragraph; "The answer seems

23 to be different in each county."  Do you see

24 that in the second paragraph there?

25    A.   Yes.

Page 61

1    Q.   Do you agree that issue is handled

2 differently in different counties?

3    A.   Yes.

4    Q.   Okay.  Take a look at 2795.

5 There's a question -- it's about the fourth

6 page in.  There's a question by Wayne Coates

7 from Hamilton County; "When you get an

8 assignment of a mortgage with the mortgage do

9 you write in the book and page number on the

10 assignment?"  Do you see that?

11    A.   Yes.

12    Q.   And then at the top there's a

13 response by Sarah from Henry County saying; "I

14 will do it if instructed to do so by the

15 sender."  Do you see that?

16    A.   Okay.

17    Q.   And then if you look to the next

18 page, there's a response from a different

19 Recorder named Brian, 2794 -- go one more

20 page -- Brian says; "Yes, we do write the

21 instrument number for the mortgage on the

22 assignment."  Do you see that?

23    A.   Yes.

24    Q.   So that's another example of

25 Recorders having their own policies and

16 (Pages 58 - 61)

Page 62

1  procedures for handling recording issues?
2      A.  Okay.
3      Q.  Just shifting gears a little bit
4  now -- we're done with that.  Thank you.
5      Ms. Gingerich, can you tell me
6  roughly how many documents were recorded in
7  Geauga County in 2011?
8      A.  No.  I would have to -- no.
9          - - - - -
10         (Thereupon, Deposition Exhibit 12,
11         An Online Newsletter, was marked for
12         purposes of identification.)
13         - - - - -
14     Q.  Ms. Gingerich, I'm handing you
15  what's been marked Defendants' Exhibit Number
16  12.  Can you identify this document?
17     A.  It's my newsletter.
18     Q.  And for the record, there's no
19  Bates stamp on this document.  It's something
20  from your website?  That's where I got it.
21     A.  Yes.
22     Q.  And so you send a newsletter out
23  periodically?
24     A.  Yes.
25     Q.  Does it go to folks in Geauga

Page 63

1  County?
2      A.  No.  Well, no.  I'm sorry.  I don't
3  send it out.  I put it on my website.
4      Q.  Got it.  So it's there for the
5  public to read?
6      A.  Yes.
7      Q.  Turn over to page 2.  There's sort
8  of a box with some stats there.  Do you see
9  that?
10     A.  Yes.
11     Q.  Did you or someone on your staff
12  compile that information to put in your
13  newsletter?
14     A.  Yes.
15     Q.  And you believe it to be reasonably
16  accurate?
17     A.  Yes.
18     Q.  For 2010, if you go across from
19  left to right, I added it up.  It's roughly
20  about 13,000 documents in 2010.  Does that
21  sound about right being recorded, if you go
22  from left to right?
23     A.  Yes.
24     Q.  Okay.  So that's for 2010.  I'm
25  just trying to get a ballpark of what we're

Page 64

1  talking about in terms of recordations.
2      Is 2011, was it roughly the same as
3  2010?
4      A.  I don't know.
5      Q.  Okay.
6      A.  I --
7      Q.  Do you do any analysis each year to
8  see how that number is trending?
9      A.  I do.
10     Q.  Is it trending up or down, or
11  staying about the same?
12     A.  I haven't done one in 2011.  I
13  mean --
14     Q.  So we don't know.
15     A.  I --
16     Q.  Has anyone on your staff come to
17  you and reported that it's significantly going
18  down or significantly going up?
19     A.  No.
20     Q.  Your answer was "no"?
21     A.  No.
22     Q.  How did you compile this
23  statistical information?
24     A.  There's -- on the ACS computer.
25     Q.  So you can run reports?

Page 65

1      A.  Yes.
2      Q.  And if you want to know the number
3  of mortgages in a certain year, they're in that
4  computer system, it will tell you that?
5      A.  Yes.
6      Q.  Can it identify the number of
7  mortgagees for a particular year that might
8  have recorded a document?  Can you search by
9  name of the grantee or the mortgagee?
10     A.  Yes.
11     Q.  Probably whatever information you
12  input with respect to a document you could
13  search for that on the ACS system?
14     A.  I can find an individual.
15     Q.  Can you search the ACS system for
16  the information that you index as to each
17  particular document?
18     A.  You've got to be more specific.
19     Q.  That's all right.
20         - - - - -
21         (Thereupon, Deposition Exhibit 13, A
22         Document Bates Stamped GCR-000946,
23         was marked for purposes of
24         identification.)
25         - - - - -

17 (Pages 62 - 65)

Page 66

1    Q.   I'm handing you what's been marked
2  Defendants' Exhibit 13. It's Bates number
3  GCR-946. Can you tell me what this is, Ms.
4  Gingerich?
5    A.   This is a compilation of how many
6  deeds, mortgages, leases, liens, releases.
7    Q.   Is this generated from the ACS
8  system?
9    A.   Yes.
10    Q.   If you actually compare, it appears
11  to be a printout that links up with what's in
12  your newsletter, I think?
13    A.   Yes.
14    Q.   If you look -- if you look down
15  each column, it would appear the number of
16  documents being recorded is declining. Let's
17  just look at deeds. In 2006 you had 4,114. In
18  2010, just 2,924. Do you see that?
19    A.   Yes.
20    Q.   And under "mortgages" you had 8,000
21  and some odd, down to 5,360. Do you see that?
22    A.   Yes.
23    Q.   Under "leases", it went from 524 in
24  2006 down to 164. Do you see that?
25    A.   Yes.

Page 67

1    Q.   Liens was about the same. Releases
2  went from 7,063 down to 5,123. Do you see
3  that?
4    A.   Yes.
5    Q.   Is it fair to say the number of
6  documents declined, at least from 2006 to 2010,
7  that were recorded in your office?
8    A.   Yes.
9    Q.   And your office generates less
10  revenue if fewer documents are recorded?
11    A.   No.
12    Q.   That's not correct?
13    A.   No.
14    Q.   Tell me why.
15    A.   Because it depends on the size of
16  the documents.
17    Q.   All other things being equal,
18  assuming that the same size documents are being
19  recorded during that five-year period, would
20  the amount of revenue be going down?
21    A.   Yes.
22      - - - - -
23      (Thereupon, Deposition Exhibit 14, A
24      Document Bates Stamped GCR-000974,
25      was marked for purposes of

Page 68

1  identification.)
2      - - - - -
3    Q.   I'm handing you what's been marked
4  number 14, Exhibit 14. It's GCR-974. Can you
5  identify this document for me? If you can't,
6  you can't. That's fine.
7    A.   It's a summary of deeds with
8  affidavits and mortgages.
9    Q.   Did you generate this?
10    A.   I don't remember.
11    Q.   Okay. That's fine.
12      - - - - -
13      (Thereupon, Deposition Exhibit 15, A
14      Document Bates Stamped GCR-002870,
15      was marked for purposes of
16      identification.)
17      - - - - -
18    Q.   Handing you what's been marked
19  Defendants' Exhibit 15. Could you identify
20  this document for me? And for the record, it's
21  GCR-2870.
22    A.   It's an ACS printout.
23    Q.   Okay. At the top it's called an
24  "Auditor's Report". What's an Auditor's
25  Report?

Page 69

1    A.   It's just a term they use.
2    Q.   Did they print this out or were you
3  all able to print it out at your office?
4    A.   I can print it out.
5    Q.   And what's the purpose of this
6  document?
7    A.   It tells you the money taken in
8  from July 1, 2009 to June 22, 2010, and the
9  total recorded documents.
10      - - - - -
11      (Thereupon, Deposition Exhibit 16, A
12      Document Bates Stamped GCR-002, was
13      marked for purposes of
14      identification.)
15      - - - - -
16    Q.   Thank you. Just one more on this
17  topic. I'm handing you what's been marked as
18  Defendants' Exhibit 16, Ms. Gingerich. It's
19  Bates number GCR-002. Can you identify this
20  document?
21    A.   It is a statistics page.
22    Q.   Do you know how this was generated?
23    A.   The information would have come
24  from ACS.
25    Q.   Now, one thing on all these

18 (Pages 66 - 69)

Page 70

1  documents we've just seen, the last four or
2  five documents, I don't see "assignments"
3  listed as a category.  Is it subsumed with one
4  of the other categories?
5      A.   Probably.
6      Q.   How could we find that out?
7      A.   By looking at the ACS, by looking
8  at the menus.
9      Q.   Is it possible that the number of
10  assignments are included?  For example, on this
11  document under "release" it could be
12  categorized as a "release"?
13      A.   I don't know that.
14      Q.   You don't know that?
15      A.   I don't know that.
16      Q.   Do you have any idea the number of
17  assignments that were recorded in Geauga County
18  in 2011?
19      A.   I do not.
20      Q.   Any ballpark?  Not even a ballpark.
21  Okay.
22          Now, what are the major expenses
23  that you incur to run your office on a yearly
24  basis?
25      A.   That would be salaries and

Page 71

1  contracts.
2      Q.   So we have the ACS contract that we
3  talked about?
4      A.   Right.
5      Q.   Which is two dollars times every
6  recorded document, so it's not too hard to
7  figure out?
8      A.   Right.
9      Q.   And salaries for the folks you
10  mentioned?
11      A.   Correct.
12      Q.   Any other contracts, other than the
13  ACS contract?
14      A.   Yes.
15      Q.   What are those?
16      A.   The public copiers.
17      Q.   And that's if people want copies of
18  records?
19      A.   Yes.
20      Q.   Roughly, what do you pay for that
21  contract each year?
22      A.   It is $209 a month.  Yeah.
23      Q.   Anything else in a major category,
24  other than salaries and contracts?
25      A.   No.

Page 72

1      Q.   Any other contracts besides the
2  copying and the ACS?
3      A.   No.
4      Q.   Have those office expenses changed
5  materially since you've been Recorder either up
6  or down?
7      A.   They've gone down a little.
8      Q.   Where have they gone down?
9      A.   Well, the copier, salaries.
10      Q.   So you got a better contract for
11  the copying?
12      A.   Yes.
13      Q.   And why did salaries go down?
14      A.   Because one of our long-time
15  employees left.
16      Q.   Who was that?
17      A.   Kathy Dash.
18      Q.   And you did not replace her?
19      A.   I promoted Jared.
20      Q.   In order to run the office and to
21  have the funds to pay ACS and to pay salaries,
22  Geauga County Recorder's Office obtains funds
23  from Geauga County?  The funding for your
24  operations comes from Geauga County?
25      A.   From the general fund, yes.

Page 73

1      Q.   Yes.  They allocate funds to the
2  Geauga County Recorder's Office?
3      A.   Yes.
4      Q.   And that is the source of funds
5  that your office uses to function?
6      A.   Yes.
7      Q.   You are dependent on that source of
8  funding to operate?
9      A.   Yes.
10      Q.   And I assume each Ohio Recorder's
11  Office has a similar arrangement with its
12  county, correct?
13      A.   Yes.
14      Q.   And each county's budget is going
15  to be different?
16      A.   Yes.
17      Q.   Depending on the various
18  circumstances they might find themselves in?
19      A.   Yes.
20      Q.   Tell me how the budget process
21  works in Geauga County.
22      A.   We send an estimate of what we're
23  going -- our expenses are going to be.  They
24  say "yes" or "no", and that's it.
25      Q.   Do you do that once a year?

19 (Pages 70 - 73)

Page 74

1    A.    Yes.
2    Q.    And who do you send the request to?
3    A.    Well, the Commissioner's Office.
4    Q.    And do they hold some kind of
5  public hearing about your request, or all the
6  county requests, all the departments of the
7  county, before they say "yes" or "no"?
8    A.    No.
9    Q.    It's not done publicly?
10   A.    They have meetings.
11   Q.    Okay.  And are those public?
12   A.    Yes.
13   Q.    And what is the request that you
14  send called?
15   A.    Estimated budget.
16   Q.    And who prepares that in your
17  office?
18   A.    Celesta and I.
19   Q.    What point in the year do you make
20  that request?
21   A.    Sometime in the summer.
22   Q.    And that would cover what period of
23  time, the upcoming year starting January 1st?
24   A.    Calendar year.
25   Q.    Do you recall what your request was

Page 75

1  last summer for calendar year 2012, roughly?
2    A.    About 250.
3    Q.    And did the Commissioners approve
4  that amount?
5    A.    Yes.
6    Q.    But as you mentioned, they are free
7  to not approve that amount, correct?
8    A.    Correct.
9    Q.    Have they done that in the past?
10   A.    No.
11   Q.    Didn't the Commissioners cut your
12  budget by about 10 percent in 2009?
13   A.    Yes.
14   Q.    Okay.  Is it fair to say that
15  Geauga County is under some budget pressures
16  these days?
17   A.    Yes.
18   Q.    And in setting the budget, the
19  Commissioners of Geauga County have to do what
20  they think is best given all the various
21  competing needs within the county?
22   A.    Yes.
23   Q.    And each county in Ohio, each
24  County Commissioner, set of County
25  Commissioners in Ohio has to make a similar

Page 76

1  determination for its own county?
2    A.    Yes.
3    Q.    Geauga County can't set the budget
4  for Cuyahoga County, correct?
5    A.    Correct.
6    Q.    And vice-versa?
7    A.    Correct.
8         MR. YENOUSKAS:  Take a quick break?
9         MR. SIEBOTT:  Okay.
10        (Thereupon, a recess was taken.)
11        MR. YENOUSKAS:  Back on the record
12  at 11:16.
13        - - - - -
14        (Thereupon, Deposition Exhibit 17, A
15        Document Entitled "Annual
16        Appropriation Resolution", was
17        marked for purposes of
18        identification.)
19        - - - - -
20   Q.    Ms. Gingerich, I'm going to hand
21  you another document.  I'm handing you what's
22  been marked Defendants' Exhibit Number 17.  It
23  has no Bates numbers on it.  I found it on the
24  Internet.  Is this the Geauga County Budget
25  Appropriation Resolution for 2012?

Page 77

1    A.    I've not seen this before.  So I
2  don't know.
3    Q.    Could you turn over to page 9?  Let
4  me ask you this question before we talk about
5  page 9.  How do you learn the amount that's
6  been budgeted for your office after the
7  Commissioners meet?
8    A.    They send us -- they send us a
9  sheet.
10   Q.    Is it one page, or --
11   A.    Well --
12   Q.    An e-mail?
13   A.    It's two pages.
14   Q.    It's not this document?
15   A.    No.
16   Q.    On page 9 it's got -- it talks
17  about Recorder there in the middle, and it has
18  various items, and there's a total of $251,698;
19  do you see that?
20   A.    Yes.
21   Q.    That sort of links up with your
22  recollection before about what you testified
23  earlier.  Does that seem like an accurate
24  breakdown of the expenses of your office for
25  2012?

20 (Pages 74 - 77)

Page 78

1   A.   Yes.
2   Q.   Where is the ACS contract shown
3 here; if you can tell?
4   A.   That is not here.
5   Q.   Is it budgeted separately?
6   A.   Yes.
7   Q.   How does that work?
8   A.   It's called the equipment fund --
9 no. It's not called equipment fund. It's
10 called the "set aside fund".
11   Q.   That's a new term for me. So how
12 does that work?
13   A.   $4 out of the 14 goes for
14 contracts.
15   Q.   Now, when you say "of the 14", what
16 is "the 14"?
17   A.   The fees, the fee charges.
18   Q.   And that's $14 per page charge to
19 record a document? Is it per page or per
20 document?
21   A.   No. No. Our fees are $28 for two
22 pages. $14 comes to us.
23   Q.   And $14 goes to the Ohio Trust
24 Fund?
25   A.   Right.

Page 79

1   Q.   And from the $14 that is paid to
2 the Recorder, $4 is used for contracts?
3   A.   Yes.
4   Q.   Now I understand. Thank you.
5        Ms. Gingerich, can you tell me
6 roughly the amount of recording fees that
7 Geauga County took in in 2011, just ballpark?
8   A.   No. I would have to see.
9   Q.   Is it over a million or under a
10 million?
11   A.   Under.
12        - - - - -
13        (Thereupon, Deposition Exhibit 18, A
14        Document Entitled "Burton Blog", was
15        marked for purposes of
16        identification.)
17        - - - - -
18   Q.   I'm handing you what's been marked
19 Exhibit Number 18, Ms. Gingerich. Can you
20 identify this document?
21   A.   Burton Blog.
22   Q.   What is the Burton Blog?
23   A.   It's a blog that someone writes in
24 Burton.
25   Q.   And it looks like the individual

Page 80

1 took your newsletter and put it into the blog,
2 essentially?
3   A.   Correct.
4   Q.   If you turn to the second page,
5 this is what I'm trying to get at, the number.
6 It says at the top of the second page that the
7 Recorder's Office brought in $833,000 in fees.
8 Does that help sort of jog your memory about
9 what the amount of recording fees you might
10 have taken in in 2010? Actually, this is as of
11 2010.
12   A.   Yeah. 2010.
13   Q.   Does that sound about right?
14   A.   Yes.
15   Q.   And do you know how it's changed
16 between 2010 and 2011?
17   A.   It's probably similar.
18   Q.   Okay. And over time, how has that
19 changed going back in time over the last few
20 years? Is that number increasing, decreasing
21 or staying about the same?
22   A.   I really don't -- I can't -- I
23 don't remember.
24   Q.   We could probably tell from the ACS
25 system pretty accurately if we wanted to find

Page 81

1 out?
2   A.   Oh, absolutely.
3   Q.   To the penny probably? Yes?
4   A.   Yes.
5        - - - - -
6        (Thereupon, Deposition Exhibit 19, A
7        Geauga County Website Document, was
8        marked for purposes of
9        identification.)
10        - - - - -
11   Q.   Handing you what's been marked as
12 Exhibit Number 19, Ms. Gingerich. Have you
13 seen this document before?
14   A.   No.
15   Q.   Again, this is something I got off
16 the Geauga County website. And it talks about
17 various receipts, expenditures and balances and
18 so forth. If you look right on the first page,
19 it's talking about receipts at the very top of
20 the first page, and it's got recording fees,
21 line 13 B-A. Do you see that, recorder fees?
22 And it's sort of got them for 2009, 2010, 2011
23 and "estimated"; do you see that?
24   A.   Yes.
25   Q.   And that sort of links up with the

21 (Pages 78 - 81)

Page 82

1  $800,000, in the sense that you said half of it
2  goes to the Ohio Trust Fund?
3      A.  Yes.
4      Q.  And these numbers seem to be
5  declining.  You've got $373,000 for '09, and
6  then for 2012 estimated it's all the way down
7  to $309,000; do you see that?
8      A.  Yes.
9      Q.  So it seems to be trending down by
10  about 20, 25 percent; would you agree?
11      A.  That's what it says, yes.
12          - - - - -
13      (Thereupon, Deposition Exhibit 20, A
14      Document Bates Stamped GCR-00247 and
15      GCR-002479, was marked for purposes
16      of identification.)
17          - - - - -
18      Q.  I'm handing you what's been marked
19  as Exhibit 20.  It's Bates number GCR-2478,
20  2479.  Can you identify this document for me?
21      A.  It's a chart of revenue from 2004
22  to present.
23      Q.  And I assume that other than
24  recording fees there are no other revenues that
25  your office takes in, correct?

Page 83

1      A.  Copies.
2      Q.  Okay.  So you make revenue through
3  copies.
4      A.  Yes.
5      Q.  And if we look at this chart, it
6  shows that your office made revenue in 2004 of
7  $1.45 million.  And through 2009, it was all
8  the way town to $500,000; is that correct?
9      A.  Correct.
10      Q.  So the revenue has gone down by
11  two-thirds?
12      A.  Correct.
13      Q.  What do you attribute that decline
14  to?
15      A.  The housing market.
16      Q.  I agree.
17          - - - - -
18      (Thereupon, Deposition Exhibit 21, A
19      Document Bates Stamped GCR-000938
20      Through GCR-000941, was marked for
21      purposes of identification.)
22          - - - - -
23      Q.  I'm handing you what's been marked
24  as Exhibit 21.  It's Bates numbered GCR-938
25  through 941.  Can you identify this document

Page 84

1  for me?
2      A.  Comparisons of noncompliant fees.
3      Q.  Okay.  And those are the documents
4  that don't meet the recording requirements set
5  forth in the Ohio Code?
6      A.  Correct.
7      Q.  And this shows the amount of fees
8  that your office was able to take in as a
9  result of those noncompliant documents?
10      A.  Correct.
11      Q.  Did you generate this from the ACS
12  system?
13      A.  No.
14      Q.  How did you generate this?
15      A.  Well, partially.
16      Q.  Okay.
17      A.  Well, yeah.  It does come from ACS.
18  But this report, I just wrote it into a
19  spreadsheet.
20      Q.  So you developed this spreadsheet,
21  and you used information from ACS to populate
22  it?
23      A.  Yes.
24          - - - - -
25      (Thereupon, Deposition Exhibit 22, A

Page 85

1      Document Bates Stamped GCR-000876
2      Through GCR-000894, was marked for
3      purposes of identification.)
4          - - - - -
5      Q.  I'm handing you what's been marked
6  as Exhibit 22.  It's GCR-876 through 894.  Same
7  question; what does this report show?
8      A.  Monthly totals.
9      Q.  And monthly totals of what?
10      A.  Their revenue from the office.
11      Q.  What are the various columns across
12  the top?  Like, "01/OHT", what is that?
13      A.  Ohio Housing Trust.
14      Q.  So is that the amount of revenue
15  that would go to the Ohio Housing Trust?
16      A.  Yes.
17      Q.  And then what's "01/CRM"?
18      A.  That's the one -- the contracts.
19      Q.  The equipment contracts?
20      A.  Well --
21      Q.  That's the amount of money that
22  would go to the equipment fund?
23      A.  Well, yeah.
24      Q.  The contract fund, or --
25      A.  Yeah.

22 (Pages 82 - 85)

Page 86

1    Q.   Now, does that money that you get
2  for the contract fund go into the county
3  general revenue to be used for any contracts in
4  the county --
5    A.   No.
6    Q.   -- or does it stay with your
7  office?
8    A.   Yes.
9    Q.   It stays with your office?
10   A.   Yes.
11   Q.   And what's "13 B-A"; is that you?
12   A.   I'm not sure.
13   Q.   It looks like it would probably
14  have to be, since half went to the Ohio Trust
15  Fund, and then it looks like the other half
16  probably went to the county, correct?
17   A.   Yes. It's ours.
18   Q.   It's yours; it's Geauga County's?
19   A.   Yes.
20   Q.   Okay. And is this something that
21  was generated by the ACS system?
22   A.   Yes. Well, again, yes and no. The
23  figure is, but we did the spreadsheet.
24   Q.   And what was the purpose of
25  generating the spreadsheet?

Page 87

1    A.   Just to know.
2       - - - - -
3      (Thereupon, Deposition Exhibit 23, A
4      Document Bates Stamped GCR-001156
5      Through GCR-001161, was marked for
6      purposes of identification.)
7       - - - - -
8    Q.   I'm handing you what's been marked
9  Exhibit 23. It's GCR-1156 to 1161. Could you
10  identify this report?
11   A.   This is a report generated -- this
12  is a report about the accounts.
13   Q.   Okay.
14   A.   Records.
15   Q.   And the account here is that 13 B-A
16  that we just saw in the last exhibit. Do you
17  see at the very top, account 13 B-A? So this
18  is the money for Geauga County?
19   A.   Right.
20   Q.   And what date did you run this
21  report; if you can tell?
22   A.   This is not my report. This comes
23  from the Auditor.
24   Q.   Okay. So there's an Auditor for
25  Geauga County?

Page 88

1    A.   Correct.
2    Q.   And how does he or she get the
3  information to conduct this audit?
4    A.   I don't know.
5    Q.   Who in your office would know?
6    A.   Oh, this is the daily amounts that
7  come in.
8    Q.   So this is a daily report --
9    A.   Yeah.
10   Q.   -- of amounts taken in each day?
11   A.   Right.
12   Q.   Okay. But it's generated by the
13  Auditor?
14   A.   By the Auditor, yes.
15   Q.   Okay. And this doesn't look like
16  it reflects the copying charges, just the
17  recording fees, correct?
18   A.   Yes.
19      - - - - -
20      (Thereupon, Deposition Exhibit 24, A
21      Document Bates Stamped GCR-000947
22      Through GCR-000973, was marked for
23      purposes of identification.)
24      - - - - -
25   Q.   I'm handing you what the court

Page 89

1  reporter has marked Exhibit 24. It's GCR-947
2  to GCR-973. Can you tell me what this document
3  is?
4    A.   This is a report from January 2010
5  through December 2010.
6    Q.   And what does the report show?
7    A.   It shows the amount of documents.
8    Q.   Amount of documents recorded?
9    A.   Recorded.
10   Q.   Can you tell me where assignments
11  are reflected in this; if at all?
12   A.   Under "mortgages", there's
13  "assignments".
14   Q.   Which page?
15   A.   Second page.
16   Q.   Okay.
17   A.   948. And down below that is "lease
18  assignments".
19   Q.   Okay. So as to mortgages, there
20  were 5,630 mortgages, mortgage type documents,
21  of which 478 were assignments in 2010?
22   A.   Yes.
23   Q.   It looks like the fees for
24  recording those assignments was approximately
25  $18,000?

23 (Pages 86 - 89)

Page 90

1  A.  Yes.
2      - - - - -
3      (Thereupon, Deposition Exhibit 25, A
4      Document Bates Stamped GCR-000915
5      Through GCR-000932, was marked for
6      purposes of identification.)
7      - - - - -
8  Q.  I'm handing you what's been marked
9  as Exhibit 25. It's GCR-915 through 932. Is
10 this a similar report for a different period?
11 A.  Correct. Yes.
12 Q.  And did you tell me how this was
13 generated?
14 A.  Through ACS.
15 Q.  So you can hit a button on ACS and
16 print out this kind of report?
17 A.  Correct.
18 Q.  Do you know where they're located,
19 ACS?
20 A.  Texas.
21 Q.  Do they do onsite visits at your
22 office from time to time?
23 A.  Yes.
24 Q.  Support-type visits?
25 A.  Yes.

Page 91

1  Q.  Who's your point of contact there?
2  A.  Dave Weaver.
3  Q.  Are they in Dallas? Do you know?
4  Are they located in Dallas, or do you know
5  where in Texas?
6  A.  No. I don't know -- I don't
7  remember the name of it. They just moved here.
8  Q.  To Ohio?
9  A.  No. To another location. Another
10 city. You're asking me for a city. I --
11 Q.  And on this document, Exhibit 25,
12 we have the same information about mortgages on
13 the first page, looks like, on the right-hand
14 side, "ASSN 613"?
15 A.  Yes.
16     - - - - -
17     (Thereupon, Deposition Exhibit 26, A
18     Document Bates Stamped GCR-000942
19     Through GCR-000945, was marked for
20     purposes of identification.)
21     - - - - -
22 Q.  The court reporter has handed you
23 what's been marked Exhibit 26, and it's Bates
24 numbered GCR-942 through 945. Can you identify
25 this document, Ms. Gingerich?

Page 92

1  A.  Distribution totals.
2  Q.  What does that mean?
3  A.  It tells where the fees go.
4  Q.  When you say where they go, do you
5  mean how much fee was charged for each type of
6  document?
7  A.  No.
8  Q.  Tell me what you mean by "where the
9  fees go"?
10 A.  Well, if you look in the last copy,
11 the fees went to copies, I mean, the last
12 column. The second to last, they went to CRM.
13 Q.  What's the CRM? I'm sorry.
14 A.  That's the one we talked about with
15 the contracts.
16 Q.  Okay.
17 A.  It's a breakdown.
18 Q.  And do you generate this report on
19 a regular basis?
20 A.  Yes.
21 Q.  And what do you do with the report
22 after you generate it?
23 A.  Sometimes I save it. Sometimes I
24 don't.
25 Q.  Is it requested by another agency

Page 93

1  of the county?
2  A.  No.
3  Q.  You just do it for informational
4  purposes?
5  A.  Correct.
6  Q.  To see where the money is going?
7  A.  Correct.
8  Q.  Ms. Gingerich, what is the Ohio
9  Recorders Association?
10 A.  It's the association that the Ohio
11 Recorders belong to.
12 Q.  And is Geauga County a member?
13 A.  Yes.
14 Q.  What does the association do?
15 A.  Many things. They provide
16 continuing education. They work on legislative
17 issues, such as standardization.
18 Q.  Anything else?
19 A.  That's the main thrust.
20 Q.  And how often does the ORA meet?
21 A.  We're down to three times a year.
22 We have spring, CE.
23 Q.  And it sounds like you met more
24 frequently in the past?
25 A.  Yes.

24 (Pages 90 - 93)

Page 94

1    Q.   And how many times did you used to
2  meet?
3    A.   Four.
4    Q.   Budget issues?
5    A.   Yes.
6    Q.   How does the ORA communicate with
7  its members?
8    A.   ListServe.
9    Q.   That's what we talked about
10  earlier?
11    A.   Yes.
12    Q.   So anyone can post a question on
13  ListServe for any other Recorder to see and
14  comment on and respond to?
15    A.   Yes.
16    Q.   And you use that ListServe when you
17  have questions?
18    A.   Yes.
19    Q.   And you've responded to inquiries
20  from other counties?
21    A.   Yes.
22    Q.   Have you ever posted an issue about
23  this case on the ListServe; any questions or
24  comments or invited feedback about this case on
25  the ListServe?

Page 95

1    A.   On the ListServe, no.
2    Q.   Why is that?
3    A.   There was nothing to ask.  There
4  was no reason to.
5    Q.   You didn't want to alert other
6  members to the case?
7    A.   No.  They know.  They were alerted.
8    Q.   We'll get to that in a minute.
9         But you didn't put anything on
10  ListServe about the case?
11    A.   No.  Not that I recall.
12    Q.   Were you discouraged from putting
13  anything on ListServe about the case by anyone?
14    A.   I don't remember.
15    Q.   Do you hold any positions within
16  the ORA?
17    A.   I'm on committees.
18    Q.   Tell me about that.
19    A.   I'm on the Q&A, the question and
20  answer moderator, and Legislative Committee.
21    Q.   How long have you been on the
22  Legislative Committee?
23    A.   Four months.
24    Q.   What does the committee do?
25    A.   Talk about legislation.

Page 96

1    Q.   Okay.  Does it just talk among
2  itself about legislation?
3    A.   Yes.
4    Q.   What kinds of legislation?  What
5  kinds of topics have you talked about in the
6  committee since you've been on it?
7    A.   Well, there's the clean-up bill,
8  which is to remove things that aren't relevant
9  anymore, you know, in the code.
10    Q.   So let me just interrupt you there.
11  There's an effort under way to amend the code
12  concerning recording practices?
13    A.   Yes.
14    Q.   And is there some bill introduced
15  in the legislature right now about that?
16    A.   No.
17    Q.   Not yet.  Are you going -- is your
18  association going to present a bill?
19    A.   Yes.
20    Q.   When do you anticipate doing that?
21    A.   This year.
22    Q.   This year.  Will that proposed
23  legislation have anything to do with recording
24  of assignments?
25    A.   No.

Page 97

1    Q.   What other topics have you talked
2  about in the committee, legislative topics?
3    A.   Veterans issues.
4    Q.   Anything else you can recall?
5    A.   It's not coming to me.
6    Q.   That's okay.  Does the committee
7  record in written form the results of its
8  meetings?
9    A.   Minutes?  Yes.
10    Q.   Okay.  So that would reflect what
11  you discussed?
12    A.   Yes.
13    Q.   We talked about the clean-up bill.
14  Has the Legislative Committee discussed any
15  proposals regarding recording of assignments of
16  mortgages?
17    A.   No.
18    Q.   Not at all?
19    A.   No.
20    Q.   Why is that?
21    A.   There was no reason to.
22    Q.   Why is there no reason to?
23    A.   I can't answer that.  I don't know.
24    Q.   Other than the meeting minutes, is
25  there any other way the committee communicates

25 (Pages 94 - 97)

Page 98

1   its work to its members of the ORA?
2       A.   Well, we talk.
3       Q.   Among all the Recorders.  In other
4   words, when the committee meets to discuss an
5   issue, other than the meeting minutes, do you
6   also communicate your activities to the members
7   in another way?
8       A.   At conference.
9       Q.   At the three times a year
10  conference?
11      A.   Correct.
12      Q.   You also produced something called
13  a "legislation update"?
14      A.   "Book and page".
15      Q.   What do you mean by that?
16      A.   It's called the "book and page".
17      Q.   It's called the "book and page"?
18  That's what you call it?
19      A.   Yes.
20      Q.   Let's put that in the record, so we
21  can make it clear what we're talking about.
22          - - - - -
23          (Thereupon, Deposition Exhibit 27, A
24          Document Bates Stamped GCR-000041,
25          GCR-000044 and GCR-000046, was

Page 99

1           marked for purposes of
2           identification.)
3           - - - - -
4       Q.   I'm handing you what's been marked
5   Exhibit Number 27.  It's Bates numbered GCR-41
6   to 46.  Do you see this document?
7       A.   I see it.
8       Q.   Is this what we were just
9   discussing?
10      A.   Yes.
11      Q.   And how often does the Legislative
12  Committee send out these legislation updates?
13      A.   I don't know.
14      Q.   Is it periodic rather than regular?
15      A.   Yes.
16      Q.   Do you ever send them out as a
17  member of the committee?
18      A.   No.
19      Q.   The Chair of the committee would
20  send them out?
21      A.   Yes.
22      Q.   Now, do you ever -- have you ever,
23  in your individual capacity as the Recorder of
24  Geauga County, have you ever lobbied or talked
25  to representatives about legislation of

Page 100

1   interest to Geauga County?
2       A.   Yes.
3       Q.   Tell me about that.
4       A.   Ohio Housing Trust Fund.
5       Q.   Tell me what the issue is there.
6       A.   We tried to get some of that to
7   come back to the county.
8       Q.   And was it successful?
9       A.   No.
10      Q.   That's a general fund maintained by
11  the governor?
12      A.   The Ohio Housing Trust Fund.
13      Q.   Maintains and administrates those
14  funds as it sees fit?
15      A.   Yes.
16      Q.   And as we talked about, half of
17  your recording income goes to this fund?
18      A.   Yes.
19      Q.   And nothing comes back to Geauga
20  County?
21      A.   Yes.
22      Q.   How did you try to get that
23  changed?
24      A.   Legislatively.
25      Q.   Who did you talk to?

Page 101

1       A.   Senator Grendel.  Everyone I saw.
2   I mean --
3       Q.   Were any bills ever introduced on
4   that?
5       A.   Yes.
6       Q.   There was a bill introduced?
7       A.   Yes.
8       Q.   It just didn't pass?
9       A.   Yes.  It didn't pass.
10          - - - - -
11          (Thereupon, Deposition Exhibit 28, A
12          Document Bates Stamped GCR-001284,
13          was marked for purposes of
14          identification.)
15          - - - - -
16      Q.   Okay.  I'm handing you what's been
17  marked as Exhibit 28.  For the record, it's
18  Bates number GCR-1284.  Can you identify this
19  document?
20      A.   It's a memo to State Rep Marlene
21  Anielski.
22      Q.   And is this something you wrote?
23      A.   Yes.
24      Q.   Is this another example of you in
25  your individual capacity as Geauga County

26 (Pages 98 - 101)

1  Recorder lobbying for a specific issue?
2      A.   Yes.
3      Q.   And what's the issue with the
4  defunding of county government involve?
5      A.   The county governments were
6  defunded in the beginning of 2010 with the new
7  administration.
8      Q.   Tell me what that means.  I'm not
9  from Ohio, so I don't know what the defunding
10  of the county government involved.
11      A.   I can't give you specifics.  I just
12  know that the moneys were cut.
13      Q.   So the amount of appropriations
14  that were given to the Ohio counties were cut
15  by the State?
16      A.   Yes.
17      Q.   And then this memo goes on to talk
18  about the Ohio Trust Fund issue that we just
19  discussed?
20      A.   Yes.
21      Q.   This was part of your -- part of
22  your pleas to try to get some of that money
23  back?
24      A.   Yes.
25      Q.   Has that defunding placed further

1  pressure on individual county governments
2  throughout Ohio?
3      A.   I -- I don't really know.  I can't
4  speak for all the counties.
5      Q.   Has it put pressure on your county,
6  budget pressures?
7      A.   No.
8      Q.   How much -- was the budget for the
9  amount of appropriations in Geauga County cut
10  by the State in 2010?
11      A.   Yes.
12      Q.   Now, Ms. Gingerich, I assume as
13  part of your job you have give speeches to the
14  public?
15      A.   Yes.
16      Q.   And various groups?
17      A.   Yes.
18      Q.   And you talk about issues of
19  concern to citizens in Geauga County?
20      A.   Yes.
21          - - - - -
22          (Thereupon, Deposition Exhibit 29, A
23          Document Bates Stamped GCR-002427
24          Through GCR-002431, was marked for
25          purposes of identification.)

1          - - - -
2      Q.   I'm going to hand you a document I
3  think is a speech, but you need to tell me.
4  I'm handing you what's been marked Exhibit
5  Number 29.  It's GCR-2427 to 2431.  This is a
6  copy of a speech you gave?
7      A.   No.
8      Q.   What is this?
9      A.   These are my notes.
10      Q.   Of what?
11      A.   Of a speech I was going to give.
12      Q.   But you never gave it?
13      A.   I did not give everything in here.
14  It was too much.
15      Q.   Understood.  Where was the
16  presentation going to be?
17      A.   Tea Party.
18      Q.   Tea Party.  And was that a Tea
19  Party meeting in your county or somewhere else?
20      A.   In our county.
21      Q.   And what was the approximate date?
22      A.   Mid-March.
23      Q.   Of 2012?
24      A.   Yes.
25      Q.   Turn over to page 2429.  At the top

1  of the first full paragraph it says; "Bottom
2  line is that the Recorder and the other elected
3  positions are there to give their residents" --
4      A.   I'm sorry.  This is not -- this is
5  not Tea Party.
6      Q.   Okay.  What is it?
7      A.   This was something I was going to
8  give and didn't.  And I don't even know -- the
9  reason I say that is because it says "I will
10  soon begin e-recording", and that was --
11      Q.   Okay.
12      A.   This --
13      Q.   So this is probably earlier than
14  2012?
15      A.   Yes.
16      Q.   And this was not given either --
17      A.   No.  Anywhere.
18      Q.   But you did type it up?
19      A.   I did type it up.
20      Q.   And it reflects your views?
21      A.   Yes.
22      Q.   Okay.  That's fine, too.  Let's go
23  over to page 2429.  And the first full
24  paragraph there says; "Bottom line is that the
25  Recorder and other elected positions are there

Page 106

1  to give their residents their Constitutional
2  freedom to choose." What do you mean by that?
3      A.  To elect.
4      Q.  To elect whom?
5      A.  Whoever they want.
6      Q.  And that's important because it's a
7  Constitutional principle, correct?
8      A.  Correct.
9      Q.  And the officials who elect
10  officials in Geauga County have the right to
11  have those citizens carry out their wishes?
12      A.  Yes.
13      Q.  And they should not have officials
14  in other counties carrying out their wishes,
15  correct, of Ohio? In other words, they elect
16  officials in Geauga County to carry out their
17  wishes, correct?
18      A.  The county elects officials.
19      Q.  Right. And so the citizens of
20  Geauga County should not be controlled in any
21  way by citizens of other Ohio counties,
22  correct?
23      A.  Correct.
24      Q.  And vice-versa; Geauga County
25  should not be allowed to control the wishes of

Page 107

1  the citizens of other Ohio counties?
2      A.  Correct.
3      Q.  When you drop down to the next
4  paragraph, it says; "The Recorder does not
5  always agree with other officials on how land
6  transactions should be handled." What do you
7  mean by that?
8      A.  Putting the records online.
9      Q.  Is that specifically what you were
10  talking about there?
11      A.  Yes.
12      Q.  So explain to me what was going on
13  with that.
14      A.  Other people might want to put
15  records online. I do not.
16      Q.  And why do you not want to put
17  records online?
18      A.  Privacy issues. Social Security.
19      Q.  And who in the county wanted to put
20  records online?
21      A.  Well, it was -- well, in the
22  campaign it would have been my opponent, but --
23  this is hypothetical. It would be something
24  that they might want to do.
25      Q.  I understand. But your point was

Page 108

1  as the elected official, you would want to have
2  control over decisions about land recording in
3  Geauga County?
4      A.  Yes.
5      Q.  And by the same token elected
6  officials in other counties can't control those
7  issues?
8      A.  Not about land recording. About
9  what I do with it about putting it online.
10      Q.  Well, this says "land transactions
11  should be handled."
12      A.  Meaning, putting it online.
13      Q.  Even as to putting it online, you
14  wouldn't want officials in other counties
15  telling you what to do, would you?
16      A.  Correct.
17      Q.  And you wouldn't propose to tell
18  them what to do, would you?
19      A.  No.
20      Q.  If you flip over to the last page,
21  2431, you say; "I can only speak for Geauga
22  County", correct?
23      A.  Yes.
24      Q.  Which is what we just talked about.
25  And then you go on to say that; "Just because

Page 109

1  Geauga County voters wanted different things
2  than Cuyahoga County voters is not a reason to
3  throw out the baby with the bath water." What
4  did that involve?
5      A.  That refers to the movement to
6  combine offices in the county.
7      Q.  So in some counties some Recorder
8  offices were eliminated?
9      A.  Yes. They did a whole new system,
10  yes.
11      Q.  And I assume Cuyahoga County was
12  one of those?
13      A.  Yes.
14      Q.  And instead of it being an elected
15  official, it was an appointed official
16  probably?
17      A.  Yes.
18      Q.  Appointed by the County
19  Commissioners?
20      A.  No.
21      Q.  Who would appoint the person, or
22  would it be taken over by a different official
23  in that county?
24      A.  Ask one question.
25      Q.  Sorry. I'll try again. In a

28 (Pages 106 - 109)

Page 110

1  county where the Recorder's Office is done away
2  with, who took over the function of the
3  Recorder?
4      A.  Chief Executive.
5      Q.  And you're opposed to that?
6      A.  Yes.
7      Q.  Another example of just different
8  counties having different views about how to do
9  things?
10     A.  Yes.
11          - - - - -
12          (Thereupon, Deposition Exhibit 30, A
13          Document Bates Stamped GCR-002244
14          Through GCR-002245, was marked for
15          purposes of identification.)
16          - - - - -
17     Q.  I'm handing you what's been marked
18  Exhibit Number 30.  It's Bates numbered
19  GCR-2244 to 2245.  Could you identify this
20  document for me?
21     A.  This is more about why our Geauga
22  County government is a good government as is.
23     Q.  And not wanting to do away with the
24  Recorder's Office?
25     A.  Right.

Page 111

1      Q.  And you drafted this?
2      A.  Yes.
3      Q.  Would it have been the same time
4  frame as Exhibit 29 or a different time?
5      A.  Probably.
6      Q.  Did you ever give this as a speech?
7      A.  No.
8      Q.  Paragraph J, you talk about how
9  Cuyahoga County and Summit County did away with
10  Recorders, and you said "Summit has saved
11  nothing."  How do you know Summit saved no
12  money from doing that?
13     A.  Someone made the statement.
14     Q.  Do you remember who that was?
15     A.  No, I do not.
16     Q.  You also say in that same
17  paragraph; "In Geauga, everything is
18  transparent."  What do you mean by that?
19     A.  Well, people know what we do.
20  We're right there.  Obviously, it -- it's not
21  corrupt.
22     Q.  Is there a problem in other
23  counties with transparency?
24     A.  Well, there must have been.
25     Q.  Save that for another day?

Page 112

1      MR. YENOUSKAS:  Off the record.
2      (Thereupon, a discussion was had
3  off the record.)
4      MR. YENOUSKAS:  Back on the record.
5      Q.  You say in paragraph J that; "The
6  Commissioners have such tight reins on our
7  budget, we cannot hire people to work for us
8  who do not work for us."  What do you mean by
9  that?
10     A.  I don't know.
11     Q.  What do you mean by "the
12  Commissioners have such tight reins on our
13  budget"?
14     A.  We can't do anything without
15  approval.
16     Q.  So, in other words, that budget
17  that you're given at the start of the year is
18  the funds you have to work with?
19     A.  Right.
20     Q.  And only those funds?
21     A.  Right.
22     Q.  Do you know what you meant by "we
23  can't hire people to work for us who do not
24  work for us"?
25     A.  Oh, I do know.  It goes to Cuyahoga

Page 113

1  County.
2      Q.  Okay.  What does that mean?
3      A.  There was a lot of things going on
4  there, which is why they changed their
5  government.
6      Q.  All right.  Let's talk about MERS
7  now.  Can you tell me what MERS is?
8      A.  Mortgage Electronic Registration
9  Systems.
10     Q.  And what does it do?
11     A.  It takes the mortgages, the
12  assignments, and assigns them from one bank to
13  another, to another, to another.
14     Q.  How does it do that?
15     A.  I don't know.
16     Q.  When did you first hear about MERS?
17     A.  About 2009.
18     Q.  How did you first hear about it?
19     A.  At a Recorders meeting.
20     Q.  Ohio Recorders meeting?
21     A.  Correct.
22     Q.  And who was informing you about
23  MERS at that time?
24     A.  I don't remember.
25     Q.  What were the discussions about

29 (Pages 110 - 113)

Page 114

1    MERS?
2        A.    That the chain of title was
3    clouded.
4        Q.    So this was a comment by some other
5    Recorder, and you can't remember who it was?
6        A.    No.
7        Q.    Did you do anything in reaction to
8    that meeting?
9        A.    No.
10       Q.    Do you know who the members of MERS
11   are?
12       A.    No.
13       Q.    Or how many there are?
14       A.    No.
15       Q.    Do you know when MERS began
16   operations?
17       A.    In the mid 1990s.
18       Q.    Do you know anything else about
19   MERS, other than it assigns mortgages from one
20   bank to another?
21       A.    Yes.
22       Q.    What else do you know about MERS?
23       A.    They do it within their own system.
24   It's not open to the public.
25       Q.    Have you ever accessed the MERS

Page 115

1    website?
2        A.    No.
3        Q.    Have you ever gone to MERS?
4        A.    No.
5        Q.    Have you ever talked to any
6    officials in MERS?
7        A.    No.
8        Q.    So the information you're getting
9    about MERS is secondhand information?
10       A.    Yes.
11       Q.    Who are some of the sources of your
12   information about MERS?
13       A.    Other Recorders.  Robert Holman.
14   You have to --
15       Q.    Have you met with Chris Peterson?
16       A.    No.
17       Q.    Have you ever talked to him on the
18   phone?
19       A.    No.
20       Q.    Do you know who he is?
21       A.    Yes.
22       Q.    Who is he?
23       A.    He wrote some things about MERS.
24       Q.    Have you read any of his articles?
25       A.    I have not.

Page 116

1        - - - - -
2        (Thereupon, Deposition Exhibit 31, A
3    Mortgage, was marked for purposes of
4    identification.)
5        - - - - -
6        Q.    Ms. Gingerich, I'm handing you
7    what's been marked as Exhibit Number 32.  Can
8    you identify this document?
9        A.    It is a mortgage recorded in 2005.
10       Q.    Okay.  And it was recorded in
11   Geauga County?
12       A.    Yes.
13       Q.    And I assume Mary Margaret McBride
14   is one of your predecessors?
15       A.    Yes.
16       Q.    Where is she now?
17       A.    Virginia.
18       Q.    I'm sorry?
19       A.    Virginia.
20       Q.    Do you know where in Virginia?
21       A.    I think Roanoke.
22       Q.    What is she doing there?
23       A.    She works for the Veterans
24   Administration.
25       Q.    And it appears this document was

Page 117

1    actually recorded in the land records at Geauga
2    County?  It has a book and page number stamped
3    on it?
4        A.    Yes.
5        Q.    So this was accepted for recording?
6        A.    Yes.
7        Q.    And look at page 1, right in the
8    middle.  Do you see it references MERS there?
9        A.    Yes.
10       Q.    And have you seen that on other
11   mortgages that are recorded in Geauga County?
12       A.    Yes.
13       Q.    So there's no hiding the fact that
14   MERS is involved in this transaction, is there?
15       A.    No.
16       Q.    And there's a sentence there that
17   says; "MERS is the mortgagee under the security
18   instrument."  Do you see that?
19       A.    Yes.
20       Q.    Do you agree that it's the
21   mortgagee under the security instrument?
22       A.    I don't know.  I can't -- I have
23   nothing to base it on.
24       Q.    Do you believe that's false in any
25   way?

30 (Pages 114 - 117)

Page 118

1    A.   I don't know.
2    Q.   Do you know how long Geauga County
3 has been accepting mortgages such as this for
4 recording?
5    A.   No.
6    Q.   Do you have any reason to dispute
7 that it would have been accepting them since
8 1997 when MERS started up?
9    A.   Would you repeat that?
10    Q.   Do you have any reason to dispute
11 that it would have been recording these since
12 MERS started operations in the 1990s?
13    A.   Do I have any reason to dispute it?
14 No.
15    Q.   Has Geauga County ever communicated
16 to MERS in any way that it believed MERS is
17 adversely impacting the land records in Geauga
18 County?
19    A.   Not that I know of.
20    Q.   Has Geauga County ever complained
21 to a lender the same fact?
22    A.   Not that I know of.
23    Q.   Has Geauga County ever refused to
24 record a MERS mortgage?
25    A.   I don't know that either.

Page 119

1    Q.   Have you ever refused to record a
2 MERS mortgage?
3    A.   I don't know.  It would have
4 depended, did they meet standardization?
5    Q.   Assuming they met the
6 standardization, would you refuse to accept it
7 because "MERS" is listed on the document?
8    A.   No.
9    Q.   If your view is that MERS is
10 clouding the title, why are you accepting the
11 MERS mortgages for filing?
12    A.   Because it meets the requirements.
13    Q.   Even though it clouds the title?
14    A.   Yes.
15    Q.   Have you ever asked Mr. Joyce for
16 an opinion -- I'm not going to ask you what he
17 said -- but have you ever asked Mr. Joyce for
18 an opinion as to whether a MERS mortgage clouds
19 the title and you can refuse to accept it?
20    A.   No.
21    Q.   Now, you are aware, Ms. Gingerich,
22 that a lawsuit has been filed by Geauga County
23 against various defendants about this
24 assignment issue?
25    A.   Yes.

Page 120

1    Q.   When did you first become aware
2 that a lawsuit was contemplated?
3    A.   In the fall of last year.
4    Q.   How did you learn about that?
5    A.   My prosecutor.
6    Q.   Mr. Joyce?
7    A.   Mr. Joyce.
8    Q.   And you had a meeting about this?
9    A.   Yes.
10    Q.   And without giving me the specifics
11 of the discussion, did he ask your opinion
12 about whether you wanted to proceed with this
13 lawsuit or not, or had he made the decision to
14 proceed with it without you?  Did he ask for
15 your input?
16    A.   Yes.
17    Q.   He did ask for your input?
18    A.   No.  What do you mean "input"?
19    Q.   Did he ask for your approval to
20 file the lawsuit or not?
21    A.   Yes.
22    Q.   And you gave him the go-ahead to
23 file the lawsuit?
24    A.   It wasn't my -- no.  I mean, it
25 wasn't --

Page 121

1    Q.   Just go ahead.  Tell me what you --
2    A.   Yeah.  Okay.  Yes.
3    Q.   Okay.  Let me try again.  What was
4 the nature of the meeting?
5    A.   He said he was going to file the
6 lawsuit.
7    Q.   And did he ask you whether you had
8 any reservations about the lawsuit?
9    A.   He did not.
10    Q.   Between the fall of 2011 and '09,
11 when you first learned about MERS, had you
12 gathered any information, other information
13 about MERS before you talked to Mr. Joyce?
14    A.   No.
15    Q.   So in that two-year gap, MERS
16 wasn't something that was a concern of yours,
17 essentially?
18    A.   No.
19    Q.   Now, do you know if the Geauga
20 County Commissioners approved of the filing of
21 the lawsuit on behalf of Geauga County?
22    A.   Yes.
23    Q.   How did they do that?
24    A.   They said okay.
25    Q.   Was there a meeting held about

31 (Pages 118 - 121)

Page 122

1  that?
2  A.  Yes.
3  Q.  Were you at that meeting?
4  A.  Yes.
5  Q.  Was that a public meeting or a
6  private manage?
7  A.  Private.
8  Q.  Who else attended?
9  A.  I think David Lair was in there.
10  Q.  Who is he?
11  A.  He is the Administrator.
12  Q.  And the Commissioners as well?
13  A.  Yes.
14  Q.  And you and Mr. Joyce?
15  A.  Yes.
16  Q.  Mr. Siebott?
17  A.  No.
18  Q.  Just folks from Geauga County?
19  A.  Yes.
20  Q.  Do you recall how long the meeting
21  lasted?
22  A.  No.
23  Q.  Do you have any notes of the
24  meeting?
25  A.  No.

Page 123

1  Q.  Do you know if anyone else does?
2  A.  I do not know.
3  Q.  How many Commissioners are there?
4  A.  Three.
5  Q.  Did they all vote in favor of the
6  lawsuit?
7  A.  Yes.
8  Q.  How long did the meeting last?
9  A.  I don't know.
10  Q.  Can you give me a rough estimate?
11  A.  It wasn't very long.
12  Q.  Do you know if there was a copy of
13  the complaint, a draft copy of the complaint
14  available at that meeting to discuss with them?
15  A.  No.
16  Q.  Do you remember if they asked any
17  questions?
18  A.  They did.
19  Q.  And do you recall any of those
20  questions?
21  A.  No.
22  Q.  Did Mr. Joyce lead the discussion
23  about the lawsuit, or did you?
24  A.  Mr. Joyce.
25  Q.  Did you have any involvement in the

Page 124

1  decision to hire Mr. Siebott and his law firm?
2  A.  No.
3  Q.  It was done by Mr. Joyce?
4  A.  Yes.
5  Q.  Now, in the lawsuit there's an
6  allegation, and I think you stated at the very
7  start that MERS somehow breaks the chain of
8  title?
9  A.  Correct.
10  Q.  Tell me the basis for your belief
11  that MERS breaks the chain of title.
12  A.  Because you don't know what
13  assignments have been made.
14  Q.  And how does that break the chain
15  of title?
16  A.  You don't know who owns the
17  mortgage.
18  Q.  Is not knowing who owns the
19  mortgage different from saying there is a break
20  in the chain of title?
21  A.  No.
22  Q.  What is a break in the chain of
23  title?
24  A.  Not knowing who owned the mortgage.
25  Q.  So you think not knowing the owner

Page 125

1  is a break in the chain of title?
2  A.  Yes.
3  Q.  You're aware that sometimes trusts
4  will file documents in the land records?
5  A.  Yes.
6  Q.  And you can't tell who the members
7  are of the trust from the document they filed,
8  can you?
9  A.  You can.
10  Q.  You can.  Does it always state it
11  in the trust?
12  A.  I think so.
13  Q.  Is there any other way that MERS
14  breaks the chain of title?
15  A.  Other than not filing assignments?
16  I don't know.
17  Q.  Do you know that borrowers have a
18  right under Federal Law to write to their loan
19  servicer and ask who owns the mortgage?
20  A.  To do what?
21  Q.  Do you know that a borrower has a
22  right under Federal Law to write to the loan
23  servicer and ask who the owner of their
24  mortgage is?
25  A.  I didn't know.

32 (Pages 122 - 125)

Page 126

1 Q. Mr. Joyce never told you that?
2 A. No.
3 Q. Mr. Siebott never told you that?
4 A. No.
5 Q. Does that change your opinion about
6 MERS breaking the chain of title?
7 A. No.
8 Q. But your concern was not knowing
9 who the owner of the mortgage was?
10 A. Right.
11 Q. So if you could write a letter to
12 your loan servicer and they would have to tell
13 you under Federal Law, wouldn't that remedy the
14 problems you've just described?
15 A. I don't know.
16 Q. Now, you know what a title company
17 is?
18 A. Yes.
19 Q. And you know they insure loans?
20 A. Yes.
21 Q. Do you know any title companies
22 that have refused to insure loans in Geauga
23 County where MERS is listed as the mortgagee?
24 A. I do not know.
25 Q. Do you know of any reports by the

Page 127

1 Federal Government that MERS breaks the chain
2 of title?
3 A. I do not know.
4 Q. Do you know that various government
5 agencies participated in the formation of MERS?
6 A. I did not know.
7 Q. Do you know that County Recorders
8 were asked to give their input into the
9 creation of MERS in --
10 A. I didn't know --
11 Q. You didn't know that either?
12 A. No.
13 Q. Do you know that title insurers
14 participated in the formation of MERS?
15 A. I did not.
16 Q. Now, the lawsuit also says that
17 "There will be devastating consequences on the
18 public if assignments are not recorded." Can
19 you tell me what those devastating consequences
20 would be?
21 A. No.
22 Q. You don't know?
23 A. I do not.
24 Q. Who would know that, Mr. Joyce?
25 A. Yes.

Page 128

1 Q. Did he ever ask you?
2 A. No.
3 Q. Now, the lawsuit that was filed by
4 Geauga County is based on a duty to record
5 these mortgage assignments?
6 A. Yes.
7 Q. Alleged duty under Ohio Law. And I
8 know you're not a lawyer, so I'm not going to
9 ask you legal questions.
10 But Mr. Joyce believes it's a clear
11 legal duty that certain lenders have been
12 avoiding, I take it?
13 A. Yes.
14 Q. Have there been any other lawsuits
15 prior to the fall of 2012 alleging this issue,
16 that you're aware of, in Geauga County?
17 A. I don't know. Not that I'm aware
18 of.
19 Q. If it was a clear duty, do you have
20 any reason to know why there would not have
21 been lawsuits about this previously?
22 A. I don't know.
23 Q. MERS has been around for 20 years,
24 correct?
25 A. Yes.

Page 129

1 Q. Does the current budget situation
2 have anything to do with it?
3 A. No.
4 Q. How do you know that?
5 A. Because it's an issue of title.
6 It's an issue of chain of title.
7 Q. Right. But we've just -- there's a
8 Federal Law that allows borrowers to figure out
9 the information you say they don't have. So
10 the problem --
11 A. The question --
12 Q. -- the problem is remedied. You
13 disagree?
14 A. Correct.
15 Q. Were you asked to review a draft of
16 the complaint and give comments before it was
17 filed?
18 A. No.
19 Q. Why are you laughing?
20 A. I'm not a lawyer.
21 Q. No. But there are factual
22 allegations in the complaint that you might
23 have been asked to state your opinion on.
24 A. No.
25 Q. You were not asked.

33 (Pages 126 - 129)

Page 130

1    Are you kept apprised of the status
2 of the case?
3    A.    No.
4    Q.    Now, as to assignments, and which
5 assignments have to be recorded, we talked
6 about at the very start mortgages and notes,
7 correct?
8    A.    Yes.
9    Q.    Do you contend that assignments of
10 mortgages need to be recorded, or assignments
11 of notes?
12    MR. SIEBOTT:  Objection.
13 Foundation and compound.
14    Q.    You can answer.
15    A.    I don't know how to answer it.  Can
16 you --
17    Q.    Okay.  Let me ask you this; we
18 talked earlier that there are two separate
19 documents, a mortgage and a note, correct?
20    A.    Right.
21    Q.    And is it your position that
22 lenders should be assigning -- recording
23 assignments of mortgages or assignments of
24 notes?
25    A.    Mortgages.

Page 131

1    Q.    And do you know whether assignments
2 of mortgages that are registered on the loan
3 system exist in a physical form to be recorded?
4    A.    Would you restate that?
5    MR. YENOUSKAS:  Could you read it
6 back?
7    (Thereupon, the requested portion
8 of the transcript was read by the Court
9 Reporter.)
10    Q.    Well, I don't think he got it down
11 right.  Let me ask it again.
12    Do you know whether for a loan
13 that's registered on the MERS system, whether
14 there's an actual physical document called an
15 "assignment of mortgage" that's in existence
16 that could be recorded?
17    A.    Thank you.  I do not know.
18    Q.    Do you know whether Ohio Law
19 requires assignments of transfers in interest
20 of notes?
21    A.    I do not know.
22    Q.    You would agree with me that if
23 something doesn't exist, it can't be recorded,
24 correct?
25    A.    I would agree.

Page 132

1    Q.    Thank you.  Now, the lawsuit
2 alleges that Geauga County has been deprived of
3 recording fee revenue as a result of this lack
4 of assignments, correct?
5    A.    Yes.
6    Q.    What is your estimate of the amount
7 of revenue that's been deprived?
8    A.    I do not know.
9    Q.    Do you have a ballpark?
10    A.    I do not.
11    - - - - -
12    (Thereupon, Deposition Exhibit 32,
13    An Article From "Maple Leaf", was
14    marked for purposes of
15    identification.)
16    - - - - -
17    Q.    I'm handing you what's been marked
18 Exhibit Number 32.  Do you recognize this
19 document?
20    A.    I do.
21    Q.    What is this?
22    A.    An article from Maple Leaf.
23    Q.    And Maple Leaf is a Geauga County
24 newspaper?
25    A.    Yes.

Page 133

1    Q.    Dated Thursday, October 13, 2011?
2    A.    Yes.
3    Q.    And if you look around at the
4 bottom, the very last sentence states that
5 "Geauga County Recorder Sharon Gingerich said
6 the alleged unlawful effort has cost the county
7 more than $250,000 in missed mortgage filing
8 fees since 1997."
9    A.    Yes.
10    Q.    Did you make that statement to the
11 reporter?
12    A.    I did.
13    Q.    And what's your basis for that
14 statement?
15    A.    A figure given to me by Ms. Joyce.
16    Q.    Mr. Joyce came up with that number?
17    A.    Yes.
18    Q.    Do you know how he came up with
19 that number?
20    A.    I do not.
21    Q.    Could Mr. Joyce have developed the
22 number without somehow accessing your systems?
23    A.    I don't know.
24    Q.    Do you have any reason to believe
25 whether that number is accurate or not?

34 (Pages 130 - 133)

Page 134

1  A.  I don't know.
2  Q.  Have you done any analysis for how
3  much money the county has lost because of
4  non-recorded assignments?
5  A.  No.
6  Q.  You've not been asked to do that?
7  A.  No.
8  Q.  How would you do that if you were
9  asked?
10  A.  How could you -- how could I
11  determine what hasn't been recorded?  I
12  couldn't.
13  MR. CUNNINGHAM:  Joe, can I
14  interject?  You identified Exhibit 31 as
15  Exhibit 32.  I had 33 as -- did we miss one?
16  MR. YENOUSKAS:  Let's take a break.
17  (Thereupon, a recess was taken.)
18  MR. YENOUSKAS:  Back on the record
19  at 1:21.  Just to clear up some confusion about
20  exhibit numbers, the mortgage that was recorded
21  in Geauga County is Exhibit Number 31; is that
22  right?
23  MR. SIEBOTT:  That's correct.
24  MR. YENOUSKAS:  And Exhibit Number
25  32 is an article from the Maple Leaf?  That's

Page 135

1  Exhibit Number 32.  We have yet to get to
2  number 33.
3  MR. SIEBOTT:  So we also want to
4  put on the record that the intent is that this
5  deposition is for class certification purposes.
6  If there -- if anyone has merits-related
7  questions, you should probably wait to ask
8  them.  You'll have another opportunity if you
9  want to hold a deposition on the merits of Ms.
10  Gingerich at a later date.  And I hope that
11  that that's clear.
12  MR. BROCHIN:  In other words, if we
13  don't ask questions on the merits, that's
14  without prejudice for us to come back and
15  redepose her at a later date, if need be?
16  MR. SIEBOTT:  That's correct.  On
17  one condition, that if there is another
18  deposition, it be held in Geauga County rather
19  than Cleveland, rather that Cuyahoga County.
20  MR. YENOUSKAS:  Is that because of
21  the issue we talked about before?
22  MR. SIEBOTT:  No.  I think it's
23  just because for her to come here, she has to
24  take days off of work, and she doesn't go home
25  at night, and it's just a little -- so that

Page 136

1  would be the one thing.  Of course, that can
2  be -- I'm sure we can work that out.
3  MR. YENOUSKAS:  That's not a big
4  deal.  And the other thing I just would put on
5  the record is that this is the deposition of
6  the Office of this Geauga County Recorder.
7  It's not a 30(b)(6) deposition of the county.
8  So we all still retain the right to notice a
9  30(b)(6) deposition of Geauga County as well in
10  the case and get its testimony about the
11  matters in the lawsuit.
12  MR. SIEBOTT:  That's correct.  One
13  last thing, if everybody could -- I know we
14  talked about this.  But it would help me just
15  to have -- to put faces to names.  If everybody
16  could just introduce themselves and tell me who
17  they represent.
18  MR. BROCHIN:  I'm Bobby Brochin,
19  Morgan Lewis.  I represent the two MERS
20  entities; MERSCORP and Mortgage Electronic
21  Registration Systems.
22  MS. GHANNOUM:  Lisa Gannoum of
23  Baker & Hostetler, on behalf of KeyBank
24  National Association, Fifth Third Bank and the
25  Huntington National Bank.

Page 137

1  MR. WALL:  Brett Wall, Baker &
2  Hostetler, also representing Key, Fifth Third
3  and Huntington.
4  MR. CARPENTER:  Mike Carpenter,
5  Carpenter, Lipps & Leland.  I represent
6  Nationwide Advantage Mortgage Company.
7  MR. CUNNINGHAM:  Tom Cunningham,
8  from Locke Lord.  I represent GMAC Mortgage and
9  US Bank.
10  MR. ERNST:  Christopher Ernst, from
11  Bricker & Eckler, here in place of Nelson Reed,
12  representing Chase.
13  MS. YAKSIC:  Barbara Yaksic, from
14  McGlinchey Stafford, for CoreLogic, SunTrust,
15  Bank of America, Ever Home, et al.
16  MS. MUSIEK:  Candice Musiek, from
17  McGlinchey Stafford, and the same group of
18  defendants.
19  MR. WERTHEIM:  Jim Wertheim, the
20  same.
21  MR. DUHAMEL:  Marcel Duhamel.  I
22  have Corinthian.
23  MR. QUINLAN:  Michael Quinlan,
24  representing MGIC Investigator Services Corp.
25  MR. HICKS:  Todd Hicks, Thrasher,

35 (Pages 134 - 137)

Page 138

1  Dinsmore & Dolan. I represent Home Savings.
2       MR. WHOLEY: Matthew Wholey of
3  Ulmer & Berne. We represent HSB Bank USA.
4       MR. POSEY: Terry Posey, Thompson
5  Hine, for Wells Fargo Bank.
6       MS. KOESEL: Margaret Koesel,
7  Porter Wright, for Deutsche Bank National Trust
8  Company.
9       MR. ALLENSWORTH: Bruce
10 Allensworth, K&L Gates, Goldman Sachs Mortgage
11 Company, GS Mortgage Securities.
12      MR. POPE: David Pope, Mayer Brown,
13 for the Citi Defendants.
14      MR. SIEBOTT: I'm Christian
15 Siebott, Bernstein Leibhard. We represent
16 Geauga County.
17      MS. GOODMAN: Sara Goodman. The
18 same.
19      Q.   Okay. Let's keep going. Ms.
20 Gingerich, let me what you understand your
21 ability to be to reject a document for
22 filing -- for recording, excuse me, that's
23 presented to you?
24      A.   Standardization.
25      Q.   Could you explain that?

Page 139

1       A.   Three inches at the top, an inch
2  around the sides, things in the margin. In
3  other words, it has to be three inches at the
4  top, but nothing but stamps from the Auditor,
5  the Engineer, the Recorder. Same thing with
6  the margin. If there's not a legal fee -- a
7  legal description, and a legal is required, we
8  would reject it. There's -- illegibility. We
9  would reject it. It's clerical problems.
10 Clerical issues.
11      Q.   So it has to meet the requirements
12 of the code for what the document must consist
13 of and the appropriate fee?
14      A.   Correct.
15      Q.   Do you have any substantive ability
16 to review a document and reject it for a
17 substantive reason, if it's not a legal
18 document in some way?
19      A.   It has to be a document that we
20 have a category for.
21      Q.   Like a mortgage or an assignment?
22      A.   Yes.
23      Q.   What about if you had concerns
24 about the contents of the document?
25      A.   No.

Page 140

1       - - - - -
2       (Thereupon, Deposition Exhibit 33, A
3       Document Entitled "Chapter 317:
4       Recorder", was marked for purposes
5       of identification.)
6       - - - - -
7       Q.   I'm handing you what's been marked
8  Exhibit Number 33, Ms. Gingerich. Do you see
9  it's entitled "Chapter 317" of the Ohio Code?
10      A.   Yes.
11      Q.   And that's the other main chapter
12 that deals with your duties as a Recorder?
13      A.   Yes.
14      Q.   Turn to chapter -- excuse me --
15 Section 317.13. It's on page 12. Do you see
16 there it has the duties of Recorder in the
17 middle?
18      A.   Yes.
19      Q.   Take a look at Section B. Just
20 read that to yourself.
21      A.   Yes.
22      Q.   And it appears in this section that
23 you do have the ability to, quote, "refuse to
24 record an instrument if it's not required or
25 authorized by the code, or if you have a

Page 141

1  reasonable cause to believe the instrument is
2  materially false or fraudulent." Do you see
3  that?
4       A.   Yes, I do.
5       Q.   And so it appears you do have the
6  authority to reject certain documents that
7  might be false or fraudulent, correct?
8       A.   Yes.
9       Q.   What policies and procedures do you
10 have in place to assess whether a document is
11 materially false or fraudulent?
12      A.   If someone believes that for some
13 reason, they bring it to me, and I take it to
14 Mr. Joyce.
15      Q.   And when you say "someone", give me
16 an example of that?
17      A.   Jared, Celesta, Mike, Beth.
18      Q.   Has that happened before?
19      A.   No.
20      Q.   And what kinds on of things would
21 they look for to determine --
22      A.   I take that back. There is one
23 incident that has happened.
24      Q.   Tell me about that.
25      A.   It has -- it's Worsing.

36 (Pages 138 - 141)

Page 142

1    MR. SIEBOTT: It's an open fraud
2  investigation, so she can't really talk about
3  it. It's the Worsing documents I was talking
4  to you about earlier.
5    Q.  Let me ask a different question.
6  When you receive a document for recording, what
7  are the kinds of things you look at to make
8  sure that it's not materially false or
9  fraudulent?
10    A.  Well, if it's a mortgage,
11  everything in it should be about a mortgage.
12  This -- if it's something that's off-the-wall,
13  we take it to Dave.
14    Q.  Well, I guess how do your employees
15  know what is false or fraudulent?
16    A.  If it's really off-the-wall, and --
17  in other words, if somebody comes in and files
18  a document that says "I hereby renounce the
19  flag," and something that doesn't have to do
20  with a land record, then we would ask
21  Mr. Joyce.
22    Q.  Okay.  That would seem to fall into
23  a document that's not required or authorized by
24  the code.  But what if it's a document that is
25  authorized by the code, such as a mortgage or

Page 143

1  an assignment or a deed; is there a policy and
2  procedure in place to determine whether that
3  mortgage or --
4    A.  No.
5    Q.  -- let me finish -- deed or
6  assignment is false or fraudulent?  Go ahead.
7    A.  No.
8    Q.  Now, did either you or Mr. Joyce
9  hold any public meetings about this lawsuit
10  before the filing of the lawsuit to alert the
11  citizens of Geauga County that you were going
12  to be filing the lawsuit?
13    A.  No.
14    Q.  Did Mr. Joyce or you send any
15  surveys or questionnaires out to citizens of
16  Geauga County about their views of this lawsuit
17  before it was filed?
18    A.  No.
19    Q.  Would you agree that Mr. Joyce and
20  you should only be taking matters that are in
21  the public interest, correct?
22    A.  Yes.
23    Q.  And you wouldn't want to take a
24  matter that was not in the public interest and
25  that would hurt the public, would you?

Page 144

1    A.  No.
2    Q.  Let's just look at some of the
3  possible impacts of this lawsuit.  You would
4  agree with me that it would be not in the
5  interest of Geauga County residents if they had
6  to pay higher interest rates as a result of
7  this lawsuit?
8    A.  What is the -- I understand the
9  content, but what is your question?
10    Q.  Give me a "yes" or "no" answer.
11    A.  I'm not sure how "yes" or "no"
12  goes.
13    Q.  Okay.  Do you believe personally it
14  would be in the interest of the residents of
15  Geauga County if their interest rates went up
16  for --
17    A.  Do I believe it would be in the
18  best interest?
19    Q.  Yes.  In the public interest.
20    A.  No.
21    Q.  Your answer was what?
22    A.  No.
23    Q.  Now, if Geauga County prevails in
24  this case, you've requested that all mortgage
25  assignments in the past be recorded, correct?

Page 145

1    A.  Yes.
2    Q.  And you've requested that all
3  mortgage assignments in the future be recorded
4  as well?
5    A.  Yes.
6    Q.  And lenders will have to incur
7  costs to create and record those assignments,
8  correct?
9    A.  I don't know.
10    Q.  Will they have to pay a fee to your
11  county to record them?
12    A.  Yes.
13    Q.  Will they have to transmit them to
14  your office somehow?
15    A.  Yes.
16    Q.  Will an employee at those lenders
17  have to physically create those assignments?
18    A.  Yes.
19    Q.  Those are all costs, correct?
20    A.  Yes.
21    Q.  And if the lenders pass those costs
22  along to their borrowers, that will result in
23  higher interest rates; will it not?
24    A.  I don't know.  Interest rates?  I
25  don't know.

37 (Pages 142 - 145)

Page 146

1  Q.  Will you agree with me that if as a
2  result of that interest rates went up, that
3  would be adverse to the interest of your
4  citizens?
5  A.  I don't know.
6  Q.  You don't know?  Do you like paying
7  higher interest rates or lower interest rates?
8  A.  Lower, but --
9  Q.  Did Mr. Joyce discuss that
10  possibility with you when you had the initial
11  meeting about this lawsuit?
12  A.  No.
13  Q.  Did you and Mr. Joyce discuss that
14  with the Commissioners --
15  MR. SIEBOTT: Objection.  That's
16  privileged conversation.
17  MR. YENOUSKAS: What's the basis?
18  MR. SIEBOTT: Mr. Joyce represents
19  the county.  Any discussion they had is
20  privileged.
21  Q.  Do you agree that if as a result of
22  the remedy that you're seeking, the recording
23  of assignments, interest rates would go up in a
24  county, you agree that that's a decision that
25  each county needs to make on its own, whether

Page 147

1  it wants to visit that on its citizens?
2  A.  I don't know.
3  Q.  You don't know.  Would you like
4  another county increasing the interest rates of
5  Geauga County through its actions?
6  A.  No.
7  Q.  Now, you testified earlier that
8  currently you record each document to be
9  presented in essentially one day, 24 hours?
10  A.  Yes.
11  Q.  Would you agree with me that it
12  would be bad for the public interest if the
13  recording of documents would be delayed?
14  A.  Yes.
15  Q.  What would be the impact if you
16  prevailed in this lawsuit on the time frame in
17  which it would take you to record documents?
18  A.  One day.
19  Q.  What would happen if, for
20  example -- and just taking a hypothetical -- on
21  January 1, 2013 you were presented with -- and
22  I'm using a hypothetical -- 30,000 documents,
23  assignments that need to be recorded; how long
24  would it take you to record those documents?
25  A.  I don't know.

Page 148

1  Q.  Could you record them in one day?
2  A.  I don't know.
3  Q.  You don't know whether -- you think
4  you could record them in one day?
5  A.  We have had many come through.  I
6  have not counted, but assignments, and we have
7  done it in one day, yes.
8  Q.  It looked like from the statistics
9  you had done 13,000 in the entire year of 2010,
10  correct?
11  A.  Yes.
12  Q.  So this would be more than two
13  times the amount of assignments you did in a
14  year.  How could you record a similar amount in
15  one day?
16  A.  You know, I would have to see the
17  document.  I don't know.
18  Q.  I'm not asking -- you don't need to
19  see a document to answer the question.  You
20  know your office better than I do.  You're
21  averaging a few hundred a day, roughly,
22  correct?
23  A.  Because that's what's brought in.
24  Q.  Right.  How could your staff, your
25  limited staff, which several of the documents

Page 149

1  say you're strained to the bone in terms of
2  your staff, and everyone is working at
3  capacity, how could you record 30,000 documents
4  in one day?
5  MR. SIEBOTT: Objection.  She said
6  she doesn't know.  It's asked and answered.
7  Q.  That would be 1,000 an hour.
8  MR. SIEBOTT: Objection.
9  Argumentative.
10  Q.  Could your office record 1,000
11  documents in one hour?
12  A.  I would have to see the documents.
13  I don't know.
14  Q.  Do your employees work overtime?
15  A.  No.
16  Q.  So they would have to get these
17  30,000 documents reported in an
18  eight-and-a-half hour day?
19  A.  Yes.
20  Q.  Did you tell the -- did Mr. Joyce
21  tell you about the possibility that you might
22  have to record 30,000 assignments if you
23  prevailed in this lawsuit?
24  A.  No.
25  Q.  Any discussions with the

38 (Pages 146 - 149)

Page 150

1 Commissioners about that issue?
2   A.  No.
3   Q.  Do you agree with me that each
4 county would need to decide for itself whether
5 it wanted to have that remedy visited upon
6 them, and whether they had the capabilities to
7 handle it?
8   A.  Yes.
9   Q.  If these additional assignments had
10 to be recorded, you would have to pay two
11 dollars to ACS for each document, correct?
12   A.  Yes.
13   Q.  And that would be less money that
14 the county would have at its disposal, correct?
15   A.  Less money?
16   Q.  Yes.
17   A.  I'm not following your reasoning.
18   Q.  That's fine.
19       Ms. Gingerich, you stated you
20 believe it's in the public interest to have a
21 complete chain of title, correct?
22   A.  Yes.
23   Q.  As to each mortgage.  Is it in the
24 public interest if some lenders are required to
25 record assignments and others are not?

Page 151

1   A.  Is it in the public interest?  No.
2   Q.  And you know that you're only suing
3 a small number of lenders in this case,
4 correct?
5   A.  I guess it depends on your
6 definition of "small."
7   Q.  Approximately 30 lenders, correct?
8   A.  Okay.
9   Q.  And all the other lenders that
10 aren't sued would not have to record
11 assignments, correct?
12   A.  Yes.
13   Q.  Did you discuss that issue with
14 Mr. Joyce before filing the lawsuit?
15   A.  No.
16   Q.  Did you discuss it with the
17 Commissioners?
18   A.  No.
19   Q.  Now, would you agree with me, Ms.
20 Gingerich, that it would not be in the public
21 interest to do something that was an
22 unnecessary or useless act?
23   A.  Would I agree that it's not in the
24 best interest?  Yes.
25   Q.  I just want to explore that a

Page 152

1 little bit.  Let's say you have a borrower who
2 obtains a loan in 2008, and a mortgage is
3 placed and recorded in the Geauga County land
4 records.  Are you following me so far?
5   A.  Yes.
6   Q.  And that loan, that mortgage and
7 the loan associated with that mortgage is
8 assigned several times.
9   A.  Okay.
10   Q.  Those are not recorded.  And then
11 in 2010 the borrower refinances, and they get a
12 new loan with a new lender, and that mortgage
13 is recorded in the land records.  So now you
14 have a second mortgage replacing the first
15 mortgage.  Are you following me so far?
16   A.  Yes.
17   Q.  Could you tell me what the public
18 interest would be in recording the assignments
19 as to the first two transfers after a new
20 mortgage has been put in place?
21   A.  What the public interest would be?
22   Q.  How would that serve the public
23 interest?
24   A.  It would serve the land owner.
25   Q.  Explain to me how.

Page 153

1   A.  Well, if you wanted to trace his
2 chain of title to make sure the right person --
3 that he knows who held his mortgage.
4   Q.  Right.  But under my scenario he's
5 refied his mortgage with a new lender.  He's
6 left the old loan behind.  He's gotten a new
7 loan.  He knows who his new lender is.  Why
8 does he care about the prior loan?
9   A.  What if it wasn't done right?
10   Q.  In what way?
11   A.  It wasn't released.
12   Q.  Let's assume it was released, and
13 the release was filed by lender A.  Lender B
14 comes along and makes a new mortgage.  Why does
15 he care about the assignments of the first
16 loan?
17   A.  He may not have a clear title.
18   Q.  If his loan is released, how is his
19 title unclear?  He's no longer obligated on
20 that.
21   A.  I don't know.
22   Q.  You don't know?
23   A.  I don't know.
24   Q.  Let me ask you this question; who
25 has the obligation to record the assignment?

39 (Pages 150 - 153)

Page 154

1  Is it lender A, who's assigning the loan to
2  lender B, or is it lender B?
3      A.  It's the person assigning the loan.
4      Q.  The assignor.  Okay.  The person
5  making the assignments.  So lender A in our
6  hypothetical.
7          What would happen if lender A went
8  bankrupt, or gone out of business; how would
9  that assignment be executed?
10     A.  I don't know.
11     Q.  You have no idea?
12     A.  I don't know.
13     Q.  Have you discussed these kinds of
14 issues with the County Commissioners?
15     A.  No.
16     Q.  You agree with me that other
17 counties might conclude that not having
18 assignments in those circumstances weren't
19 necessary to create a clear title, correct?
20     A.  I don't know what other counties
21 would do.
22     Q.  Do you know if they all adhere to
23 your view about what's required?
24     A.  I do not.
25     Q.  Ms. Gingerich, we talked about

Page 155

1  earlier the provisions of the code that talk
2  about how a person with multiple mortgages
3  could assign them on a single instrument, by
4  means of a single instrument.  Do you remember
5  that testimony?
6      A.  Yes.
7      Q.  Your lawsuit seeks to mandate a
8  written document for each mortgage, correct?
9      A.  I'm not sure.
10     Q.  Do you agree with me though that
11 each county should be allowed to decide whether
12 it wants to allow the separate instruments or
13 use of a single instrument?
14     A.  Each county makes their own policy,
15 yes.
16     Q.  Ms. Gingerich, do you believe that
17 Geauga County benefited in any way by the
18 non-recording of assignments for loans
19 registered on the MERS system, or any other
20 loans?
21     A.  Benefited by the non-recording?
22 No.
23     Q.  If assignments had been recorded
24 all along, as you're contending is required in
25 your lawsuit, you would have had to have staff

Page 156

1  devoted to doing those tasks, correct?
2      A.  Yes.
3      Q.  You would have had to index those
4  documents?
5      A.  Yes.
6      Q.  Scan the documents?
7      A.  Yes.
8      Q.  Send them back to borrower, to the
9  grantors or the mortgagees, correct?
10     A.  Yes.
11     Q.  And those costs were saved by not
12 having those documents filed, correct?
13     A.  Yes.
14     Q.  Okay.  And that is going to vary
15 from county to county in terms of the amount of
16 the savings that may have occurred?
17     A.  Is that a question?
18     Q.  Yes.
19     A.  Yes
20     Q.  Okay.
21         - - - - -
22     (Thereupon, Deposition Exhibit 34, A
23 Document Bates Stamped GCR-1286, was
24 marked for purposes of
25 identification.)

Page 157

1          - - - - -
2      Q.  I'm handing you what's been marked
3  Defendants' Exhibit Number 34 by the court
4  reporter.  It is GCR-1286.
5          Could you identify this document
6  for me, Ms. Gingerich?
7      A.  It is a Mortgage Electronic
8  Registration Systems, dated January 2012.
9      Q.  And is this something you wrote?
10     A.  Yes.
11     Q.  And what was the purpose of writing
12 this?
13     A.  This might have been the Tea Party
14 one.
15     Q.  Okay.  Did you transmit this to
16 anyone outside the office?
17     A.  No.
18     Q.  You never did; it just went in your
19 file?
20     A.  It was going to go to the Tea
21 Party.
22     Q.  Was the meeting canceled for some
23 reason, or you just decided not to participate
24 in the meeting?
25     A.  I did not -- I decided not to hand

40 (Pages 154 - 157)

1  this out. The meeting was not canceled. I
2  think this was the one.
3      Q.   Now, in the middle of the page you
4  talk about the status of your lawsuit. You've
5  mentioned a lawsuit has been filed. And you
6  talk about a bill by Senator Corker?
7      A.   Yes.
8      Q.   Is that a bill that you are in
9  favor of?
10     A.   No.
11     Q.   Tell me why.
12     A.   Because it would create a single
13  national database and take it out of the
14  Recorder's Office.
15     Q.   And why are you against that?
16     A.   Because it should be local.
17  Because people can come in and access their
18  information, if I have it. And because it
19  shouldn't be a government function. It should
20  be local.
21     Q.   If members of the public could
22  access the national database through a website,
23  would you be okay with it then?
24     A.   You know, you would be putting out
25  the socials again if you did that kind of

1  thing. And would they be able to? If it's
2  MERS, it's not available to the public.
3      Q.   Let me ask you this; where does the
4  social come from?
5      A.   They used to write them in for some
6  reason, and the law has changed to not allow
7  that anymore.
8      Q.   So there are no socials?
9      A.   Correct.
10     Q.   So that wouldn't be a problem?
11     A.   Right.
12     Q.   So I'm just trying to get at what
13  you don't like about the bill.
14     A.   Are you asking me --
15     Q.   Sorry.
16     A.   I'm sorry. I was waiting for you
17  to ask another question.
18     Q.   I thought you were thinking. I
19  would like to get at what specific problem you
20  have with the bill then, if socials aren't
21  involved?
22     A.   I just think the county government,
23  the County Recorder can keep better records
24  than a government. And we keep better track.
25     Q.   That's your personal opinion?

1      A.   That is my opinion.
2      Q.   At the bottom of this memo, you say
3  that "MERS is responsible for inability to
4  trace chain of title." Can you explain that
5  sentence?
6      A.   You cannot go back and find out who
7  owns your mortgage, because -- if it's in MERS.
8      Q.   Well, MERS is listed as the
9  mortgagee on the mortgage. We saw that on one
10  of the exhibits, correct? So we know who the
11  mortgagee is?
12          MR. SIEBOTT: Objection.
13  Argumentative.
14     Q.   Do you mean the owner of the loan?
15     A.   The mortgage, yes.
16     Q.   The loan. Okay. Because we talked
17  about the note and the mortgage. So you're
18  talking about who the lender is?
19     A.   Yes. They cannot find out who owns
20  it.
21     Q.   But you're not aware of the Federal
22  Truth in Lending Law that allows borrowers to
23  write to the lender and ask them that
24  information? You're not aware of that,
25  correct?

1          MR. SIEBOTT: Objection. Asked and
2  answered.
3      Q.   You established you weren't aware
4  of that. Okay.
5          You state that "often times
6  assignments are lost." What is the basis for
7  that statement?
8      A.   One of the other sources that I
9  took this from. One of the other papers.
10     Q.   Do you remember which one?
11     A.   I think it was the OAITA.
12     Q.   Mr. Holman?
13     A.   Yes.
14     Q.   So something he wrote led you to
15  write that sentence?
16     A.   Yes.
17     Q.   Are you aware of any specific
18  examples in Geauga County of assignments being
19  lost from mortgages?
20     A.   No.
21     Q.   You're not? I'm sorry?
22     A.   No.
23     Q.   You state that "The information
24  contained in the registry is wrong." What's
25  the basis for that statement?

1    A.   Same.

2    Q.   Mr. Holman?

3    A.   Yes.

4    Q.   And you state that "The person
5  assigning the mortgage has no tangible
6  relationship to MERS or to a participating
7  financial institution, i.e., Robo-signer." Is
8  it, again, Mr. Holman is your source for that?

9    A.   No. It's mortgages that have --
10  have on record that they were owned by one
11  bank, and then another bank releases them.

12    Q.   Okay. And tell me how you came to
13  understand that the person assigning it has no
14  tangible relationship to MERS or the
15  participating financial institution?

16    A.   Because MERS would sign it, or
17  someone else would sign it who wasn't the last
18  person to own it.

19    Q.   And tell me how you know that.

20    A.   Because I've seen it in records.

21    Q.   Which records?

22    A.   In my office.

23    Q.   You have?

24    A.   I saw one. I saw one. Well, no.
25  I take that back. It was on one of the

1  production of documents I saw.

2    Q.   By one of the lenders, or
3  something?

4    A.   Yes.

5    Q.   So you're not aware of any
6  instances in Geauga County?

7    A.   Personally, I'm not aware.

8    - - - - -

9        (Thereupon, Deposition Exhibit 35, A
10       Document Bates Stamped GCR-001294,
11       was marked for purposes of
12       identification.)

13    - - - - -

14    Q.   Exhibit Number 35 has been handed
15  to you, Ms. Gingerich. It's Bates numbered
16  GCR-1294. Could you identify this document?

17    A.   This is the one that went out to
18  the Tea Party.

19    Q.   Okay. So this was sent out. How
20  do you know that this one was sent out?

21    A.   Sorry. Because of the form --

22    Q.   Okay.

23    A.   -- on the letter.

24    Q.   Fair enough. And roughly what time
25  period are we talking about?

1    A.   March.

2    Q.   March of this year?

3    A.   Yes.

4    Q.   And the second bullet point from
5  the bottom -- we've talked about some of the
6  other stuff -- you say; "MERS is a system that
7  has created chaos with the court system and the
8  real estate industry." Can you tell me the
9  basis for that statement?

10    A.   Because of foreclosures that have
11  had to be postponed, or whatever, because they
12  couldn't trace the chain of title. They
13  couldn't find the proper person to release the
14  mortgage.

15    Q.   And do you have any specific
16  examples of that?

17    A.   No.

18    Q.   Now, Ms. Gingerich, after the
19  lawsuit was filed, there were efforts made by
20  Mr. Joyce and by yourself to try to alert the
21  other counties to the filing of the lawsuit,
22  and alert the other prosecutors, and to invite
23  their participation in the lawsuit?

24    A.   Yes.

25    Q.   Tell me about those efforts.

1    A.   I told the Recorders that it had
2  been filed, and that they should talk to their
3  prosecutors.

4    Q.   So you alerted them to the lawsuit?

5    A.   Yes.

6    Q.   How did you do that?

7    A.   At a meeting.

8    Q.   And where was that?

9    A.   Columbus.

10    Q.   So the lawsuit was filed in
11  October. Do you recall roughly when after
12  October it would have been?

13    A.   November.

14    Q.   November. Is this one of your
15  three annual meetings?

16    A.   Yes.

17    Q.   And you told them to talk to their
18  prosecutors?

19    A.   Yes.

20    Q.   Did you give them a copy of the
21  complaint at that time?

22    A.   No.

23    Q.   Were you asked any questions at
24  that meeting about the lawsuit?

25    A.   No.

42 (Pages 162 - 165)

1    Q.  Nothing at all?

2    A.  No.

3    Q.  People just said "thank you"?

4    A.  It was part of an update.

5    Q.  And after that meeting in November,

6  did you have any other communications with

7  counties about the lawsuit?

8    A.  Yes.

9    Q.  Tell me about those.

10    A.  People would ask how it's going, or

11  what was going on.  And most of the time I said

12  "I don't know".

13    Q.  Did any of the other counties

14  express their views about the lawsuit to you?

15    A.  About the lawsuit, no.

16    Q.  Did any prosecutors express their

17  views to Mr. Joyce who told you about those

18  views?

19    A.  I don't know.

20    Q.  You don't recall him saying I

21  talked to a certain prosecutor, and he said

22  "X"?

23    A.  He -- no.

24    Q.  Did Mr. Joyce have any meetings

25  with prosecutors about the lawsuit?

1    A.  Yeah.  Well, I don't know about

2  meetings.  But, yes.

3    Q.  Okay.  How did he interact with

4  other prosecutors about the case?

5    A.  I think he spoke at their

6  conference, or something.

7    Q.  That would have been in January?

8    A.  I don't know when that was.

9    Q.  What did he say to you after the

10  conference?

11    A.  He didn't say anything.

12    Q.  You didn't ask him how it went?

13    A.  No.

14    Q.  Okay.  Do you have any interest in

15  the views of other counties about the lawsuit?

16    A.  Yeah.

17    Q.  But you didn't ask him about that?

18    A.  I did not ask.

19    Q.  Has the Ohio Recorders Association

20  endorsed the lawsuit?

21    A.  No.  Not that I know of.

22        - - - - -

23        (Thereupon, Deposition Exhibit 36, A

24        Document Bates Stamped ORA 00147

25        Through ORA 00150, was marked for

1        purposes of identification.)

2        - - - - -

3    Q.  I'm handing you Exhibit Number 36,

4  Ms. Gingerich.  I'm handing you a document that

5  has been marked Exhibit Number 36, and it's

6  Bates number ORA 147 to 150.  Do you see that

7  document?

8    A.  Yes.

9    Q.  Are these what the minutes look

10  like of the legislative meetings of the ORA?

11    A.  Yes.

12    Q.  They're typed up afterwards?

13    A.  Yes.

14    Q.  And they record what happened.  Bad

15  use of words.  They capture afterwards what

16  happened at the meeting?

17    A.  Yes.

18    Q.  Turn over to the second page.

19  There's sort of an entry about "Geauga County

20  Class Action Suit."  Just read that to

21  yourself.

22        Now, who is Tony Brigano?

23    A.  He works for Hicks Partners.

24    Q.  And that's a lobbying firm?

25    A.  Yes.

1    Q.  So he was providing an update,

2  sounds like, to the ORA about the lawsuit?

3    A.  Yes.

4    Q.  Why would the lobbying firm be

5  providing the update; do you know?

6    A.  I don't know.

7    Q.  Do you work with Hicks Partners?

8    A.  No.

9    Q.  Not at all.  They work directly

10  with the ORA?

11    A.  Yes.

12    Q.  And who is Wayne?  Is that Wayne

13  Coates, C-O-A-T-E-S, if you look at the first

14  page?

15    A.  Yeah.  Wayne Coates.  Wait --

16    Q.  It says Wayne -- "Wayne believes

17  the Attorney General" --

18    A.  It must be Wayne Coates.

19    Q.  "The Attorney General should take

20  the lead on this as far as what the next step

21  is."  Have you had any discussions with the

22  Attorney General's Office about this case?

23    A.  No.

24    Q.  Has Mr. Joyce?

25    A.  I don't know.

43 (Pages 166 - 169)

Page 170

```
1     Q.   Has anyone?
2     A.   I don't know.
3     Q.   Have you discussed Mr. Wayne's
4  concern about involving the Attorney General
5  with him -- excuse me -- Mr. Coates' concern?
6     A.   No.
7     Q.   Do you share his view that the
8  Attorney General should take the lead on this?
9     A.   No.
10     Q.   Why not?
11     A.   Because Dave is.
12     Q.   Anything other than that?
13     A.   No.
14     Q.   Now, it next says; "Sandy asked
15  Barb to send a letter to the AG inquiring as to
16  how they will handle this."  Is "Sandy" Sandy
17  Barber?
18     A.   That's a good guess, yeah.  Must
19  be.  It must be.
20     Q.   Is she a Recorder?
21     A.   Yes.
22     Q.   Is Barb Sessler a Recorder as well?
23     A.   Yes.  She was the president that
24  year, I think.  No, she wasn't.  I'm sorry.
25     Q.   Do you know if Barb ever sent a
```

Page 171

```
1  letter to the AG?
2     A.   I do not know.
3     Q.   Have you ever discussed this with
4  Sandy or Barb?
5     A.   No, I have not.
6     Q.   It next says that "Geauga County
7  was told by their prosecutor not to talk about
8  this."  Do you see that?
9     A.   Yes.
10     Q.   Why did Mr. Joyce tell you not to
11  talk about it?
12     A.   It's pending legislation.
13     Q.   You mean litigation?
14     A.   Litigation.
15     Q.   And when did he tell you not to
16  talk about it?
17     A.   You know, I don't remember.  It had
18  to be between now and last fall.
19     Q.   And how did that conversation come
20  up?
21     A.   You know, I don't remember.
22     Q.   You wrote something to the Tea
23  Party about the litigation, correct?
24     A.   Yes.
25     Q.   And I think we'll see you sent some
```

Page 172

```
1  other e-mails about it as well.  So it appears
2  that you weren't following his guidance there?
3     MR. SIEBOTT:  Objection.
4  Argumentative.
5     Q.   I'm just asking a question.  Were
6  you following his guidance when you were
7  talking about MERS?
8     A.   Apparently not.
9     Q.   And since it's a matter involving
10  the public land records, and you're an elected
11  official, what harm could be done by talking
12  about it in the public, correct?
13     A.   I don't know.
14     Q.   I agree.
15
16     (Thereupon, Deposition Exhibit 37,
17     An Article From the Cleveland
18     Business Website, Dated October 24,
19     2011, was marked for purposes of
20     identification.)
21          - - - - -
22     Q.   I'm handing you what's been marked
23  Exhibit 37, which is a printout of an article
24  from the Cleveland Business website, dated
25  October 24, 2011.  And this is about five days
```

Page 173

```
1  after that meeting we were just talking about.
2     If you look down towards the bottom
3  there, the paragraph beginning "Mr. Joyce",
4  that's the one I'm going to ask you about.
5  "Mr. Joyce said he has begun talking to other
6  county prosecutors in Northeast Ohio, and he
7  hopes the rest of the 88 counties will join in
8  litigation."  Do you see that?
9     A.   Yes.
10     Q.   So did you know that he was in that
11  process at that time, of talking -- in October,
12  of talking to other counties?
13     A.   I don't remember.
14     Q.   And have any of the other 88
15  counties joined the lawsuit?
16     A.   Not yet, that I know of.  Not
17  officially.
18     Q.   Have you spoken to any prosecutors
19  of any other counties as to why they have not
20  joined?
21     A.   No.
22     Q.   Have you spoken to any or
23  communicated with any Recorders about why their
24  prosecutors have not joined?
25     A.   I've asked them if they have, but
```

44 (Pages 170 - 173)

Page 174

1  that's it.
2    Q.  You don't know the reasons?
3    A.  No.
4       - - - - -
5       (Thereupon, Deposition Exhibit 38, A
6       Document Bates Stamped ORA 00656
7       Through ORA 00662, was marked for
8       purposes of identification.)
9       - - - - -
10   Q.  I'm handing you what's been marked
11  Exhibit Number 38, which is Bates numbered ORA
12  656 to ORA 662.  And does this appear to be the
13  minutes from a meeting December 14, 2011 of the
14  Legislative Committee of the ORA?
15   A.  Yes.
16   Q.  Now, if you go over to page 660, at
17  the bottom there's a part that talks about
18  MERS.  Do you see that at the very bottom
19  there?
20   A.  Yes.
21   Q.  And then it goes onto the top of
22  661.  Have you had a chance to read that
23  paragraph?
24   A.  Yes.
25   Q.  Now, it starts off by someone named

Page 175

1  Judy Nedwick.  Is she a Recorder?
2    A.  Yes.
3    Q.  She's on the committee?
4    A.  Yes.
5    Q.  She recommended that your committee
6  change your next meeting to coincide with the
7  prosecutors meeting that was going to take
8  place in January, and suggested you could send
9  two or three committee members to that meeting.
10  And did that, in fact, happen?
11   A.  No.
12   Q.  Why is that?
13   A.  I don't know, because they didn't
14  tell me about this until afterwards.
15   Q.  When you say "tell me about this",
16  meaning what?
17   A.  The meeting.  They didn't tell me
18  they were going to do this.
19   Q.  You weren't at this meeting?
20   A.  No.
21   Q.  And it does say "excused".  On the
22  front page it lists you as having been
23  "excused".
24       But you do know as a fact that
25  nobody went to that meeting on the 19th?

Page 176

1    A.  I do know that.
2    Q.  It says "Danny".  Is that Danny
3  Crank?
4    A.  Yes.
5    Q.  Which county is he with?
6    A.  Butler.
7    Q.  It says "he's not comfortable
8  taking a stand against MERS without the backing
9  of the prosecutors."  Do you see that?
10   A.  Yes.
11   Q.  Have you discussed that view with
12  him?
13   A.  No.
14   Q.  Not at all?
15   A.  No.
16   Q.  Have you discussed the lawsuit with
17  Danny Crank at all?
18   A.  No.  Other than to say that it was,
19  that it was.  That it was created.
20   Q.  You've not discussed his reluctance
21  expressed here with him?
22   A.  No.
23   Q.  How soon after the meeting do you
24  get the minutes?
25   A.  It depends.  It depends on when

Page 177

1  they --
2    Q.  A couple weeks?
3    A.  Yeah.
4    Q.  When you read that, did you -- why
5  didn't you call up Danny to discuss it with
6  him?
7    A.  Why would I?  I mean, I've --
8  that's his opinion.
9    Q.  And he's his own Recorder; he can
10  do what he sees fit?
11   A.  Yeah.
12   Q.  It says; "Sharon Gingerich would
13  like to see Zach fight the issue federally."
14   A.  That did not happen.  I never made
15  that statement.
16   Q.  Okay.  Any idea how this got into
17  the minutes?
18   A.  I have no idea.
19   Q.  And who's Zach?  He works for Hicks
20  Partners?
21   A.  Yes.
22   Q.  He is the main lobbyist?
23   A.  Yes.
24   Q.  And you never made the statement
25  you would like to see them fight the issue

45 (Pages 174 - 177)

Page 178

1  federally?
2      A.  That is correct.
3      Q.  Who wrote the minutes?  Whose job
4  is that?
5      A.  I don't know.  Who signed it?
6  Joyce Gifford.
7      Q.  What did you do when you read that
8  sentence?
9      A.  At the next meeting I called, and I
10  said in the meeting I never said that.  I want
11  it out of there.
12      Q.  And did you get any explanation for
13  how it got in there?
14      A.  They just said it was said.
15      Q.  It next states that "Robin", and I
16  assume that's Robin Edwards?  Do you know Robin
17  Edwards?
18      A.  Yes.
19      Q.  "Questions whether this should be
20  an Attorney General issue rather than a class
21  action suit."  Have you discussed her concern
22  with Robin?
23      A.  No.
24      Q.  For the same reasons you didn't
25  discuss them with Danny?

Page 179

1      A.  Yes.
2          - - - - -
3          (Thereupon, Deposition Exhibit 39, A
4          Document Bates Stamped ORA 00921
5          Through ORA 00923, was marked for
6          purposes of identification.)
7          - - - - -
8      Q.  I'm handing you what's been marked
9  Exhibit Number 39.  It's Bates number ORA 921
10  to 923.
11          Now, Ms. Gingerich, this purports
12  to be minutes of the same meeting of December
13  14, 2011.  Now you're listed as "present", if
14  you look at the first page, not as "excused".
15  And the MERS discussion is gone.  Do you see
16  that?
17      A.  I've never seen this before.
18      Q.  So you were not present at the
19  meeting?
20      A.  December 14th, no.
21      Q.  Any idea why the MERS discussion
22  has been deleted?
23      A.  This must have been January.  This
24  must be labeled wrong.
25      Q.  Okay.

Page 180

1      A.  Sure.  Because at the end it says
2  "next meeting February."  It's got to be
3  January.
4      Q.  So you think it's mislabeled at the
5  top?
6      A.  Yeah.
7      Q.  Okay.  Got it.  Thank you.  But
8  you're sure you weren't at the December
9  meeting?
10      A.  I'm sure.
11      Q.  Even though they said you were.
12      A.  When did they say I was?
13      Q.  In the first document, it said you
14  were -- you had said that Zach should fight it
15  federally.  But you never made that statement?
16      A.  No.  They said that I -- no.  I was
17  excused.  It didn't say I was at the meeting.
18      Q.  It said you were excused?
19      A.  Right.
20          - - - - -
21          (Thereupon, Deposition Exhibit 40, A
22          Document Bates Stamped ORA 00792,
23          was marked for purposes of
24          identification.)
25          - - - - -

Page 181

1      Q.  Ms. Gingerich, I'm handing you a
2  document that the reporter has marked Exhibit
3  40.  It's ORA 792.  Do you know Mona Losh of
4  Allen County?
5      A.  Yes.
6      Q.  She's a Recorder?
7      A.  Yes.
8      Q.  And she sent a message to Rick and
9  Lisa Campbell.  Who's Rick Campbell?
10      A.  He's the president.
11      Q.  And she asked her "whether the
12  Executive Committee has an opinion yet on
13  whether my prosecutor should join the MERS
14  lawsuit."  Do you see that?
15      A.  Yes.
16      Q.  And there's an Executive Committee
17  of the ORA?
18      A.  Yes.
19      Q.  Have they ever issued an opinion as
20  to whether individual counties should join the
21  lawsuit?
22      A.  Not that I know of.
23      Q.  And Mona says, "FYI, he", meaning
24  her prosecutor, "doesn't believe the ruling
25  will be in our favor."  Do you see that?

46 (Pages 178 - 181)

Page 182

1    A.  Yes.
2    Q.  Have you discussed that position
3  with Mona Losh?
4    A.  I never saw this before.
5    Q.  Does that concern you, that one of
6  the prosecutors believes the ruling will not be
7  in your favor?
8    A.  No.
9    Q.  And as of today, Allen County has
10  not joined your lawsuit, correct?
11    A.  As far as I know.
12    Q.  Any conversations with Mona about
13  the lawsuit?
14    A.  No.
15            - - - - -
16        (Thereupon, Deposition Exhibit 41, A
17        Document Bates Stamped ORA 00115,
18        was marked for purposes of
19        identification.)
20            - - - - -
21    Q.  I'm handing you what's been marked
22  as Exhibit Number 41.  It's marked ORA 115.
23  Again, it's from Mona Losh, Allen County
24  Recorder.  And she says, "Our prosecutor has
25  been asked to join the MERS class action

Page 183

1  lawsuit."  Had she ever discussed that with
2  you --
3    A.  No.
4    Q.  -- the request to join?  And she
5  also says; "My prosecutor wanted me to ask you
6  what position the ORA is taking on the issue."
7  Do you see that?
8    A.  Yes.
9    Q.  And the ORA it sounds like has not
10  taken a position on the lawsuit as of right
11  now?
12    A.  As far as I know, yes.
13    Q.  Have you asked the ORA to take a
14  position in favor of the lawsuit?
15    A.  No.
16    Q.  Why not?
17    A.  It just didn't dawn on me to do it,
18  to ask them.
19            - - - - -
20        (Thereupon, Deposition Exhibit 42, A
21        Document Bates Stamped ORA 00979 and
22        ORA 00965, was marked for purposes
23        of identification.)
24            - - - - -
25    Q.  I'm handing you what's been marked

Page 184

1  Exhibit Number 42, Ms. Gingerich.  It's Bates
2  numbered ORA 979 and 965.  Do you know Denise
3  Goll in the Butler County Recorder's Office?
4    A.  Yes.
5    Q.  You met her before?
6    A.  Yes.
7    Q.  And do you know who Roger Gates is?
8    A.  No.
9    Q.  She says in the first paragraph;
10  "It's my understanding that county prosecutors
11  are contacting their Recorder to discuss this
12  matter."  Do you see that?
13    A.  Yes.
14    Q.  Did any of the counties call you or
15  contact you after their prosecutors contacted
16  them?
17    A.  No.
18    Q.  None at all?
19    A.  None at all.
20    Q.  So they're making their own
21  decisions independently?
22    A.  Yes.
23            - - - - -
24        (Thereupon, Deposition Exhibit 43, A
25        Document Bates Stamped ORA 00100

Page 185

1        Through ORA 00104, was marked for
2        purposes of identification.)
3            - - - - -
4    Q.  I'm handing you what's been marked
5  Exhibit 43.  It's ORA 100 to 104.  Ms.
6  Gingerich, these appear to be minutes of the
7  ORA Executive Committee meeting on December
8  14th.  Do you see that?
9    A.  Yes.
10    Q.  If you turn over to page 3 at the
11  bottom, it says -- it talks about how "the
12  Legislative Committee will be meeting again on
13  January 19th in conjunction with a meeting
14  scheduled with the Prosecuting Attorneys
15  Association."  Do you see that, the first
16  sentence of the last paragraph?
17    A.  Page 4?
18        (Thereupon, a recess was taken.)
19        MR. YENOUSKAS:  Back on the record.
20    Q.  Okay.  We were talking about
21  Exhibit Number 43, Ms. Gingerich, and
22  specifically page 3.  Do you see that paragraph
23  about --
24    A.  Yes.
25    Q.  -- some MERS issues, and your

47 (Pages 182 - 185)

Page 186

1  lawsuit. It says there, it talks about "Danny"
2  again. I assume that's Danny Crank?
3    A.  Yes.
4    Q.  It says; "Danny wanted to make sure
5  the Prosecuting Attorneys Association
6  understood this suit was not being driven by
7  the Recorders Association." Do you know why
8  Danny had that concern?
9    A.  No.
10   Q.  Have you discussed that concern
11 with him?
12   A.  No.
13   Q.  It sounds as if he's reluctant to
14 have the Recorders Association endorse the
15 lawsuit, correct?
16   A.  I don't know what his motivation
17 was.
18   Q.  It was just different than yours in
19 some respects? Different than your motivation,
20 and you're in favor of the lawsuit? You joined
21 the lawsuit?
22   A.  He doesn't -- he just says he
23 doesn't want the association to drive it.
24   Q.  And why would the Association of
25 the County Recorders not be driving a lawsuit

Page 187

1  that might possibly benefit the Recorders?
2    A.  I don't know.
3    Q.  You don't know? You have no idea?
4    A.  Because it's an association.
5    Q.  Well, aren't they there to advance
6  the interest of the members?
7    A.  They're to educate, and do a list
8  of other things, yes.
9    Q.  But through legislation try to
10 advance the interests, right?
11   A.  I don't know.
12   Q.  You don't know.  Okay.
13     - - - - -
14     (Thereupon, Deposition Exhibit 44, A
15     Document Bates Stamped GCO-000003
16     Through GCO-000005, was marked for
17     purposes of identification.)
18     - - - - -
19   Q.  I'm handing you what's been marked
20 Exhibit Number 44. It's Bates labeled GCO-3
21 through GCO-5. Do you see this is a memorandum
22 from Mr. Jones to Ohio county prosecuting
23 attorneys about the case?
24   A.  Joyce.
25   Q.  Or Mr. Joyce?

Page 188

1    A.  Yes.
2    Q.  Did you see a draft of this memo
3  before it went out?
4    A.  No.
5    Q.  Did he tell you he was going to be
6  sending the memo before it went out?
7    A.  No.
8    Q.  Have you seen it since January 6th
9  and before today?
10   A.  No.
11   Q.  So you don't know whether any of
12 the statements in the memo are accurate or not?
13   A.  No. I don't know.
14     - - - - -
15     (Thereupon, Deposition Exhibit 45, A
16     Document Bates Stamped ORA 01062
17     Through ORA 01063, was marked for
18     purposes of identification.)
19     - - - - -
20   Q.  I'm handing you what's been marked
21 Exhibit 45. It's ORA 1062 to ORA 1063. This
22 is the ORA Executive Committee meeting minutes
23 for January 6, 2012. At the very bottom there,
24 the second -- it's really the last, or second
25 to last paragraph. It says; "The Legislative

Page 189

1  Committee Chair or his rep will meet with the
2  Ohio Prosecuting Attorneys Association on
3  January 19th concerning the MERS suit." And
4  this was just 13 days before that meeting.
5  You're still sure that you never went to that
6  meeting?
7    A.  I'm sure.
8    Q.  Was there an affirmative reason why
9  the Legislative Committee decided not to go?
10   A.  I don't remember. It was -- I just
11 don't remember.
12   Q.  You're on the Legislative Committee
13 though?
14   A.  Yes. But I don't remember. It
15 had -- I don't think they met that day. I
16 don't think the prosecutors met that day, or
17 something like that.
18   Q.  You're just not really sure?
19   A.  I'm not really sure.
20   Q.  You know that the Legislative
21 Committee did not meet with the prosecutors
22 though?
23   A.  I'm positive they did not meet.
24   Q.  Okay. Have they met with them
25 since January 19, 2012?

48 (Pages 186 - 189)

1    A.   Not that they told me about.

2    Q.   But you're on the committee; you

3  would know?

4    A.   No.  The committee has not, no.

5        - - - - -

6        (Thereupon, Deposition Exhibit 46, A

7        Document Bates Stamped HP00132, was

8        marked for purposes of

9        identification.)

10       - - - - -

11   Q.   I'm handing you what's been marked

12  Defendants' Exhibit 46, Ms. Gingerich.  It's

13  Bates stamped HP00132, and it's an e-mail

14  exchange between Tammy Barger -- do you know

15  Tammy?

16   A.   Yes.

17   Q.   And Zach Holzapfel?  Do you know

18  Zach?

19   A.   Yes.

20   Q.   And it has to do with the lawsuit.

21  And Tammy writes to Zach in February of this

22  year, that -- this is at the bottom -- her

23  prosecutor received a letter asking her if

24  Mercer wants to be included in the class

25  action.  "I had given her the copy of the

1   information that we received in one of our

2   meetings.  She called me to ask if I wanted her

3   to pursue it.  I said I would get with you to

4   see what others had done and if you thought it

5   would be a good idea."  And Zach writes back;

6   "We're still trying to wrap our head around the

7   direction to go.  I've asked for a meeting with

8   the Prosecutors Association.  I believe we need

9   to work in consultation, and the determination

10  to add a respective county to the suit is and

11  should be determined by the county elected

12  officials."  Do you see that?

13   A.   Yes.

14   Q.   And do you agree with that

15  statement, with Zach's statement?

16   A.   Yes.

17   Q.   Who is Pat Perotti?

18   A.   A Lake County attorney.

19   Q.   And what involvement has he had

20  with these issues?

21   A.   In --

22   Q.   These MERS issues, and the lawsuit

23  issues.

24   A.   I don't know.

25   Q.   No involvement that you're aware

1   of?

2    A.   I believe now -- with our lawsuit,

3   no.

4    Q.   What about before your lawsuit?

5    A.   I think he wanted to, but I don't

6   know what the details were.  I did hear his

7   name.

8    Q.   Did he ever call you to discuss the

9   case?

10   A.   No.

11   Q.   He never communicated directly with

12  you?

13   A.   No.

14   Q.   How did you hear about this;

15  through other Recorders?

16   A.   I think so.  I think Frank talked

17  about it.

18   Q.   Frank?

19   A.   Suponcic.  From Lake County.

20   Q.   Spoke to you about that?

21   A.   Yes.

22   Q.   And what do you remember about

23  those conversations?

24   A.   Just that he wanted to be involved,

25  and basically that was it.  And I don't know

1   how, what extent.

2        - - - - -

3        (Thereupon, Deposition Exhibit 47, A

4        Document Bates Stamped HP00184, was

5        marked for purposes of

6        identification.)

7        - - - - -

8    Q.   I'm handing you what's been marked

9   Defendants' Exhibit 47.  It's Bates marked

10  HP00184.

11   A.   Yes.

12   Q.   Does this help you remember

13  Mr. Perotti?

14   A.   Yes.

15   Q.   Tell me what this helps you

16  remember.

17   A.   Yes.  Yes.  Okay.  I think he

18  wanted to start his own lawsuit against MERS.

19  If I remember right, yes.

20   Q.   So you got some message from

21  Mr. Joyce, it sounds like, that you've copied

22  here.  You said "this is from my prosecutor",

23  and you put in quotes.

24   A.   Yeah.

25   Q.   Okay.  And what did you do in

49 (Pages 190 - 193)

Page 194

1  response to Mr. Joyce's e-mail?
2      A.    What e-mail?
3      Q.    Well, he sent you what you have
4  quoted there, right, in quotation marks? He
5  sent you some message?
6      A.    I sent this to Barb.
7      Q.    Right. And in what capacity, just
8  as another Recorder?
9      A.    Yeah.
10      Q.    And did you take any other actions?
11      A.    No.
12      Q.    Did you discuss this further with
13  Barb?
14      A.    Not that I recall.
15      Q.    What did you do to try to keep
16  your -- Mr. Joyce says; "Please keep your
17  Recorders together with us." What did you do
18  to try to keep the Recorders together with you?
19      A.    You know, I really didn't talk to
20  anybody. I just gave the presentation at the
21  conference that said we were, you know, we had
22  filed the lawsuit.
23          - - - - -
24          (Thereupon, Deposition Exhibit 48, A
25          Document Bates Stamped GCR-001306

Page 195

1          Through GCR-001307, was marked for
2          purposes of identification.)
3          - - - - -
4      Q.    Ms. Gingerich, I'm handing you
5  what's been marked Exhibit 48. It's GCR-1306
6  to 1307. Have you seen this document before?
7      A.    Yes.
8      Q.    And did you draft this document?
9      A.    Yes.
10      Q.    Is this the presentation you gave
11  to the County Recorders?
12      A.    Yes.
13      Q.    So I did it backwards. This is
14  back from October?
15      A.    Yes. Or November.
16      Q.    Now, it says there in the middle
17  you talked to your staff, and you did some
18  preliminary research. Do you remember what the
19  preliminary research you did was?
20      A.    We just -- we did some things
21  for -- looked at some records.
22      Q.    What was that? What did that
23  involve?
24      A.    It was for whatever we were asked
25  to do.

Page 196

1      Q.    You don't recall what it was?
2      A.    Well, we were asked to do some
3  research on mortgages. We were asked by our
4  prosecutor.
5      Q.    I'm just trying to get a sense of
6  what specifically you looked at.
7      A.    I did not do research. The staff
8  did.
9      Q.    And do you know what those topics
10  were?
11          MR. SIEBOTT: Objection. That's
12  trial preparation.
13      Q.    Who on your staff did the research?
14      A.    Jared.
15      Q.    Now, on the second page you talk
16  about how you've met with OAITA, which you
17  mentioned earlier, the Ohio Association of
18  Independent Title Agents, and you talk about an
19  Amicus brief that had been filed in a similar
20  case in October. And you said; "I have a copy
21  of it, and I will send it to you individually
22  and not over ListServe." Why did you not want
23  to send a brief over ListServe?
24      A.    ListServe does not take
25  attachments.

Page 197

1      Q.    I see. So to send it to someone it
2  had to go direct e-mail?
3      A.    Yes.
4      Q.    It says that "Robert Holman said
5  there are local and national organizations 100
6  percent in support of our suit." How are they
7  supporting your suit?
8      A.    Just by saying they're in support
9  of our suit.
10      Q.    Do you know if he's contributed
11  financially to the suit?
12      A.    Not that I know of. I mean --
13      Q.    Have you had meetings with him
14  about these issues?
15      A.    I did meet with him, yes.
16      Q.    When was that?
17      A.    You know, I don't remember when it
18  was. I think it was before the first of the
19  year.
20      Q.    And where was that meeting?
21      A.    In my office.
22      Q.    Tell me about that meeting.
23      A.    I told him we could not discuss
24  MERS, but he talked about some other issues
25  that they had been lobbying in Congress that

50 (Pages 194 - 197)

Page 198

1  were similar. And I didn't follow a lot of
2  what he was saying, but --
3      Q.   Other than that meeting, has he
4  supported the lawsuit in any other way, other
5  than saying he's in favor of it?
6      A.   I think they wrote a white paper.
7      Q.   And then you talk about how "my
8  prosecutor, Mr. Joyce, will be speaking about
9  MERS to all of your prosecutors at their annual
10 meeting on November 30th. He has copied your
11 PAs. If you're interesting in doing something
12 about MERS, please talk to your prosecutors
13 before the 30th."
14      Do you know to what extent other
15 Recorders had talked to their prosecutors
16 before that meeting?
17      A.   I do not know.
18      - - - -
19      (Thereupon, Deposition Exhibit 49, A
20      Document Bates Stamped GCR-001518
21      Through GCR-001520, was marked for
22      purposes of identification.)
23      - - - -
24      Q.   Exhibit 49. Ms. Gingerich, I'm
25 handing you a document marked Exhibit 49. It's

Page 199

1  Bates labeled GCR-1518 to 1520. This looks
2  like an e-mail you wrote to Elizabeth Goodwin?
3      A.   Yes.
4      Q.   Who is Elizabeth Goodwin?
5      A.   She works for the Attorney General.
6      Q.   Why did you send this e-mail?
7      A.   Because I met her at a function,
8  and I wanted to make sure she knew about the
9  lawsuit.
10      Q.   And you said the first paragraph,
11 that exact thing; "I want to make sure the AG's
12 office has heard about our class action
13 lawsuit, and hopefully to know that he is
14 behind this effort." Do you see that?
15      A.   Yes.
16      Q.   Did you ever get a response from
17 Ms. Goodwin?
18      A.   I did not.
19      Q.   And has the Attorney General joined
20 your lawsuit?
21      A.   No.
22      - - - -
23      (Thereupon, Deposition Exhibit 50, A
24      Document Bates Stamped GCR-001910,
25      was marked for purposes of

Page 200

1      identification.)
2      - - - -
3      Q.   Exhibit 50. I'm handing you what's
4  been marked Exhibit 50, Bates labeled GCR-1910.
5  Have you had a chance to look that over?
6      A.   Yes.
7      Q.   And who is Barb Sessler again?
8      A.   She is a Recorder.
9      Q.   And she's saying that she's
10 informing the members about the lawsuit,
11 correct?
12      A.   Yes.
13      Q.   And she said; "A copy will soon be
14 available under the ORA member section." She
15 also says; "Due to the sensitive nature of this
16 action, it is vital that we do not," bold and
17 capital, "discuss this on the ListServe."
18      Did you ask Barb to include that
19 direction to people?
20      A.   I said I didn't think it would be
21 wise to put on it the ListServe, no.
22      Q.   And why is that?
23      A.   Because it's just not -- it's
24 pending litigation.
25      Q.   Any other reason?

Page 201

1      A.   No.
2      - - - -
3      (Thereupon, Deposition Exhibit 51, A
4      Document Bates Stamped GCR-003077,
5      was marked for purposes of
6      identification.)
7      - - - -
8      Q.   I'm handing you what's been marked
9  Exhibit 51. It's GCR-3077. Have you seen this
10 document before?
11      A.   Yes.
12      Q.   Did you draft this?
13      A.   Yes.
14      Q.   And when did you draft this?
15      A.   I don't remember. It's since
16 October 13th.
17      Q.   And who did you send this to?
18      A.   Zach Holzapfel.
19      Q.   And why did you send it to Zach?
20      A.   Because he asked me to.
21      Q.   Do you know what Zach did with this
22 document after you sent it to him?
23      A.   I do not.
24      Q.   In the last paragraph you talk
25 about various folks that have been apprised of

51 (Pages 198 - 201)

Page 202

1  the pending legislation. This is this Corker
2  legislation. And about the lawsuit. And you
3  say -- at the very last sentence you say; "The
4  Ohio Revised Code in relation to mortgage
5  recording should be strengthened by
6  legislation." What did you mean by that?
7      A.  Well, I thought that since it was
8  being circumvented, or because it wasn't
9  being -- because assignments weren't being
10  recorded, it should be.
11     Q.  Should be made more clear?
12     A.  No. I don't know. It's just --
13  something should have been done so that you
14  wouldn't do that.
15     Q.  How would the code be strengthened,
16  in your opinion?
17     A.  I don't know.
18     Q.  You're on the Legislative
19  Committee, right?
20     A.  Yes.
21     Q.  And Zach is the lobbyist?
22     A.  Yes.
23     Q.  So I assume you're saying this to
24  him for purpose of advancing your interests and
25  ORA's interests in Ohio?

Page 203

1      A.  No. For the clarity -- for the
2  purpose of clarity of title.
3      Q.  Right. But he's hired to try to
4  enact legislative changes on behalf of your
5  county and other counties, correct?
6      A.  Correct.
7      Q.  So when you told him, when you told
8  Zach that the Ohio Revised Code in relation to
9  mortgage recording should be strengthened, how
10  did you want it strengthened?
11     A.  So that this isn't done anymore.
12  So that assignments are recorded.
13     Q.  Do you have any specific changes
14  that you proposed to him?
15     A.  No.
16     Q.  Did Mr. Joyce propose any to him?
17     A.  Not that I know of.
18     Q.  Have you discussed this issue with
19  Mr. Joyce at all?
20     A.  No.
21     Q.  Other members of the committee?
22     A.  No.
23          - - - - -
24     (Thereupon, Deposition Exhibit 52, A
25     Document Bates Stamped GCR-001877

Page 204

1     Through GCR-001878, was marked for
2     purposes of identification.)
3          - - - - -
4      Q.  I'm handing you what's been marked
5  Exhibit 52. It's GCR-1817 -- excuse me. It's
6  GCR-1877 to 1878. Have you had a chance to
7  look this over?
8      A.  Yes.
9      Q.  What is this document?
10     A.  This is notes to myself.
11     Q.  Okay. And roughly when would you
12  have made these notes?
13     A.  You know, between now and last
14  October.
15     Q.  And is this for purposes of giving
16  a presentation again?
17     A.  It had to be after November 15th.
18  I'm sorry. A presentation -- I probably took
19  some things out of here for presentation, yes.
20     Q.  So is the purpose just to gather
21  all your thoughts on this specific issue in one
22  place?
23     A.  Yes. Yes.
24     Q.  Turning over to the second page,
25  you talk about legislation, 6-A. You say "what

Page 205

1  would our legislation be?" And you say, "is
2  our current code strong enough to address what
3  MERS has been doing? Can we create something
4  to enforce/strengthen the code?" Do you see
5  that?
6      A.  Yes.
7      Q.  Did you discuss that concern with
8  anyone?
9      A.  No.
10          - - - - -
11     (Thereupon, Deposition Exhibit 53, A
12     Document Bates Stamped GCR-002411
13     Through GCR-002417, was marked for
14     purposes of identification.)
15          - - - - -
16     Q.  I'm handing you what's been marked
17  Exhibit 53. It's Bates labeled GCR 2411 to
18  2417.
19     MR. YENOUSKAS:  Why don't we take a
20  break for five minutes. I'm just about done,
21  and if I can check my notes, I'm just about
22  done.
23     (Thereupon, a recess was taken.)
24     MR. YENOUSKAS:  Back on the record.
25     Q.  Ms. Gingerich, we talked about

52 (Pages 202 - 205)

Page 206

1    Defendants' Exhibit 53. What is that document?
2        A. This was one that's notes that I
3    pulled for the Tea Party.
4        Q. I'm sorry?
5        A. This was notes to myself for the
6    Tea Party that I pulled from here.
7        Q. Okay. Did you give this speech?
8        A. No. I drew from this.
9        Q. On page 2413 you've got some
10   statements about MERS there in bullet points?
11       A. Yes.
12       Q. "Robo-signing is a product of MERS.
13   MERS has no penalty to its members for the
14   inaccurate entry of mortgage assignment
15   information." Where did you get that
16   information from?
17       A. OAITA paperwork.
18       Q. So it's all from Mr. Holman?
19       A. Yes. And, again, it was too wordy,
20   so I didn't use it.
21       Q. Page 2414, you say in one of the
22   bullet points there, the second to last bullet
23   point; "MERS has jeopardized the sanctity of
24   the mortgage foreclosure process and inserted
25   uncertainty in the mortgage finance process."

Page 207

1            Can you tell me what the basis is
2    for that statement?
3        A. Because you don't have clear chain
4    of title.
5        Q. How has MERS jeopardized the
6    sanctity of the mortgage foreclosure process?
7        A. Because some mortgages can't be
8    foreclosed on, because they can't find out who
9    owns it.
10       Q. And what's your expertise in that
11   area?
12       A. I don't have any expertise.
13       Q. And what do you know about the
14   mortgage finance process?
15       A. You buy a house and you mortgage
16   it. You borrow money, you mortgage it.
17       Q. How do you know that MERS has
18   created uncertainty in the mortgage finance
19   process?
20       A. Because you can't trace the chain
21   of title.
22       Q. And how do you know that's created
23   uncertainty? Do you know any lenders that have
24   refused to make loans because of MERS?
25       A. No.

Page 208

1        Q. And do you know of any title
2    insurance companies that have refused to insure
3    MERS loans?
4        A. I do not know of any, no.
5        Q. And do you know of any borrowers
6    that have refused to accept funds from a lender
7    because MERS is listed as the mortgagee?
8        A. I do not know.
9        Q. So you have no specific basis for
10   your statements, do you?
11       A. No.
12          - - - - -
13          (Thereupon, Deposition Exhibit 54, A
14          Document Bates Stamped GCR-003107
15          Through GCR-003108, and GCR-003049
16          Through GCR-003053, was marked for
17          purposes of identification.)
18          - - - - -
19       Q. I'm handing you what's been marked
20   Exhibit 54, Ms. Gingerich. It's Bates labeled
21   GCR-3107 to 3108, and 3049 to 3053.
22          What is this document?
23       A. This is a letter to Dave from
24   OAITA.
25       Q. Dave Joyce?

Page 209

1        A. Dave Joyce.
2        Q. Okay. And this was in your files.
3    Did Mr. Joyce give you a copy of this?
4        A. Yes.
5        Q. And I assume you had this before
6    your meeting with Mr. Holman?
7        A. Yes.
8        Q. And is this his white paper that's
9    attached about MERS?
10       A. No.
11       Q. What is the attachment?
12       A. It's the National Association of
13   Independent --
14       Q. And is he associated with that
15   group as well?
16       A. I'm not sure.
17       Q. If you look at his letter, it sort
18   of appears to refer to them interchangeably.
19   OAITA and NAILTA. You don't know?
20       A. No. I don't know.
21       Q. Now, Ms. Gingerich, you know a
22   lawsuit was filed by Brown County, Ohio about
23   this issue?
24       A. I do.
25       Q. Who is the prosecutor of Brown

53 (Pages 206 - 209)

Page 210

```
1   County?
2       A.  I do not know.
3       Q.  Do you know who the Recorder is?
4       A.  Not without my book, no.
5       Q.  Is it Ms. Little?
6       A.  I don't know.
7       Q.  It's -- that's the prosecutor.
8   Sorry.  What did you do when you became aware
9   that Brown County filed a lawsuit on the same
10  issue?
11      A.  Nothing.
12      Q.  Have you -- nothing?  You didn't
13  reach out to the Brown County prosecutor to
14  discuss it?
15      A.  No.  No.
16      Q.  Would you rather have them be part
17  of your suit than filing a competing suit?
18      A.  I -- I don't know.  I mean, it's
19  not up to me.
20      Q.  And you have made no attempt to
21  talk to them about these issues at all?
22      A.  No.  No.
23
24          (Thereupon, Deposition Exhibit 55, A
25          Document Bates Stamped GCR-001521
```

Page 211

```
1           Through GCR-001522, GCR-001524,
2           GCR-001508 Through GCR-001520, and
3           GCR-001479, GCR-001467, GCR-001449
4           and GCR-001450, was marked for
5           purposes of identification.)
6           - - - - -
7       Q.  I'm handing you what's been marked
8   as Exhibit Number 55.  It's Bates numbered
9   GCR-1521 through 1522, and then 1524, 1508,
10  through 1520, and then 1479, 1467, 1449 and
11  1450.  A group exhibit.  The first two pages
12  are an e-mail from Mr. Holman to Christopher
13  Peterson at, looks like a law school in Utah.
14  And he talks about your lawsuit in Ohio, and
15  stating he had met with you.  And he says, "I
16  was wondering if it might be possible to
17  arrange a teleconference meeting between Ms.
18  Gingerich and the Geauga County prosecutor,
19  David Joyce."  Do you see that at the bottom?
20      A.  I do.
21      Q.  And did that teleconference ever
22  take place?
23      A.  It did not.
24      Q.  Did you ever have any meetings with
25  Mr. Peterson?
```

Page 212

```
1       A.  No.
2       Q.  Any e-mail exchanges with him?
3       A.  No.
4       Q.  Has Mr. Joyce?
5       A.  I don't know.
6       MR. YENOUSKAS:  I have nothing
7   further.  Pass the witness.
8           EXAMINATION OF SHARON GINGERICH
9   BY MR. BROCHIN:
10      Q.  Good afternoon, Ms. Gingerich.  My
11  name is Bobby Brochin.  I represent two of the
12  defendants.  One is MERSCORP Holdings, Inc.,
13  which I'll refer to as "MERSCORP", and the
14  other one is Mortgage Electronic Registration
15  Systems, Inc., which we'll refer to as "MERS".
16  Those are two defendants that have been named
17  in the lawsuit.  And I want to -- before I ask
18  you some questions to follow-up on what
19  Mr. Yenouskas asked you, I just wanted to get
20  some understanding of some of the terms that
21  you were using.
22          Now, you talked about in your
23  testimony a note, or a promissory note.  Do you
24  know what a promissory note is?
25      A.  Just a note signed that says you
```

Page 213

```
1   owe money.
2       Q.  And then you talked about a
3   mortgage.  Do you know what a mortgage is?
4       A.  It's that you owe money.
5       Q.  Do you understand a mortgage to be
6   a different instrument than a note?
7       A.  Yes.
8       Q.  Do you understand a mortgage to be,
9   and have a different purpose than a note?
10      A.  No.
11      Q.  Do you understand that a note and a
12  mortgage are the same purpose?
13      A.  Yes.
14      Q.  Do you understand a mortgage and a
15  note as a document that's used interchangeably?
16      A.  Is it?  I don't know.
17      Q.  Do you understand what the word
18  "mortgagee" means?
19      A.  Yes.
20      Q.  What does the word "mortgagee"
21  mean?
22      A.  The person who is giving the money.
23      Q.  And do you understand that there
24  are entities or persons who can have liens on
25  properties in Geauga County?
```

54 (Pages 210 - 213)

Page 214

1    A.   Yes.
2    Q.   And what would you refer to those
3  persons or entities as?  I'll ask it -- if one
4  has a lien on property, what would you refer to
5  that person or entity as?
6    A.   I can't tell you at the moment.
7    Q.   You don't know?
8    A.   It's escaping me.  I don't
9  remember.
10   Q.   I'm sorry?
11   A.   I'm trying to remember.  I can't.
12   Q.   So if MERS is listed as the
13  mortgagee on a mortgage, it would be your
14  understanding that one owes money to MERS;
15  someone owes money to MERS?
16   A.   Yes.
17   Q.   And if MERS is on a promissory
18  note, you would then understand that somebody
19  owes money to MERS?
20   A.   If they were the one receiving the
21  money, yeah.
22   Q.   Well, if --
23   A.   If they were the one --
24   Q.   If MERS was the name on the note,
25  would that mean that the money would be owed to

Page 215

1  MERS if they were named on the promissory note?
2    A.   If it said that they were owed
3  money.
4    Q.   And so when you refer to owning the
5  mortgage, remember you talked a little bit
6  about owning the mortgage, what was that
7  referring to?  If one owns the mortgage, what
8  does one own when they own the mortgage?
9    A.   They're the one that's supposed to
10  be paid.
11   Q.   And back to my follow-up question
12  then.  Where would the entity be listed that
13  had a lien on the property?  I'm going to ask
14  it differently.
15       Is the person who has the lien on
16  the property the same person who is owed the
17  money?
18   A.   Not necessarily.
19   Q.   They can be different?
20   A.   Yes.
21   Q.   You can owe money to one person,
22  yet another entity or person can have a lien on
23  the property?
24   A.   Correct.
25   Q.   What is the document that

Page 216

1  establishes the person that has the lien on the
2  property?
3    A.   The lien.
4    Q.   Now, you mentioned in your office,
5  I believe, that you have categories of
6  documents that are subjected to recording.  Do
7  you recall that?
8    A.   Yes.
9    Q.   And do you have a list somewhere of
10  those categories that are subject to recording?
11   A.   Yes.
12   Q.   And where is that list?
13   A.   On my website.
14   Q.   So if I go to your website there
15  would be a complete list of all the categories
16  for documents for which you accept for
17  recording?
18   A.   Correct.
19   Q.   And is "mortgages" one of those
20  categories?
21   A.   Yes.
22   Q.   And when one records a mortgage,
23  what do you list as the mortgagee?  Who do you
24  list as the mortgagee?  The entity on the
25  mortgage?

Page 217

1    A.   Yes.
2    Q.   So the mortgage that Mr. Yenouskas
3  showed you --
4        MR. BROCHIN:  Perhaps, Christian,
5  if you don't mind placing it in front of the
6  witness.
7        MR. YENOUSKAS:  31.  Something like
8  that.
9    Q.   That's Exhibit Number 31 in front
10  of you.  That's the MERS mortgage, if you will,
11  that Mr. Yenouskas asked you some questions
12  about.  If that's brought to your office for
13  recording, who does your office list as the
14  mortgagee?
15   A.   The person borrowing the money
16  would be Jill Kennedy.
17   Q.   My question though is when that
18  mortgage is proffered for recording, and you
19  record it in your office, who does your office
20  list as the mortgagee?
21   A.   The person receiving the money.
22  Jill Kennedy.  I'm sorry.  Wait a minute.  I
23  see what you're saying.  MERS would be the
24  lender.  Jill would be the borrower.  So she's,
25  so, yeah.  She would be the mortgagee, I think.

55 (Pages 214 - 217)

Page 218

1  Yeah.
2       Q.   So just so I'm clear on my
3  question, and therefore clear on your answer,
4  when that Exhibit 31 is brought to your office
5  for recording, and your office records it, who
6  in that example would your office list on the
7  public records as the mortgagee?
8       A.   I think it would be Jill.
9       Q.   Jill?
10      A.   Kennedy.
11      Q.   Now, you read, I believe, the fact
12  that that document says that MERS is the
13  mortgagee?
14      A.   Okay.  Then it would be MERS.
15      Q.   Well, that's what the document
16  says.  I just want to know what your office
17  lists --
18      A.   I would need to see -- I'm sorry.
19  But I would need to see that screen in front of
20  it, and they would be in the number 1 position,
21  and the borrower would be the number 2.
22      Q.   Now, you also used the phrase
23  "chain of title."  Do you remember that phrase?
24      A.   Yes.
25      Q.   Now, were you referring to title in

Page 219

1  the property when you used the term "chain of
2  title"?
3       A.   Title in who owns the property.
4  Who owns the mortgage.
5       Q.   Is there a difference as to who
6  owns the mortgage as compared to who owns the
7  property?
8       A.   There shouldn't be.
9       Q.   So in your mind the owner of the
10  mortgage should be the owner of the property?
11      A.   Oh, no.  No.  The owner of the
12  mortgage is the one loaning the money to the
13  person who owns the property.
14      Q.   But you did say to me that the
15  person who has the mortgage or the lien could
16  be a person different than the person who
17  owns -- who is owed the money, correct?
18      A.   Right.
19      Q.   So when you're talking about "chain
20  of title", you're not talking about who owns
21  the property, correct?
22      A.   No.  I'm talking about who owns the
23  mortgage.
24      Q.   So when you complain that MERS has
25  clouded the chain of title, you're not

Page 220

1  complaining about the chain of title as to who
2  owns the property?
3       A.   No.
4       Q.   So you don't believe that MERS has
5  caused any confusion on who owns chain of title
6  to the property?
7       A.   Well, no.  No.
8       Q.   Your complaint is that MERS causes
9  confusion to who causes -- causes confusion on
10  the chain of who owns the mortgage?
11      A.   Yes.
12      Q.   And who owns the mortgage is
13  usually referred to as the "mortgagee"?
14      A.   Okay.
15      Q.   Do you agree with that?
16      A.   Okay.
17      Q.   I'm asking; do you agree with that?
18      A.   Yes.
19      Q.   You do.  So the person who owns the
20  mortgage is called the "mortgagee"?  That's a
21  question.
22      A.   I don't know.
23      Q.   So as a County Recorder, you're
24  telling me you don't know --
25      A.   Yes.

Page 221

1       Q.   -- whether the owner of the
2  mortgage is the mortgagee?
3       A.   Is the mortgagee, yes.
4       Q.   Yes, you don't know, or yes, it is?
5       A.   Yes, it is.
6       Q.   So the owner of the mortgage is the
7  mortgagee, right?
8       A.   Yeah.
9       Q.   And on Exhibit 31 it says MERS is
10  the mortgagee; is that right?
11      A.   Yes.
12      Q.   So if a mortgage is recorded in
13  your records that clearly states in bold that
14  MERS is the mortgagee, where is it that there
15  is confusion on that chain of title?
16      A.   Because it may have been assigned
17  after this document.
18      Q.   The mortgage?
19      A.   And we wouldn't know, yes.
20      Q.   The mortgage.  The mortgage may
21  have been assigned, and you didn't know?
22  That's --
23      A.   Correct.
24      Q.   -- the confusion?  But if the
25  mortgage then wasn't assigned, there would be

56 (Pages 218 - 221)

Page 222

1  no confusion?
2      A.   Correct.
3      Q.   And do you have any information to
4  suggest that any of the MERS mortgages were
5  assigned and not recorded?
6      A.   I don't know.
7      Q.   Pardon me?
8      A.   I don't know if they were not
9  recorded.
10     Q.   Do you have any reason to believe
11 that a MERS mortgage was assigned and not
12 recorded?
13     A.   Yes.
14     Q.   I'm sorry?
15     A.   Yes.
16     Q.   And what basis do you have to
17 believe that?
18     A.   Because people can't trace the
19 chain, or find out who owns their mortgage,
20 because it's not recorded in my office.
21     Q.   I think we're speaking about double
22 negatives.  The question I'm asking is; is
23 there any information or facts, do you know,
24 that when that mortgage was recorded on your
25 county records that somebody assigned that

Page 223

1  mortgage, which would be MERS, right?  They're
2  the mortgagee, so they would assign the
3  mortgage, right?
4      A.   Right.
5      Q.   Do you have any information or
6  basis to suggest that MERS assigned a mortgage
7  that they recorded and didn't record that
8  assignment?
9      A.   No.
10     Q.   Do you have any instances that you
11 can point to where that occurred?
12     A.   Do I?
13     Q.   Yes.
14     A.   No.
15     Q.   Now, you mentioned you had been the
16 County Recorder, an elected position, since
17 2009?
18     A.   Yes.
19     Q.   Is that a four-year term?
20     A.   Yes.
21     Q.   So are you up for reelection?
22     A.   Yes.
23     Q.   Are you running for reelection?
24     A.   Yes.
25     Q.   Do you have opposition?

Page 224

1      A.   Yes.
2      Q.   Are the elections for your position
3  partisan elections?
4      A.   Yes.
5      Q.   So what party are you?
6      A.   Republican.
7      Q.   Are you already the nominee of the
8  Republican party for the election?
9      A.   Yes.
10     Q.   Is there a Democratic nominee?
11     A.   Yes.
12     Q.   And who is he or her?
13     A.   Joanne Wertz Reilly.
14     Q.   And I take it that's an election in
15 November?
16     A.   Yes.
17     Q.   And is there anyone else that's
18 filed and qualified to be on the ballot, other
19 than the Democratic nominee and yourself?
20     A.   No.
21     Q.   Now, back to the questions I was
22 asking you about the category.  You said
23 there's a category for mortgages for recording.
24 Is there a category for mortgage assignments?
25     A.   There's an assignment category,

Page 225

1  yes.
2      Q.   Is that a category generally for
3  assignments, and then has various types of
4  assignments under them?
5      A.   I have to look at my documents.
6  But I'm pretty sure.
7      Q.   You're pretty sure it does have
8  specific categories?
9      A.   Yes, it does.
10     Q.   Are you also pretty sure that one
11 of those categories would be "mortgage
12 assignments"?
13     A.   Yes.
14     Q.   Now, is there a category for notes,
15 or promissory notes?
16     A.   No.
17     Q.   In your three, four years as the
18 County Recorder, has anyone proffered to the
19 county a promissory note to be recorded?
20     A.   I do not know.
21     Q.   If someone was to proffer to your
22 office a note to be recorded, given that it's
23 not in a category, what would you or somebody
24 at your office do in response to somebody
25 proffering a document like a note, which is not

57 (Pages 222 - 225)

Page 226

1  part of your -- one of your categories?
2     A.   If there's no category for it, they
3  would tell them it needs to have a category.
4     Q.   So if someone brings to you -- can
5  I take it from that then that if someone
6  brought to your office a note to record, and
7  you've said there's no category, they would be
8  pulled, and they cannot record that document?
9     A.   As -- as prepared, yes.  Yes.
10    Q.   As a note?
11    A.   Yes.
12    Q.   So is it then fair to say that your
13 office does not accept for recording promissory
14 notes?
15    A.   I have to look at the list for
16 promissory -- I would have to look at our list.
17 I don't think so.
18    Q.   Well, let's assume, as you've
19 already testified, that that's not a category.
20    A.   Okay.
21    Q.   And if that's true, then it would
22 then be true, right, that your office would not
23 accept promissory notes for recording?
24    A.   If there's no category, correct.
25    Q.   And if there's no category for

Page 227

1  promissory notes, it would then stand to reason
2  that notes are not recorded in Geauga County's
3  records?
4     A.   Right.
5     Q.   And I think you've said, as you sit
6  here today, three-and-a-half years into being
7  the County Recorder, you don't know of any
8  promissory note that's been ever recorded on
9  the Geauga County records?
10    A.   I do not know of any.
11    Q.   You don't know of any, not one?
12    A.   Because I haven't been through all
13 the records.
14    Q.   Now, do you understand that the
15 lawsuit you've brought, or the county has
16 brought, seeks in some part the requirement to
17 record promissory notes?
18    A.   Okay.
19    Q.   That's a question; do you
20 understand that?
21    A.   Yes.
22    MR. SIEBOTT:  Objection.
23 Foundation.
24    Q.   I'm just asking if you understand
25 that's what your lawsuit asks for?

Page 228

1     A.   Yes.
2     Q.   You do understand that?
3     A.   Yes.
4     Q.   And do you as the County Recorder
5  know of any law in Ohio that would mandate the
6  recording of promissory notes?
7     A.   I do not know.
8     Q.   And as the County Recorder, do you
9  know of any law that would mandate the
10 recording of mortgages?
11    A.   Yes.
12    Q.   You do?
13    A.   Yes.
14    Q.   And what law is that?
15    A.   It's in the code.  I don't know
16 exactly.  But mortgages must be recorded.
17    Q.   So as the County Recorder, it's
18 your view that every mortgage entered into
19 between parties must be recorded?
20    A.   Yes.
21    Q.   And you believe the basis for that
22 is in Ohio Law somewhere, correct?
23    A.   Yes.
24    Q.   In the code itself?
25    A.   Yes.

Page 229

1     Q.   And do you believe that the code
2  requires the recording of mortgage assignments?
3     A.   Yes.
4     Q.   And do you believe that the Ohio
5  Law mandates that?
6     A.   Yes.
7     Q.   And you think that's in the county
8  code?
9     A.   And I think that's where?
10    Q.   In the code, the Ohio Law?
11    A.   Yes.
12    Q.   Now, what is your understanding
13 then if Ohio Law requires recording of
14 mortgages and requires the recording of
15 mortgage assignments?  What would be your
16 understanding as to the consequence to a party
17 who fails to comply with Ohio Law and record a
18 mortgage or mortgage assignment?
19    A.   I don't know.
20    Q.   So as the County Recorder, you
21 believe it's the duty of everyone to record --
22 everyone in Ohio to record mortgages and
23 mortgage assignments, but yet you don't know
24 what the --
25    MR. SIEBOTT:  Asked and answered.

58 (Pages 226 - 229)

Page 230

1    Q.   You don't know what the consequence
2  is if one fails to do so?
3         MR. SIEBOTT:  Objection.  Asked and
4  answered.
5    A.   It's been asked and answered.
6    Q.   Yes.  Could you answer it, please?
7  I just want to make sure I'm clear, that you as
8  the County Recorder, believe that it's
9  mandatory in Ohio to record mortgages and
10 assignments, but yet you as the County Recorder
11 don't know the consequence if one fails to
12 record a mortgage or mortgage assignment?
13   A.   The consequence is a clouded title.
14   Q.   So the consequence of one failing
15 to record a mortgage or mortgage assignment is
16 a cloud on the title to the mortgage?
17   A.   Right.
18   Q.   Is there any other consequence,
19 that you're aware of, to anybody failing to
20 meet what you believe Ohio Law requires, and
21 that is recording mortgages or mortgage
22 assignments?
23   A.   I don't know.
24   Q.   You don't know of any?
25   A.   Not of any.

Page 231

1    Q.   Now, in the lawsuit, what is it
2  that you believe the Defendants did wrong?
3    A.   Didn't properly follow the Ohio
4  Revised Code.
5    Q.   And didn't properly follow Ohio
6  Code in doing what?
7    A.   Recording assignments.
8    Q.   Would that also include mortgages
9  themselves?
10   A.   I don't know what you didn't
11 record.
12   Q.   I'm not asking that.  I'm asking
13 what the lawsuit claims the Defendants did
14 wrong.  I believe you said they didn't record
15 mortgage assignments?
16   A.   Right.
17   Q.   Do you believe what the Defendants
18 did wrong according to the lawsuit is they also
19 didn't record mortgages?
20   A.   I don't know.
21   Q.   You don't know whether the lawsuit
22 makes that claim against the Defendants or not?
23   A.   I would have to look at -- I
24 don't -- I don't remember what's in the lawsuit
25 specifically.  Sorry.

Page 232

1    Q.   And just to be clear, I know
2  Mr. Yenouskas asked you a lot of questions
3  about the complaint, and if he asked you this,
4  I apologize.  But did you read the complaint
5  before it was filed?
6    A.   No.
7    Q.   So it was filed and then you read
8  it?
9    A.   Yes.
10   Q.   I assume you've read the complaint?
11   A.   Yes.
12   Q.   But they filed it, and before they
13 filed it, you never read a version that was
14 going to be filed?
15   A.   That's correct.
16   Q.   Now, Mr. Yenouskas also asked you
17 about the County Recorder's authority under
18 Ohio Law to accept documents for recording.  Do
19 you remember those questions?
20   A.   Yes.
21   Q.   And I was not clear; but do you
22 believe, other than for form of the mortgage or
23 mortgage assignment, the County Recorder, you
24 as the County Recorder, has the authority to
25 reject documents for recording, if they're --

Page 233

1    A.   Yes.
2    Q.   -- false --
3    A.   Yes.
4    Q.   -- materially or fraudulent?
5         And is your staff trained to review
6  documents each and every time to determine if
7  there's something false in the documents?
8    A.   They do not.
9    Q.   They do not review them for that
10 purpose?
11   A.   They do not review them for that
12 purpose.
13   Q.   So how would you then, as the
14 County Recorder, go about making a
15 determination as to whether a document
16 proffered for recording was false, such that it
17 shouldn't be recorded?
18   A.   It would have to be blatant.  It
19 would have to be something we knew, and then we
20 wouldn't -- we wouldn't -- we wouldn't reject
21 it.  We would show it to Mr. Joyce and say is
22 this -- do you think this is fraudulent, or
23 should we accept this?
24   Q.   I'm just trying to understand what
25 policy you have at your office that gets you to

59 (Pages 230 - 233)

Page 234

1  a point where you would then take it to
2  Mr. Joyce.
3      A.   There is no policy.
4      Q.   And I think if I heard it
5  correctly, you only know of one incident in the
6  four years you've been a County Recorder where
7  you've actually taken any document proffered
8  for recording to Mr. Joyce because it may have
9  been fraud, or fraudulently presented?
10     A.   Yes.
11     Q.   And if I thought I understood it
12 correctly, that was because there was an
13 ongoing investigation?
14     MR. SIEBOTT:  I think that the line
15 of questioning led to a discussion about the
16 ongoing investigation, and because of the
17 ongoing investigation she can't testify about
18 it.
19     Q.   I'll ask it a different way.
20 That's fair enough.
21     The reason the document, the one
22 document that wasn't recorded wasn't because
23 your staff thought it was false or fraudulent
24 on its own and presented it to Mr. Joyce?
25     A.   Yes.  That is the reason.

Page 235

1      Q.   In other words, the investigation
2  came after you presented the document?
3      A.   Yes.
4      Q.   Now, do you know who Barbara
5  Sessler is?
6      A.   Yes.
7      Q.   And who is Barbara Sessler?
8      A.   She's a Recorder.
9      Q.   She's a Recorder in Erie County?
10     A.   I think so.
11     Q.   Is she currently the recorder for
12 Erie County?
13     A.   She's currently a Recorder.  Yeah.
14     Q.   And was Erie County at some point
15 interested in joining the lawsuit that was
16 going to be brought by Geauga County?
17     A.   I don't know.
18     Q.   Isn't it true that they were
19 eventually -- they were initially interested in
20 being a part of this lawsuit?
21     A.   I don't know.
22     Q.   And isn't it true that they decided
23 against it?
24     A.   I don't know.
25     Q.   Do you, as the County Recorder,

Page 236

1  have any understanding as to whether Ohio Law
2  requires that the owner of the mortgage
3  disclose to the public that he or she owns the
4  mortgage?
5      A.   Say that again.
6      Q.   Sure.  Do you, as the County
7  Recorder, have an understanding that Ohio Law
8  requires the owner of the mortgage to disclose
9  to the public who owns the mortgage?
10     A.   They have -- they have to file --
11 they have to file it, yeah.  If that's what you
12 mean disclose to the public.
13     Q.   So you, as the County Recorder,
14 understand Ohio Law requires that the owner of
15 the mortgage has to file it, record it and
16 identify who owns the mortgage?
17     A.   Yes.
18     Q.   And the basis for your
19 understanding is what?
20     A.   Ohio Revised Code.
21     Q.   So you're saying that comes right
22 out of the statute itself?
23     A.   Yes.
24     Q.   Is it your understanding, as the
25 County Recorder, that the entity who holds the

Page 237

1  promissory note has to identify themselves in
2  the public record?
3      A.   I need to look at my fee chart
4  about the promissory note.  You said "note"?
5      Q.   I did say --
6      A.   Before --
7      Q.   I'm sorry, what is it you have to
8  look at?  A fee chart?
9      A.   If a promissory note is one of our
10 categories.
11     Q.   Okay.  But assume it is or it
12 isn't, the question is -- you're the County
13 Recorder.  Do you have an understanding under
14 Ohio Law that a note has to be proffered for
15 recording to identify who has that promissory
16 note?
17     A.   I would have to look at the code
18 regarding the note.
19     Q.   So the answer is you don't know?
20     A.   Correct.
21     Q.   So as the County Recorder, you
22 don't know one way or another whether a note
23 has to be recorded in the county records?
24     A.   I look at the list.
25     Q.   I'm just asking you; as you sit

60 (Pages 234 - 237)

1  here today, do you know?

2     A.  No.

3     Q.  Now, Mr. Yenouskas also asked you

4  some questions about MERS and what they do.

5  Did I hear you correctly to say the first you

6  heard of MERS was in 2009 when you became the

7  County Recorder?

8     A.  Yes.

9     Q.  So before --

10     A.  A couple of months before I heard.

11     Q.  So is it fair to say you learned

12  and knew everything about MERS since 2009

13  forward?

14     A.  Right.

15     Q.  And tell me again what your

16  understanding is of what MERS does?

17     A.  They sell the mortgages from bank A

18  to bank B to bank C, or assign them.

19     Q.  Does MERS lend money?

20     A.  I don't know.

21     Q.  Does MERS service loans?

22     A.  I don't know.

23     Q.  Does MERS serve as mortgagee?

24     A.  Well, yeah.

25     Q.  So MERS not only, in your mind,

1  would then assign mortgages, or sell them, as

2  you say, they would also be the mortgagee?

3     A.  Yes.

4     Q.  Can you be the mortgagee, like MERS

5  is, without lending money?

6     A.  I don't know. I thought it was

7  just tracking.

8     Q.  On the tracking, you also, I think,

9  testified something to the effect that MERS

10  does it within their own system. And is there

11  anything on the MERS system that is available

12  to the public?

13     A.  I don't know.

14     Q.  Well, I thought you said, and

15  correct me if I heard you wrong, that the MERS

16  system was not open to the public?

17     A.  That's what it says in the

18  documents that I used, the OAITA documents.

19  That's where I got that.

20     Q.  But what do you believe?

21     A.  I believe it.

22     Q.  You believe that the system is not

23  open to anyone for any purpose, right?

24     A.  Right.

25     Q.  And I think you also said you've

1  never tried to access the system that MERS has

2  yourself?

3     A.  Correct.

4     Q.  To see if, in fact, you could get

5  information from the MERS system?

6     A.  Correct.

7     Q.  And I take it no one on your staff

8  has ever tried to use the MERS system to access

9  information?

10     A.  Correct.

11     Q.  Have you in the four, three or four

12  years you've been the County Recorder had any

13  training about who MERS is when documents are

14  proffered to your office for recording?

15     A.  No.

16     Q.  Have you made any attempts to try

17  to understand who MERS is, so when their

18  documents are proffered for recording you would

19  know what to do with them?

20     A.  No.

21     Q.  Do you have any estimate of how

22  many mortgages, like Exhibit Number 31, naming

23  MERS as the mortgagee have been recorded on

24  Geauga County's records since you've been the

25  County Recorder?

1     A.  There is a list -- oh, of how many

2  mortgages, or how many by MERS? I don't know.

3     Q.  Well, let me reask the question so

4  it's clearer. Looking at Exhibit Number 31, do

5  you know how many mortgages virtually identical

6  to Exhibit Number 31 have been recorded in

7  Geauga County's records since the time you

8  became the County Recorder?

9     A.  I do not.

10     Q.  Would you say it's more than 10?

11     A.  Yes.

12     Q.  Would you say it's more than 1,000?

13     A.  I don't know.

14     Q.  Would you say it's more than 100?

15     A.  I don't know.

16     Q.  Really?

17     A.  I would -- I don't know.

18     Q.  So as the County Recorder you have

19  no sense at all as to how many MERS mortgages

20  have been recorded in the last four years on

21  your records?

22       MR. SIEBOTT: Objection. Asked and

23  answered.

24     Q.  You can answer, please.

25     A.  No. I don't know. I don't know

Page 242

1  how many.
2      MR. BROCHIN:  Can we take a
3  five-minute break?
4      MR. SIEBOTT:  Sure.
5      (Thereupon, a recess was taken.)
6      MR. BROCHIN:  Back on the record.
7      Q.  Ms. Gingerich, Mr. Yenouskas was
8  asking you, and we kind of left off talking
9  about what MERS does.  We also talked a little
10  bit about the recording system, and how it
11  related to the MERS database.  And I think I
12  was asking you whether anyone at your office
13  has accessed the MERS database or the MERS
14  system to obtain any sort of information.  Have
15  they?
16      A.  No.
17      Q.  And is the -- what is the reason
18  you haven't had anyone in your office try to
19  access the MERS database?
20      A.  There's no reason to.
21      Q.  Is it because you were under the
22  belief that you wouldn't have access to that
23  database?
24      A.  No.
25      Q.  Now, I also understand in response

Page 243

1  to a question Mr. Yenouskas asked you who had,
2  in the case of an assignment of a mortgage, the
3  obligation to record a document.  Do you
4  remember that question?  And you believed, or
5  testified, that it was the assignor?
6      A.  Yes.
7      Q.  Does that accurately state your
8  testimony?
9      A.  The person who was -- yes.
10      Q.  So let's just use an example.
11  Again, Exhibit Number 31 is a MERS mortgage,
12  correct?
13      A.  Correct.
14      Q.  And if that mortgage was going to
15  be assigned, it would be assigned by who?
16      A.  MERS.
17      Q.  And so that means that MERS would
18  be the assignor, correct?
19      A.  You know, I don't do the daily
20  input, so -- okay.  Whatever word you want to
21  use.
22      Q.  Well, I want to use the word you
23  want to use.  I'm just asking the questions.  I
24  just want to understand your understanding of
25  who you believe has the obligation to record

Page 244

1  assignments of mortgages.  You've already told
2  me that it's mandatory in Ohio Law.  Now I'm
3  asking who has that obligation?
4      A.  MERS, if they assign it to someone,
5  has the obligation to record it.
6      Q.  And what is the basis for your
7  understanding that it would be the assignor, or
8  in this example MERS, who has the obligation to
9  record?
10      A.  Because it's their document.
11      Q.  Is there anything in the Ohio Law
12  or Code Sections that suggest that it is the
13  assignor's obligation to record the document?
14      A.  Not that I know of.
15      Q.  So your basis is because you are
16  speculating that since it's their document,
17  they would be the one obligated to record it?
18      A.  Correct.
19      Q.  And when you were talking about the
20  obligation of the assignor, were you limiting
21  that obligation to the assignment of mortgages,
22  or any assignments?
23      A.  Any assignments.
24      Q.  What other assignments do you in
25  your office record other than assignments of

Page 245

1  mortgages?
2      A.  Leases.
3      Q.  And does Ohio Law mandate, as your
4  understanding, that entities or persons record
5  assignments of leases?
6      A.  Yes.
7      Q.  They're obligated to do so?
8      A.  Yes.
9      Q.  Have you had any instances where
10  entities have not met that statutory obligation
11  and recorded their assignments of leases?
12      A.  I wouldn't know.
13      Q.  Well, how is it you know -- strike
14  that.
15      Do you know that MERS hasn't met
16  its obligation in recording assignments of
17  mortgages?
18      A.  Yes.
19      Q.  And how is it that you know MERS
20  hasn't met their obligation to record
21  mortgages, but you don't know if certain
22  lessors -- lessees haven't recorded the
23  assignments of those leases?
24      A.  It's not been brought to my
25  attention.

62 (Pages 242 - 245)

Page 246

1    Q.   So the way you know MERS didn't
2  meet its obligation is because somebody brought
3  it to the County Recorder's attention?
4    A.   Correct.
5    Q.   And that somebody is who?
6    A.   It would be different.  I mean, it
7  might be a Title Examiner.  It might be whoever
8  couldn't find something.
9    Q.   Have you had in your office chain
10 of title issues or clouding for mortgages other
11 than MERS mortgages?
12   A.   I don't -- I don't know.
13   Q.   I mean, are there mortgages who are
14 list mortgagees other than MERS who are not
15 assigning those mortgages?
16   A.   I don't know.  Not that's been said
17 to me.
18   Q.   But why is it then you're going
19 after just MERS for not assigning the
20 mortgages?  Isn't it possible there are other
21 entities that aren't assigning mortgages?
22       MR. SIEBOTT:  Objection.
23 Foundation.
24   A.   I don't know.
25   Q.   Do you feel a sense of

Page 247

1  responsibility to determine whether other
2  entities are not recording documents according
3  to Ohio Law?
4    A.   No.
5    Q.   Have you conducted any
6  investigation at all to determine if there's
7  any entities that aren't recording documents
8  under Ohio Law?
9    A.   No.
10   Q.   Have you ever done any
11 investigation as to entities not recording
12 documents under Ohio Law?
13   A.   No.
14   Q.   Do you know if your predecessors
15 have ever done any such investigations?
16   A.   I do not know.
17   Q.   Do you know if there's ever been
18 any claims by anyone, including County
19 Recorders, whether you or anyone, for any
20 entity not meeting what you believe to be a
21 statutory obligation to record documents?
22   A.   I do not know.
23   Q.   Would you believe this to be the
24 first case of its kind, where one is seeking to
25 enforce the recording of documents under Ohio

Page 248

1  Law?
2    A.   As far as I know.
3    Q.   Has the law on the recording of
4  documents changed since you've been a County
5  Recorder?
6    A.   Yes.
7    Q.   How so?
8    A.   There's been, like, Veterans
9  documents --
10   Q.   Sorry?
11   A.   Veterans D-214s.  They used to be
12 public records.  They are not anymore.  That's
13 one example.  I can't think off the top of my
14 head.  But there's been other changes like
15 that.  There was a change in the way the
16 transfer on death deeds are recorded.  Again,
17 off the top of my head, I really can't
18 remember.
19   Q.   When you came into office in 2009,
20 was the law in Ohio then, as you understand it,
21 that there was a requirement to record
22 mortgages and mortgage assignments?
23   A.   Yes.
24   Q.   How long was that law in existence?
25   A.   I don't know.  I would have to look

Page 249

1  at the code.
2    Q.   But it was -- in your understanding
3  when you came to office in 2009 there was a
4  requirement that all mortgages be recorded in
5  the records, and all mortgage assignments be
6  recorded?
7    A.   Correct.
8    Q.   And you don't know how long that's
9  been in place in Ohio?
10   A.   I do not.
11   Q.   That's all I have.  Thank you.
12 Thank you for your time.
13       MR. BROCHIN:  Oh, I'm not asking
14 any more questions under the specific
15 understanding that if we wish to depose Ms.
16 Gingerich again on the merits, we would have
17 the opportunity to do so.
18       (Thereupon, a discussion was had
19 off the record.)
20       EXAMINATION OF SHARON GINGERICH
21 BY MS. YAKSIC:
22   Q.   Good afternoon, Ms. Gingerich.  I
23 appreciate your patience.  I know it's been a
24 long day.  We met earlier.  I'm Barbara Yaksic,
25 and I represent a couple of Defendants in this

63 (Pages 246 - 249)

Page 250

1  lawsuit. But I'm here today to ask you
2  questions with respect to one of those
3  Defendants, CoreLogic.
4       What do you know about CoreLogic?
5       A.   Nothing.
6       Q.   Is it your understanding that the
7  lawsuit that brings us here today is against
8  entities that have lent money or securitized
9  mortgages?
10      A.   I don't know why they're partners.
11      Q.   Do you have any evidence that
12  CoreLogic has been involved in the making of
13  any loans in the State of Ohio?
14      A.   I have no knowledge. I don't know.
15      Q.   Do you have any knowledge or
16  information that CoreLogic has been involved in
17  the securitization of loans connected to the
18  State of Ohio?
19      A.   I do not know.
20      Q.   Do you have any reason -- do you
21  have any information as to why CoreLogic has
22  been named a Defendant in this lawsuit?
23      A.   I do not know.
24      Q.   Are you aware of any assignments
25  made by or to CoreLogic?

Page 251

1       A.   I do not know.
2       Q.   Then I'm not going to even take 10
3  minutes. That's it.
4       A.   I'm sorry.
5       Q.   Well, if you don't know, I can't
6  ask you. Thank you for your time.
7       EXAMINATION OF SHARON GINGERICH
8  BY MR. DUHAMEL:
9       Q.   Ms. Gingerich, I'm Marcel Duhamel.
10 I represent Corinthian Mortgage. I'm not sure
11 how long my questioning is going to go. I'm
12 going to try not to plow over any ground that's
13 already been covered.
14      Were you ever asked to investigate
15 any potential claims against Corinthian?
16      A.   No.
17      Q.   Were you ever asked by anyone to
18 look for any records that might involve
19 Corinthian?
20      A.   No.
21      Q.   Are you aware that Corinthian
22 served a set of requests for production on
23 Geauga County in this case?
24      A.   No.
25      Q.   Did anyone -- go ahead.

Page 252

1       A.   I don't remember who was on that.
2  I don't think it was Corinthian, the one I
3  received.
4       Q.   Did anyone ever ask you to look for
5  documents in your office that might relate to
6  Corinthian Mortgage in any way?
7       A.   No.
8       Q.   Does your office use an e-mail
9  system?
10      A.   Yes.
11      Q.   Have you ever taken any steps to
12 search your e-mail system for any reference to
13 Corinthian Mortgage?
14      A.   No.
15      Q.   Have you taken any steps to ensure
16 that no e-mails that might relate to Corinthian
17 Mortgage have been deleted since this lawsuit
18 began?
19      A.   No.
20      Q.   Has anyone ever asked you to do
21 that?
22      A.   No.
23      Q.   Has anybody ever asked you to
24 ensure that you preserve any records that might
25 relate to Corinthian that are in your

Page 253

1  possession?
2       A.   No.
3       Q.   Has anyone ever asked you to
4  preserve any records that might relate to MERS
5  that are in your possession?
6       A.   To preserve them?
7       Q.   Right. Keep them, not destroy
8  them.
9       A.   No one has asked me to do anything.
10 I just don't.
11      Q.   Has anybody ever asked you to
12 search your e-mail systems for any reference to
13 MERS?
14      A.   Yes.
15      Q.   And did you find documents
16 referring to MERS in your e-mail system?
17      A.   Yes.
18      Q.   And have you produced those to your
19 attorney?
20      A.   Yes.
21      Q.   Were there any other documents that
22 you found referring to MERS that you did not
23 produce?
24      A.   No.
25      Q.   You've testified a little bit about

64 (Pages 250 - 253)

Page 254

1  the complaint in this case.  Have you ever seen
2  the amended complaint?
3     A.  I have not.
4         - - - - -
5         (Thereupon, Deposition Exhibit 56, A
6     Document Entitled "Amended Class
7     Action Complaint", was marked for
8     purposes of identification.)
9         - - - - -
10    Q.  Ma'am, I'm handing you Exhibit 56,
11  or rather the court reporter has handed it to
12  you.  You've never seen it before today?
13    A.  No.
14    Q.  I would like you to turn to page
15  45.  There's a series of allegations that
16  begins at paragraph 7, and it ends at paragraph
17  59.  Do you see them?
18    A.  Yes.
19    Q.  Do you know if any of those
20  allegations are actually true?
21    A.  Yeah.  Yes.
22    Q.  And are they, in fact, true?
23    A.  Yes.
24    Q.  How do you know?
25    A.  Because they're in our request for

Page 255

1  production.
2     Q.  So have you ever actually seen a
3  March 25, 2003 note executed by a Geauga County
4  resident and given to Corinthian Mortgage,
5  d/b/a South Bank?
6     A.  I have not personally seen that,
7  no.
8     Q.  So how do you know that allegation
9  is true?
10    A.  It's an assumption.
11    Q.  You're assuming it's true?
12    A.  Yes.
13    Q.  So when I asked you if you knew it
14  was true, what you meant to say is you assumed
15  it was true?
16    A.  Yes.
17    Q.  All right.  Paragraph 58 says; "On
18  June 26, 2003 the mortgage loan was
19  securitized."  Do you see that?
20    A.  Yes.
21    Q.  How do you know?
22    MR. SIEBOTT:  Objection.
23  Foundation.
24    Q.  Do you know?
25    A.  I don't know.

Page 256

1     Q.  Did anyone ever ask you if that was
2  true?
3     A.  Other than you, no.
4     Q.  Mr. Joyce never asked you if that
5  was true before he prepared the complaint?
6     A.  No.
7     Q.  Mr. Joyce or anyone on Mr. Joyce's
8  staff has never asked you to confirm whether
9  anyone of the allegation about Corinthian were
10  true; is that right?
11    A.  That's correct.
12        - - - - -
13        (Thereupon, Deposition Exhibit 57, A
14     Mortgage, was marked for purposes of
15     identification.)
16        - - - - -
17    Q.  Ma'am, I've handed you what is
18  marked as Exhibit 57.  Have you ever seen this
19  document before?
20    A.  No.
21    Q.  Does it appear to be a mortgage
22  that was recorded on April 11, 2003?
23    A.  Yes.
24    Q.  And it was recorded in the Geauga
25  County office --

Page 257

1     A.  Yes.
2     Q.  -- the Recorder's Office?  Yes?
3     A.  Yes.
4     Q.  Who recorded it?
5     A.  You mean which -- which person at
6  the front desk?
7     Q.  Let me rephrase.  Who's the
8  mortgagee?
9     A.  Corinthian.
10    Q.  So certainly you're not of the
11  belief that Corinthian violated any Ohio
12  statute by failing to record this document
13  because, in fact, it recorded it, right?
14    A.  Right.
15        - - - - -
16        (Thereupon, Deposition Exhibit 58, A
17     Mortgage, was marked for purposes of
18     identification.)
19        - - - - -
20    Q.  This is 58.  Have you seen this
21  document before?
22    A.  No.
23    Q.  Does it appear to be an assignment
24  of mortgage?
25    A.  Yes.

65 (Pages 254 - 257)

Page 258

1    Q.    And, in fact, it was recorded in
2  the Geauga County Recorder's Office, right?
3    A.    Yes.
4    Q.    And the assignee -- I'm sorry.  The
5  assignor is who?  Who's assigning it?
6    A.    Corinthian.
7    Q.    Is that an answer or a question?
8    A.    Corinthian.
9    Q.    And that, in fact, is exactly what
10  you claim Corinthian was obligated to do, if it
11  assigned this mortgage, right?
12    MR. SIEBOTT:  Objection.
13  Foundation.
14    A.    I'm sorry?
15    Q.    It's your belief that if Corinthian
16  assigned this mortgage it was obligated to have
17  this document recorded in the Geauga County
18  Recorder's Office, right?
19    A.    Yes.
20    Q.    And as far as you can tell, that's
21  exactly what Corinthian did; is that right?
22    A.    Yes.
23    Q.    These two documents, this mortgage
24  and this assignment, do they appear to be the
25  documents that are referred to in paragraph

Page 259

1  57 -- let's start with paragraph 57 of the
2  amended complaint.  Just looking at the
3  mortgage.
4    A.    I'm sorry, what was the question?
5    Q.    Look at paragraph 57, and tell me
6  if the mortgage appears to be the mortgage that
7  relates to that paragraph.
8    A.    Yeah.
9    Q.    Now, looking at paragraph 58,
10  there's a list of assignments that start in
11  sub-paragraph A.  Do you see that?
12    A.    Yes.
13    Q.    It says in paragraph B; "first the
14  mortgage loan was sold to the sponsor,
15  Residential Funding Corporation", right?
16    A.    Yes.
17    Q.    And all of that happens after June
18  26, 2003.  At least what's what the first line
19  of paragraph 58 says, right?
20    A.    Yes.
21    Q.    And when is the assignment from
22  Corinthian to JPMorgan, which we just looked
23  at, number 58, when is that dated?
24    A.    It is dated 11-6-2003.
25    Q.    11-6?

Page 260

1    A.    Yes.
2    Q.    Okay.  And I made an assumption.
3  Do we know who the assignment is to, looking at
4  this document?
5    A.    Do we know who it's to?
6    Q.    Right.  Corinthian assigns it.  Do
7  we know to whom they're assigning it?
8    A.    JP.  To JPMorgan Chase.
9    Q.    Then there's another alleged
10  assignment from Residential Funding Corporation
11  to Residential Funding Mortgage Securities 2,
12  Inc., right?
13    A.    Yes.
14    Q.    Does Corinthian have anything to do
15  with that transaction, as far as you know?
16    A.    I don't know.
17    Q.    Does it have anything to do with
18  the first transaction, the loan being sold to a
19  sponsor of Residential Funding Corporation?
20    A.    I don't know.
21    Q.    Then there's another transaction,
22  Residential Funding Mortgage Securities sells
23  it to JPMorgan Chase.  Do you see that?
24    A.    Yes.
25    Q.    Do you know if Corinthian has

Page 261

1  anything to do with that?
2    A.    I don't know.
3    Q.    Then paragraph 59 says that on
4  March 25th, someone purporting to be an
5  assistant secretary of Corinthian certifies or
6  executes a corporate assignment of mortgage.
7  That's what we've been talking about here,
8  right?
9    A.    Yes.
10    Q.    And that document is actually
11  recorded in the Geauga County Recorder's
12  Office; is that right?
13    A.    Yes.
14    Q.    So on this chain, assuming that
15  every word in these two paragraphs is true,
16  what do you believe, if anything, Corinthian
17  failed to record that it was obligated to
18  record?
19    A.    I don't know.  I don't see
20  anything.
21    Q.    Do you know if anywhere else in the
22  amended complaint there's any other reference
23  to Corinthian having engaged in any transaction
24  where it is alleged to have done anything
25  wrong?

66 (Pages 258 - 261)

Page 262

1    A.  I do not know.

2    Q.  You've said before that if -- I
3 understand correctly -- if somebody assigned a
4 mortgage and didn't record it, you wouldn't be
5 in the position to know about that because they
6 didn't record it; is that right?

7    A.  Correct.

8    Q.  You understand that Geauga County
9 anyway has accused my client of having done
10 exactly that; that's the whole point of the
11 lawsuit against my client, right?

12    A.  Okay.

13    Q.  So help me understand.  If there's
14 no way you could possibly know if we ever did
15 that, how can you accuse us of having done it?

16    A.  I don't know.

17    Q.  Did you ever ask Mr. Joyce about
18 that?

19    A.  I did not.

20    Q.  Did you ever ask Mr. Joyce whether
21 or not Corinthian was an appropriate Defendant
22 in this case?

23    A.  No.

24    Q.  Sitting here right now, are you
25 aware of any transaction in which you actually

Page 263

1 believe Corinthian had an obligation to record
2 something and failed to do it?

3    A.  I am not.

4    Q.  Are you aware that Geauga County
5 provided a list to me of a number of
6 transactions involving Corinthian that were
7 recorded in Geauga County?

8    A.  No.

9    Q.  So, obviously, you've never seen
10 that list?

11    A.  Correct.

12    - - - - -

13    (Thereupon, Deposition Exhibit 59, A
14    Document Bates Stamped GCR-003192
15    Through GCR-003219, was marked for
16    purposes of identification.)

17    - - - - -

18    Q.  I'm giving you Exhibit 59, which is
19 a group exhibit.  For the record, it's Bates
20 labeled GCR-3192 through 3219.  Have you ever
21 seen this document before today?

22    A.  No.

23    Q.  I'd like you to just look at the
24 first page.  In the middle of the page there's
25 a list of party names.  Do you see that?

Page 264

1    A.  Yes.

2    Q.  And then to the side of that, under
3 the column "series", there's some notations.
4 One says "direct", and everything else says
5 "reverse"; do you see that?

6    A.  Yes.

7    Q.  What's the "direct" refer to?

8    A.  I don't know.

9    Q.  Do you know what the "reverse"
10 refers to?

11    A.  I don't know.  I don't input the
12 documents.

13    Q.  Does this look like it's a
14 screenshot of some sort of electronic query off
15 of the Geauga County Recorder's system?

16    A.  Yes.

17    Q.  Just looking at the first page, is
18 there anything on the first page of this
19 document that would suggest to you that there's
20 any reason to believe that with respect to the
21 transaction that's been recorded Corinthian did
22 anything wrong?

23    A.  I don't know.

24    Q.  So looking at it, you don't know
25 how to interpret this document?

Page 265

1    A.  As to whether or not you did
2 anything wrong, no.

3    Q.  Would you agree with me that if
4 Corinthian was a mortgagee and it recorded the
5 mortgage, and then if Corinthian assigned the
6 mortgage to somebody else and recorded that
7 assignment, it did everything that you believe
8 it was required to do under Ohio Law with
9 respect to that mortgage and that assignment?

10    A.  Yes.

11    Q.  And it is not your intent to sue
12 Corinthian for that, correct?

13    MR. SIEBOTT:  Objection.
14 Foundation.

15    Q.  As far as you know.  That's not
16 your intent anyway --

17    A.  I don't know.

18    Q.  -- as the Geauga County Recorder;
19 is that correct?

20    A.  I don't know.

21    Q.  It's not my intent to go through
22 every one of these, but I'll pull some examples
23 out.

24    - - - - -

25    (Thereupon, Deposition Exhibit 60, A

67 (Pages 262 - 265)

Page 266

1     Mortgage, was marked for purposes of
2     identification.)
3           - - - - -
4     Q.   Have you seen this document before
5  today?
6     A.   No.
7     Q.   It is Exhibit 60. I'll represent
8  to you that it's a copy of a mortgage that my
9  office caused to be pulled from the Geauga
10  County Recorder's Office after receiving a
11  production of documents from Geauga County.
12        It appears on the face of this
13  mortgage that it was, in fact, recorded in the
14  Geauga County Recorder's Office, right?
15     A.   Yes.
16     Q.   And that the mortgagee is
17  Corinthian Mortgage Corporation, d/b/a South
18  Bank Mortgage; is that correct?
19     A.   Yes.
20           - - - - -
21        (Thereupon, Deposition Exhibit 61,
22        An Assignment of Mortgage, was
23        marked for purposes of
24        identification.)
25           - - - - -

Page 267

1     Q.   And this is 61. Does this appear
2  to be an assignment of the mortgage you just
3  looked at?
4     A.   Yes.
5     Q.   And it's an assignment from
6  Corinthian Mortgage, correct?
7     A.   Yes.
8     Q.   And it's to Mortgage Electronic
9  Registration Systems, Inc.; is that correct?
10     A.   Correct.
11     Q.   And at least under your view of the
12  law, it's your belief that Corinthian was
13  obligated to record this assignment in the
14  Geauga County Recorder's Office; is that
15  correct?
16     A.   Yes.
17     Q.   And that's exactly what happened,
18  right?
19     A.   Yes.
20     Q.   So at least with respect to this
21  transaction, in your view Corinthian didn't do
22  anything wrong?
23     A.   Correct.
24     Q.   And if I showed you a string of 17
25  or 18 mortgages and assignments that looked

Page 268

1  exactly like this; in other words, it's a
2  mortgage where Corinthian is the mortgagee, and
3  then Corinthian assigns it to someone else, you
4  would tell me that at least with respect to
5  those transactions, in your view, Corinthian
6  didn't do anything wrong?
7     A.   Correct.
8     Q.   Now, if Corinthian assigns the
9  mortgage to somebody else, and then that person
10  turns around and assigns it to yet another
11  person, is it your view that Corinthian has any
12  obligation to make sure that that assignment
13  gets recorded?
14     A.   No.
15     Q.   And if Corinthian is a mortgagee
16  and doesn't assign the mortgage, it simply
17  keeps it, there's obviously no violation there
18  either, as long as Corinthian recorded the
19  mortgage; is that correct?
20     A.   Correct.
21     Q.   And sitting here right now, you're
22  not aware of any circumstance where as far as
23  you know Corinthian received a mortgage,
24  assigned it to anyone and failed to record that
25  assignment?

Page 269

1     A.   To my knowledge, no.
2     Q.   And you've never been asked to see
3  if that's the case?
4     A.   No.
5     Q.   Are you aware of any other county
6  in which Corinthian has even recorded a
7  mortgage?
8     A.   I don't know.
9     Q.   Have you ever tried to look?
10     A.   No, I have not.
11     Q.   Do you know if Corinthian has ever
12  recorded an assignment in any other county?
13     A.   I don't know.
14     Q.   Do you know if Corinthian has ever
15  had any mortgage or any interest in any
16  mortgage that was recorded in any county other
17  than Ohio?
18     A.   I don't know.
19     Q.   Do you know if Corinthian has ever
20  securitized any mortgage?
21     A.   I do not know.
22     Q.   Do you know if Corinthian has ever
23  participated in the securitization of any
24  mortgage in any way?
25     A.   I don't know.

68 (Pages 266 - 269)

Page 270

1    Q.   Do you know what securitization is?
2    A.   Yes.
3    Q.   Could you describe that to me?
4    A.   It's when you put a bunch of
5  mortgages together and bundle them.
6    Q.   Okay.  And you're not aware of
7  Corinthian doing that with respect to any
8  mortgage in Ohio?
9    A.   I wouldn't know.  I don't know.
10   Q.   Certainly not with respect to
11  Geauga County, as far as you know?
12   A.   I don't know.
13   Q.   And as a Geauga County Recorder,
14  you've never been asked to determine whether or
15  not Corinthian participated in even one such
16  transaction before this lawsuit was filed?
17   A.   That is correct.
18   Q.   Were you asked in any way to
19  investigate anything having to do with
20  Corinthian before this lawsuit was filed?
21   A.   No.
22   Q.   Do you know if Mr. Joyce asked
23  anyone in your staff to conduct any
24  investigation of Corinthian before filing this
25  lawsuit against Corinthian?

Page 271

1    A.   I don't know what he asked.
2    Q.   Has anyone on your staff ever told
3  you that Mr. Joyce asked them to investigate
4  anything concerning Corinthian?
5    A.   No.
6    Q.   Have you ever seen the results of
7  any pre-lawsuit investigation involving
8  Corinthian?
9    A.   No.
10        - - - - -
11        (Thereupon, Deposition Exhibit 62, A
12        Mortgage, was marked for purposes of
13        identification.)
14        - - - - -
15   Q.   Ma'am, this is Exhibit 62.  Have
16  you seen this before?
17        MR. SIEBOTT:  Do you have another
18  copy?
19        MR. DUHAMEL:  I'm sorry.  That's
20  rude of me.  I apologize.
21   A.   You asked a question?  I have not.
22   Q.   Have you ever seen it before?
23   A.   No.
24   Q.   Would you agree with me that it
25  appears to be a mortgage?

Page 272

1    A.   Yes.
2    Q.   And that it appears to have been
3  recorded in the Geauga County, Ohio Recorder's
4  Office?
5    A.   Yes.
6    Q.   And that it identifies the
7  mortgagee as Mortgage Electronic Registration
8  Systems, Inc.?
9    A.   Yes.
10   Q.   "As nominee for lender, as defined
11  herein"; yes?
12   A.   Yes.
13   Q.   And then it identifies the lender
14  as Corinthian Mortgage Corporation.  Do you see
15  that?
16   A.   Yes.
17        - - - - -
18        (Thereupon, Deposition Exhibit 63, A
19        Certificate of Satisfaction, was
20        marked for purposes of
21        identification.)
22        - - - - -
23   Q.   Ma'am, this is 63.  I assume you
24  haven't seen this document before today, right?
25   A.   That's correct.

Page 273

1    Q.   Would you agree that it appears to
2  be a Certificate of Satisfaction?
3    A.   Yes.
4    Q.   Would you agree that it appears to
5  have been filed in the Geauga County Recorder's
6  Office?
7    A.   Yes.
8    Q.   Would you agree that it is -- that
9  it reflects that the holder of the mortgage at
10  the time is Mortgage Electronic Registration
11  Systems, Inc.?
12   A.   Yes.
13   Q.   Would you agree that it identifies
14  Corinthian Mortgage Corporation, d/b/a South
15  Bank Mortgage, as the original mortgagee?
16   A.   Yes.
17   Q.   And, in fact, as you said before,
18  this is, in fact, filed in Geauga County, in
19  the Geauga County Recorder's Office, yes?
20   A.   Yes.
21   Q.   With respect to the transactions
22  that are reflected by these two documents, do
23  you believe Corinthian did anything wrong?
24   A.   I don't know.
25   Q.   Is there anything that you can see

Page 274

1   from these two documents that Corinthian failed
2   to record but should have?
3       A.   I don't know.
4       Q.   Do you know if Corinthian has ever
5   entered into any kind of an agreement with
6   MERS?
7       A.   Didn't it just say you did?
8       Q.   Well, did it?  Is that what that
9   said?  You tell me.  I'm asking you the
10  questions.
11      A.   I don't know.
12      Q.   You don't know?
13      A.   I don't know.
14      Q.   Do you know what a conspiracy is?
15      A.   Yes.
16      Q.   Do you have any evidence that
17  Corinthian has conspired with MERS to do
18  anything at all?
19      A.   No.
20      Q.   Thank very much.  I don't have
21  anything else.
22          MR. SIEBOTT:  Since it's 5:00, do
23  we want to continue?  How long are -- I guess
24  we'll take a break and pick up tomorrow.
25          MS. YAKSIC:  Before you leave --

Page 275

1   before you leave I would ask if you waive
2   signature?  Would you explain that to the
3   witness.
4           MR. SIEBOTT:  We want to reserve
5   our right to review and correct.  We will
6   review and correct.
7           MS. YAKSIC:  The witness is not
8   waiving signature?
9           MR. SIEBOTT:  Right.
10          (The deposition was concluded at
11  4:58 p.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 276

1   Whereupon, counsel was requested to give
2   instruction regarding the witness's review of
3   the transcript pursuant to the Civil Rules.
4
5           SIGNATURE:
6   It was agreed by and between counsel and the
7   parties that the Deponent will read and sign
8   the transcript of said deposition.
9
10          TRANSCRIPT DELIVERY:
11  Counsel was requested to give instruction
12  regarding delivery date of transcript.
13          ORIGINAL: Mr. Yenouskas
14          COPY: Mr. Brochin
15          COPY: Mr. Duhamel
16          COPY: Ms. Ghannoum
17          COPY: Mr. Cunningham
18          COPY: Mr. Carpenter
19          COPY: Mr. Allensworth
20          COPY: Mr. Pope
21          COPY: Ms. Koesel
22
23
24
25

Page 277

1           REPORTER'S CERTIFICATE
2   The State of Ohio,  )
3                       SS:
4   County of Cuyahoga.  )
5
6           I, Todd L. Persson, a Notary Public
7   within and for the State of Ohio, duly
8   commissioned and qualified, do hereby certify
9   that the within named witness, SHARON
10  GINGERICH, was by me first duly sworn to
11  testify the truth, the whole truth and nothing
12  but the truth in the cause aforesaid; that the
13  testimony then given by the above-referenced
14  witness was by me reduced to stenotypy in the
15  presence of said witness; afterwards
16  transcribed, and that the foregoing is a true
17  and correct transcription of the testimony so
18  given by the above-referenced witness.
19          I do further certify that this
20  deposition was taken at the time and place in
21  the foregoing caption specified.
22
23
24
25

70 (Pages 274 - 277)

Page 278

1        I do further certify that I am not
2  a relative, counsel or attorney for either
3  party, or otherwise interested in the event of
4  this action.
5        IN WITNESS WHEREOF, I have hereunto
6  set my hand and affixed my seal of office at
7  Cleveland, Ohio, on this _25_ day of
8  _april_, 2012.
9
10
11
12
13  _Todd L. Persson_
14  Todd L. Persson, Notary Public
15  within and for the State of Ohio
16
17  My commission expires July 28, 2012.
18
19
20
21
22
23
24
25

---

Page 279

1      DEPOSITION REVIEW
       CERTIFICATION OF WITNESS
2
3  ASSIGNMENT NO. 48824
    CASE NAME: State of Ohio v. MERSCORP, Inc.
    DATE OF DEPOSITION: April 24, 2012
4    WITNESS' NAME: Sharon Gingerich
5  In accordance with the Rules of Civil Procedure,
    I have read the entire transcript of my testimony or it
6  has been read to me.
7    I have made no changes to the testimony as
    transcribed by the court reporter.
8
9
10  Date     Sharon Gingerich
11
12    Sworn to and subscribed before me, a Notary Public in
    and for the State and County, the referenced witness did
13  personally appear and acknowledge that:
14    They have read the transcript;
    They signed the foregoing sworn Statement; and
15    Their execution of this Statement is of their free
    act and deed.
16
17    I have affixed my name and official seal this _____
18  day of _____, 20_____.
19
20    Notary Public
21
22    Commission Expiration Date
23
24
25

---

Page 280

1      DEPOSITION REVIEW
       CERTIFICATION OF WITNESS
2
3  ASSIGNMENT NO. 48824
    CASE NAME: State of Ohio v. MERSCORP, Inc.
    DATE OF DEPOSITION: April 24, 2012
4    WITNESS' NAME: Sharon Gingerich
5  In accordance with the Rules of Civil Procedure,
    I have read the entire transcript of my testimony or it
6  has been read to me.
7    I have listed my changes on the attached Errata
    Sheet, listing page and line numbers as well as the reason(s)
8  for the change(s).
9    I request that these changes be entered as part of the
    record of my testimony.
10
    I have executed the Errata Sheet, as well as this
11  Certificate, and request and authorize that both be appended
    to the transcript of my testimony and be incorporated therein.
12
13  Date     Sharon Gingerich
14
15    Sworn to and subscribed before me, a Notary Public in
    and for the State and County, the referenced witness did
    personally appear and acknowledge that:
16
17    They have read the transcript;
    They have listed all of their corrections in the
18    appended Errata Sheet
    They signed the foregoing sworn Statement; and
19    Their execution of this Statement is of their free
    act and deed.
20    I have affixed my name and official seal this _____
21  day of _____, 20_____.
22
23    Notary Public
24
25    Commission Expiration Date

---

Page 281

1      ERRATA SHEET
  RENNILLO DEPOSITION & DISCOVERY - A VERITEXT COMPANY
2      ASSIGNMENT NO. 48824
3  PAGE/LINE(S) /    CHANGE    / REASON
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
    Date     Sharon Gingerich
20
  SUBSCRIBED AND SWORN TO BEFORE ME THIS_____ DAY OF
21  _____, 20___.
22
23    NOTARY PUBLIC
24
25    Commission Expiration Date

---

71 (Pages 278 - 281)

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE NORTHERN DISTRICT OF OHIO

3              ~~~~~~~~~~~~~~~~~~~~

4     STATE OF OHIO,

      ex rel. DAVID P. JOYCE,

5

6              Plaintiff,

7

      vs.      Civil Action No.  1:11-cv-02474

8

9     MERSCORP, INC., et al.,

10

               Defendants.

11

               ~~~~~~~~~~~~~~~~~~~~

12

               Deposition of

13            SHARON GINGERICH

               VOLUME II

14

15             APRIL 25, 2012

16              9:00 a.m.

17

18

19              Taken at:

20          Baker & Hostetler, LLP

21      1900 East Ninth Street, Suite 3200

22           Cleveland, Ohio

23

24

25      Todd L. Persson, Notary Public

Page 283

```
 1   APPEARANCES:
 2
 3      On behalf of the Plaintiff:
 4         Berstein Liebhard, LLP, by
 5         CHRISTIAN SIEBOTT, ESQ.
 6         SARA GOODMAN, ESQ.
 7         10 East 40th Street
 8         New York, NY 10016
 9         (212) 779-1414
10         siebott@bernlieb.com
11
12      On Behalf of the Defendants, Huntington
13   Bank, Fifth Third Bank and Key Bank
14   National Association:
15         Baker & Hostetler, LLP, by
16         BRETT A. WALL, ESQ.
17         LISA M. GHANNOUM, ESQ.
18         1900 East 9th Street
19         Suite 3200
20         Cleveland, OH 44114
21         (216) 861-7597
22         bwall@bakerlaw.com
23         lghannoum@bakerlaw.com
24
25
```

Page 284

```
 1   APPEARANCES, Continued:
 2
 3      On Behalf of the Defendants, CoreLogic,
 4   SunTrust:
 5         McGlinchey Stafford, PLLC, by
 6         CANDICE L. MUSIEK, ESQ.
 7         25550 Chagrin Boulevard, Suite 406
 8         Cleveland, OH 44122
 9         (216) 378-9905
10
11      On Behalf of the Defendants, Nationwide
12   Advantage Mortgage Company:
13         Carpenter, Lipps & Leland, LLP, by
14         MICHAEL H. CARPENTER, ESQ.
15         280 Plaza, Suite 1300
16         280 North High Street
17         Columbus, OH 43215
18         (614) 365-4100
19         carpenter@carpenterlipps.com
20
21
22
23
24
25
```

Page 285

```
 1   APPEARANCES, Continued:
 2
 3      On Behalf of the Defendants, MERSCORP,
 4   MERS:
 5         Morgan, Lewis & Bockius, LLP, by
 6         ROBERT M. BROCHIN, ESQ.
 7         200 South Biscayne Boulevard
 8         Suite 5300
 9         Miami, FL 33131
10         (305) 415-3546
11         rbrochin@morganlewis.com
12
13      On Behalf of the Defendant, Corinthian
14   Mortgage Corporation, by
15         Vorys, Sater, Seymour and Pease,
16   LLP, by
17         MARCEL C. DUHAMEL, ESQ.
18         2100 One Cleveland Center
19         1375 East Ninth Street
20         Cleveland, OH 44114
21         (216) 479-6112
22         mcduhamel@vorys.com
23
24
25
```

Page 286

```
 1   APPEARANCES, Continued:
 2
 3      On Behalf of the Defendant, MGIC Investor
 4   Services Corp.:
 5         Mansour, Gavin, Gerlack & Manos Co.,
 6   LPA, by
 7         MICHAEL P. QUINLAN, ESQ.
 8         55 Public Square
 9         Suite 2150
10         Cleveland, OH 44113
11         (216) 523-1500
12         mquinlan@mggmlpa.com
13
14      On Behalf of the Defendant, Wells Fargo
15   Bank, N.A.:
16         Thompson Hine, LLP, by
17         TERRY W. POSEY, ESQ.
18         Austin Landing I
19         10050 Innovation Drive
20         Suite 400
21         Dayton, OH 45342
22         (937) 443-6857
23         terry.posey@thompsonhine.com
24
25
```

2 (Pages 283 - 286)

Page 287

1  APPEARANCES, Continued:
2
3      On Behalf of the Defendant, Deutsch Bank
4  National Trust Company:
5      Porter, Wright, Morris & Arthur,
6      LLP, by
7      MARGARET M. KOESEL, ESQ.
8      925 Euclid Avenue
9      Suite 1700
10     Cleveland, OH 44115
11     (216) 443-2530
12     mkoesel@porterwright.com
13
14     On Behalf of the Defendants, GMAC
15  Mortgage, LLC and US Bank, N.A.:
16     Locke Lord, LLP, by
17     THOMAS J. CUNNINGHAM, ESQ.
18     111 South Wacker Drive
19     Chicago, IL 60606
20     (312) 443-1731
21     tcunningham@lockelord.com
22
23
24
25

Page 289

1  APPEARANCES, Continued:
2
3      On Behalf of the Defendant, Goldman Sachs
4  Mortgage Company, 65 Mortgage Securities
5  Corporation:
6      K&L Gates, LLP, by
7      R. BRUCE ALLENSWORTH, ESQ.
8      State Street Financial Center
9      One Lincoln Street
10     Boston, MA 02111
11     (617) 261-3119
12     bruce.allensworth@klgates.com
13
14     On Behalf of the Defendant, HSB Bank USA,
15  N.A.:
16     Ulmer Berne, LLP, by
17     MATTHEW T. WHOLEY, ESQ.
18     RICHIK SARKAR, ESQ.
19     1660 West 2nd Street
20     Suite 1100
21     Cleveland, OH 44113
22     (216) 583-7000
23     mwholey@ulmer.com
24
25

Page 288

1  APPEARANCES, Continued:
2
3      On Behalf of the Defendant, Chase:
4      Bricker & Eckler, LLP, by
5      CHRISTOPHER M. ERNST, ESQ.
6      1001 Lakeside Avenue East
7      Suite 1350
8      Cleveland, OH 44114
9      (216) 523-5405
10     cernst@bricker.com
11
12     On Behalf of the Defendant, Home Savings:
13     Thrasher, Dinsmore & Dolan, by
14     TODD C. HICKS, ESQ.
15     100 7th Avenue, Suite 150
16     Chardon, OH 44024
17     (440) 285-2242
18     thicks@tddlaw.com
19
20
21
22
23
24
25

Page 290

1  APPEARANCES, Continued:
2
3      On Behalf of the Defendant, CitiMortgage,
4  Inc., Citigroup, Inc., and Citibank,
5  N.A.:
6      Mayer Brown, LLP, by
7      DAVID D. POPE, ESQ.
8      71 South Wacker Drive
9      Chicago, IL 60606
10     (312) 701-8733
11     dpope@mayerbrown.com
12
13     On Behalf of the Defendant, United
14  Guaranty Corporation, via teleconference:
15     Fennemore Craig, P.C., by
16     TODD S. KARTCHNER, ESQ.
17     3003 North Central Avenue
18     Suite 2600
19     Phoenix, AZ 85012
20     (602) 916-5461
21     tkartchn@fclaw.com
22
23
24
25

3 (Pages 287 - 290)

Page 291

```
 1   APPEARANCES, Continued:
 2
 3      On Behalf of the Defendant, Deutsche Bank
 4   National Trust Company, via
 5   teleconference:
 6      Morgan, Lewis & Bockius, LLP, by
 7      BRENDAN E. RADKE, ESQ.
 8      One Market
 9      Spear Street Tower
10      San Francisco, CA 94105
11      (415) 442-1213
12      bradke@morganlewis.com
13
14            ~ ~ ~ ~ ~
15
16
17
18
19
20
21
22
23
24
25
```

Page 292

```
 1         TRANSCRIPT INDEX
 2
 3   APPEARANCES............................... 283
 4
 5   INDEX OF EXHIBITS ........................ 12
 6
 7   EXAMINATION OF SHARON GINGERICH:
 8   By Mr. Cunningham.......................... 295
 9   By Mr. Carpenter........................... 309
10   By Mr. Wholey.............................. 426
11   By Mr. Ernst............................... 432
12   By Mr. Siebott............................. 434
13   By Mr. Duhamel............................. 436
14   By Mr. Brochin............................. 436
15
16   REPORTER'S CERTIFICATE.................... 439
17
18   EXHIBIT CUSTODY
19   EXHIBITS RETAINED BY COURT REPORTER
20
21
22
23
24
25
```

Page 293

```
 1           INDEX OF EXHIBITS
 2   NUMBER    DESCRIPTION      MARKED
 3   Exhibit 64  A Document Bates Stamped ..... 332
          GCR-001718 Through
 4        GCR-001719
 5   Exhibit 65  A Document Bates Stamped ..... 335
          GCO-000001 Through
 6        GCO-000002
 7   Exhibit 66  A Document Bates Stamped ..... 346
          GCR-001467
 8
 9   Exhibit 67  A Document Bates Stamped ..... 349
          GCR-001505
10   Exhibit 68  A Document Bates Stamped ..... 351
          GCR-001508 Through
11        GCR-001509
12   Exhibit 69  A Document Bates Stamped ..... 353
          GCR-001512 Through
13        GCR-001513
14   Exhibit 70  A Document Bates Stamped ..... 356
          GCR-001524 Through
15        GCR-001525
16   Exhibit 71  A Document Bates Stamped ..... 361
          GCR-001528 Through
17        GCR-001530
18   Exhibit 72  A Document Bates Stamped ..... 363
          GCR-001574 Through
19        GCR-001580
20   Exhibit 73  A Document Bates Stamped ..... 367
          GCR-001593 Through
21        GCR-001602
22   Exhibit 74  A Document Bates Stamped ..... 370
          GCR-001603 Through
23        GCR-001604
24   Exhibit 75  A Document Bates Stamped ..... 371
          GCR-001635 Through
25        GCR-001637
```

Page 294

```
 1   Exhibit 76  A Document Bates Stamped ..... 374
          GCR-001695 Through
 2        GCR-001698
 3   Exhibit 77  A Document Bates Stamped ..... 379
          GCR-001713 Through
 4        GCR-001717
 5   Exhibit 78  A Document Bates Stamped ..... 387
          GCR-001800
 6
 7   Exhibit 79  A Document Bates Stamped ..... 390
          GCR-002644 Through
          GCR-002645
 8
 9   Exhibit 80  A Document Bates Stamped ..... 393
          GCR-001979 Through
          GCR-001981
10
11   Exhibit 81  A Document Bates Stamped ..... 396
          GCR-001917
12   Exhibit 82  A Document Bates Stamped ..... 398
          GCR-001963 Through
13        GCR-001964
14   Exhibit 83  A Document Bates Stamped ..... 401
          GCR-002146 Through
15        GCR-002148
16   Exhibit 84  A Document Bates Stamped ..... 404
          GCR-002180 Through
17        GCR-002181
18   Exhibit 85  A Document Bates Stamped ..... 419
          GCR-002921 Through
19        GCR-002937
20   Exhibit 86  A Document Bates Stamped ..... 420
          GCR-002961 Through
21        GCR-002963
22   Exhibit 87  A Document Bates Stamped ..... 422
          GCR-002966 Through
23        GCR-002968
24
25
```

4 (Pages 291 - 294)

Page 295

1  SHARON GINGERICH, of lawful age, called
2  for examination, as provided by the Federal
3  Rules of Civil Procedure, being by me first
4  duly sworn, as hereinafter certified, deposed
5  and said as follows:
6  EXAMINATION OF SHARON GINGERICH
7  BY MR. CUNNINGHAM:
8  Q. Good morning, Ms. Gingerich. My
9  name is Tom Cunningham. I represent GMAC
10  Mortgage and US Bank in this case. I'd like to
11  start out this morning by asking what you did
12  to prepare for this deposition?
13  A. I met with my attorney and talked.
14  Q. How many times did you meet with
15  your attorney?
16  A. Once.
17  Q. And when was that?
18  A. Monday night.
19  Q. So Monday night was the first time
20  that you met with your attorney to talk about
21  this deposition?
22  A. About the deposition, yes.
23  Q. Did you look at any documents?
24  A. Yes.
25  Q. What documents did you look at?

Page 296

1  MR. SIEBOTT: Objection.
2  Privileged.
3  Q. Can you tell me which documents you
4  looked at?
5  MR. SIEBOTT: I'm instructing you
6  not to answer that question.
7  A. I may not answer that question.
8  Q. Did you look at any of the
9  documents before this deposition that you were
10  shown yesterday that were marked as exhibits?
11  A. That were marked as exhibits? I
12  may have seen some.
13  Q. Whose idea was it to file this
14  lawsuit? Was this lawsuit your idea?
15  A. No, sir.
16  Q. Whose idea was it?
17  A. David Joyce.
18  Q. Have you ever testified at a
19  deposition before?
20  A. No.
21  Q. Have you ever testified at a trial
22  before?
23  A. No.
24  Q. Have you ever testified before any
25  legislative body?

Page 297

1  A. No.
2  Q. Have you ever offered nay testimony
3  under oath under any circumstances before
4  yesterday?
5  A. You mean -- well, I'm divorced, if
6  that's what you mean.
7  Q. Did you give testimony in your
8  divorce under oath?
9  A. Probably. You know what, that was
10  a long time ago. I don't remember if they
11  swore us in. I don't remember. It wasn't a
12  trial situation.
13  Q. Fair enough. Other than your
14  divorce, you haven't given testimony anywhere
15  else; is that right?
16  A. No. Correct.
17  Q. Now, yesterday morning
18  Mr. Yenouskas asked you some questions about
19  the processes in your office that you go
20  through to record documents. I would like to
21  ask you a few follow-up questions about that.
22  Would you agree that those
23  processes differ from county to county across
24  the State of Ohio?
25  A. Some of them, yes.

Page 298

1  Q. And would you agree that the
2  policies and practices differ from county to
3  county across the State of Ohio?
4  A. Yes.
5  Q. Would you agree that the number of
6  employees differs from county to county?
7  A. Yes.
8  Q. And would you agree that the volume
9  of documents recorded also varies from county
10  to county?
11  A. Yes.
12  Q. So some counties see a far larger
13  number of documents than others, correct?
14  A. Correct.
15  Q. Have you made any effort to
16  forecast the amount of additional work your
17  office would need to complete if you were
18  successful in obtaining the injunction you seek
19  in this lawsuit?
20  MR. SIEBOTT: Objection.
21  Foundation.
22  Q. You can answer, if you can.
23  A. No.
24  Q. And you've made no effort to
25  forecast the additional work that would be

5 (Pages 295 - 298)

Page 299

1  imposed on other Ohio counties if the
2  injunction were entered, correct?
3      A.   Correct.
4      Q.   Mr. Yenouskas also asked you some
5  questions about the fees that you charge and
6  how they're set. Can you tell us, do this
7  recorders in Ohio have any flexibility in
8  setting fees?
9      A.   No.
10     Q.   So they're set by the State
11 legislature?
12     A.   Yes.
13     Q.   And you can't add additional
14 amounts on top of whatever the legislature
15 sets?
16     A.   Correct.
17     Q.   And that's the same for all Ohio
18 counties?
19     A.   Correct.
20     Q.   Would you agree with me that the
21 burden of recording assignments of mortgages
22 might fall disproportionately on some counties?
23     A.   I have no way of knowing that.
24     Q.   Would you agree that if that were
25 true, those counties should have the right to

Page 300

1  decide whether the benefits that you perceive
2  form requiring the assignments to be recorded
3  are worth costs of recording those assignments?
4      A.   Can you clarify that?
5      Q.   Sure. You believe that it would be
6  beneficial to the public, specifically the
7  citizens of Geauga County, to have assignments
8  of mortgages recorded?
9      A.   Yes.
10     Q.   Correct?
11     A.   Yes.
12     Q.   There's a cost that goes along with
13 that, right? You have to pay employees to
14 process the paperwork, take it in?
15     A.   Yes.
16     Q.   So there's an issue of whether the
17 cost to provide that service exceeds the value
18 of the service. You've determined that it's
19 worth it to try to force companies to record
20 assignments of mortgages. Would you agree that
21 other counties should have the right to make
22 that decision for themselves?
23     A.   Counties should make decisions, but
24 I'm not forcing.
25     Q.   Your intention here isn't to force

Page 301

1  other counties to record assignments?
2      A.   Just to follow the law.
3      Q.   Do you know whether the fees you
4  charge cover the entire cost to record
5  documents in Geauga County?
6      A.   Yes.
7      Q.   Do you know whether that's true in
8  other counties in the State of Ohio?
9      A.   I can't speak for other counties.
10 I don't know.
11     Q.   Mr. Yenouskas also asked you some
12 questions yesterday about the Ohio Attorney
13 General opinion that indicates multiple
14 assignments can be recorded on a single
15 instrument. Do you remember those questions?
16     A.   Yes.
17     Q.   Would you agree that if a lender
18 recorded a single instrument that listed
19 thousands of assignments, and paid only one fee
20 to record that single document, the county
21 would incur far greater expense to index all
22 those assignments listed on that instrument
23 than it would collect in fees?
24     A.   No.
25     Q.   Why not?

Page 302

1      A.   Well, because you're just indexing.
2  I don't understand your reasoning why you think
3  it would cost more. I mean, we do documents
4  every day, all day, every day.
5      Q.   And every day when you receive a
6  document you testified yesterday that somebody
7  takes the information from that document and
8  inputs it into the computer, right?
9      A.   Yes.
10     Q.   So if you had a single document
11 that you charged $28 to record, and that
12 document contained information about thousands
13 of transactions, and an employee had to sit at
14 an computer terminal and enter the information
15 for those thousands of transactions, do you
16 think you would pay that employee more than $28
17 to do that work?
18     A.   No. It's set by code. They're
19 doing their work, whatever it is, all day. I
20 don't understand how you --
21     Q.   Can you estimate how long it would
22 take an employee to enter the information
23 relating to, say, 1,000 transactions in the
24 computer system?
25     A.   No.

6 (Pages 299 - 302)

Page 303

1    Q.    Safe to say it would take more than
2  a day?
3    A.    I do not know.
4    Q.    Do you believe the MERS system
5  fails to serve the public interest?
6    A.    Yes.
7    Q.    Why?
8    A.    Because they fail to record
9  assignments.
10   Q.    Are you aware of any information in
11 the MERS system that is erroneous?
12   A.    No.
13   Q.    Are you aware of any examples where
14 there's missing information in the MERS system?
15   A.    I don't know personally.
16   Q.    Are you aware of any mortgages that
17 could not be foreclosed because of errors or
18 omissions in the MERS system?
19   A.    I have heard people talking about
20 failure to find out who owns the mortgage, yes.
21   Q.    Are you aware of any specific cases
22 that you can tell me about, a specific borrower
23 or property, in which a foreclosure could not
24 be completed because of an error or omission in
25 the MERS system?

Page 304

1    A.    A specific case to name, no.
2    Q.    Yesterday afternoon Mr. Brochin
3  asked you some questions about recording
4  assignments today that relate to mortgages that
5  have already been released, and I wanted to ask
6  you some follow-up questions about that.
7         Does a party recording an
8  assignment of mortgage in Geauga County need to
9  include some reference to the prior mortgage
10 that is now being assigned, a book and page
11 number --
12   A.    Yes.
13   Q.    -- a recordation number?  Is that a
14 required piece of information on the
15 assignment?
16   A.    Yes.
17   Q.    And is that a requirement of Ohio
18 Law, or is that just a practice that you follow
19 in your office?
20   A.    You know, I would have to look at
21 the code on that.  It is a practice we follow,
22 so we can follow the chain of title.
23   Q.    Do you know whether all Ohio
24 counties require assignments of mortgage to
25 specifically identify a number, or a book page

Page 305

1  number relating to the mortgage being assigned?
2    A.    I cannot speak for other counties.
3    Q.    Now, assignments of mortgages are
4  ordinarily recorded prior to the release of the
5  same mortgage, correct?
6    A.    Correct.
7    Q.    Normally you would want to record
8  documents in chronological order; is that
9  correct?
10   A.    Correct.
11   Q.    Do you take steps in your office to
12 try to record documents in chronological order
13 when you can?
14   A.    Yes.
15   Q.    Why do you do that?
16   A.    Because that's when they're handed
17 to us.
18   Q.    But if you were handed two
19 documents at the same time, and one was dated
20 yesterday and one was dated today, would your
21 staff try to record the one dated yesterday
22 first?
23   A.    Probably.
24   Q.    And why would they do that?
25   A.    To record them in chronological

Page 306

1  order, so it made sense.
2    Q.    Would you agree that it would be
3  unusual to record an assignment of a mortgage
4  after a mortgage has been released?
5    A.    I don't know.  I don't work the
6  front desk, so I don't know.
7    Q.    You're not aware of that ever
8  happening?
9    A.    I don't know.  I don't work the
10 front desk.
11   Q.    Do you believe that recordation of
12 an assignment of a mortgage today when the
13 mortgage was actually released years ago might
14 result in confusion among members of the
15 public?
16   A.    No.
17   Q.    Why not?
18   A.    Well, because then they could trace
19 what happened.
20   Q.    I wanted to ask some follow-up
21 questions about the testimony yesterday about
22 land trusts as well.  Occasionally land in the
23 State of Ohio is owned by a trust; is that
24 correct?
25   A.    Correct.

7 (Pages 303 - 306)

1    Q.   Do you know why people establish
2  trusts to hold title to land?
3    A.   No.  I don't really know.
4  Inheritance reasons.
5    Q.   Isn't it true that one of the
6  reasons people create trusts to hold title to
7  real estate is to conceal who owns the
8  beneficial interest of that trust?
9        MR. SIEBOTT:  Objection.  She just
10  said she doesn't know.
11    A.   I don't know.
12    Q.   Isn't it true that the
13  beneficiaries of a trust are not always shown
14  on a trust agreement?
15    A.   I don't know.
16    Q.   Would you agree that if the
17  beneficiaries of a trust are not shown on the
18  trust agreement, and then the beneficial
19  interest of a trust changes hands, that
20  transaction does not need to be disclosed or
21  recorded in any way to your office?
22    A.   I don't know.
23        MR. BROCHIN:  I'm sorry, what was
24  the answer?
25        MR. CUNNINGHAM:  She doesn't know.

1    A.   I don't know.
2    Q.   Does US Bank owe your office any
3  fees today?
4    A.   I don't know.
5    Q.   Does GMAC Mortgage owe your office
6  any fees today?
7    A.   I don't know.
8    Q.   Are you aware of anything that GMAC
9  Mortgage was obligated to record with your
10  office but failed to record?
11    A.   I do not know.
12    Q.   Are you aware of anything that US
13  Bank was obligated to record but failed to
14  record with your office?
15    A.   I do not know.
16    Q.   Thank you, Ms. Gingerich.  Those
17  are all the questions I have for you.
18        MR. SIEBOTT:  Just before the next
19  line of questioning, is that the last -- how
20  many more?  Just one?  And how long do you
21  think you'll go.
22        MR. WHOLEY:  Maybe 20 minutes.
23        MR. SIEBOTT:  And these are for
24  class certification?
25        MR. WHOLEY:  It will be

1  class-related.
2        EXAMINATION OF SHARON GINGERICH
3  BY MR. CARPENTER:
4    Q.   Ms. Gingerich, my name is Mike
5  Carpenter, and I represent Nationwide Advantage
6  Mortgage Company.  One of the advantages of
7  going last is many of my questions have already
8  been asked, so I'll try to make it as brief as
9  I can today.
10        First of all, I wanted to know, do
11  you have any personal knowledge of my client,
12  Nationwide Advantage Mortgage Company?
13    A.   I do not.
14    Q.   Do you know of anything, to your
15  personal knowledge, that Nationwide Advantage
16  Mortgage Company did wrong in Geauga County?
17    A.   I do not.
18    Q.   Do you know of anything that
19  Nationwide Advantage Mortgage Company did wrong
20  in the State of Ohio?
21    A.   I do not know.
22    Q.   Do you have any personal criticism
23  of Nationwide Advantage Mortgage Company?
24    A.   No.
25    Q.   We've asked you a little bit about

1  your background.  Have you ever been an
2  employee of a Recorder's Office prior to
3  becoming the Recorder of Geauga County?
4    A.   No.
5    Q.   Had you had any prior experience
6  with MERS prior to becoming the Recorder of
7  Geauga County?
8    A.   No.
9    Q.   Had you ever worked with respect to
10  the real estate industry in any capacity prior
11  to becoming the Recorder of Geauga County?
12    A.   Well, I worked for an attorney, and
13  we recorded deeds.
14    Q.   Which attorney was that?
15    A.   Mary Bender.
16    Q.   And where is she located?
17    A.   In Chardon.
18    Q.   And did you personally get involved
19  in the recording of the deeds?
20    A.   I took the deeds to the Recorder's
21  Office, yes.
22    Q.   Okay.  And --
23    A.   In Geauga.
24    Q.   In Geauga County?
25    A.   Other ones were mailed.

Page 311

1    Q.   Okay.  And how long did you work
2  for Mary Bender?
3    A.   Seven years.
4    Q.   And when was that?
5    A.   Seven years prior to 2009.
6    Q.   Okay.  So 2002 to 2009; is that
7  right?  What was your title in Mary Bender's
8  office?
9    A.   Secretary, assistant.
10    Q.   Did you ever have any document you
11  submitted to the Recorder's Office rejected for
12  recording?
13    A.   Yes.
14    Q.   Did Mary Bender ever represent any
15  clients that used the MERS system?
16    A.   Not to my knowledge.
17    Q.   Did she ever discuss the MERS
18  system with you?
19    A.   No.
20    Q.   So how would you know if she did or
21  did not?
22    A.   I said "not to my knowledge".  I
23  don't know.
24    Q.   So she may have?
25    A.   She may have.

Page 312

1    Q.   Does she have a list of clients
2  that she was representing at that time?
3    A.   I don't know if she has a list.
4    Q.   Did she represent mostly
5  individuals, or did she represent banks and
6  lending institutions?
7    A.   She was a domestic relations
8  attorney.
9    Q.   Domestic relations attorney.  So in
10  the seven years you worked for Mary Bender,
11  about how many deeds would you have recorded?
12    A.   I don't know.
13    Q.   Would it have been thousands, less
14  than thousands?
15    A.   Probably -- I don't -- probably
16  less than thousands.
17    Q.   Other than working for Mary Bender
18  in her domestic relations practice as a
19  secretary, did you work for anyone else with
20  respect to the real estate industry?
21    A.   You mean, like, a title company, or
22  anything like that?
23    Q.   Anything related to the real estate
24  industry.
25    A.   Oil and gas?  Would you consider

Page 313

1  that?
2    Q.   What did you do for the oil and gas
3  company?
4    A.   I was a secretary.
5    Q.   What company was that?
6    A.   Northeast Operating.
7    Q.   And did you do anything with
8  respect to the real estate operations of
9  Northeast Operating?
10    A.   I did everything a secretary does.
11  I mean, type things, and --
12    Q.   Did Northeast Operating file any
13  leases with Recorder's offices?
14    A.   Yes.
15    Q.   And did you play any role in the
16  filing of those leases?
17    A.   Yeah.  I probably stuck them in the
18  mail, yeah.
19    Q.   Did you ever go to a Recorder's
20  Office on behalf of Northeast Operating?
21    A.   Yes.
22    Q.   And what Recorder's Office?
23    A.   Pennsylvania.  It was in
24  Pennsylvania.  And I do not remember the
25  county.  That was in the '70s.

Page 314

1    Q.   Your work employment at Northeast
2  Operating was in the 1970s?
3    A.   Yes.
4    Q.   Anything else, other than what
5  we've covered now with Mary Bender and the
6  Northeast Operating?
7    A.   No.
8    Q.   Have you ever been elected a public
9  official for any county prior to being elected
10  the County Recorder of Geauga County?
11    A.   For any county, no.
12    Q.   Were you elected as a public
13  official in some other capacity?
14    A.   Yes.
15    Q.   Tell me about that.
16    A.   Burton Village Councilwoman.
17    Q.   Burton Village Council?
18    A.   Yes.
19    Q.   When was that?
20    A.   Three years prior to 2009 I was
21  elected.
22    Q.   So while you were working at Mary
23  Bender's office?
24    A.   Yes.
25    Q.   Anything else that you've been

9 (Pages 311 - 314)

1 elected as a public official?
2   A.   Yes.  Precinct Committee person.
3   Q.   And when was that?
4   A.   Eight years -- I was for eight
5 years.  It's a two-year term, so it was about
6 eight years prior to this past election.
7   Q.   Was that in Burton also?
8   A.   Yes.
9   Q.   When you were on the village
10 council for Burton, did you attempt to exercise
11 any authority over other villages, or did you
12 focus on what was going on in Burton?
13   A.   Just Burton.
14   Q.   Did you bring any lawsuits in your
15 capacity --
16   A.   No.
17   Q.   -- on the Burton Village Council?
18   A.   No.
19   Q.   How about when you were the
20 precinct committee person for eight years in
21 Burton; did you attempt to exercise any
22 authority over any other precincts other than
23 yours?
24   A.   No.
25   Q.   Did you bring any lawsuits on

1 behalf of your precinct?
2   A.   No.
3   Q.   The fees that you collect for
4 recording documents at the Geauga County
5 Recorder's Office, how are those fees
6 allocated?  And I don't mean in what amounts;
7 but in what manner are you told how they are to
8 be allocated?
9   A.   In what manner am I told?
10   Q.   Yes.  I heard testimony about the
11 Housing Trust, and you said that $14 of every
12 $28 must go to the Housing Trust?
13   A.   Correct.
14   Q.   How do you know that?
15   A.   It's in the code.
16   Q.   It's in the Ohio Revised Code?
17   A.   Yes.
18   Q.   And what about the other amounts
19 that you spoke of, the amounts for ACS and the
20 amounts that go to your office; how are those
21 determined?
22   A.   We have a $4 fee that goes into the
23 CRM fund, and -- how did that start?
24   Q.   Yes.
25   A.   I wasn't -- I wasn't Recorder then.

1   Q.   Is that in the Ohio Revised Code?
2   A.   I believe it is.
3   Q.   And the remaining moneys that are
4 saved and are turned over to the general fund
5 of Geauga County, how is that determined?
6   A.   How is it determined?
7   Q.   Yes.  Who tells you to pay that to
8 the general fund of Geauga County?
9   A.   The process is we turn in the
10 receipts every day, they go to the Auditor, and
11 they take the money.  I mean, we don't divide
12 up our money.
13   Q.   And my question is; how do you know
14 that you're supposed to turn it over?  Who
15 tells you to turn it over?
16   A.   The county.
17   Q.   Is there anything that you are
18 aware of as the County Recorder of Geauga
19 County that says that you can allocate a
20 portion of the fees you collect for recording
21 documents in Geauga County, and give them to a
22 law firm?
23   A.   No.
24   Q.   Are you aware that one of the
25 retention items in this case includes the

1 possibility that the fees paid to the law firm
2 from New York City representing you would be an
3 agreement to pay future filing fees to
4 Mr. Siebott's law firm?
5   A.   I'm not aware of that.
6   Q.   Would that be something that you're
7 authorized and ethically obligated to do?
8   A.   I don't know anything about that.
9   Q.   Have you investigated with respect
10 to future filing fees the authority or ethical
11 obligation you may have to pay them to a law
12 firm from New York City?
13   A.   I don't know anything about that.
14   Q.   Do you intend to do that after this
15 deposition?
16   A.   No.  I'm not paying anybody.
17   Q.   In the Amended Complaint there is
18 an allegation with respect to Nationwide
19 Advantage Mortgage Company, and a property on
20 328 Bonniewood Drive in Cleveland, Ohio.  Are
21 you familiar with that allegation?
22   A.   I am not.
23   Q.   Is Cleveland, Ohio in Geauga
24 County?
25   A.   It is not.

Page 319

1  Q.  Do you have any jurisdiction over
2  Cuyahoga County?
3  A.  I do not.
4  Q.  Have you ever been the Recorder of
5  Cuyahoga County, and specifically as of
6  February 18, 2003?
7  A.  I have not.
8  Q.  Who does have jurisdiction over the
9  recording of mortgages and mortgage assignments
10  in Cuyahoga County currently?
11  A.  I don't know.
12  Q.  Who had them in 2003?
13  A.  The Recorder.
14  Q.  And do you know what the Recorder
15  of Cuyahoga County in 2003's position is with
16  respect to this lawsuit?
17  A.  I do not know about that.
18  Q.  Do you know what the current person
19  responsible for the recording of mortgages and
20  mortgage assignments in Cuyahoga County's
21  position is with respect to this lawsuit?
22  A.  I do not know.
23  Q.  Have you spoken to that person
24  about this lawsuit?
25  A.  No.

Page 320

1  Q.  Do you know anything about how the
2  mortgage loan on 328 Bonniewood in Cuyahoga
3  County and in Cleveland came to be?
4  A.  I do not.
5  Q.  Do you know whether it was
6  securitized or not?
7  A.  I do not.
8  Q.  The allegation says it was.  Do you
9  know that to be true?
10  A.  I do not know.
11  Q.  Do you know how securitization of
12  the property at 328 Bonniewood in Cleveland,
13  Ohio would have occurred?
14  A.  I do not.
15  Q.  You were not involved in that
16  securitization process, were you?
17  A.  No.
18  Q.  Do you know who was?
19  A.  No.
20  Q.  And I take it you have no personal
21  knowledge of Nationwide Advantage Mortgage
22  Company being involved in securitizing the 328
23  Bonniewood mortgage loan; is that fair?
24  A.  What's the beginning of that?  I
25  have no knowledge --

Page 321

1  Q.  Yes.  You have no knowledge --
2  A.  I have no knowledge.
3  Q.  Would you have played any role in
4  the Bonniewood property recording in Cuyahoga
5  County from your position in Geauga County?
6  A.  No.
7  Q.  Do you have any power as the County
8  Recorder of Geauga County to require the
9  recording of the Bonniewood property be done
10  differently in Cuyahoga County?
11  A.  No.
12  Q.  Would the same hold true with any
13  other county in the State of Ohio; do you have
14  any power to direct how the County Recorders of
15  any of the other 87 counties in Ohio should be
16  handling the recording of the documents
17  presented to them?
18  A.  No.
19  Q.  Would your office in Geauga County
20  accept a mortgage on a property in another
21  county?
22  A.  No.
23  Q.  Why not?
24  A.  Because we only accept Geauga
25  County properties.

Page 322

1  Q.  And that's based on the Ohio
2  Revised Code, correct?
3  A.  Correct.
4  Q.  And the mortgage is to be recorded
5  in the county in which the property is located,
6  correct?
7  A.  Correct.
8  Q.  Would your office charge a fee for
9  a mortgage or a mortgage assignment recorded in
10  another county in Ohio?
11  A.  No.
12  Q.  What other County Recorders have
13  contacted you about joining in this lawsuit as
14  parties?
15  A.  None.
16  Q.  Do you represent the citizens of
17  Cuyahoga County in any way?
18  A.  No.
19  Q.  Do you represent the citizens of
20  any other county in Ohio, other than Geauga
21  County, in any way?
22  A.  No.
23  Q.  Were you elected by the citizens of
24  any other county in Ohio, other than Geauga
25  County?

11 (Pages 319 - 322)

Page 323

1    A.   No.
2    Q.   Do the citizens of Cuyahoga County
3  or any other county in Ohio have the right to
4  vote you out if they do not like the manner in
5  which you're conducting your office?
6    A.   No.
7    Q.   Only the citizens of Geauga County;
8  is that correct?
9    A.   Correct.
10   Q.   Do you think the citizens of the
11  other counties should have that right to vote
12  you out depending on how you handle this
13  lawsuit?
14   A.   No.
15   Q.   Do you believe that the Ohio
16  Revised Code gives you the power to order a
17  private citizen to record a mortgage or a
18  mortgage assignment in the State of Ohio?
19   A.   No.
20   Q.   There's no individual mandate from
21  you that can require that citizen to so file,
22  correct?
23   A.   Correct.
24   Q.   And only if a citizen decides to
25  record must they comply with certain

Page 324

1  requirements of the Recorder's Office, correct?
2    A.   Correct.
3    Q.   And only if they decide to record
4  must they pay you a fee; is that fair?
5    A.   Correct. Can you back up to that
6  question about the Ohio Revised Code?
7    Q.   Why don't I keep going.
8        MR. SIEBOTT: If she wants to
9  clarify an answer, I think she should be
10  permitted to do so. You can hear the question
11  back.
12       THE WITNESS: The one about -- did
13  the code -- does the code require me to order a
14  citizen, is that what you said, to pay?
15       MR. SIEBOTT: Could you read the
16  question back?
17       THE WITNESS: About ordering a
18  citizen to record a mortgage?
19   Q.   Let me ask it again for you, and
20  see if this clarifies it for you. Do you have
21  a power to order a private citizen in the State
22  of Ohio to record a mortgage or a mortgage
23  assignment? Is that the question?
24   A.   Do I have -- yeah. Do I have the
25  power? The code has -- the code mandates.

Page 325

1    Q.   Do you have the power as a Recorder
2  in Geauga County to order a private citizen to
3  record a mortgage or a mortgage assignment?
4    A.   No. The code does.
5    Q.   Is that the question you had a
6  concern about?
7    A.   Yes.
8    Q.   We've now clarified it, right?
9    A.   Yes.
10   Q.   So Mr. Siebott's objection has been
11  addressed, correct?
12   A.   Yes.
13   Q.   Do you agree that the recording
14  system in Ohio was enacted to benefit and
15  protect mortgagees?
16   A.   Yes.
17   Q.   Do you agree that the recording
18  system in Ohio was enacted to benefit and
19  protect bonafide purchases?
20   A.   Yes.
21   Q.   Do you agree that the recording
22  system in Ohio was enacted to benefit and
23  protect creditors?
24   A.   To protect everybody, yes.
25   Q.   Do you agree the recording system

Page 326

1  in Ohio was enacted to benefit and protect the
2  public's right to notice of prior liens?
3    A.   To know their prior what?
4    Q.   Do you believe and agree that the
5  recording system in Ohio was enacted to benefit
6  and protect the public's right of notice of
7  prior liens?
8    A.   Yes.
9    Q.   Were there any recordings that your
10  office actually did for which you were not
11  paid?
12   A.   Well, the county -- the county does
13  some of the county that we don't charge for.
14   Q.   So you have some situations --
15   A.   The county -- if the county
16  records a deed the county owns.
17   Q.   Are you claiming a right of
18  recovery for those amounts that the county
19  records and does not pay you for?
20   A.   No.
21   Q.   Are you making any claims in this
22  case for any fees that you believe that you
23  were owed for recording items that you actually
24  recorded?
25       MR. SIEBOTT: Objection.

12 (Pages 323 - 326)

1  Foundation.

2  A.  No. I'm not claiming.

3  Q.  It's only if you record something

4  that you're entitled to a fee, correct?

5  A.  Correct.

6  Q.  Let's say that I have some property

7  in Geauga County and I want to sell it, and

8  I'll just pick some round numbers. I want to

9  sell it for $100,000, and I'm going to sell it

10  to a private individual, okay?

11  A.  Okay.

12  Q.  And I'm going to carry a note for

13  $90,000 on that property, and the person buying

14  it from me is going to pay me $10,000. Are you

15  with me so far?

16  A.  Okay.

17  Q.  And I take a mortgage on that

18  property to secure my interest for the $90,000.

19  Are you with me so far?

20  A.  Yes.

21  Q.  And I decide I don't want to record

22  the mortgage for whatever reason. Let's say

23  it's for one of my children, and we want to

24  keep it private. Okay?

25  A.  Okay.

1  Q.  Do you have the power to order me

2  to record that mortgage?

3  A.  The code says all mortgages are to

4  be recorded.

5  Q.  Have you ever sued anyone under the

6  circumstances I just gave you for refusing to

7  record the mortgage between them and their

8  child?

9  A.  No.

10  Q.  Would you do that?

11  A.  How would I know?

12  Q.  If it were brought to your

13  attention, and I've just told you here today in

14  this deposition about it, would you go tomorrow

15  and go to Mr. Joyce and sue me?

16  A.  No.

17  Q.  Why not?

18  A.  I don't know. I just -- I'd

19  probably -- maybe I would ask him. I would

20  probably ask him if I should. That's what I

21  would do. If brought to my attention, I would

22  consult with my prosecutor and ask him.

23  Q.  And if he told you that he thought

24  you should sue me under those circumstances,

25  would you authorize him to sue me?

1  A.  If he told me that that's what I

2  had to do, I would follow his advice.

3  Q.  And the same would be true if you

4  learned of any other private citizen, or any

5  other private transaction that was occurring,

6  and they chose for whatever reason, privacy or

7  family, not to place that of record in the

8  public documents of Geauga County, you would go

9  to the prosecutor; and if he said you should

10  sue them, you would sue all of them; is that

11  correct?

12  A.  I would follow his advice.

13  Q.  What if he told you not to sue

14  them?

15  A.  I would follow his advice.

16  Q.  You would not sue them; is that

17  correct?

18  A.  I would do what he said.

19  Q.  So it would be Mr. Joyce's

20  decision?

21  A.  Correct.

22  Q.  Have you ever sued any private

23  citizen of Ohio or anywhere else for any reason

24  to compel them to record anything?

25  A.  No.

1  Q.  Have you ever gone to Mr. Joyce for

2  any reason to compel any private citizen to

3  record anything?

4  A.  No.

5  Q.  Do you favor more efficient

6  recording systems?

7  A.  Sure.

8  Q.  Do you favor systems that reduce

9  errors associated with paper processes?

10  A.  Sure, yes.

11  Q.  Do you favor electronic recording?

12  A.  Yes.

13  Q.  And you put some software in place

14  to assist in Geauga County with electronic

15  recording; have you not?

16  A.  I wanted to.

17  Q.  You wanted to. And the reason it

18  wasn't was because of lack of funding, correct?

19  A.  No. That is not correct.

20  Q.  What's the reason it was not done?

21  A.  IT could not do it. The IT

22  department could not accomplish it.

23  Q.  If they could have accomplished it,

24  you would have had it done?

25  A.  Correct.

13 (Pages 327 - 330)

Page 331

1    Q.    Were you involved in the decision
2  to file this lawsuit?
3    A.    Dave asked me, yes.
4    Q.    He came to you, or did you go to
5  him?
6    A.    He came to me.
7    Q.    And when you say "Dave", you mean
8  David Joyce?
9    A.    Yes.
10   Q.    And I understand there was some
11 processes that went after that meeting, and
12 after the decision to proceed, to protect the
13 citizens of Geauga County; is that correct?
14       MR. SIEBOTT: Objection. Vague.
15   A.    I don't know what you're talking --
16   Q.    Did you and Mr. Joyce just go file
17 this suit, or did you go to the County
18 Commissioners of Geauga County?
19   A.    We went to the Commissioners.
20   Q.    Did you go to anyone else?
21   A.    No.
22   Q.    And do you believe that that same
23 opportunity to discuss and be heard should be
24 afforded all the other counties of Ohio before
25 they are forced into this lawsuit?

Page 332

1    A.    Sure.
2    Q.    They should have the same rights
3  and opportunities, since they represent the
4  citizens of their respective county, to meet
5  with their prosecutors and to meet with their
6  Boards of County Commissioners, correct?
7    A.    Yes.
8    Q.    Is it fair to say, Ms. Gingerich,
9  that each county acts independently the others
10 in terms of the operations of their county?
11   A.    Yes
12       MR. CARPENTER: And, Christian, I
13 tried to follow as closely as I can with some
14 of these exhibits in the back, but if any of
15 these are duplicates, let me know. I don't
16 think this one is, but let me know.
17       - - - - -
18       (Thereupon, Deposition Exhibit 64, A
19       Document Bates Stamped GCR-001718
20       Through GCR-001719, was marked for
21       purposes of identification.)
22       - - - - -
23   Q.    Do you recognize, Ms. Gingerich,
24 this e-mail that we've marked as Exhibit 64?
25 And let's start with the first e-mail on the

Page 333

1  chain, which is an e-mail from you to a Robert
2  Holman?
3    A.    Yes.
4    Q.    And it's dated October 20, 2011.
5  Do you see that?
6    A.    Yes.
7    Q.    Do you recall sending Mr. Holman
8  this e-mail?
9    A.    Yes.
10   Q.    And in your e-mail to Mr. Holman
11 you're saying "Mr. Joyce filed this lawsuit
12 with my office's research assistance and on my
13 behalf." Is that a true statement when you
14 wrote it to Mr. Holman?
15   A.    I thought it was, but I was wrong.
16   Q.    So it was not a true statement?
17   A.    It was not a true statement.
18   Q.    And how was it false?
19   A.    It's on the county's behalf. Not
20 mine.
21   Q.    But you thought at the time it was
22 being brought on your behalf, correct?
23   A.    I did.
24   Q.    And on your behalf as the County
25 Recorder of Geauga County; is that correct?

Page 334

1    A.    That is correct.
2    Q.    Mr. Holman writes back to you, and
3  he says "Sharon", colon. Are the two of you on
4  a first name basis?
5    A.    No. We are now.
6    Q.    He called you "Sharon" there. Was
7  that false for him to do that?
8    A.    It didn't matter. I signed it
9  "Sharon", so --
10   Q.    Are you on a first name basis
11 today?
12   A.    Yes.
13   Q.    And we heard a lot about Cleveland,
14 Ohio yesterday in terms of discussions about
15 the city and the community and what's happened
16 here with respect to some public corruption.
17 Do you recall that testimony?
18   A.    Yes.
19   Q.    And he tells you in his first
20 sentence in the first paragraph, "I am actually
21 in Cleveland, Ohio." Do you see that?
22   A.    Yes.
23   Q.    Did that set any bells off for you?
24   A.    No. Why? No.
25       MR. ERNST: Excuse me, Mike, what

14 (Pages 331 - 334)

1 were there Bates numbers on that?

2 MR. CARPENTER: I apologize. Yes.

3 GCR-001718 and 001719.

4 MR. ERNST: Thank you.

5 - - - - -

6 (Thereupon, Deposition Exhibit 65, A

7 Document Bates Stamped GCO-000001

8 Through GCO-000002, was marked for

9 purposes of identification.)

10 - - - - -

11 Q. Ms. Gingerich, I've marked as

12 Exhibit 65 a document Bates numbered GCO-000001

13 and 000002. Do you have that in front of you,

14 ma'am?

15 A. Yes, I do.

16 Q. And you recognize it a letter dated

17 October 6, 2011 from the Bernstein Liebhard law

18 firm in New York City to David Joyce?

19 A. Yes.

20 Q. When did you first see this

21 document?

22 A. A couple of days ago.

23 Q. And do you take any disagreement

24 with the fee arrangements that have been made

25 with the Geauga County prosecutor in this

1 lawsuit?

2 A. No.

3 Q. Directing your attention to the

4 third paragraph then, I take it you are in

5 agreement when it says; "At the conclusion of

6 the litigation, or any part thereof, the firm

7 shall apply to the Court for approval of an

8 award of attorneys fees and expenses with fees

9 amounting to up to 25 percent of the recovery,

10 whether comprised of a cash fund, the payment

11 of past filing fees and/or an agreement to pay

12 future filing fees." Do you see that?

13 A. Yes, I do.

14 Q. And is it is your position that you

15 have the authority and power under the Ohio

16 Revised Code as the Recorder of Geauga County

17 to allocate the payment of either past filing

18 fees or future filing fees; is that your

19 testimony?

20 A. I do not know how that will work.

21 I do not know how that will physically work.

22 Q. Do you intend to report this fee

23 agreement, and this fee arrangement to allocate

24 a portion of your filing fees to the Bernstein

25 Liebhard law firm to any ethical authorities in

1 the State of Ohio?

2 A. I do not know.

3 Q. Are you going to report it to

4 anyone?

5 A. I don't know. I don't know.

6 Q. Can you do that ethically under the

7 State of Ohio's rules for you?

8 A. I don't know.

9 Q. Do you intend to bring that to the

10 Ohio Recorders Association's attention?

11 A. No. I'll ask Dave what to do.

12 Q. Do you intend to post it on your

13 website?

14 A. No. Again, I will ask Dave what to

15 do.

16 Q. And will you follow whatever Dave

17 tells you to do?

18 A. I will.

19 Q. Will you seek any independent

20 counsel?

21 A. No, I will not.

22 Q. And Mr. Joyce, just so the record

23 is clear, is the named Plaintiff in this

24 lawsuit?

25 A. The county.

1 Q. "State of Ohio, ex rel. David

2 Joyce." Are you aware that's the name of the

3 lawsuit?

4 A. Yes. Yes.

5 Q. And so you will let a party to this

6 lawsuit determine your ethical obligations

7 under the Ohio Revised Code; is that correct?

8 MR. SIEBOTT: Objection.

9 Foundation.

10 Q. Is that correct?

11 A. I will defer to my prosecutor.

12 Q. Even though he is also the named

13 Plaintiff in the lawsuit?

14 MR. SIEBOTT: Objection. Asked and

15 answered.

16 Q. Is that correct?

17 A. I will defer to my prosecutor.

18 MR. CARPENTER: I believe this one

19 was marked as Exhibit 48 previously. It's

20 GCR-001306. Just to make it more efficient,

21 unless you've got them in order, Christian, if

22 you can confirm that it's Exhibit 48. Is that

23 correct?

24 MR. SIEBOTT: Uh-huh.

25 MR. CARPENTER: Thank you. So for

15 (Pages 335 - 338)

Page 339

1 everyone in the audience, it's GCR-001307 to
2 001306. I apologize. 001306 is the first
3 page. I'm on the second page. It's GCR-001306
4 and 1307. And I'm on page 2, 1307.
5    Q.   Paragraph 5 says that "Robert
6 Holman, President of OAITA, said their local
7 and national organization is 100 percent in
8 support of our suit." Do you see that?
9    A.   Yes.
10    Q.   Is Mr. Holman a lawyer?
11    A.   I don't know.
12    Q.   Well, we'll get to that in a moment
13 then. Assume he is. Have you ever received
14 legal advice from Mr. Holman on this lawsuit?
15    A.   No.
16    Q.   Number 6 says, "My prosecutor."
17 Would that be David Joyce?
18    A.   Yes.
19    Q.   "Will be speaking about MERS to all
20 of your prosecutors at their annual meeting on
21 November 30th. He has copied your PAs." Did
22 he speak to the prosecutors on November 30th?
23    A.   Yes.
24    Q.   Could you tell the Court how many
25 of the prosecutors have joined in your lawsuit?

Page 340

1    A.   None that I know of.
2    Q.   It says; "If you're interested in
3 doing something about MERS, please talk to your
4 prosecutors before the 30th." That would be
5 November 30th of 2011, right?
6    A.   Correct.
7    Q.   "They do know about this suit, and
8 all the time and money that we have already
9 invested in it." Do you see that?
10    A.   Yes.
11    Q.   Describe for me under oath and on
12 the record all of the money that you have
13 invested in this lawsuit.
14    A.   Well, the money would be -- and,
15 actually, that probably wasn't real accurate,
16 because the money would be the research done.
17    Q.   What research was done by your
18 office?
19       MR. SIEBOTT: Objection. That's
20 trial preparation.
21       MR. CARPENTER: She's a public
22 official in Ohio. Are you intending to
23 obstruct my chance to ask her questions on
24 this?
25       MR. SIEBOTT: Yes.

Page 341

1       MR. CARPENTER: Are you instructing
2 her not to answer?
3       MR. SIEBOTT: I'm instructing her
4 not to answer that question.
5       MR. CARPENTER: As to what research
6 was done by her office with respect to this
7 lawsuit?
8       MR. SIEBOTT: Correct.
9       MR. CARPENTER: And the basis for
10 your objection is what?
11       MR. SIEBOTT: Trial preparation.
12 Any research that was done was done at the
13 direction of the county prosecutor, and is
14 trial preparation.
15    Q.   Do you consider the work done by
16 your office during your business hours to be
17 private and not available to the citizens of
18 Ohio, Ms. Gingerich?
19    A.   It was trial preparation.
20    Q.   So you and Mr. Joyce were planning
21 on going to trial before you retained the
22 Bernstein Liebhard law firm; is that correct?
23    A.   Correct.
24    Q.   When did you first, you and
25 Mr. Joyce, get together and decide that you

Page 342

1 were going to prepare to take this case to
2 trial? Give me the date.
3    A.   I don't know the date. It was --
4 it was in the fall.
5    Q.   The fall of what year?
6    A.   Of 2011.
7    Q.   And where did you first meet about
8 that?
9    A.   In my office.
10    Q.   Was that a private meeting or a
11 public meeting?
12    A.   Private.
13    Q.   Did you keep any records of that
14 meeting with Mr. Joyce?
15    A.   I did not.
16    Q.   And did Mr. Joyce tell you that
17 that meeting was privileged and confidential?
18    A.   He didn't say -- no.
19    Q.   And was anyone else present at the
20 meeting?
21    A.   No.
22    Q.   And other than the research that
23 your lawyer has instructed you not to provide
24 any information to me about, what money did
25 your Recorder's Office expend and have invested

16 (Pages 339 - 342)

Page 343

1  in this lawsuit?
2     A.   When I said that, I meant the
3  attorneys.
4     Q.   I'm sorry. I don't understand what
5  you're saying.
6     A.   But that was wrong, because I see
7  in the agreement that there is no money expent
8  until afterwards. So this is a misstatement?
9     Q.   So this statement on Exhibit 48
10 that you sent out as the MERS update story,
11 when it says that you have invested all the
12 time and money in this suit, that was a false
13 statement?
14    A.   I did not send this out.
15    Q.   Why did you prepare this?
16    A.   These were my notes that I
17 presented at the ORA.
18    Q.   You presented these notes?
19    A.   I said -- I said this. I did not
20 give this paper to them. I said it.
21    Q.   Do you think there's a difference
22 between saying it to the Ohio Recorders
23 Association and actually handing this document
24 to them?
25    A.   Yes. Because I probably didn't say

Page 344

1  everything that's in it.
2     Q.   Well, did you say that you had
3  invested time and money in this lawsuit?
4     A.   Probably.
5     Q.   And I'm asking you what money had
6  you invested in the lawsuit when you told the
7  Ohio Recorders Association that?
8     A.   And I'm just saying nothing. I was
9  wrong. It was -- I misspoke.
10    Q.   Have you paid or deferred or in any
11 way defrayed the cost of travel to Ohio for the
12 New York City law firm that you retained?
13    A.   Have I paid them?
14    Q.   Has the county of Geauga County --
15    A.   No.
16    Q.   To your knowledge, they've submit
17 to no bills for any expenses incurred in this
18 case?
19    A.   That's correct.
20    Q.   Would you see those, or would your
21 prosecutor, David Joyce, have those?
22    A.   David would have them.
23    Q.   And he's not mentioned that to you,
24 correct?
25    A.   Correct.

Page 345

1     Q.   What about time; have you spent any
2  time invested in this lawsuit?
3     A.   Staff has, yes.
4     Q.   Your staff at the Geauga County
5  Recorder's office?
6     A.   Yes.
7     Q.   And how much time have they spent
8  on this lawsuit?
9     A.   We did not keep track.
10    Q.   You did not attempt to account to
11 the citizens of Geauga County or Ohio for that
12 time, correct?
13       MR. SIEBOTT:  Objection.
14 Foundation.
15    Q.   Correct?
16    A.   Correct.
17    Q.   Would that have been during their
18 workday?
19    A.   Yes.
20    Q.   Would it have been on their work
21 computers?
22    A.   Yes.
23    Q.   Did you type these notes to the
24 Ohio Recorders Association for your
25 presentation on your work computer during your

Page 346

1  workday?
2     A.   Yes.
3        - - - - -
4        (Thereupon, Deposition Exhibit 66, A
5        Document Bates Stamped GCR-001467,
6        was marked for purposes of
7        identification.)
8        - - - - -
9     Q.   This one is Bates numbered
10 GCR-001467. Is this a White Paper that you
11 would have prepared, Ms. Gingerich?
12    A.   Yes.
13    Q.   And why did you prepare this?
14    A.   Because Zach asked me to.
15    Q.   Zach Holzapfel?
16    A.   Yes.
17    Q.   At Hicks Partners?
18    A.   Correct.
19    Q.   Is Zach Holzapfel the lobbyist for
20 the Ohio Recorders Association?
21    A.   Yes.
22    Q.   Is Hicks Partners also your
23 lobbyist; that is, for Geauga County Recorder's
24 Office?
25    A.   No.

17 (Pages 343 - 346)

Page 347

1    Q.   Do you pay him anything?
2    A.   No.
3    Q.   He's paid out of the funds of the
4  Ohio Recorders Association?
5    A.   Yes.
6    Q.   And why did Zach Holzapfel ask you
7  to prepare this?
8    A.   Because he wanted to know -- he
9  wanted a White Paper.  I --
10    Q.   Does Zach Holzapfel have the duty,
11  power or authority to direct you to prepare
12  things on county time on county computers if he
13  requests it?
14    A.   No.
15    Q.   So if Zach Holzapfel instructed you
16  to do other things with respect to Geauga
17  County Recorder's Office, would you do them?
18    A.   Well, if it had to do with the
19  Recorders Association, yes.
20    Q.   And why is that?
21    A.   Because I'm a member of the
22  Recorders Association.  Because I'm on the
23  Legislative Committee and Q&A.
24    Q.   So if he said to you I want you to
25  stop charging money for recording a deed on

Page 348

1  behalf of the Ohio Recorders Association, would
2  you stop charging?
3    A.   No.
4    Q.   What if he told you I want you to
5  start sending one dollar from every recording
6  fee to the Ohio Recorders Association; would
7  you do that?
8    A.   No.
9    Q.   So there are things in which you in
10  your discretion would determine not to do,
11  correct?
12    A.   Correct.
13    Q.   But with respect to this request by
14  Mr. Holzapfel, that is marked as Exhibit 66,
15  you, in fact, agreed to do it on county time,
16  correct?
17    A.   Correct.
18    Q.   The last sentence of this document
19  says; "The Ohio Revised Code in relation to
20  mortgage recording should be strengthened by
21  legislation."  Do you see that?
22    A.   I do.
23    Q.   I take it since you prepared this
24  you felt that the Ohio Revised Code in relation
25  to mortgage recordings was not as strong as you

Page 349

1  would like it, correct?
2    A.   Correct.
3    Q.   What specifically did you want to
4  see the legislation strengthen to provide?
5    MR. SIEBOTT:  Objection.  This was
6  asked and answered yesterday.
7    A.   I wanted to see the code enforced.
8  I wanted to see -- I wanted to see you pay the
9  recording fees that are supposed to be paid.
10    Q.   Did you want to see you be given
11  the right to sue private citizens if they did
12  not record a document?
13    A.   No.
14        - - - -
15        (Thereupon, Deposition Exhibit 67, A
16        Document Bates Stamped GCR-001505,
17        was marked for purposes of
18        identification.)
19        - - - -
20    Q.   Ms. Gingerich, I'm going to hand
21  you what's been marked as Exhibit 67.  Here's a
22  copy for your counsel.
23    MS. GOODMAN:  The White Paper was
24  already an exhibit.
25    MR. CARPENTER:  We'll just leave

Page 350

1  it, since I've already marked it.  Thank you.
2    Q.   Ms. Gingerich, looking at Exhibit
3  67, who is Jim Helmink?
4    A.   He is someone who I met who was
5  running for an office.
6    Q.   What office?
7    A.   State Rep.
8    Q.   From what county?
9    A.   Cuyahoga.
10    Q.   Cuyahoga County?
11    A.   Correct.
12    Q.   Where did you meet him?
13    A.   At a holiday party.
14    Q.   Where was that holiday party?
15    A.   At -- in Mentor.
16    Q.   Did Mr. Helmink get elected?
17    A.   I don't think so.
18    Q.   According to this, he says he was
19  very interested in what you had to say on MERS.
20  Were the two of you talking at the Mentor
21  holiday party about the MERS lawsuit?
22    A.   Yes.
23    Q.   What were you telling him?
24    A.   I was telling him that we had
25  brought suit.

18 (Pages 347 - 350)

Page 351

1    Q.  Did you forward him any
2  information?
3    A.  If I did, it would have been just
4  the lawsuit.
5        MR. CARPENTER:  The Bates numbers
6  for Exhibit 67 are GCR-001505.  And let's mark
7  this as 68.
8            - - - - -
9        (Thereupon, Deposition Exhibit 68, A
10        Document Bates Stamped GCR-001508
11        Through GCR-001509, was marked for
12        purposes of identification.)
13           - - - - -
14    Q.  Ms. Gingerich, you've been handed
15  what we've marked as Exhibit 68, which bears
16  Bates numbers GCR-001508 to 1509.
17        Do you have that in front of you,
18  ma'am?
19    A.  Yes.
20    Q.  And this is the same Robert Holman?
21    A.  Yes.
22    Q.  Do you see after his name he puts
23  "Esquire"?
24    A.  Yes.
25    Q.  Does that refresh your memory as

Page 352

1  to --
2    A.  Yes.  Obviously, yes.
3    Q.  He is a lawyer, correct?
4    A.  Yes.
5    Q.  And Oakwood Village is in Cuyahoga
6  County, right?
7    A.  Yes.
8    Q.  Is says he was hoping to schedule a
9  meeting to meet with you at your office.  Do
10  you see that?
11    A.  Yes.
12    Q.  Did that meeting occur?
13    A.  Yes.
14    Q.  At your office?
15    A.  Yes.
16    Q.  In Geauga County, during the course
17  of business days, correct?
18    A.  Yes.
19    Q.  And it says; "The purpose of the
20  visit would be to discuss the MERS litigation
21  and ways we might be able to help your office
22  and the other County Recorders to understand
23  the importance of challenging MERS for the
24  future of land title records."  Do you see
25  that?

Page 353

1    A.  Yes.
2    Q.  Did he charge you anything for his
3  advice during that meeting?
4    A.  No.
5    Q.  Do you know why Mr. Holman is so
6  interested in your litigation?
7    A.  Because he's a title person.
8    Q.  Has he offered to join in the
9  lawsuit?
10    A.  No.
11    Q.  Has he offered his organization to
12  join in the lawsuit?
13    A.  Not to my knowledge.
14           - - - - -
15        (Thereupon, Deposition Exhibit 69, A
16        Document Bates Stamped GCR-001512
17        Through GCR-001513, was marked for
18        purposes of identification.)
19           - - - - -
20    Q.  This is Exhibit 69.  It's marked
21  GCR-001512 and 1513.  Ms. Gingerich, do you
22  recognize this as an e-mail you sent to Zach
23  Holzapfel on or about November 7, 2011?
24    A.  No.
25    Q.  I apologize.  You sent it to Barb

Page 354

1  Sessler, correct?
2    A.  Correct.
3    Q.  Who is Barb Sessler?
4    A.  She was another Recorder, Erie
5  County.
6    Q.  Is she still the Erie County
7  Recorder?
8    A.  Yes.
9    Q.  And you wrote Barb a note.  You
10  said; "Barb, will Zach be talking about MERS,
11  or should I give an update for the Q&A
12  section?"  Do you see that?
13    A.  Yes.
14    Q.  Were you and Zach acting
15  interchangeably on the MERS lawsuit?
16    A.  I'm not -- what do you mean?
17    Q.  Well, in other words, either you
18  could speak about the MERS lawsuit or Zach
19  Holzapfel from Hicks Partners could speak about
20  it to the Ohio Recorders Association, correct?
21    A.  Yes.
22    Q.  Who was paying Zach Holzapfel for
23  his lobbying charges, public relations charges
24  for Geauga County?
25    A.  Well, the Recorders Association

19 (Pages 351 - 354)

1  pays Zach.
2      Q.   And my question is then, that
3  Geauga County is not paying him, but he's
4  speaking on behalf of Geauga County, correct?
5      A.   He -- he could have, yeah.
6      Q.   Well, he was speaking about the
7  Geauga County MERS lawsuit, correct?
8      A.   He did not.
9      Q.   He did not?
10     A.   He did not.
11     Q.   But you were talking about will he
12  be talking about, it or should I, correct?
13     A.   Correct.
14     Q.   Has Zach Holzapfel ever addressed
15  the Ohio Recorders Association about your MERS
16  lawsuit?
17     A.   I don't recall.  But if he did, it
18  was never anything specific.  It was just that
19  it existed.
20     Q.   Has the Ohio Recorders Association
21  ever allocated any portion of Zach Holzapfel's
22  fees from Hicks Partners to Geauga County?
23     A.   No.
24     Q.   Why not?
25     A.   Why should he?  I mean, there's no

1  reason.
2      Q.   You're on the Executive Committee
3  of the Ohio Recorders Association?
4      A.   No.
5      Q.   You're on the Legislative
6  Committee?
7      A.   Correct.
8      Q.   Have you ever suggested that it's
9  only fair that since you're doing this work
10  with Zach Holzapfel for the Geauga County
11  lawsuit that Geauga County reimburse Mr.
12  Holzapfel for the time spent?
13         MR. SIEBOTT:  Objection.
14  Foundation.
15     A.   No.
16         - - - - -
17         (Thereupon, Deposition Exhibit 70, A
18         Document Bates Stamped GCR-001524
19         Through GCR-001525, was marked for
20         purposes of identification.)
21         - - - - -
22     Q.   This document bears Bates number
23  GCR-001524 to 1525.  Do you recognize this, Ms.
24  Gingerich, as an e-mail --
25     A.   Yes.

1      Q.   -- that you sent to Zach Holzapfel?
2      A.   Yes.
3      Q.   You said; "I met with State
4  Representative Marlene Anielski."  Did I
5  pronounce that correctly?
6      A.   Anielski.
7      Q.   Representative Anielski is from
8  Cuyahoga County again, correct?
9      A.   Yes.
10     Q.   Did you ever meet with the State
11  Representative for Geauga County?
12     A.   No.
13     Q.   Who would that be?
14     A.   At the time we were without.
15     Q.   Do you have one now?
16     A.   We do.
17     Q.   Have you met with that person?
18     A.   No.
19     Q.   What's that person's name?
20     A.   Matt Lynch.
21     Q.   And why have you not met with Matt
22  Lynch about your MERS lawsuit?
23     A.   Because he was just appointed a
24  couple of weeks ago.
25     Q.   Do you intend to meet with Matt

1  Lynch?
2      A.   At this point, no.
3      Q.   Why not?
4      A.   Because I'm staying out of it.
5      Q.   What do you mean by that, "staying
6  out of it"?
7      A.   I just -- I'm going to let the
8  lawyers handle it.
9      Q.   As the Recorder of Geauga County,
10  is it your view to this lawsuit is no longer
11  something that you have an interest in?
12     A.   No.
13     Q.   But you're going to let the lawyers
14  handle it?
15     A.   Yes.
16     Q.   And do you believe that even though
17  the lawsuit would have an impact on you at the
18  Geauga County Recorder's, you're going to let
19  the lawyers take care of discharging your
20  duties?
21         MR. SIEBOTT:  Objection.
22  Foundation.
23     A.   That's -- those aren't my duties.
24     Q.   Is that part of your election
25  campaign, that you're going to stay out of this

Page 359

1   case?
2       A.   No.
3       Q.   Have you posted that on your
4   website?
5       A.   That I'm going to stay out of the
6   case?  No.
7       Q.   That you're going to let the
8   lawyers handle it?
9       A.   No.
10      Q.   Has Marlene Anielski introduced any
11  legislation you may need?
12      A.   No.
13      Q.   Have you asked her to introduce any
14  legislation?
15      A.   She offered.
16      Q.   Have you asked her to do that?
17      A.   No.
18      Q.   Have you drafted any proposed
19  legislation that you may need on your MERS
20  lawsuit?
21      A.   No.
22      Q.   Who would do that?
23      A.   Who would draft proposed
24  legislation?
25      Q.   Yes.  Who would do that for you?

Page 360

1       A.   A State Rep.  An elected official.
2       Q.   Matt Lynch?
3       A.   Matt Lynch.
4       Q.   Why would Representative Anielski
5   introduce legislation for Geauga County?
6           MR. SIEBOTT:  Objection.
7   Foundation.
8       A.   Because legislation would have been
9   for the State.  Not -- but we didn't need any,
10  so --
11      Q.   It was determined you didn't need
12  any legislation; is that correct?
13      A.   Well, no.  Because if we follow the
14  code.
15      Q.   And who determined that, that you
16  did not need any legislation?
17      A.   There wasn't any specific
18  conversation or any specific determination.  It
19  just hasn't happened.
20      Q.   My question to you is; as a member
21  of the Legislative Committee for the Ohio
22  Recorders Association, did your committee
23  determine that you did not need legislation?
24      A.   My committee did not talk about
25  MERS to me.

Page 361

1       Q.   So the Ohio Recorders Association
2   has never considered legislation to alter the
3   MERS system in Ohio; is that correct?
4       A.   Not that I know of.  Not that I --
5       Q.   Not while you've been present?
6       A.   Correct.
7       Q.   And you've never asked them to
8   consider preparing or proposing legislation
9   that would address the MERS system in Ohio,
10  correct?
11      A.   That is correct.
12          MR. SIEBOTT:  I would like to take
13  a break.
14          MR. CARPENTER:  I've got one more
15  here that.  Why don't you let me finish this
16  one.
17          - - - - -
18          (Thereupon, Deposition Exhibit 71, A
19          Document Bates Stamped GCR-001528
20          Through GCR-001530, was marked for
21          purposes of identification.)
22          - - - - -
23      Q.   Ms. Gingerich, do you see this is
24  another e-mail to you from Robert Holman, dated
25  November 2, 2011?

Page 362

1       A.   Yes.
2       Q.   He references that he was handling
3   a Municipal Court case for a client in
4   Massillon, Ohio.  Do you see that?
5       A.   Yes.
6       Q.   And that refreshes your memory that
7   he was, in fact, a lawyer?
8       A.   Yes.
9       Q.   Does it refresh your memory as to
10  whether he ever provided legal advice to you,
11  or provided you with a legal opinion as to the
12  MERS system?
13      A.   He did not.
14      Q.   Did you ever reimburse on behalf of
15  Geauga County Mr. Holman?
16      A.   No.
17      Q.   Do you consider Mr. Holman one of
18  the lawyers that you are conferring with and
19  leaving this case to at this point?
20      A.   No.
21          MR. CARPENTER:  That's a good time
22  for a break.  That was GCR-001528 to 1530.
23          (Thereupon, a recess was taken.)
24          MR. CARPENTER:  Back on the record.
25          - - - - -

21 (Pages 359 - 362)

Page 363

1    (Thereupon, Deposition Exhibit 72, A
2    Document Bates Stamped GCR-001574
3    Through GCR-001580, was marked for
4    purposes of identification.)
5    - - - - -
6    Q.  We have marked as Exhibit 72 Bates
7    numbered document GCR-001574 through 1580.
8    Ms. Gingerich, do you recognize
9    this as a series of e-mails between you and
10   Zach Holzapfel of Hicks Partners?
11   A.  Yes.
12   Q.  And I believe it also includes near
13   the back some e-mails between you and
14   Mr. Holman again; do you see that?
15   A.  Yes.
16   Q.  On the second page, 1575 on the
17   Bates number, do you see Zach, who signed his
18   name "Z"; is that correct?
19   A.  Yes.
20   Q.  He said: "Sharon, I would encourage
21   that you work on a White Paper outlining
22   concerns, objectives, supporting arguments for
23   the legislation.  We can then take that to the
24   Association to determine how we move forward.
25   Thanks for the information."

Page 364

1    Does that refresh your memory as to
2    whether you were ever involved in proposing
3    legislation for the Ohio Recorders Association?
4    A.  We didn't propose legislation.
5    Q.  Were you involved in taking to the
6    Ohio Recorders Association a request to propose
7    legislation?
8    A.  No.
9    Q.  And does Mr. -- you want to change
10   your answer?
11   A.  Yes.  I wrote this because he said
12   that -- because what he said, we can then take
13   it to the Association to determine how to move
14   forward.  But he never did that, to my
15   knowledge.
16   Q.  So it's like the chicken and the
17   egg.  Which came first; Mr. Holzapfel's desire
18   to take legislation to the Recorders
19   Association, or your desire to have Mr.
20   Holzapfel take legislation to the Ohio
21   Recorders Association?
22   A.  I don't know which came first.
23   Q.  Whose idea was it, yours or
24   Mr. Holzapfel's?
25   A.  To do a White Paper?  His.

Page 365

1    Q.  And whose idea was it to do
2    legislation?
3    A.  I mentioned it -- Marlene asked
4    me -- oh, okay.  Marlene asked me.  She said do
5    you want -- if you need any legislation
6    drafted, I'll do it.  And I told Zach.
7    Q.  And who's Marlene?
8    A.  Marlene Anielski.
9    Q.  And who brought up the legislation
10   with Marlene Anielski?  Was that you?
11   A.  She did.
12   Q.  In a conversation with you?
13   A.  Yes.
14   Q.  And you're explaining to her about
15   the MERS lawsuit?
16   A.  Yes.
17   Q.  And she said if you need
18   legislation, let me know, I'll introduce it?
19   A.  Yes.
20   Q.  And then you went to Zach Holzapfel
21   at Hicks Partners, your public relations
22   lobbyist firm in Columbus, Ohio, and you told
23   Zach Holzapfel about it; is that correct?
24   A.  I did.
25   Q.  And then Zach instructed you to

Page 366

1    prepare a White Paper, correct?
2    A.  Correct.
3    Q.  And that's what this exhibit is,
4    correct?
5    A.  Correct.
6    Q.  And if Zach Holzapfel requested you
7    to do that on behalf of the Association, you
8    were going to do it, correct?
9    A.  Correct.
10   Q.  And you did, in fact, prepare a
11   White Paper; did you not?
12   A.  I did.
13   Q.  And you provided it to Zach?
14   A.  I did.
15   Q.  And no legislation has ever been
16   proposed, correct?
17   A.  Correct.
18   Q.  None has ever been approved by the
19   Ohio Recorders Association?
20   A.  Correct.
21   Q.  If you will look at Exhibit 51, I
22   believe that we marked yesterday.  If not, I
23   have another copy and we can remark this.
24   MR. SIEBOTT:  The White Paper?
25   MR. CARPENTER:  Yes.  Does it look

22 (Pages 363 - 366)

Page 367

1  like this?
2      MR. SIEBOTT:  No.
3      Q.  I thought perhaps this was marked
4  yesterday.  I'm sorry, Ms. Gingerich.
5      - - - - -
6      (Thereupon, Deposition Exhibit 73, A
7      Document Bates Stamped GCR-001593
8      Through GCR-001602, was marked for
9      purposes of identification.)
10     - - - - -
11     Q.  We've now marked as Exhibit 73 a
12  cover e-mail from you dated 11-28-2011 to Zach
13  Holzapfel.  Do you see that?
14     A.  Yes.
15     Q.  And it is marked -- this document,
16  Exhibit 73, is Bates numbered GCR-001593 to
17  1602.
18         It says; "Zach, attached please
19  find the White Paper you requested."  Correct?
20     A.  Yes.
21     Q.  And you drafted it at his request,
22  correct?
23     A.  Correct.
24     Q.  And you sent a copy to Rick as
25  well, correct?

Page 368

1      A.  Correct.
2      Q.  Who is Rick?
3      A.  The President of the ORA.
4      Q.  What is his last name?
5      A.  It's Stark County.  It's Rick --
6  Rick -- why can't I think of that -- I'm
7  drawing a blank.  Rick -- I'm drawing a blank.
8  It's on the other documents.
9      Q.  He is the Stark County Recorder?
10     A.  Yes.
11     Q.  Okay.  We'll find his name.
12         If you go back to page 1597 on the
13  bottom right, do you see Zach Holzapfel writing
14  you on November 22, 2011?
15     A.  Yes.
16     Q.  And he says; "I would encourage
17  that you work on a White Paper outlining
18  concerns/objectives/supporting arguments for
19  the legislation."  What was "the legislation"?
20     A.  There wasn't any.
21     Q.  So he was just making this request
22  from you for the first time, and you never
23  heard anything about it?
24     A.  No.  There was no legislation.  It
25  was if there was going to be any legislation.

Page 369

1      Q.  He says; "We can then take that to
2  the Association to determine how we move
3  forward."  Do you see that?
4      A.  Yes.
5      Q.  And it was taken to the
6  Association, correct?
7      A.  I do not know if he gave that to
8  the Association.
9      Q.  Well, you certainly gave it --
10     A.  No to my knowledge.
11     Q.  You certainly gave it to Rick of
12  Stark County, the President of the Ohio
13  Recorders Association, correct?
14     A.  Correct.
15     Q.  That's as high up as it guess in
16  the Ohio Recorders Association, isn't it?
17     A.  Yes.  But I don't know if he gave
18  it to the committee or anybody else.
19     Q.  Did Rick from Stark County ever
20  introduce it?
21     A.  No.
22     Q.  Someone has just given me a note
23  that says -- is his name Rick Campbell?
24     A.  Yes.
25     Q.  Okay.  Good.  We don't want to

Page 370

1  embarrass Mr. Campbell.
2         So when we're referring to "Rick",
3  it's Rick Campbell, the Stark County Recorder?
4      A.  Yes.
5      Q.  Okay.  Thank you.
6      - - - - -
7      (Thereupon, Deposition Exhibit 74, A
8      Document Bates Stamped GCR-001603
9      Through GCR-001604, was marked for
10     purposes of identification.)
11     - - - - -
12     Q.  Exhibit 74, Ms. Gingerich, which is
13  marked GCR-001603 to 14604; do you see that?
14     A.  Yes.
15     Q.  This is your response to Jim
16  Helmink about meeting him at the holiday party?
17     A.  Yes.
18     Q.  You said; "It was good to meet you
19  as well."  Correct?
20     A.  Yes.
21     Q.  "I'm very glad you've taken an
22  interest in this, and hope you've seen the
23  merits of stopping MERS."  Is that what you are
24  telling Mr. Helmink?
25     A.  Yes.

23 (Pages 367 - 370)

Page 371

1    Q.    "I am attaching a copy of the
2    lawsuit." Do you see that?
3    A.    Yes.
4    Q.    You didn't have any trouble sending
5    Mr. Helmink, who was running for State
6    Representative, a copy of the lawsuit, did you?
7    A.    No.
8    Q.    You didn't have any questions or
9    problems responding to any concerns he might
10   have had about the lawsuit, did you?
11   A.    No.
12          - - - - -
13          (Thereupon, Deposition Exhibit 75, A
14          Document Bates Stamped GCR-001635
15          Through GCR-001637, was marked for
16          purposes of identification.)
17          - - - - -
18   Q.    I've marked this as Exhibit 75, and
19   it bears Bates numbers GCR-01635 to 1637.
20          Do you recall getting a note from
21   Barb Sessler from Erie County, the Recorder of
22   Erie County?
23   A.    Yes.
24   Q.    She says; "Sharon, I really think
25   Zach would prefer that you touched on this

Page 372

1    subject." Do you see that?
2    A.    Yes.
3    Q.    This was November 14, 2011; was it
4    not?
5    A.    Yes.
6    Q.    "Zach" would be Zach Holzapfel?
7    A.    Correct.
8    Q.    She says; "he", meaning Zach,
9    "really doesn't more about it." I think
10   there's a word left out. But it says; "He
11   really doesn't more about it than you do, and
12   just like you stated, you spoke to the Title
13   Association about this, and this would be
14   something that the Association would like to
15   know." When did you speak to the Title
16   Association?
17   A.    That would be Robert Holman.
18   Q.    So did you just speak to Mr. Holman
19   about this, or did you speak to the Title
20   Association?
21   A.    No.  Just Mr. Holman.
22   Q.    So there wasn't a speech you gave
23   to someone in which all of the independent
24   title agents of Ohio gathered and heard you
25   speak?

Page 373

1    A.    No.
2    Q.    So you were representing by
3    speaking to Mr. Holman that you had spoken to
4    the Title Association, correct?
5    A.    Correct.
6    Q.    Because he holds a position of
7    power and authority for the Title Association?
8    A.    Yes.  He's the President, I think.
9    Q.    Well, we know he's a lawyer, right?
10   A.    Right.
11   Q.    And we know he's from Cleveland,
12   right?
13   A.    Right.
14   Q.    Do you know if he's the President?
15   A.    I think he is.  I think that's what
16   that said on that document I just read.
17   Q.    You had suggested to Barb Sessler,
18   by the way, on the e-mail in this string, you
19   said; "On second thought, I don't need to say
20   anything about MERS.  I would like Zach to
21   bring it up though." Do you see that?
22   A.    Yes.
23   Q.    "I met with OAUTA, Ohio Association
24   of Independent Title Agents, and they are
25   backing us big time."  Is that true?

Page 374

1    A.    It was Holman.  I did not meet with
2    the Association.  No.  Technically, no.  That's
3    not true.
4    Q.    So was or was not the Ohio
5    Association of Independent Title Agents the
6    organization backing you big time?
7    A.    Yes.
8    Q.    Through Mr. Holman's communications
9    to you?
10   A.    Yes.
11   Q.    Are they still backing you big
12   time?
13   A.    I have not spoken to him, but I
14   would assume.
15   Q.    When's the last time you've spoken
16   with Mr. Holman?
17   A.    It's been a while.  I don't know.
18          - - - - -
19          (Thereupon, Deposition Exhibit 76, A
20          Document Bates Stamped GCR-001695
21          Through GCR-001698, was marked for
22          purposes of identification.)
23          - - - - -
24   Q.    Do you have Exhibit 76 in front of
25   you, Ms. Gingerich?

24 (Pages 371 - 374)

Page 375

1     A.  Yes.
2     Q.  By the way, when you were
3  conducting research in your office for the
4  lawsuit that we're about here in this case
5  today, how much time did you have your staff
6  spend on the research?
7     A.  I don't know.
8     Q.  Would it have been 100 hours, 1,000
9  hours? Can you give us some magnitude?
10    A.  No.
11    Q.  Did you have anybody keep track of
12  their time?
13    A.  No.
14    Q.  How many people in your office
15  conducted the research?
16    A.  I think just Jared.
17    Q.  Just Jared. Would he have spent a
18  full week on it?
19    A.  I don't know.
20    Q.  Would he have spent less than a
21  week?
22    A.  No. He has other things to do.
23    Q.  So would he have spent an hour or
24  two?
25    A.  I don't know.

Page 376

1     Q.  So less than a week, correct?
2     A.  I don't know.
3     Q.  Did you ever check with him?
4     A.  I did not ask him to keep time.
5     Q.  I asked did you ever check with him
6  to see how much time he was spending
7  researching the lawsuit?
8     A.  No.
9     Q.  Did you give him any boundaries
10  that he was not to spend more than a day or two
11  days, or whatever time?
12    A.  No.
13    Q.  Did you give him any supervision at
14  all in terms of his research?
15    A.  No.
16    Q.  Did Mr. Joyce take that role?
17    A.  He communicated with, yes, the
18  attorneys.
19    Q.  So Mr. Joyce was working with Jared
20  as to the research that Mr. Joyce needed?
21    A.  Yeah. Mr. Joyce or Sara, yes.
22    Q.  Does Mr. Joyce run your office?
23    A.  No, he does not.
24    Q.  Did he clear it with you first?
25    A.  Yes.

Page 377

1     Q.  How much time did he tell you he
2  needed from Jared?
3     A.  He did not.
4     Q.  So you gave him an open-ended
5  access to your employee?
6     A.  I did.
7     Q.  Do you do that with others?
8     A.  As requested, yes.
9     Q.  Exhibit 76, this is a note from you
10  to Zach Holzapfel, again, at your lobbying firm
11  in Columbus, Hicks Partners, correct?
12    A.  Correct.
13    Q.  The third paragraph down says; "I
14  don't want to make things worse for the ORA.
15  But I am wondering if now is the time to put
16  the Congressmen in the loop." Do you see that?
17    A.  Yes.
18    Q.  You're writing this as of November
19  22, 2011?
20    A.  Yes.
21    Q.  What did you mean by you don't want
22  to make things worse for the Ohio Recorders
23  Association?
24    A.  I didn't want to involve them.
25    Q.  Why not?

Page 378

1     A.  Because it wasn't their lawsuit.
2     Q.  And it also was something that you
3  were prosecuting on behalf of Geauga County,
4  correct?
5        MR. SIEBOTT: Objection.
6  Foundation.
7     A.  I didn't -- I wasn't prosecuting
8  it.
9     Q.  So the Ohio Recorders Association
10  did not -- was not involved with respect to the
11  lawsuit being brought in this case, correct?
12    A.  Correct.
13    Q.  And you didn't want to make things
14  worse for them by involving them, correct?
15    A.  If they didn't want to be, correct.
16    Q.  And did they ever express to you
17  that they wanted to be involved in this
18  lawsuit?
19    A.  No.
20    Q.  And the Ohio Recorders Association,
21  just so the record's clear, is a recording
22  association of all County Recorders in the
23  State of Ohio, correct?
24    A.  Correct.
25    Q.  And that Recorders Association told

25 (Pages 375 - 378)

1  you that they did not want to be involved in
2  this lawsuit, correct?
3      A.   They did not tell me that.  They
4  didn't tell me anything.
5      Q.   But they never got involved,
6  correct?
7      A.   Correct.
8          MR. CARPENTER:  The last exhibit
9  was GCR-001695 to 1698, Exhibit 76.
10          - - - - -
11          (Thereupon, Deposition Exhibit 77, A
12          Document Bates Stamped GCR-001713
13          Through GCR-001717, was marked for
14          purposes of identification.)
15          - - - - -
16      Q.   Do you recognize Exhibit 77 as a
17  series of e-mails between you and Mr. Holman?
18      A.   Yes.
19      Q.   And you said that you believed he
20  was the President of the Ohio Association of
21  Independent Title Agents; do you see that?
22      A.   Yes.
23      Q.   Actually, on page 1716 he's the
24  President of the General Title Insurance
25  Company -- let me finish my question.

1  Actually, Mr. Holman, who is a lawyer, is the
2  President of the General Title Insurance
3  Company; 24262 Broadway Avenue, Oakwood
4  Village, Ohio 44146, correct?
5      A.   Correct.
6      Q.   Does it list him as being an
7  officer anywhere on this e-mail of the Ohio
8  Association of Independent Title Agents?
9      A.   No.
10      Q.   Actually, it lists him as a
11  founding member, correct?
12      A.   Correct.
13      Q.   But not as an officer, correct?
14      A.   Correct.
15      Q.   And it lists him as the Secretary
16  of the National Association of Independent Land
17  Title Agents, but not as any member -- excuse
18  me -- not as any officer of the Ohio
19  Association of Independent Title Agents,
20  correct?
21      A.   Correct.
22      Q.   So when you spoke to him, in what
23  capacity was he acting?
24      A.   I don't -- I don't know.  You would
25  have to ask him.

1      Q.   Well, what did you tell others in
2  the e-mails we just covered?
3      A.   Oh, I said the OAITA.  Yes.  Okay.
4  You're right.
5      Q.   Did he tell you that he was the
6  President of the Ohio Association of
7  Independent Title Agents?
8      A.   No.
9      Q.   Did he tell you he was authorized
10  to speak on behalf of the Ohio Association of
11  Independent Title Agents?
12      A.   No.
13      Q.   Did you ever investigate his role?
14      A.   No.
15      Q.   Just for the record, where is
16  Oakwood Village, Ohio?
17      A.   It's next to Walton Hills.
18      Q.   How big of a village is it; do you
19  know?
20      A.   I don't know.
21      Q.   Less than 5,000 people?
22      A.   I have no idea.
23      Q.   Have you ever been there?
24      A.   I've been through it, yes.
25      Q.   You write him a note on the 9th of

1  November 2011 on Exhibit 77, and now you're
2  calling him "hi, Robert."  Are you on a first
3  name basis with him?
4      A.   That's not me.
5      Q.   That's not you.  It's from Chris.
6  You're correct.  Who's Chris Peterson?
7      A.   He's a law professor.
8      Q.   He's --
9      A.   He's a dean -- Associate Dean For
10  Academic Affairs, Professor of Law.
11      Q.   Have you ever talked to Chris
12  Peterson?
13      A.   I have not.
14      Q.   And he, Chris Peterson, and Robert
15  Holman, at least according to this e-mail, are
16  on a first name basis, correct?
17      A.   Correct.
18      Q.   Was Robert Holman attempting to
19  provide you with Mr. Peterson's name,
20  background information as a prospective expert
21  witness in this case?
22      A.   He said I might want to talk to
23  him.
24      Q.   Why did you choose not to talk to
25  him?

26 (Pages 379 - 382)

Page 383

1    A.   Because I didn't have time.
2    Q.   Why didn't you have time?
3    A.   Because I'm busy.
4    Q.   Being the Recorder of Geauga
5  County?
6    A.   Yes. Yes.
7    Q.   You're short-staffed?
8    A.   No.
9    Q.   You're fully staffed?
10    A.   We are -- we have just what we
11  need.
12    Q.   And just what you need for the
13  current volume of business, correct?
14    A.   Correct.
15    Q.   Did you send Mr. Holman your White
16  Paper?
17    A.   I don't recall.
18    Q.   Did you send Mr. Holman the
19  lawsuit?
20    A.   I don't think so. I may have, but
21  I thought he already had it.
22    Q.   Do you know where he got it?
23    A.   Off line. I don't know. I don't
24  know.
25    Q.   We've been covering a number of

Page 384

1  e-mails you have as exhibits here in this
2  deposition. Have you ever deleted any e-mails
3  from your office computer?
4    A.   About -- I've deleted junk e-mail,
5  yeah.
6    Q.   So you do delete e-mails from time
7  to time?
8    A.   But not since --
9    Q.   Not -- go ahead. Not since when?
10    A.   Since we started all this.
11    Q.   When was that?
12    A.   In the fall.
13    Q.   Of 2011?
14    A.   Yes.
15    Q.   Did you start with that first
16  meeting with David Joyce?
17    A.   I still deleted junk mail.
18    Q.   Okay. You're referring to you
19  haven't deleted anything relating to this
20  lawsuit?
21    A.   Correct.
22    Q.   What about with respect to your
23  communications with others about MERS; have you
24  deleted anything on that?
25    A.   Not that I know of. Not that I

Page 385

1  recall.
2    Q.   Do you have a deletion policy at
3  the Geauga County Recorder's Office?
4    A.   For -- yeah. We have records
5  retention, yeah.
6    Q.   Have you produced that in this
7  case?
8    A.   Yes.
9    Q.   And have you adhered to the
10  retention record -- the records retention
11  policy of Geauga County?
12    A.   Yes.
13    Q.   As a public official, do you have
14  special obligations to maintain public records?
15    A.   Yes.
16    Q.   Are your e-mails considered public
17  records?
18    A.   Some of them are.
19    Q.   Would those relating to this
20  lawsuit be considered public records?
21    A.   Yeah.
22    Q.   Have you deleted any of those
23  public records?
24    A.   Not that I recall.
25    Q.   But you might have?

Page 386

1    A.   Not that I recall.
2    Q.   Do you keep them in a file on your
3  computer?
4    A.   Yes.
5    Q.   What's the file called?
6    A.   "MERS".
7    Q.   How long have you had a MERS file
8  on your computer?
9    A.   Since about October 13th.
10    Q.   Of 2011?
11    A.   Correct.
12    Q.   Prior to that where did you collect
13  all of the information that you had on MERS?
14    A.   I don't know how much I had. I
15  don't know that I had much before the lawsuit.
16    Q.   Would it be fair to say that prior
17  to October 13, 2011 you had never collected and
18  stored any information on MERS?
19    A.   Yeah. Not to my knowledge anyway.
20    Q.   Is October 13, 2011 the date in
21  which you and Mr. Joyce first met about this
22  lawsuit?
23    A.   Okay. No. That's the date he
24  filed it, okay. So since we talked, there may
25  be -- whenever that was.

27 (Pages 383 - 386)

Page 387

1    Q.   You would have talked before he
2   filed the lawsuit, correct?
3    A.   Correct. Correct.
4    Q.   So prior to October 13, 2011 where
5   was the material you had on MERS on your
6   computer?
7    A.   Probably in a MERS file.
8    Q.   And how long had you had that MERS
9   file prior to October 13, 2011?
10   A.   Probably since whenever Dave and I
11  talked about it.
12   Q.   So if we looked at that file, could
13  you tell us when you first started collecting
14  material?
15   A.   If -- yeah.
16   Q.   And have you produced that file in
17  this case?
18   A.   Yes.
19           - - - - -
20        (Thereupon, Deposition Exhibit 78, A
21        Document Bates Stamped GCR-001800,
22        was marked for purposes of
23        identification.)
24           - - - - -
25   Q.   For the record, Exhibit 78 is Bates

Page 388

1   numbered GCR-001800. Ms. Gingerich, whose
2   notes are these?
3    A.   Mine.
4    Q.   And it says these are your notes
5   from the legislative meeting of February 15,
6   2012, correct?
7    A.   Yes.
8    Q.   And the legislative meeting would
9   be of the Ohio Recorders Association, correct?
10   A.   Yes.
11   Q.   Directing your attention down to
12  the full paragraph at the bottom after the
13  numbered paragraphs, do you see that; "Thoughts
14  regarding the unrest"?
15   A.   Yes.
16   Q.   What do you mean? What was the
17  "unrest"?
18   A.   There was an issue about continuing
19  education, and who should be -- who should
20  receive continuing education if they didn't pay
21  their Recorder's fees to the Association, and
22  it was -- people had different opinions on who
23  should be allowed to have continuing education.
24   Q.   It says; "There are 86 people in
25  this Association. There are 86 different

Page 389

1   opinions." Is that a true statement?
2    A.   Correct.
3    Q.   Would you agree with that statement
4   today, as it relates to the MERS lawsuit?
5    A.   You know what? That is not a true
6   statement. There are 86 Recorders, but they do
7   not all belong to the Association.
8    Q.   How many belong to the Association?
9    A.   I don't know.
10   Q.   So there are 86 Recorders?
11   A.   Yes.
12   Q.   In Ohio. And two counties do not
13  have Recorders, correct?
14   A.   Correct.
15   Q.   And so with respect to all of the
16  members of the Ohio Recorders Association, does
17  each one have a different opinion?
18   A.   Probably.
19   Q.   And you don't pretend to speak or
20  control the opinions they have or hold, do you?
21   A.   No.
22   Q.   And do you believe they're entitled
23  to their own opinion, correct?
24   A.   Correct.
25   Q.   And you believe they're entitled to

Page 390

1   differ from what you are saying and doing?
2    A.   Correct.
3    Q.   Including in this lawsuit, correct?
4    A.   Correct.
5    Q.   Have you consulted with the other
6   86 Recorders in Ohio and the two counties that
7   do not have Recorders directly with respect to
8   participating in this lawsuit?
9    A.   No.
10   Q.   Have you ever done any sort of
11  survey or solicitation of the 86 Recorders plus
12  the two counties without Recorders with respect
13  to their opinions about this lawsuit?
14   A.   No.
15   Q.   Do you know if anyone else has?
16   A.   I do not know.
17       MR. CARPENTER:  Let me go back for
18  purposes of the record.  Exhibit 77 was Bates
19  numbered GCR-001713 to 1717.
20           - - - - -
21        (Thereupon, Deposition Exhibit 79, A
22        Document Bates Stamped GCR-002644
23        Through GCR-002645, was marked for
24        purposes of identification.)
25           - - - - -

28 (Pages 387 - 390)

Page 391

1      Q.   Exhibit 79 is Bates numbered
2  GCR-002644 to 002645.  Do you recognize this
3  as, first, an e-mail from you, Sharon
4  Gingerich, to Barb Sessler on October 14, 2011?
5      A.   Yes.
6      Q.   It says; "I will wait to do
7  anything to hear what you want me to do as to
8  telling the other Recorders about the
9  complaint.  I really would like them to know,
10  however, before it hits the media and they find
11  out from the media."  Do you see that?
12      A.   Yes.
13      Q.   Were you distributing to the media;
14  that is, the lawsuit?
15      A.   Did I distribute it to the media?
16      Q.   Yes.
17      A.   No.
18      Q.   Who did?
19      A.   They were in the -- they were in
20  the Commissioners meetings.
21      Q.   The media was at the Board of
22  County Commissioners of Geauga County's meeting
23  in which they approved the lawsuit?
24      A.   In which -- no.  In which
25  Prosecutor Joyce told them that he had filed

Page 392

1  it, or he was going to file it.  Let's see.
2  This was Friday 13th -- so the Commissioners
3  meeting was probably on -- well, I don't know
4  when it was.  But he told them he was going to,
5  or when he did.
6      Q.   And then Barb writes back to you;
7  "We are putting the complaint on the Recorder's
8  website under the membership as we speak.  I
9  will put out on the ListServe for the
10  Association to go to the site and read it for
11  themselves.  I sent a copy to Zach and Tony
12  yesterday."  Do you see that?
13      A.   Yes.
14      Q.   "We will definitely discuss it at
15  winter conference."  Do you see that?
16      A.   Yes.
17      Q.   Did you?
18      A.   Yes.
19      Q.   And that's the winter conference of
20  the Ohio Recorders Association, correct?
21      A.   Yes.
22      Q.   "Thank you for allowing me to put
23  this out."  Do you see that?
24      A.   Yes.
25      Q.   And did, in fact, Barb place it on

Page 393

1  the ListServe?
2      A.   No.  She put it on the Recorder's
3  website.
4           - - - - -
5           (Thereupon, Deposition Exhibit 80, A
6           Document Bates Stamped GCR-001979
7           Through GCR-001981, was marked for
8           purposes of identification.)
9           - - - - -
10      Q.   Exhibit 80 is GCR-001979 to 1981.
11  You write back to Barb Sessler on October 14th
12  at 10:16 a.m., correct?
13      A.   Yes.
14      Q.   And you tell her you would advise
15  that you tell the Recorders that not discuss it
16  on ListServe, correct?
17      A.   Correct.
18      Q.   "Not" is in all caps, correct?
19      A.   Correct.
20      Q.   "You can ask Zach."  That would be
21  Zach Holzapfel?
22      A.   Correct.
23      Q.   Why would she ask Zach?
24      A.   I don't know.  Because he's their
25  lobbyist.

Page 394

1      Q.   "But I would think that it is not a
2  good idea due to pending litigation.  You know
3  how the ListServe conversations go."  Correct?
4      A.   Correct.
5      Q.   Are the ListServe conversations
6  public record?
7      A.   Yes.
8      Q.   And you didn't want this lawsuit
9  discussed in the public record, did you?
10      A.   No.
11      Q.   Actually, I have this marked as
12  Exhibit 50.
13           MR. CARPENTER:  Christian, if you
14  could just check to be sure I'm right.
15           MR. SIEBOTT:  Yes.
16      Q.   Exhibit 50, which again, for the
17  record, is GCR-001910.  Do you recognize this
18  as Barb Sessler's communication to all on the
19  Ohio Recorder's ListServe?
20      A.   Yes.
21      Q.   And she's communicating about "the
22  class action lawsuit filed yesterday by the
23  prosecuting attorney of Geauga County."  Do you
24  see that?
25      A.   Yes.

29 (Pages 391 - 394)

Page 395

1    Q.   And she says; "A copy of the suit
2  will soon be available to you on the Ohio
3  Recorders Association website under the
4  member's section."  Correct?
5    A.   Correct.
6    Q.   And she says; "Due to the sensitive
7  nature of this action, it is vital that we do
8  not", in all caps, "discuss this on the
9  ListServe."  Why is that?
10   A.   Because it's pending litigation.
11   Q.   And the ListServe, again, is a
12  public record, correct?
13   A.   Right.
14   Q.   Was it pending litigation with the
15  Ohio Recorders Association?
16   A.   No.
17   Q.   Was it pending litigation between
18  the Ohio Recorders Association and anyone else?
19   A.   No.
20   Q.   And, in fact, it was a publicly
21  filed complaint as of October 14, 2011,
22  correct?
23   A.   Correct.
24   Q.   Is the Ohio Recorders Association
25  in the habit of attempting to shield the

Page 396

1  citizens of Ohio discussion among public
2  officials as to public actions taken by
3  Recorders?
4    A.   I do not know.
5    Q.   Did you request that they do that,
6  that they not discuss publicly your lawsuit?
7    A.   I didn't.
8    Q.   Does the code control what a public
9  official is to do with respect to blocking
10  access to public records in Ohio?
11   A.   The access was not blocked.  If
12  they talked to Barb, that's public records,
13  too.  I just asked them not to put it on
14  ListServe.
15   Q.   My question was; does the Ohio
16  Revised Code speak to public officials
17  attempting to bar the public's access to public
18  records?
19   A.   Yes.
20   Q.   What does it say?
21   A.   It says you can't bar it.
22         - - - - -
23         (Thereupon, Deposition Exhibit 81, A
24         Document Bates Stamped GCR-001917,
25         was marked for purposes of

Page 397

1         identification.)
2         - - - - -
3    Q.   I've marked as Exhibit 81 a
4  document that bears Bates number GCR-001917.
5  This is a note from Barb Sessler, Erie County
6  Recorder, to the ListServe, correct?
7    A.   Correct.
8    Q.   And it's dated back in June of
9  2011, correct?
10   A.   Correct.
11   Q.   It says; "A brief note.  Please
12  keep in mind that this ListServe is for all
13  Recorders to interact with one another on
14  issues that relate to our offices and our
15  positions."  Is that true?  That's what the
16  purpose of the ListServe is?
17   A.   That's what she says, yes.
18   Q.   "It is not, however, to be used for
19  political opinions or any other negative
20  remarks."  Do you see that?
21   A.   I do.
22   Q.   "Please keep in mind that any of
23  these communications are subject to a public
24  records request, and they may also be viewed by
25  others that are not Recorders."  Do you see

Page 398

1  that?
2    A.   Yes.
3    Q.   And you knew that before you
4  requested that Ms. Sessler not place this on
5  the ListServe, correct?
6    A.   Okay.  Two things here.  I didn't
7  tell her not to put the lawsuit on the
8  ListServe, because you cannot physically put
9  the lawsuit on the ListServe.
10   Q.   Okay.
11   A.   I asked her not to talk about it on
12  the ListServe.
13   Q.   All right.  Thank you for
14  clarifying that.
15         - - - - -
16         (Thereupon, Deposition Exhibit 82, A
17         Document Bates Stamped GCR-001963
18         Through GCR-001964, was marked for
19         purposes of identification.)
20         - - - - -
21   Q.   We've marked as Exhibit 82 a
22  document bearing Bates numbers GCR-001963 to
23  1964.
24         Do you recall sending this e-mail
25  on December 21, 2011 at 8:17 p.m. to Renee

Page 399

1  Petro?
2      A.  Yes.
3      Q.  Who's Renee Petro?
4      A.  She's one of the heads of Women
5  Safe.
6      Q.  It says; "Renee, it's the time of
7  the year when my pet peeve starts to choke me."
8  Do you see that?
9      A.  Yes.
10     Q.  So this peeve is greater to you
11  than MERS, correct?
12     A.  No.
13     Q.  It's your pet peeve.  Do you have
14  many pet peeves?
15     A.  It's a phrase.
16     Q.  I understand.  I'm trying to get it
17  in a hierarchy.  How do you rank this one?
18     A.  There's no ranking there.
19     Q.  "It's the time of year when my pet
20  peeve starts to choke me.  My office is $14,000
21  short of bringing in $900,000 for the year of
22  2011.  Half of that amount", all caps, "goes to
23  the Ohio Housing Trust Fund."  Do you see that?
24     A.  I do.
25     Q.  What is your pet peeve about that

Page 400

1  money going to the Ohio Housing Trust Fund?
2      A.  It doesn't come back to our county.
3      Q.  Where does it go?
4      A.  Who knows.
5      Q.  To other counties?
6      A.  Yes.
7      Q.  You say, "this is so very unfair."
8  Correct?
9      A.  Correct.
10     Q.  Is this an example of where each
11  county controls their own operations, and
12  counties may be pitted against each other?
13     A.  No.
14     Q.  Are you not pitted against the
15  counties that get money that you think should
16  go back to Geauga County?
17     A.  No.
18     Q.  So you don't mind them getting that
19  money, correct?
20     A.  I think we should get the money we
21  send.
22     Q.  And you don't though, do you?
23     A.  We do not.
24     Q.  And, therefore, you would like that
25  money returned from the counties that received

Page 401

1  Geauga County's money, and send it to Geauga
2  County, correct?
3      A.  Correct.
4      Q.  Do you think the other counties
5  would prefer to keep it, or do you think they
6  would prefer to send it back to Geauga County?
7      A.  I don't -- I can't speak for other
8  counties.
9      Q.  You're right.  You can't speak for
10  other counties, can you, Ms. Gingerich?
11     MR. SIEBOTT:  Objection.
12  Argumentative.
13     Q.  What was your answer?  You can't
14  speak for other counties, can you?
15     A.  No.
16         - - - - -
17     (Thereupon, Deposition Exhibit 83, A
18     Document Bates Stamped GCR-002146
19     Through GCR-002148, was marked for
20     purposes of identification.)
21         - - - - -
22     Q.  Just for the record, Exhibit 83 is
23  GCR-002146 to 2148.  Another e-mail between you
24  and Renee Petro on December 22, 2001, correct,
25  Ms Gingerich?

Page 402

1      A.  Yes.
2      Q.  You say; "Ask for hundreds of
3  thousands of dollars.  I would so rather our
4  county's taxpayers' dollars came back to Geauga
5  than to other counties.  It just eats at me,
6  especially when I see all your needs.  Grrrrr."
7  Do you see that?
8      A.  I do.
9      Q.  Do you agree that the interest of
10  Geauga County as to what your wishes are with
11  this, county taxpayer dollars for the Ohio
12  Housing Trust Fund, that you would agree that
13  you are adverse to the other counties that get
14  your money?
15     MR. SIEBOTT:  Objection.  Asked and
16  answered.
17     A.  I already answered that.
18     Q.  And what is your answer?
19     A.  I want our money to come back to
20  us.
21     Q.  And you would agree that your
22  interest in Geauga County, your personal
23  interest as expressed in this e-mail is adverse
24  to the interest of other counties in Ohio?
25     A.  I would rather our money come to

31 (Pages 399 - 402)

Page 403

1  us.
2      Q.   And if they're getting the money
3  and you want it to come back to you, that is
4  the other counties, do you consider your
5  position to be adverse to them keeping the
6  money?
7      A.   I don't know what their position
8  is.
9      Q.   You sent out these e-mails, and
10  that's your pet peeve though, correct?
11      A.   I would like to see us -- yes.
12      Q.   Have you sued any other counties to
13  get your money back?
14      A.   No.
15      Q.   Have you talked to Mr. Joyce about
16  suing other counties to get your money back?
17      A.   No.
18      Q.   Have you talked to Mr. Joyce about
19  bringing a class action against Governor
20  Kasick?
21      A.   No.
22      Q.   Have you attempted to introduce any
23  legislation regarding the Ohio Housing Trust
24  Fund?
25      A.   Yes.

Page 404

1      Q.   And what has happened?
2      A.   Nothing.
3      Q.   You attempted to introduce it,
4  correct?
5      A.   We introduced it.
6      Q.   And it was voted down, correct?
7      A.   It passed the House, and it passed
8  the -- when it got to the Budget Bill, it was
9  vetoed.
10      Q.   By who?
11      A.   Probably the governor.
12      Q.   But who was the governor?
13      A.   Kasick.
14           - - - -
15           (Thereupon, Deposition Exhibit 84, A
16           Document Bates Stamped GCR-002180
17           Through GCR-002181, was marked for
18           purposes of identification.)
19           - - - -
20      Q.   What is this newsletter, Ms.
21  Gingerich?
22      A.   This is posted on my website.
23      Q.   This is Exhibit 84, bearing
24  GCR-002180 to 2181. When would this have been
25  posted?

Page 405

1      A.   Actually, this hasn't been posted
2  yet. This is for 2011. So this is still in
3  draft formula -- form.
4      Q.   So this is a draft letter that you
5  will eventually post?
6      A.   Yes.
7      Q.   When will you be doing that?
8      A.   When I have time.
9      Q.   I notice the sixth bullet point
10  down says you "work tirelessly with the Ohio
11  Recorders Association to introduce legislation
12  that would return a portion of the Ohio Housing
13  trust Fund tax dollars to Geauga." Do you see
14  that?
15      A.   Yes.
16      Q.   That's what we were just talking
17  about?
18      A.   Yes.
19      Q.   "The effort won favor with the
20  House and Senate and was originally included in
21  the Budget Bill only to be omitted in the final
22  version." Is that correct?
23      A.   Correct.
24      Q.   I don't see any listing here on
25  this newsletter about your MERS lawsuit.

Page 406

1      A.   Correct.
2      Q.   Why not?
3      A.   No particular reason.
4      Q.   You've posted it on your website
5  before?
6      A.   On my website, no.
7      Q.   Have you ever posted it in any
8  respect in the Geauga County records?
9      A.   "Posted it", you mean -- no.
10      Q.   I mean the existence of the
11  lawsuit.
12      A.   On my website, no.
13      Q.   Yes.
14      A.   Did I -- oh, the -- on the news
15  link, there's a copy of the article.
16      Q.   And the news link comes from your
17  website?
18      A.   Yes.
19      Q.   Why haven't you featured it as part
20  of "the list of things that have happened in my
21  office during 2011" on Exhibit 84?
22      A.   I told you. This is a draft.
23      Q.   Do you intend to amend this draft
24  and put it on?
25      A.   I will work on it, yeah.

32 (Pages 403 - 406)

Page 407

1     Q.   Have you featured the MERS lawsuit
2  in any of your campaign literature?
3     A.   No.
4     Q.   Why not?
5     A.   Because I haven't prepared my
6  campaign literature yet.
7     Q.   Do you intend to?
8     A.   I don't know.
9     Q.   It says at the bottom; "Since I've
10 been your Recorder we have back-scanned
11 seven-and-a-half years of documents and indexed
12 approximately 35 volumes to prepare them for
13 back-scanning."  Do you see that?
14    A.   Yes.
15    Q.   Was this a backlog that you
16 inherited?
17    A.   Yes.
18    Q.   And you're proud of having brought
19 your office current, correct?
20    A.   Yes.
21    Q.   It also says in the fourth bullet
22 point that you "located a facility in
23 Pennsylvania that would store our County
24 records for significantly less than what we
25 were paying."  Do you see that?

Page 408

1     A.   Yes.
2     Q.   Are you storing Geauga County
3  records in Pennsylvania now?
4     A.   Yes.
5     Q.   Are those records subject to the
6  subpoena power of an Ohio Court?
7     A.   Sure.
8     Q.   And did you consult with David
9  Joyce before taking public records offsite into
10 another state?
11    A.   Okay.  These are the county
12 records.  These are not necessarily mine.  This
13 is the whole county.  The county stores their
14 records at Iron Mountain.  They have them.
15 They have them in their office.  But this is a
16 duplicate place where we store records in case
17 of emergency.
18    Q.   So it's a back-up center?
19    A.   It's a back-up.
20    Q.   So you still have the first set --
21    A.   Yes.
22    Q.   -- in Geauga County, correct?
23    A.   Yes.
24    Q.   And you kept a set there because
25 you're aware of the public records nature of

Page 409

1  public officials, correct?
2     A.   Yes.  The only things going to Iron
3  Mountain are copies of everything we have in
4  case of disaster.
5        MR. CARPENTER:  I believe this was
6  Exhibit 29 before, Christian, but would you
7  just verify that for me?
8        MR. SIEBOTT:  Yes.
9     Q.   I'm now going to be referring then
10 to previously marked Exhibit 29, which was
11 GCR-002427 through 2431.  And I apologize, Ms.
12 Gingerich, but I wasn't sure what you were
13 indicating as to this document, that is,
14 Exhibit 29.  Are these notes that you took for
15 purposes of presenting a speech to someone?
16    A.   These are notes to put into a
17 speech.
18    Q.   When were they drafted?
19    A.   I do not remember.  Unfortunately,
20 they're not dated.
21    Q.   And was it this year, 2012?
22    A.   I don't remember.
23    Q.   Were they done at --
24    A.   No.  They were done last year.
25    Q.   In 2011?

Page 410

1     A.   Yeah.
2     Q.   Okay.  Were they done on your work
3  computer?
4     A.   Yes.
5     Q.   It says; "There's another side to
6  this issue, one that is more subtle."  What is
7  "this issue" referring to?
8     A.   Oh, boy.  I don't know.  Oh, I do
9  know.  Getting rid of the consolidation of
10 government.
11    Q.   What do you mean by that, "getting
12 rid of the consolidation of government"?
13    A.   Consolidating government.
14    Q.   Okay.  There's another side to the
15 issue of consolidating government?
16    A.   Yes.
17    Q.   What government were you
18 directly -- let me start over.
19        What government were you referring
20 to when you said the issue of consolidating
21 government?  Were you talking about Geauga
22 County?
23    A.   County government, period.  There
24 was a movement to consolidate county
25 government, period.

33 (Pages 407 - 410)

Page 411

1    Q.    Including in Geauga County?
2    A.    All counties, yes.
3    Q.    I see.  So there would be a sharing
4   of responsibilities across county lines?
5    A.    Correct.
6    Q.    And you were opposed to that,
7   correct?
8    A.    Well, I -- I don't know if it was
9   across county lines.  I think more like the
10  model in Cuyahoga County.
11   Q.    Okay.  So where Cuyahoga County has
12  gone to a county-wide government?
13   A.    Yes.
14   Q.    And you're opposed to that,
15  correct?
16   A.    I am.
17   Q.    Are there other counties --
18  obviously, Cuyahoga County believes that's a
19  good approach, correct?
20   A.    Correct.
21   Q.    And so you listed down through here
22  a number of items that I assume are items that
23  concern you about the consolidation of county
24  government, correct?
25   A.    Yeah.

Page 412

1    Q.    First you talk about "the morality
2   of this county"; meaning, Geauga County,
3   correct?
4    A.    No.  That should be -- that should
5   say "country".
6    Q.    So "the morality of this country
7   got so lax", correct?
8    A.    Yes.
9    Q.    Number 2 is you "wonder how our
10  school curriculum has changed, starting with
11  the process at college and trickled down, one
12  change that nobody noticed."  Correct?
13   A.    Correct.
14   Q.    Number 3 is "how did you lose your
15  right to carry a gun?"  Do you see that?
16   A.    I do.
17   Q.    Do you think all County Recorders
18  agree with you on the loss of the right to
19  carry a gun?
20   A.    I have no idea.
21   Q.    You've not surveyed them in any
22  way?
23   A.    I have not.
24   Q.    Do they all agree with you about
25  school curriculums changing, that it has been a

Page 413

1   bad thing?
2    A.    None of them have seen any of this.
3   These are my notes and thoughts, and I did not
4   discuss it with them.
5    Q.    In other words, when we talked
6   about there may be 86 other opinions, they
7   could have all have differing opinions about
8   these items as well, correct; that is, the
9   other County Recorders?
10   A.    Yes.
11   Q.    Even public officials within Geauga
12  County might have different views on this,
13  correct?
14   A.    Yes.
15   Q.    Number 4 is "socialize medicine."
16  Would you agree that other County Recorders
17  might have a different view than you on
18  socialized medicine?
19   A.    Yes.
20   Q.    Number 5 says; "So why not get rid
21  of the Recorder?"  What is that referring to?
22  Is there a movement in Geauga County to get rid
23  of the Recorder?
24   A.    It's a hypothetical question.
25  It's -- yes.  Actually, yes.  My opponent wants

Page 414

1   to get rid of the Recorder.
2    Q.    Your opponent in this campaign?
3    A.    Yes.  But this was written before
4   that, too, so --
5    Q.    Are you opposed to abolishing the
6   Office of Recorder in Geauga County?
7    A.    Yes.
8    Q.    Why?
9    A.    Because it serves a good purpose.
10  We take care of those records like -- you can
11  come to my office and find out what you need to
12  know.  I mean, government at the county level
13  is always better.
14   Q.    And you would agree that just as
15  you have strong feelings and opinions on that,
16  that other counties may have Recorders with
17  differing opinions, correct?
18   A.    About getting rid of the Recorder?
19  I don't think so.
20   Q.    In Geauga County.
21   A.    I don't think so.
22   Q.    Well, they may have differing
23  opinions, like they did in Cuyahoga County,
24  right?
25   A.    Your question was of the Recorders?

34 (Pages 411 - 414)

Page 415

1    Q.   We'll start with Recorders.
2    A.   The question was they did it in
3  Cuyahoga County.  And the answer is no, the
4  Recorder there didn't want to lose her job.
5    Q.   And you don't want to lose yours,
6  do you?
7    A.   I want to be able to serve the
8  people as Recorder.
9    Q.   Tell me about the Board of County
10 Commissioners in Cuyahoga County.  What was
11 their view as to eliminating the County
12 Recorder's Office?
13   A.   I can't speak for them.  They're
14 all gone.
15   Q.   And, likewise, the Board of County
16 Commissioners in each county may have differing
17 views on all sorts of things that you have
18 listed here, correct?
19   A.   Correct.
20   Q.   Socialized medicine, gun control,
21 sexual preference acceptance.  I see that in
22 number 6.  Do you see that?
23   A.   Yes.
24   Q.   A you, as the County Recorder of
25 Geauga County, or the Board of County

Page 416

1  Commissioners of Geauga County doesn't presume
2  to speak or act on behalf of the other County
3  Commissioners of the other counties in Ohio, do
4  you?
5    A.   No.
6    Q.   And you believe that's one of the
7  strengths of the Ohio system of government; is
8  that each county operates independently with
9  its own county government, correct?
10   A.   Okay.
11   Q.   Do you agree that that's one of the
12 strengths of Ohio's government system?
13   A.   Yes.
14   Q.   That we have counties as political
15 subdivisions, and those counties are authorized
16 and empowered to operate independently of the
17 other counties?
18   A.   Yes.
19   Q.   You don't want to change that, do
20 you?
21   A.   No.
22   Q.   And you don't think that should be
23 changed by the bringing of a class action
24 lawsuit, do you?
25   A.   What does that have to do with

Page 417

1  anything?
2    Q.   You don't want to change the
3  independent nature of county operations through
4  bringing this class action lawsuit, do you?
5    A.   No.
6    Q.   The page 2429, if you would look at
7  your notes on Exhibit 29.
8    A.   I take that back.  This may have
9  been written in 2010.
10   Q.   Okay.  That's fine.  There's no
11 date on it.
12        The paragraph, the first full
13 paragraph, Ms. Gingerich, it says; "The bottom
14 line is that the Recorder and the other elected
15 positions are there to give the residents their
16 constitutional freedom to choose."  Do you see
17 that?
18   A.   Yes.
19   Q.   And you would agree that that is a
20 statement that you still believe; that the
21 residents of each county should have the
22 constitutional freedom to choose, correct?
23   A.   Correct.
24   Q.   And you don't think that right to
25 choose should be infringed upon, do you?

Page 418

1    A.   Correct.
2    Q.   The next paragraph begins; "The
3  Recorder does not always agree with other
4  officials on how land transactions should be
5  handled."  Is that true?
6    A.   Correct.
7    Q.   So even within a county -- from
8  county to county, you could have a Recorder
9  disagreeing with other officials on how land
10 transactions should be handled, correct?
11   A.   Correct.
12   Q.   If you would look at the page
13 marked GCR-2431, the very last page.  Do you
14 see it begins; "I can speak only for Cuyahoga
15 County"?
16   A.   Yes.
17   Q.   That's a true statement, correct?
18   A.   Correct.  Can we break?
19        MR. SIEBOTT:  Yeah.  We'll take a
20 break.
21        MR. CARPENTER:  I am almost to the
22 bottom here.
23        MR. SIEBOTT:  She wants to take a
24 break.
25        MR. CARPENTER:  That's fine.  I

35 (Pages 415 - 418)

Page 419

1 didn't realize.
2    (Thereupon, a recess was taken.)
3    MR. CARPENTER: Back on the record.
4    - - - - -
5    (Thereupon, Deposition Exhibit 85, A
6    Document Bates Stamped GCR-002921
7    Through GCR-002937, was marked for
8    purposes of identification.)
9    - - - - -
10   Q. We'll go back on the record, Ms.
11 Gingerich. I've handed you what's been marked
12 Exhibit 85. It bears Bates numbers GCR-002921
13 to 002937. And I was wondering what this
14 document was, and why it was produced to us,
15 and I was hoping you could help me. Do you see
16 the first couple of pages are a signature
17 page -- actually, the first three pages, and
18 then the next page says "New recording
19 guidelines effective July 1, 2009."
20   A. I honestly don't know. This looks
21 like a jumbled mess of papers that were just
22 all put together. If there's some thread that
23 runs through, I don't know what it is.
24   Q. Okay. I just wondered if you could
25 help me with that. That's sort of how it

Page 420

1 looked to us, too, but we thought perhaps there
2 was some magic that you could explain.
3   A. No.
4   Q. Okay. Thank you.
5    - - - - -
6    (Thereupon, Deposition Exhibit 86, A
7    Document Bates Stamped GCR-002961
8    Through GCR-002963, was marked for
9    purposes of identification.)
10    - - - - -
11   Q. Exhibit 86 has Bates numbers
12 GCR-002961 to 2963. Do you have Exhibit 86 in
13 front of you now, Ms. Gingerich?
14   A. I do.
15   Q. Do you know the Tanglewood Greene
16 Association?
17   A. I do not.
18   Q. Is Bainbridge Township in Geauga
19 County?
20   A. Yes, it is.
21   Q. And you see it's dated June 20,
22 2007?
23   A. Yes.
24   Q. And that was before you took
25 office, correct?

Page 421

1   A. Yes.
2   Q. And do you see Franklin Walter
3 signs this as President of the Tanglewood
4 Greene Association in Chagrin Falls. Do you
5 see that?
6   A. I do.
7   Q. He's addressing it, by the way, to
8 the Geauga County Commissioners, correct?
9   A. Yes.
10   Q. And, again, I know this is before
11 you took office, okay? I want to make that
12 clear on the record. Correct?
13   A. Correct.
14   Q. It says; "There is a problem within
15 the Geauga County Recorders Office which
16 unintentionally I'm sure has cost our
17 condominium association over $5,000. I refer
18 specifically to the five-plus month delay in
19 memorializing recorded real estate documents
20 after they have been received."
21    Would you agree that a five-plus
22 month delay in memorializing real estate
23 documents is not something that would be good
24 for the citizens of Geauga County?
25   A. Would I agree, yes. I would agree

Page 422

1 with that.
2   Q. And it's not something you would
3 tolerate as Recorder, is it?
4   A. No. I would not.
5   Q. And a delay in recording is to the
6 prejudice of the citizens you serve in Geauga
7 County, correct?
8   A. Correct.
9   Q. And at least this citizen,
10 Mr. Walter, on behalf of this association, was
11 complaining that the process of entering
12 documents into the public records must be more
13 timely, correct?
14   A. That was his opinion.
15   Q. That's what he wrote in the letter?
16   A. That was his opinion.
17   Q. Right. But you agree that timely
18 entering of documents into the public record is
19 something that's important for an effective
20 Recorder's Office, correct?
21   A. Yes.
22    - - - - -
23    (Thereupon, Deposition Exhibit 87, A
24    Document Bates Stamped GCR-002966
25    Through GCR-002968, was marked for

36 (Pages 419 - 422)

Page 423

1     purposes of identification.)
2       - - - - -
3     Q.   This is Exhibit 87.  It bears Bates
4  numbers GCR-002966 through 2968.  Before I ask
5  you about this, do you have a private e-mail
6  address that you use at work?
7     A.   No.  Well, private, as --
8     Q.   Do you have a private e-mail?
9     A.   There's one that comes to my
10  office, yes.  "SGingerich" or "Recorder".  Both
11  of those come to my office.
12     Q.   What is the private e-mail address
13  that comes to your office?
14     A.   Both of them -- okay.  After the at
15  it's going to be the same.  But the first part
16  is, one is "SGingerich", and the other is
17  "Recorder".  And they're both
18  "@co.geauga.oh.us".
19     Q.   Okay.  So you don't have something,
20  like, "sharon@gmail.com"?
21     A.   No.
22     Q.   None of that at your office?
23     A.   No.
24     Q.   So when we get the documents from
25  your office at either of those two addresses,

Page 424

1  "sgingerich", or "recorder@co.geauga.oh.us", we
2  have covered all of the e-mail addresses at
3  your office that you use for business, correct?
4     A.   Correct.
5     Q.   Do you have any at home that you
6  use to conduct business for the county?
7     A.   No, I do not.
8     Q.   Looking at Exhibit 87, do you
9  recognize this at least based on this Catherine
10  Heiden letter, July 16, 1996, that there was an
11  abolishment of the Torrens Land Registration
12  System in Geauga County?
13     A.   Correct.
14     Q.   Are you familiar with the Torrens
15  Land Registration System?
16     A.   I know what it is.
17     Q.   And do any of your older books --
18  when I was getting out of law school and I used
19  to have to go so title searches, I had to go to
20  these big, huge, massive books, and I folded
21  the pages over on each one, and I went down the
22  index of names and so forth.  Does the so Land
23  System still exist in those older books?
24     A.   My understanding is that it's all
25  been converted.  However, you can still go

Page 425

1  downstairs and pull them.  They're actually in
2  files, paper.
3     Q.   Do you have any objection to the
4  elimination or abolishment of the Torrens Land
5  System back in 1996?
6     A.   No.
7     Q.   And you agree that it says here, at
8  least on the front page, 2966 of Exhibit 87,
9  that "processing land registration transactions
10  under the Torrens System takes approximately
11  two to three weeks."  Do you see that?
12     A.   Wow.
13     Q.   Do you see that, first of all?
14     A.   I see it.
15     Q.   And do you think two to three weeks
16  is an adequate time under our modern economic
17  system?
18     A.   Catherine didn't have computers.
19  So that's probably why it took two to three
20  weeks.
21     Q.   But I'm asking today; do you think
22  that would be an acceptable time period to
23  record land transactions, two to three weeks?
24     A.   No.  No.
25     Q.   Our current economic system in the

Page 426

1  United States requires things to move almost at
2  the speed of light through computers, correct?
3     A.   Correct.
4     Q.   That's all I have.  Thank you, Ms.
5  Gingerich, for your time.
6     A.   You're welcome.
7        EXAMINATION OF SHARON GINGERICH
8  BY MR. WHOLEY:
9     Q.   Good morning, Ms. Gingerich.  My
10  name is Matt Wholey, and I'll be deposing you
11  on behalf of HSBC Bank USA.  They are many
12  times named as other entities in the complaint,
13  such as HSBC Mortgage Corp, etc.  If I ask you
14  something about HSBC, I'm including all of them
15  when I say that.  Do you understand that?
16     A.   Yes.
17     Q.   I also want to thank you for your
18  time.  I understand it's been an ordeal.  We've
19  all been here for almost a day-and-a-half.  I
20  really appreciate you taking the time to be
21  here.
22        First, can you quantify or identify
23  in any way the recording fees owed to the
24  Recorder's Office by HSBC?
25     A.   I don't know.

37 (Pages 423 - 426)

Page 427

1     Q.   Do you know who can?
2     A.   Yeah. It would be -- you know, I'm
3   going to take that back.  You wouldn't owe
4   anything, because we don't take credit.
5     Q.   How do you mean you don't take
6   credit?
7     A.   You can't say record this and I'll
8   pay you later.
9     Q.   I see.  On a related point, if no
10  one ever presents a document to the Recorder to
11  be recorded, no fee could ever be charged; is
12  that right?
13    A.   Correct.
14    Q.   Under any circumstances has the
15  Recorder's Office sued HSBC or any other entity
16  to recover fees, other than this litigation?
17    A.   Not to my knowledge.
18    Q.   So can you identify any other
19  damages or injury to the Recorder's Office,
20  other than the alleged lost fees?
21    A.   The chain of title is clouded.
22    Q.   Okay.  Can you describe any
23  situation in which the Recorder's Office would
24  incur costs because a party used the MERS
25  system to transfer title or to effect an

Page 428

1   assignment?
2     A.   No.
3     Q.   So no cost could be incurred by the
4   Recorder's Office because, for example, HSBC
5   uses the MERS system?
6     A.   That's correct.
7     Q.   And is there any way that the
8   county could be injured because -- other than
9   the recording fees, which we're setting
10  aside -- because HSBC or any other entity used
11  the MERS system?
12    A.   Not to my knowledge.
13    Q.   Could the county be injured
14  because, for example, HSBC received a priority
15  lien over a lien holder when it was not
16  entitled to priority?
17    A.   Not to my knowledge.
18    Q.   How long has the Recorder's Office
19  known that HSBC and other entities has used the
20  MERS system?
21    A.   How long has the Recorder's Office
22  known?
23    Q.   Yeah.
24    A.   I don't know.  I can't -- I don't
25  know.

Page 429

1     Q.   Do you know how long the county has
2   used -- has had knowledge of the use of the
3   MERS system by HSBC and other entities to track
4   assignments and other transactions?
5     A.   I do not know.
6     Q.   You don't know.  Okay.  Do you know
7   when HSBC first utilized MERS?
8     A.   I do not know.
9     Q.   Has the county ever objected, or
10  has your office ever objected to HSBC's use of
11  the MERS system?
12    A.   No.
13    Q.   If you get a mortgage to be
14  recorded, and MERS is designated as the
15  nominee, what does the Recorder do with that
16  mortgage?
17    A.   Records it.
18    Q.   It doesn't reject it because MERS
19  is the nominee?
20    A.   No.
21    Q.   Okay.  Has the Recorder ever
22  requested an Ohio Attorney General opinion
23  regarding the use of the MERS system by HSBC
24  and other entities?
25    A.   No.

Page 430

1     Q.   Has it ever asked for any opinion
2   from any governmental entity regarding the
3   legality of the MERS system?
4     A.   No.  Not to my knowledge.
5     Q.   Okay.  Can anyone else answer that
6   question?
7     A.   The prosecutor.
8     Q.   Mr. Joyce?
9     A.   Yes.
10    Q.   Did the Recorder's Office
11  investigate HSBC and its use of practices, use
12  of the MERS system?
13    A.   I don't know what the discovery --
14  I don't know what they looked for.
15    Q.   So when you say "they" --
16    A.   I couldn't answer that.
17    Q.   -- you're talking about your staff?
18    A.   Yes.
19    Q.   So you're not sure whether they did
20  anything with HSBC specifically?
21    A.   I do not --
22    Q.   You're not aware really what they
23  did regarding any entity?
24    A.   That's correct.
25    Q.   Now, when you reviewed documents

38 (Pages 427 - 430)

Page 431

1  regarding this for this deposition, did you
2  review any regarding HSBC?
3      A.  No.  Not that I remember.
4      Q.  So HSBC never appeared on any of
5  the documents that you reviewed?  That's your
6  answer?
7      A.  I don't recall.
8      Q.  And then one last point, just to
9  follow-up on something you said earlier.  I
10  think you stated that you never had any contact
11  with the National Association of Independent
12  Land Title Agents?
13      A.  With that association, no.  Only
14  Robert Holman.
15      Q.  So would it surprise you that on
16  the NAILTA's website they list as one of their
17  accomplishments for 2011 their conversations
18  with you?
19      A.  Yes.
20      Q.  Surprised us, too.  I think
21  probably that's all I have for you.  I
22  appreciate your time.  Thanks.
23          MR. SIEBOTT:  If anyone else --
24          MR. WHOLEY:  I just want to say one
25  thing.  We reserve the right, as other parties

Page 432

1  have said, to redepose Ms. Gingerich on merits
2  issues later.
3          MR. SIEBOTT:  Okay.  So if no one
4  else wants to go, I'm going to ask just a
5  couple --
6          MR. ERNST:  I have two questions, I
7  think just housekeeping.  They're so short
8  hopefully I'll just stay back here.
9      EXAMINATION OF SHARON GINGERICH
10  BY MR. ERNST:
11      Q.  My name is Christopher Ernst.  I
12  represent Chase.  Ms. Gingerich, at the very
13  beginning of the deposition you talked about
14  your work experience.  Can you please tell us
15  what you did at the jobs you worked at
16  previously?
17      A.  At American Society For Metals I
18  was a proofreader for metallurgical journals.
19  At Farrell Chemical -- that was in there, too.
20  At Farrell Chemical I was a secretary, and I
21  did a little lab work.  When I wrote for the
22  News Herald, I wrote stories.  When I worked
23  for Geauga Link I did -- I input information.
24      Q.  Data entry?
25      A.  Data entry.

Page 433

1      Q.  Thank you.
2      A.  When I worked for the Red Maple Inn
3  I managed the front desk.  When I worked for
4  Mary Bender I did secretarial.  When I worked
5  for the oil and gas company, I did secretarial.
6  I think that's it.
7      Q.  Hang on.  Let me scroll back.
8      A.  Now, that's going back to '65.
9      Q.  And Northeast Ohio Operating,
10  that's oil and gas?
11      A.  Yes.
12      Q.  And what is your educational
13  background, please?
14      A.  High school, some college.
15      Q.  And where did you graduate high
16  school from?
17      A.  Newbury.
18      Q.  And when you say "some college",
19  how much is "some"?
20      A.  Courses.  I've taken courses,
21  English courses.
22      Q.  So were you on path to get a
23  degree?
24      A.  No.
25      Q.  That's all I have.

Page 434

1          MR. ERNST:  Obviously we reserve
2  the right to speak with Ms. Gingerich again on
3  the substance of the matter.
4          MR. SIEBOTT:  Does anyone else --
5  I'm going to take a five-minute break, come
6  back and I'm going to ask a few questions.
7  Probably the last five or 10 minutes, and then
8  whoever wants to follow-up on what I have,
9  that's fine.  But, otherwise, that will be it.
10          (Thereupon, a recess was taken.)
11          MR. DUHAMEL:  Can we put a
12  stipulation on the record, if you're willing to
13  agree to it, that if any one Defendant objects
14  to any of your questions, all the Defendants
15  are deemed to join that objection, unless
16  someone speaks up and asked not to join it?
17          MR. SIEBOTT:  Sure.
18          MR. DUHAMEL:  Thank you.  The
19  alternative is --
20          MR. SIEBOTT:  Yeah.  I know.
21          MR. DUHAMEL:  Thank you.
22          MR. SIEBOTT:  I thought through
23  that quickly.
24      EXAMINATION OF SHARON GINGERICH
25  BY MR. SIEBOTT:

39 (Pages 431 - 434)

Page 435

1  Q.  Ms. Gingerich, yesterday during the
2  questioning from Corinthian's lawyer you were
3  asked whether anyone had ever instructed you,
4  or words to that effect, whether anyone had
5  ever instructed you to preserve your e-mails
6  and other documents for this litigation.  So I
7  want to revisit that question.  I'm going to
8  ask it again.
9      Has anyone, any lawyer, whether in
10  the Prosecutor's Office or a private law firm
11  that represents the county, ever instructed you
12  to preserve documents for this litigation,
13  e-mails and paper documents?
14  A.  Yes.
15      MR. DUHAMEL:  Asked and answered.
16  Q.  The other question is yesterday,
17  again, during the questions with Corinthian you
18  were asked whether you had searched your
19  e-mails and documents for documents responsive
20  to Corinthian's discovery requests, and you
21  answered that you had not.  I want to ask you
22  whether you know if anyone on your behalf has
23  searched your e-mails and documents in order to
24  respond to Corinthian's discovery requests in
25  this litigation?

Page 436

1  A.  Yes.
2  Q.  Who did?
3  A.  My attorneys.
4  Q.  When did that happen?
5  A.  It's been going on.  It's been
6  ongoing.
7  Q.  Okay.  Thank you.  That's all the
8  questions I have.
9      MR. DUHAMEL:  You have one
10  follow-up question.
11      EXAMINATION OF SHARON GINGERICH
12  BY MR. DUHAMEL:
13  Q.  When I asked you yesterday whether
14  or not you had been instructed to search or
15  preserve yours e-mails and you told me no, and
16  then you've just answered the question
17  differently today, why the difference?  Why a
18  different answer?
19  A.  Because I forgot that I was asked.
20  Q.  Okay.  Fair enough.  Thank you.
21  That's all I have.
22      EXAMINATION OF SHARON GINGERICH
23  BY MR. BROCHIN:
24  Q.  I have just one.  Right prior to
25  some questions that were just asked of you by

Page 437

1  your counsel that we took a five, 10-minute
2  break, during that five or 10-minute break did
3  you meet with Mr. Siebott, your lawyer?
4  A.  Yes.
5  Q.  Thank you.
6      MR. SIEBOTT:  That's all, I guess.
7  Reserving my right to review and correct.
8      (The deposition was concluded at
9  11:56 a.m.)

Page 438

1  Whereupon, counsel was requested to give
2  instruction regarding the witness's review of
3  the transcript pursuant to the Civil Rules.
4
5      SIGNATURE:
6  It was agreed by and between counsel and the
7  parties that the Deponent will read and sign
8  the transcript of said deposition.
9
10      TRANSCRIPT DELIVERY:
11  Counsel was requested to give instruction
12  regarding delivery date of transcript.
13  ORIGINAL: Mr. Yenouskas.
14  COPY: Mr. Brochin
15  COPY: Mr. Duhamel
16  COPY: Ms. Ghannoum
17  COPY: Mr. Cunningham
18  COPY: Mr. Carpenter
19  COPY: Mr. Allensworth
20  COPY: Mr. Pope
21  COPY: Ms. Koesel
22  COPY: Mr. Wholey
23  COPY: Mr. Posey
24
25

40 (Pages 435 - 438)

Page 439

1    REPORTER'S CERTIFICATE
2    The State of Ohio,    )
3                          SS:
4    County of Cuyahoga.   )
5
6    I, Todd L. Persson, a Notary Public
7    within and for the State of Ohio, duly
8    commissioned and qualified, do hereby certify
9    that the within named witness, SHARON
10   GINGERICH, was by me first duly sworn to
11   testify the truth, the whole truth and nothing
12   but the truth in the cause aforesaid; that the
13   testimony then given by the above-referenced
14   witness was by me reduced to stenotypy in the
15   presence of said witness; afterwards
16   transcribed, and that the foregoing is a true
17   and correct transcription of the testimony so
18   given by the above-referenced witness.
19       I do further certify that this
20   deposition was taken at the time and place in
21   the foregoing caption specified and was
22   completed without adjournment.
23
24
25

Page 440

1        I do further certify that I am not
2    a relative, counsel or attorney for either
3    party, or otherwise interested in the event of
4    this action.
5        IN WITNESS WHEREOF, I have hereunto
6    set my hand and affixed my seal of office at
7    Cleveland, Ohio, on this  25  day of
8    april      , 2010. 2012
9
10
11
12
13   Todd L. Persson
14   Todd L. Persson, Notary Public
15   within and for the State of Ohio
16
17   My commission expires July 28, 2012.
18
19
20
21
22
23
24
25

Page 441

1    DEPOSITION REVIEW
     CERTIFICATION OF WITNESS
2
3    ASSIGNMENT NO. 48825
     CASE NAME: State of Ohio v. MERSCORP, Inc.
     DATE OF DEPOSITION: April 25, 2012
4    WITNESS' NAME: Sharon Gingerich, Volume II
5    In accordance with the Rules of Civil Procedure,
     I have read the entire transcript of my testimony or it
6    has been read to me.
7    I have made no changes to the testimony as
     transcribed by the court reporter.
8

10   Date        Sharon Gingerich, Volume II
11
12   Sworn to and subscribed before me, a Notary Public in
     and for the State and County, the referenced witness did
     personally appear and acknowledge that:
13
     They have read the transcript;
14   They signed the foregoing sworn Statement; and
     Their execution of this Statement is of their free
15   act and deed.
16
     I have affixed my name and official seal this _____
17
18   day of _____, 20_____.
19
20   Notary Public
21
22   Commission Expiration Date
23
24
25

Page 442

1    DEPOSITION REVIEW
     CERTIFICATION OF WITNESS
2
3    ASSIGNMENT NO. 48825
     CASE NAME: State of Ohio v. MERSCORP, Inc.
     DATE OF DEPOSITION: April 25, 2012
4    WITNESS' NAME: Sharon Gingerich, Volume II
5    In accordance with the Rules of Civil Procedure,
     I have read the entire transcript of my testimony or it
6    has been read to me.
7    I have listed my changes on the attached Errata
     Sheet, listing page and line numbers as well as the reason(s)
8    for the change(s).
9    I request that these changes be entered as part of the
     record of my testimony.
10
     I have executed the Errata Sheet, as well as this
11   Certificate, and request and authorize that both be appended
     to the transcript of my testimony and be incorporated therein.
12
13   _____
     Date        Sharon Gingerich, Volume II
14
     Sworn to and subscribed before me, a Notary Public in
15   and for the State and County, the referenced witness did
     personally appear and acknowledge that:
16
     They have read the transcript;
17   They have listed all of their corrections in the
     appended Errata Sheet
18   They signed the foregoing sworn Statement; and
     Their execution of this Statement is of their free
19   act and deed.
20   I have affixed my name and official seal this _____
21   day of _____, 20_____.
22
23   Notary Public
24
25   Commission Expiration Date

41 (Pages 439 - 442)

Page 443

```
1      ERRATA SHEET
       RENNILLO DEPOSITION & DISCOVERY - A VERITEXT COMPANY
2          ASSIGNMENT NO. 48825
3      PAGE/LINE(S) /     CHANGE        / REASON
4      _____
5      _____
6      _____
7      _____
8      _____
9      _____
10     _____
11     _____
12     _____
13     _____
14     _____
15     _____
16     _____
17     _____
18     _____
19     _____     _____
       Date        Sharon Gingerich, Volume II
20
       SUBSCRIBED AND SWORN TO BEFORE ME THIS_____ DAY OF
21
       _____, 20____.
22
23     _____
       NOTARY PUBLIC
24
       _____
25     Commission Expiration Date
```