# **Exhibit 13**



FOCUS - 5 of 85 DOCUMENTS

Copyright 2011 ProQuest Information and Learning
All Rights Reserved
Copyright 2011 Mortgage Bankers Association of America
Mortgage Banking

May 2011

**SECTION:** COVER REPORT: REGULATORY COMPLIANCE; Pg. 34 Vol. 71 No. 8 ISSN: 0730-0212

**ACC-NO:** 21937

**LENGTH:** 4828 words

**HEADLINE:** SETTING THE RECORD STRAIGHT ON MERS

**BYLINE:** Jones, Allen H.

Allen H. Jones is chief operating officer of RiskSpan Inc., a mortgage valuation technology and advisory consulting services firm based in New York and Washington. D.C. He can be reached at ajones@riskspan.com

**BODY:**

ABSTRACT

Mortgage Electronic Registration Systems Inc (MERS) is a wholly owned subsidiary of MERSCORP. The subsidiary's sole purpose is to serve as beneficiary or mortgagee in the land records, while the electronic registry was designed to track the transfer of beneficial ownership interests in and servicing rights to mortgage loans. This article reviews the establishment of MERS, documents its founding premise, explores how it has been used since 1995, evaluates its real impact on the foreclosure crisis, considers the impact of the consent order and shares a perspective on MERS' continued role in the future. Up until the nations foreclosure crisis emerged MERS remained largely absent from the public eye. However, with the dawning of the Foreclosure-Gate crisis, the business model of MERS came under scrutiny. The mention of MERS in the AG draft agreement signifies that its utilization may become a matter that is settled between servicers and regulators, rather than litigated or legislated.

FULL TEXT

The foreclosure crisis ignited a media firestorm around the legitimacy of an electronic registry built by the industry to track ownership of mortgages and servicing. It's taking a while to get to the truth.

It has been decried as a shell corporation. Deemed a destroyer of the Colonialera land-records system. Its most outspoken critics have argued its very existence marks the demise of the institution of property rights. I Despite the unforgiving censure of Reston, Virginia-based Mortgage Electronic Registration Systems Inc. (MERS) in the media, its right to exist, to hold legal title to a mortgage and to foreclose all have been maintained by numerous local and state courts. These decisions, along with recent organizational transformation and procedural changes within MERSCORP Inc., MERS' parent company, could mean the storm of litigation challenging its standing is finally tapering off. But MERS remains largely misunderstood by the public, and is almost regularly berated by the media. As a result, politicians are distancing

themselves from MERS. Do such maneuvers indicate awareness of a potential liability or is it simply that the public relations risk is just not worth the cost?

SETTING THE RECORD STRAIGHT ON MERS Mortgage Banking May 2011

Amidst the din, it is hard to tell. Absent from most of the discourse is an unbiased portrait of MERS, with a history of how and why it emerged, the value it confers to the mortgage lending supply chain and the real problems it faces today with respect to a recent regulatory consent order.

The MERS® System is the registry operated by MERSCORP. MERS is a wholly owned subsidiary of MERSCORP. References in this article to MERS are to the subsidiary. The subsidiary's sole purpose is to serve as beneficiary or mortgagee in the land records, while the electronic registry was designed to track the transfer of beneficial ownership interests in and servicing rights to mortgage loans.

Where things stand

As the summer approaches, the housing finance industry is anticipating significant changes in housing policy designed to mend the loose practices that steered Fannie Mae and Freddie Mac into conservatorship. As the administration and Congress attempt to wind down the mortgage giants and attract private capital back into the markets, the inventory of homes for sale and pending shadow real estate-owned (REO) inventory continues to remain at record levels. In fact, the backlog of delayed foreclosures positions the economy to face a new record volume of foreclosures in 201 1.

It was the spike in foreclosure activity in 2009 and 2010 that revealed false affidavits and other improper paperwork tied to foreclosures.

Some were carried out by "robo-signers." Others were executed with improper documentation. A few had even been carried out on the wrong house altogether. The discovery became the catalyst for a national foreclosure processing crisis that prompted several large servicers to temporarily suspend their foreclosure proceedings.

On some of those properties foreclosed with improper or incomplete paperwork, MERS was listed as the mortgagee or beneficiary of record. As a theretofore relatively unfamiliar entity, with the power to foreclose, the mortgage lien holder (MERS) unwittingly fanned the fires of the foreclosure crisis. Though numerous court rulings have since vindicated MERS, recognizing its authority to foreclose, many parties remain unconvinced.

During a self-imposed foreclosure moratorium, servicers revisited their loss-mitigation procedures and default-management practices. After conceding the challenges, many servicing institutions announced that additional remedies had been implemented to ensure that borrowers in default are evaluated for all available lossmitigation options.

Further, servicers pledged that in the event of a foreclosure, their internal reviews had resulted in new operational procedures that would be meticulously followed in the future. But the consternation and uproar caused by the so-called Foreclosure-Gate has not yet fully settled.

That's not to say MERS has not been without some serious setbacks. On April 13, the results of an interagency horizontal examination conducted by federal regulators were released to the public. The report revealed a concerted effort by the Federal Reserve System, the Office of the Comptroller of the Currency (OCC), the Federal Deposit Insurance Corporation (FDIC) and the Office of Thrift Supervision (OTS) to review the safety and soundness of mortgage servicing and foreclosure processes at 14 major mortgage servicers as well as a number of third-party vendors that provide significant services to lenders and servicers - including MERSCORP and MERS. The review has resulted in a formal consent order against the two entities.

This article reviews the establishment of MERS, documents its founding premise, explores how it has been used since 1995, evaluates its real impact on the foreclosure crisis, considers the impact of the consent order and shares a perspective on MERS' continued role in the future. The hope is that by providing this account the record will be set straight.

Background

Originally conceived in the late 1980s, the concept for an electronic clearinghouse of critical mortgage information was explained in an October 1993 white paper entitled the Whole Loan Book Entry iWLBEJ Concept for the Mortgage Finance Industry. The idea was developed by the I nter Agency Technology Task Force (IAT), a group composed of prominent industry leaders - the Mortgage Bankers Association (MBA), Fannie Mae, Freddie Mac, Ginnie Mae and servicing executives.

Their vision was simple - use modem-based electronic data interchange (EDI) to allow mortgage loan sellers, warehouse lenders, mortgage loan investors and servicers to "obtain, transfer and track interests in mortgages, essentially on a real-time basis," regardless of any internal proprietary systems that supported their business operations.

SETTING THE RECORD STRAIGHT ON MERS Mortgage Banking May 2011

Up until then, liens were tracked by local land records offices, with varying and often antiquated systems. Though seldom recognized, the purpose of the land records was not to track mortgage ownership rights, but to provide public notice of liens to protect the lien holder.

While other aspects of the mortgage lending supply chain were being digitized, including the 1990s development of automated underwriting systems (AUS) and loan origination systems (LOS), the recordation of the mortgagee or agent for the mortgagee in local land records remained a manual process.

Well-intentioned staff at bustling offices struggled to manage the congestion caused by the growing volume of mortgage loans. Missing and erroneous assignments caused gaps in the chain of title, threatening the integrity of the lending process. The late 20th-century prevalence of secondary market transactions and advancement of management information systems pushed the industry to pursue a more efficient solution.

Process

Traditionally, the borrower executes two essential documents at closing. These two documents make up the mortgage loan. Although the legal distinction between them is fundamental, it is often overlooked in common parlance. The first document is the promissory note, which signifies the borrower's promise to repay the loan over a period of time under stated terms. Notes can technically exist without collateral, so the second document, the mortgage, secures the promissory note by placing a lien on the real property as security for the loan's repayment.

The note is typically endorsed "in blank" and delivered from the lender to the mortgage loan aggregator and/or securitization trust. The note is intended to be a fluid, negotiable instrument in trade where possession is sufficient to confer the right to enforce ownership interest.

The mortgage follows the note. That is to say that a transfer in the ownership of the promissory note also transfers with it the underlying secured obligation to pay.

Traditionally, when a loan was sold to another lender - for example, an aggregator - the mortgage was "assigned" to the purchaser and recorded in the purchaser's name. However, if the servicing remained with the seller, as was often the case, the mortgage usually continued to be recorded under the servicer's name.

The seller would then prepare a "recordable assignment in blank" and deliver it to the trust. Where MERS is the mortgagee of record, subsequent assignments of the mortgage no longer need to be recorded at the local recorders' offices because MERS holds the mortgage in trust on behalf of its member, who owns the note.

The land records have never been an authoritative source for who owns beneficial interests and servicing rights to mortgages. The assignment, which is usually recorded to protect the lien holder, is generally not required by the county, and has nothing to do with the sale of servicing rights. If the servicing rights changed hands, then the county land records were updated if the new servicer desired to receive service of process in order to fully perform under its servicing agreement with the investor. The advent of MERS enhanced this last step.

A predecessor to the current configuration of MERS and MERSCORP was officially created in 1995 as an industrywide utility to hold mortgage liens in an agency capacity on behalf of participants in the mortgage banking industry, and to track the changes in the ownership and servicing of any registered loan.

At closing, the lender and borrower make MERS the mortgagee of record, and all subsequent changes in the mortgage loan ownership and servicing rights of the loan are updated in the database provided the loan continues to be registered in the MERS System. Moreover, MERS was established as a part of a tri-party organization managed by the limited staff of MERSCORP, the lender participant and the founding agencies. Accordingly, all three legs of the tri-party stool contribute to the accuracy and maintenance of the registry in addition to serving as checkpoints.

The efficiencies realized by the registry provided incremental value to lenders that sold loans into the secondary market. Mortgage banking was a process that frequently required several assignments, and even before MERS, there was already an active attempt to minimize assignment costs and third-party fees. Lenders had already begun preparing mortgage assignments in blank to enable fluid transmissions, and attempted to immobilize mortgage notes at the original clearinghouse member custodian to avoid future file movement and recertification. These practices merely continued with the introduction of MERS.

'Vault' idea

Because the original WLBE system was closely modeled after the electronic stock and bond registration model implemented by the Depository Trust Company (DTC) a couple of decades earlier, some industry participants in the early 1990s suggested that loan documents, like physical stock and bond certificates, should also be stored in a vault. The idea of a central vault was one of many ideas circulated as the clearinghouse was being brainstormed, although it never became an official feature of the clearinghouse upon its official conception.

The vault idea was forgone presumably because loan document immobilization was already taking place. The Depository Trust and Clearing Corporation's (DTCCs) depository vaults, for instance, immobilized stock and bond certificates. As a result of electronic registrations and transfers, futures, options and bonds are now issued electronically.

But the vault idea did not totally disappear - the mortgage industry continued to pursue the vault concept with the advent of the electronic mortgage (eMortgage). Prior to conservatorship, both Fannie Mae and Freddie Mac pursued initiatives for the electronic storage of eMortgages originated and closed by their approved seller/servicers and signed electronically.

Legal structure

MERS was designed to operate in accordance with existing real property law and the Uniform Commercial Code (UCC). MERS acts as mortgagee in the land records in a nominee (agent) capacity for the originating lender and the lender's successors and assigns.

The MERS System exists so MERSCORP knows who to send the service of process to because, under the MERS process, the current servicer continues to handle the day-to-day servicing responsibilities as it did prior to the advent of MERS.

When the underlying mortgage loan indebtedness (in the form of the promissory note) was sold from one lender to the next, the purchasing lender's interest would continue to be secured because MERS held legal record title for the benefit of the lender. MERS' role as agent for the promissory note owner in the land records is supported by both agency and contract law.

As mentioned earlier, it is not generally necessary to record an assignment to demonstrate mortgage loan ownership or convey a security interest. The benefit of recordation is to ensure that interested parties are apprised of existing liens or other legal encumbrances. Assignments are recorded so that subsequent servicers receive service of process for legal actions affecting the property that is encumbered by the lien.

Because mortgagee-of-record status renders MERS responsible to different parties in the mortgage loan ownership chain, contract agreements are prudently crafted between MERS, MERSCORP and third parties to establish loan ownership and security interests that retain the integrity of the original documents and have legal force.

Legal challenges and victories

Up until the nation's foreclosure crisis emerged, MERS remained largely absent from the public eye. However, with the dawning of the Foreclosure-Gate crisis, the business model of MERS came under scrutiny.

The defects in servicer foreclosure procedures were admittedly serious, and included the robo-signing of affidavits and improper notarization, but investigations did not demonstrate that the vast majority of these foreclosures were otherwise invalid. Nevertheless, the legal right of MERS to commence foreclosure action came under fire in numerous states, where plaintiffs filed suits questioning MERS' authority to foreclose as an entity that was not the actual owner of the loan.

In October 2010, Washington, D.C. Attorney General Peter Nickles issued an enforcement statement declaring foreclosures may not be initiated against a District of Columbia homeowner unless the security interest of the current noteholder is also reflected in the local recorder's office.

As a relatively unknown entity with the power to foreclose, MERS and the MERS System became the focus of intense scrutiny. However, the past couple of years have unleashed a flood of cases in judicial and non-judicial foreclosure states that were adjudicated in MERS' favor.

* Utah: Two March 2011 rulings (Wade v. Meridias Capital Inc., MERS et al; and Wareing v. Meridias Capital) in Utah, a non-judicial foreclosure state, have affirmed MERS' ability to act as the beneficiary of the deed of trust and nominee of the lender and its successors and assigns. The judges confirmed that this authority is conferred when a borrower signs a deed of trust on which MERS is expressly appointed the beneficiary. As such, mortgage assignments by

MERS are valid and its execution of foreclosure is legal. These two cases were a small number of the many court decisions and orders in Utah that have upheld MERS' ability to be the beneficiary on a deed of trust and which dismissed challenges to MERS' authority to foreclose or assign.

* Wyoming: A similar memorandum (In re Martinez) followed in March 2011 in Wyoming, where the authority of MERS relative to assigning a mortgage had likewise been contested. The argument failed because the borrower signed a mortgage at closing expressly authorizing MERS "to take any action required of the lender."

* California: Also in March 2011, a plaintiff filed a claim under the California False Claims Act (CFCA), asserting MERS has made false representations in order to circumvent payment of recording fees required to reflect security interests in real property. The suit (Bates v. MERS) was dismissed by the District Court for the Eastern District of California, which determined it was without jurisdiction over the plaintiff's action because the plaintiff was not an original source of the information as required under the CFCA.

Further rulings recognizing MERS as the beneficiary of the mortgage or deed of trust, similar to those found in Utah and Wyoming, have also been made in Oregon, New York, Massachusetts, Georgia, New Hampshire, California, Alabama, Nevada, Virginia, Rhode Island, Michigan and Kansas this year. As the mortgagee of record and holder of the original note endorsed in blank, the cases support MERS' legal standing to initiate foreclosure proceedings.

Laurence E. Piatt, a partner with K&L Gates LLP in Washington, D.C. with expertise in real estate finance who has worked on MERS issues over the years, acknowledges the significance of the rulings: "With favorable decisions in multiple states, it is clear that the basis for which MERS was founded is valid, and that MERS has the affirmation of the overwhelming majority of courts to act as the lender's nominee as provided in the mortgage documents," he says.

"MERS was created to enable efficiencies in a paper-based business. MERS continues to achieve its objectives, and if an entity like MERS did not exist today, it would have to be created to enable the efficient operation of the capital markets," Piatt says.

Corporate governance challenges

While MERS' legal standing has been vindicated by state and district courts, its corporate governance structure recently came under the review of federal regulators. The Interagency Review of Foreclosure Policies and Practices and consent order for MERS were posted to the Federal Reserve Board's website on April 13.

In testimony before the Senate Committee on Banking, Housing and Urban Affairs on Feb. 17, 2011, Acting Comptroller of the Currency John Walsh explained to the Congress that an interagency examination of MERS' operations, procedures and controls had been under way.

The recent consent order between MERS and federal regulators follows several organizational changes already taking place within MERSCORP. On Jan. 22, 2011, R.K. Arnold, president and chief executive officer of MERS and MERSCORP, resigned. MERSCORP issued a statement on its website acknowledging the resignation and announcing an interim replacement. "MERSCORP Inc. . . . today announced the retirement of President and [Chief Executive Officer] R.K. Arnold. Arnold joined the company at its inception and has been instrumental in the development of the MERS System, a registry of ownership and other mortgage rights for more than half of all outstanding residential mortgages in the United States. . . . Arnold is succeeded on an interim basis by financial services industry veteran Paul Bognanno," the company announced. An announcement on a permanent successor has yet to be made.

While Walsh made general remarks on the review of MERS and MERSCORP in his testimony, he did not mention Arnold's resignation: "[T]he agencies [OCC, the Federal Reserve Board (FRB), FDIC, OTS] conducted interagency examinations of MERSCORP and its wholly owned subsidiary, Mortgage Electronic Registration Systems Inc. . . . which provide[s] significant services to support mortgage servicing and foreclosure processing across the industry. The primary objective of the examinations was to evaluate the adequacy of controls and governance over bank foreclosure processes, including compliance with applicable federal and state law. Examiners also . . . assessed foreclosure operating procedures and controls, interviewed bank staff involved in the preparation of foreclosure documents, and reviewed approximately 2,800 borrower foreclosure cases in various stages of foreclosure. Examiners focused on foreclosure policies and procedures, organizational structure and staffing, vendor management including use of third parties, including foreclosure attorneys, quality control and audits, accuracy and appropriateness of foreclosure filings, and loan document control, endorsement and assignment."

Many of the lapses in safety and soundness cited in the final interagency review were ascribed to servicer performance in the oversight and quality control of MERS. But the agencies also identified non-servicer-related deficiencies that presented "financial, operational, compliance, legal and reputational risks to MERSCORP and MERS, and to the participating members." When the consent order was issued, it was publicly announced that MERSCORP and MERS had already begun implementing remedial procedures.

Moving forward, MERSCORP and MERS have committed to the following actions:

* Forming a compliance committee to monitor compliance with the terms of the consent order;

* Formulating an action plan with a complete description of the actions necessary to comply with the order;

* Engaging an independent third party to assess board, management, officer and staffing needs in order to operate safely and soundly;

* Formulating a communications plan with members to establish a standard protocol for dealing with significant legal matters;

* Formulating a governance plan to strengthen processes as they relate to authorizing MERS certifying officers; and

* Obtaining an independent third party to review the effective operations of the eRegistry system of recording electronic notes.

Financial sanctions against MERSCORP and MERS were not imposed by regulators in the consent order.

MERS: 'No more foreclosures in the MERS name*

Before the consent order was issued, a number of policy changes were announced by MERSCORP. The most notable was published in Policy Bulletin 2011-2 on March 8, 2011, announcing the revocation of member authority to commence foreclosures in the MERS name.

According to the Policy Bulletin, the policy would become effective Aug. i, 2011, upon approval by the board of directors of MERS and MERSCORP: "The authority to conduct foreclosures in the name of MERS granted to a member's certifying officers under the member's MERS Corporate Resolution is revoked. Effective Aug. I1 2011, the member shall be sanctioned $10,000.00 per violation for commencing a foreclosure in the name of MERS. The member will automatically be in violation of this rule and subject to the enforcement of the fine when the first legal action is taken in MERS name."

Although recent litigation has upheld the permissibility of MERS to commence foreclosure action, the practice is slated to come to an end where it has not already ended. (Where the practice ends depends on servicer policy and/or whether the securities are Fannie and Freddie securitizations, not on market/jurisdiction.)

Tri-party management allows swift policy change

Concurrent with discussions over Policy Bulletin 2011-2, several major servicers, including Charlotte, North Carolina-based Bank of America, New York-based JPMorgan Chase and San Francisco-based Wells Fargo & Co. implemented internal policy changes requiring the de-registration of loans that were in the MERS name before initiating foreclosure. The purpose of the change was to provide clarity to the defaulted mortgagor and minimize legal and compliance risk to the servicer.

Furthermore, any Fannie Mae and Freddie Mac servicers that did not implement the policy on their own are now required to do so. That change was implemented via the following policy directives:

* Freddie Mac Bulletin 2011-5, March 23, 2011: Eliminated the option of Freddie Mac servicers to foreclose in the MERS name. Going forward, the securitization must be assigned from MERS back to the servicer by means of recordation where required by law.

* Fannie Mae Announcement 2010-05, March 30, 2010: MERS may not be named as the plaintiff of any mortgage loan owned or securitized by Fannie Mae. The servicer must prepare an assignment via recordation to transfer the security interest from MERS to the servicer. Effective May 1, 2010.

The politics of MERS in the housing crisis

SETTING THE RECORD STRAIGHT ON MERS Mortgage Banking May 2011

Even as MERS turns the tide by prevailing in state courthouses around the country, the challenges the mortgage industry faces post-boom as a result of the widespread destruction of home values remains a political nightmare.

In addition to the agency consent order, a 50-state attorneys general (AG) task force contends it is negotiating a 27-point draft servicer settlement (or term sheet) with a handful of megaservicers. Conspicuously present in that draft agreement is language stating that the subject of MERS is held for separate review. It appears that the agency consent order has addressed the AG task force reference to MERS and its organizational structure.

The mention of MERS in the AG draft agreement signifies that its utilization may become a matter that is settled between servicers and regulators, rather than litigated or legislated. In light of this possibility, in my view, the probability that MERS will end up a political casualty may be lowered.

The ongoing need for an electronic registry

By serving as the mortgagee in the county land records on behalf of its members, MERS has become a critical component of housing finance. Since its inception, MERS has enabled fluent commerce in the housing finance markets, much like the advent of electronic registration in lieu of stock certificates enabled fluent commerce in an age of trading stocks online.

The soundness of a borrower's property rights is far from compromised by the frugality of paperless business; instead, it is improved, as the enormous volume of mortgages issued and transferred could not be sustained by congesting the land records with reassignments.

In fact, the services of MERSCORP have not been exploited to their full, value-adding potential. If the traditional, paper-based format of the promissory note and the mortgage document were produced electronically (versus manually) at closing and registered within a single system like MERSCORP's MERS eRegistry, it would be virtually impossible to create duplicate notes.

The incidence of fraud would be reduced by the instant visibility conferred by a system like the MERS eRegistry. The legal underpinnings necessary to realize such a system have been in place since 2000, when the Clinton administration passed the Electronic Signatures in Global and National Commerce Act (E-SIGN), recognizing the equivalence of authenticity and enforceability between electronic and paper signatures.

In addition to federal law, 47 states and the District of Columbia have enacted Uniform Electronic Transactions Act (UETA) laws in their own statutes, acknowledging the validity of electronic signatures. The three remaining states - Illinois, New York and Washington - have adopted separate laws recognizing the validity of digital signatures as well.

Chris Christensen, an attorney with PeirsonPatterson LLP law firm in Dallas, has closely followed the foreclosure crisis. Christensen says, "The MERS® eRegistry is the key to solving the lost document problem. As a critical piece of eCommerce infrastructure, the eRegistry is also key to solving the industry's data problem. These two problems have largely contributed to the housing crisis. The good news is that they are not permanent problems if the industry acts now to implement the appropriate solutions. The MERS eRegistry is part of the solution and not the problem."

Christensen adds, "Had the industry focused on understanding the MERS value proposition with its electronic registry, we could have avoided the lost-document and data-based issues at the heart of the foreclosure crisis. But hindsight is always 20/20."

SIDEBAR

All three legs of the tri-party stool contribute to the accuracy and maintenance of the registry in addition to serving as checkpoints.

SIDEBAR

Although recent litigation has upheld the permissibility of MERS to commence foreclosure action, the practice is slated to come to an end where it has not already ended.

**GRAPHIC:** Illustrations

**LOAD-DATE:** May 19, 2011