# Exhibit 14

*MERS aids electronic mortgage market Mortgage Banking January, 1997*

Copyright 1997 UMI, Inc.; Banking Information Source
Copyright Mortgage Bankers Association of America 1997
Mortgage Banking

January 1997

**SECTION:** Vol. 57, No. 4; Pg. 42-47; ISSN: 0730-0212; CODEN: MOBAAX

**LENGTH:** 3686 words

**HEADLINE: MERS** aids electronic mortgage market

**BYLINE:** Schneider, Howard

**BODY:**
(Photograph Omitted)

"MORTGAGE SERVICING RIGHTS HAVE BECOME A COMMODITY, notes Dick Hebl, senior vice president, loan administration at Knutson Mortgage Corporation in Minneapolis. "But they are traded in a cumbersome, involved manner." Hebl says that time delays-and the problem of adequately serving borrowers while transferring a loan package-increase the difficulty of buying or selling servicing.

Knutson Mortgage is an active subservicer receiving many "sight unseen" loans that often come with existing problems, adds Hebl. Ownership rights often are not correct on county land records, he explains. For instance, a defunct savings and loan might be named as the servicer. Hebl's staff then must track down a government official who is authorized to sign on behalf of the long-gone financial institution.

New approach

An automated alternative to these problems is the promise of the new **Mortgage Electronic Registration** Systems, Inc. (**MERS**). Knutson Mortgage is one of **MERS'** charter members, and Hebl recalls thinking "this is a big deal" when he first saw how **MERS** would work.

Knutson Mortgage is incorporating **MERS** into its loan origination software. In 1997, the firm will start generating an 18digit mortgage indentification number (MIN) for every origination. A MIN will stay with a loan throughout its life-even as ownership of the loan and its servicing changes hands.

Knutson will record the mortgage or deed of trust in public land records, just as it does today. But an assignment also will be recorded in the county records, naming **MERS** as mortgagee-ofrecord.

**MERS** then electronically will track ownership and servicing transfers on that loan. When rights are traded, no additional assignments would have to be recorded in the land records. And unrecorded assignments, which currently are prepared for investors or warehouse lenders, also will become unnecessary.

**MERS** will register each loan according to its MIN and serve as an electronic

clearinghouse for recording ownership rights and ongoing transfers. It will seek to cut costs and reduce errors by centralizing certain information now scattered through closing documents, public land records and mortgage assignments.

"**MERS** addresses a problem that was costing the industry a significant amount of money," says Rick Amatucci, a Fannie Mae vice president and the agency's liaison with **MERS.** He recalls that the idea grew out of an Interagency Task Force, which brought the secondary marketing agencies and the Mortgage Bankers Association of America (MBA) together "to identify ways to bring efficiencies to the industry," Amatucci says.

A feasibility study and business plan were then developed before incorporating **MERS** in 1995, says MBA Executive Vice President Warren Lasko. He cites "a very high level of enthusiasm" within the industry for an initiative that is designed to: U Lower costs for servicers, which offers benefits to themselves as well as their borrowers.

U Provide immediate access to information on mortgage ownership rights to both consumers and the industry.

(Table Omitted)

Captioned as: What **MERS** Costs

* Lessen the potential for fraud by giving lenders the ability to track individual mortgages throughout their life span. **MERS** President and Chief Executive Officer Paul Mullings cites a "very, very positive response" to the system. "Some say it was overdue for the industry," he adds. Mullings sees **MERS** as part of a movement toward the use of electronic rather than paper-based processes in mortgage lending.

The genesis of **MERS** reveals the industrywide cooperation behind the initiative. Fannie Mae and Freddie Mac each invested $ 1 million in **MERS** as startup capital. Lenders, industry vendors and real estate professional associations combined to bring in another $ 2 million.

**MERS** is a nonstock corporation owned by its members-similar to the way MasterCard is owned by financial institutions offering the cards. However, **MERS** has two classes of members. Charter members have a financial interest in the project, in addition to the voting rights that all members enjoy.

A bright idea In January 1997 **MERS** plans to hire four additional staff members-to bring the total in its McLean, Virginia, offices to just 10. Yet the senior management team of Mullings, General Counsel Roland Arnold III, and Senior Vice President of Operations and Information Management Dan McLaughlin come into the venture with reputations of previously helping to develop financial services innovations.

Mullings formerly was CEO of the residential mortgage division at Los Angeles-based First Interstate BanCorp. Arnold was part of a team at AT&T Universal Card Services which won the 1993 Malcolm Baldrige award. McLaughlin previously helped make the industry more aware of technology as an MBA staff member. **MERS** is likened to an "industry utility"-a cooperative effort to cut expenses for many lenders and servicers. Servicers, investors, warehouse lenders and consumers all should easily recognize what firm is servicing a given mortgage once it's within **MERS.** Because it is the mortgagee-of-record, **MERS** also will receive all legal notices and forward mail

to servicers.

Multiple avenues for accessing **MERS** will be available, ranging from toll-free numbers to dedicated phone lines. **MERS** officials say they want to allow lenders to use the technology they already have, as much as possible, to avoid forcing companies to make further investments in order to use **MERS.**

People involved with the development of **MERS** note that the system's largest potential problem is simply that lenders won't use it enough to build a sizable database of loans. However, four industry vendors have developed strategic marketing alliances with **MERS** in an attempt to gain early acceptance by servicers and lenders.

Servicing broker Hamilton, Carter, Smith & Co., in Los Angeles, due diligence firm Hanover Capital Partners Ltd., of Chicago, Milwaukee-based mortgage insurer MGIC Investor Services Corp., and Stewart Title in Houston will be encouraging lenders to use the new system. "We want to help increase mortgage lending profitability and efficiency," says Curt Culver, president and chief operating officer at Mortgage Guaranty Insurance Corporation (MGIC).

David Greco, vice president of marketing at MGIC, says larger lenders will be taken through a customized analysis showing the financial benefits they can expect from using **MERS,** rather than using traditional assignments. Adopting the system "doesn't appear to be a very difficult question" for most servicers, he adds.

Projected savings

An average life-of-loan savings of almost $ 70 is forecast by **MERS,** by figuring savings of $ 10 each on unrecorded assignments to an investor and warehouse lender, and $ 40 on recorded assignments when servicing is sold. Additionally, **MERS** expects to save lenders $ 7.50 per loan on lien releases.

"Savings depend on how much a lender transfers servicing," says Stephen Morrison, senior vice president, secretary and general counsel at Norwest Mortgage, Inc., in Des Moines, Iowa. Morrison currently is chairman of the **MERS** board of directors.

Adding efficiency to servicing trades should increase the intrinsic value of servicing, according to people close to the project. **MERS** estimates its use will cause loans to trade $ 25 to $ 50 higher, and that servicing liquidity also will be increased.

Herman Churchwell, chairman and CEO of Hamilton, Carter, Smith & Co., predicts a two-tier market will emerge in servicing sales. Packages of loans registered with **MERS** will trade for more, Churchwell adds.

Although most industry observers expect **MERS** to bring in savings, "estimates range widely" as to the exact amount, says Mark Fleming, vice president of strategic partnership development at Freddie Mac and the agency's representative to **MERS.** He adds that industrywide savings are projected at between $ 77 million to $ 200 million annually.

Getting involved

EDS-based in Plano, Texas-is spending millions of dollars to build and maintain the

**MERS** infrastructure, which is modeled after the book-entry system used by Wall Street firms to record ownership interests in securities. In return, EDS will earn fees from the registry's use.

"Lenders are pleasantly surprised at the ease of adjusting their systems to use **MERS**," Mullings notes. "We supply turnkey software to help."

Although Mullings won't disclose revenue projections for **MERS**, he predicts the system will register 10 to 15 percent of all new originations and servicing transfers within a year of its April 1997 rollout. At the end of year two, Mullings foresees 25 percent of assignments moving through **MERS**.

And in five years he projects that 70 to 75 percent of all new originations and servicing transfers will be performed with the help of **MERS**. "The faster the database grows, the faster the benefits grow to the mortgage banking industry," Mullings says.

Rollout of **MERS** is scheduled to begin according to the following schedule: Allied Mortgage Group, Inc., and Norwest Mortgage, Inc., will start registering MIN numbers with **MERS** in late March. Then 1st Nationwide Mortgage will go on the system in April. GE Capital Mortgage Services, Inc.; Knutson Mortgage Corp.; Merrill Lynch Credit Corp.; and ReliaStar Mortgage Corp. will follow in May.

July will see HomeSide Lending, Inc., and Weyerhaeuser Mortgage Corp. using the system, according to plans. General members will be welcomed once these charter members are on **MERS**. (See sidebar for more on charter members.) Technology partner

EDS-which also provides electronic commerce facilities for other industries-will assist **MERS** members as they go online. Service bureaus and software vendors also are being given technical information to align their systems with **MERS**.

"Building an interface is not difficult" says Lesley Grimes, vice president and mortgage servicing product manager at ALLTEL Information Services, Inc. in Jacksonville, Florida. A lack of lender awareness will slow the use of **MERS** more than technical matters will, she adds. "Education is the most important issue" for **MERS**, Grimes says.

Most servicers are taking a wait-and-see attitude toward **MERS**, adds Dick Bryant, president of Fiserv Mortgage Products in South Bend, Indiana. But he adds that acceptance of the system is a question of "not if, but when."

Grimes agrees that "most servicing managers think **MERS** is a good idea. But they will let other people do it first." However, Bryant expects Fannie Mae and Freddie Mac will "lean heavily" on lenders to encourage use of **MERS**.

Grimes notes that one way that could be done is by pricing differently for loans, depending on whether or not they are registered with **MERS**. She adds that large correspondent lenders also might put higher value on purchased mortgages that have MIN numbers.

Unresolved issues

Industry acceptance of **MERS** probably will follow a "hockey stick" pattern, says Leilani Allen, Ph.D. Allen is director of mortgage banking at Tenex Consulting in Burlington, Massachusetts, the principal consultant involved in establishing **MERS.**

She explains that technology innovations often experience a period of relatively light adoption, which is then punctuated by a sharp upward rise in use. "Once reports that efficiencies are being found come out," she says, "lenders will say, 'We must do this- or else!'"

But she notes that initally **MERS** will have some "kinks to work out," along with a challenge to explain itself to the industry. Companies deciding to move ahead with **MERS** also will find themselves with business decisions to make, adds Allen. "What do you do with the people in your firm who are doing assignments now?" she asks. Cutting back or reassigning staff are alternatives lenders will consider as they move into **MERS.**

ALLTEL's Grimes adds that servicers will need to alter their processes once they are part of **MERS.** For instance, **MERS** must be notified whenever a loan in its database goes into foreclosure.

Although several of the nation's major mortgage servicers are **MERS** charter members, some national lenders are unenthusiastic about becoming involved with the project at this time. Some are reluctant because they haven't seen the product working or analyzed its costs. Others don't see **MERS** saving them anything in the context of how they work.

Yet those already involved with the project are optimistic. Having large servicers as charter members goes a long way toward building the necessary critical mass to make **MERS** a success, note Amatucci and other observers.

Norwest's Morrison says, "It will take a year or so, and then growth will take off, as lenders see that **MERS** works." Cost savings and premium servicing values will bring the mortgage industry to **MERS,** he adds.

Morrison adds that "almost all lenders are thinking of this as a fait accompli." Software vendors tell Morrison that being able to integrate **MERS** in their systems "is a 'have to have,' not a feature that's 'nice to have: It's almost like a compliance issue," he says.

Norwest Mortgage will first use **MERS** with retail loans, by making the MIN its loan number. When correspondent or wholesale loans come to Norwest from non-**MERS** members, the MIN will be added at that point. All **MERS** members agree to make **MERS** the mortgagee-of-record or beneficiary of the deed of trust for every new loan they originate or service.

Strong commitments

Allen notes that becoming a **MERS** member generally has been a CEO-level decision for the charter companies involved. One reason is that a financial commitment was required.

Yet, she adds that another important factor for some charter members was having the opportunity to help fashion **MERS** from its inception. "Having a seat on the board

is more important than return on investment," says Allen.

In addition to the $ 1 million cash infusions from Fannie Mae and Freddie Mac, large charter members put in $ 250,000 each, midsized members added $ 100,000 apiece and small members came up with $ 10,000 to $ 50,000-to invest a total of $ 4 million in the project.

**MERS** allocates these capital investments as 75 percent debt and 25 percent equity. Loans are projected by **MERS** to return an annual compounded rate of 20 percent, while equity will earn an estimated 12 percent a year.

Capital plus interest will be repaid by the end of the year 2000, according to **MERS.** Charter members also have the option of choosing discounted transaction fees for the first three years of **MERS'** operation, in lieu of a cash investment return.

Original investors came in "on faith," notes Allen, because the details of how **MERS** would work weren't ironed out until mid-1996 at working group meetings involving different industry players. Lenders and servicers of various sizes, along with the secondary market agencies, "got in a room together, walked through the process, and came to an agreement," says **MERS'** McLaughlin.

Allen adds: "I was particularly impressed that people from very different organizations could coalesce around what **MERS** should do, and how it should operate. That's hard to do within a company, much less between fierce competitors."

Single niche But as with any new venture, there are vested interests to encounter and resistance to change. McLaughlin explains: "We're not competing with anyone, or displacing anyone. We've kept focused on a niche-electronically registering and tracking mortgage rights."

Yet, he adds that document custodians and tax service companies have wondered if **MERS** would change their industry roles. However, "**MERS** won't change" traditional industry relationships between lenders, service providers and secondary market agencies, says Norwest's Morrison.

In fact, McLaughlin believes **MERS** will make the working relationship between servicers, investors and warehouse lenders "much more congenial than it is today" He notes that all parties will more easily be able to track loans to ensure that contractual obligations are being met.

Morrison predicts that warehouse lenders will require the use of **MERS** to help avoid the possibility of funding two loans on the same property. He notes: "Today it's very much up in the air who gets stuck if the wrong party is paid." He adds that under **MERS,** warehouse lenders are released from liability if they pay according to instructions.

Future enhancements

Freddie Mac's Fleming says the existence of **MERS** will help build "a movement towards electronic commerce" in the mortgage industry. "It's possible that **MERS** could move into new functions," he notes.

Fannie Mae's Amatucci agrees that "**MERS** will be a good model. Maybe there are

other areas where we as an industry can work together."

Tenex's Allen says, "It's inevitable that **MERS** will do more in the future. **MERS** also will encourage other cooperative efforts in the industry." Sharing information to help servicers with loss mitigation is a possible example, she adds.

"**MERS** can branch out," adds board chairman Morrison. "But we want to concentrate on doing this right first. There are lots of ideas-but we want to get a few years down the road before starting any new projects." Industry concerns

Allen cites **MERS** as an example of "industry maturity. We're looking for efficiencies at the industry level, not the department level."

Yet several industry participants are concerned about how **MERS** will affect their future. "A number of different people felt threatened at the working groups," recalls James R. Maher, executive vice president of the American Land Title Association (ALTA). "There were questions about if it could come off and the cost to implement **MERS.** Some questioned the cost/benefit analysis," he adds.

Maher notes that some title insurers initially saw **MERS** as "moving away from local land records, and putting it into the hands of a third party that we had no unique access to and that was not designed to help us do our job." He adds that involvement with **MERS** since its inception has helped to soothe those concerns, although they are not totally gone from the title industry.

How much title insurers will have to pay to access **MERS** for information on many loans "is still up in the air," says Maher. He adds that "high-volume title companies may have to belong to **MERS,** at an undetermined cost." Although the openness of **MERS** is a comfort to the industry, Maher says large title firms will need access beyond having an 800 number to call.

ALTA General Counsel Edmond R. Browne notes that **MERS** "is not a substitute for title insurance or the public land records. In fact, the foundation of **MERS** is in the public records."

Having centralized, accurate information about who is servicing specific loans could save title firms money, note the ALTA executives. But they add that until half of all outstanding loans are on **MERS,** the cost of examining the database probably will outweigh any benefits.

Maher explains there is "a possible perceived diminution in the value of our product" to be weighed against "the efficiency of having close to absolute assurance that the right party is being paid" at closing.

Title insurers hope that in the future **MERS** can electronically transmit payoff amounts and other release information, Maher says. Until then, they are hoping that **MERS** will enforce lienrelease requirements.

**Recorders** are worried Less optimism is found in county **recorder** offices. **MERS** "will take fees out of **recorder's** offices," says Rebecca Jackson, Jefferson County clerk in Louisville, Kentucky. She also is the land records interest group leader for the National Association of County **Recorders** and Clerks.

Recording assignments "is one of the more profitable things we do," she adds. Although new deeds will continue to be recorded in county offices, Jackson notes, "reassignments are much easier to process."

She adds that recording fees vary across the country. In fact, Jackson claims that in some places **MERS** fees will actually be higher, which is "a downside for consumers."

Making sure homeowners are protected from fraud and guaranteeing that consumers and county **recorders** will have access to **MERS** data are her main concerns. Jackson notes that "it will be easier for the public to get information, if **MERS** keeps its promises." And she says, "**MERS** has been very responsive" to input from county **recorders.**

"But we haven't seen it yet," Jackson adds. Although "the majority of **recorders** have had information across their desks about **MERS,**" she notes "a good deal of education" will be needed before all the nation's **recorders** are aware of the new system.

Jackson says that many county **recorders** will contact **MERS** as a customer service on behalf of people seeking information about assignments. "We will be the ones educating the public at the initial point of contact," she says. "It will add time to our day." To make this easier, Jackson hopes to be able to have an online hookup with **MERS–which MERS** officials say Kenosha County in Wisconsin already has done.

Ongoing implications Tenex's Allen says that an additional issue is that the industry groups involved might disagree about how to run **MERS** in the future. However, she says items agreed on to date already "define 80 percent of the answer" to most issues that could arise.

Board Chairman Morrison adds that the **MERS** *governing structure has worked so far. We'll see how it will work with more general members."

Functionality is another concern any new technology raises. If savings come to lenders as projected, EDS could be poised to gain further business as electronic commerce grows in the industry. EDS currently is working on another project designed to offer electronic document preparation and storage.

Balanced against these challenges is the vision of cost savings, better information, and more valuable servicing assets. Providing better data about the mortgage industry's primary asset-servicing-is an important step in the industry's evolution. M B

Author Affiliation:

Howard Schneider is a freelance writer based in Ojai, California.

**GRAPHIC:** Charts

**LANGUAGE:**  ENGLISH

**JOURNAL-CODE:**  MOB

**AVAILABILITY:** Contact UMI for article reprint (order no. 8126.01). Restrictions

may apply.

**BIS-ACC-NO:**  00302672

**LOAD-DATE:** February 18, 1997