**Exhibit 15**

# Yes, There Is Life on MERS

By R. K. Arnold

After nearly four years on the drawing board, Mortgage Electronic Registration Systems, Inc., commonly known as MERS™, is a reality. MERS is the result of an industry effort to reduce the need for mortgage assignments in the residential mortgage market and thus increase efficiency and reduce costs. MERS will act as mortgagee of record for any mortgage loan registered on the computer system MERS maintains, which is called the MERS System™. It will then track servicing rights and beneficial ownership interests in those loans and provide a platform for mortgage servicing rights to be traded electronically among its members without the need to record a mortgage assignment in the public land records each time.

Some have called MERS the most significant event for the mortgage industry since the formation of Fannie Mae and Freddie Mac. Others have compared it to the creation of uniform mortgage instruments, which have become standard throughout the residential mortgage industry. This suggests that the journey to MERS will have a tremendous effect on the mortgage industry.

## What Is MERS?

MERS is a Delaware nonstock corporation owned by its members, who, in most cases, are also its users. Members pay annual fees to belong and transaction fees to execute electronic transactions on the MERS System. Members exercise control of the company through a board of directors who serve staggered two year terms. The board is empowered to set rules, fees and penalties for operating the MERS System.

MERS has three classes of membership: the Agency Class, composed of Fannie Mae and Freddie Mac; the Lender/Servicer Class, for companies engaged primarily in lending and servicing mortgage loans; and the Related-Industry Class, which includes title companies, mortgage insurance companies and others indirectly involved with the mortgage business. The federal government agencies focused on housing—FHA, VA and Ginnie Mae—serve on the MERS Advisory Council.

The MERS project formally began in October 1993 when Fannie Mae, Freddie Mac and Ginnie Mae published the Whole Loan Book Entry White Paper, which analyzed the need for an electronic mortgage registration system for mortgage rights. The acronym MERS was coined soon thereafter. The Mortgage Bankers Association of America played a key role until MERS was incorporated in October 1995 and is a charter member. The charter members initially capitalized the company and the company hired an executive team to take charge of the project on a full time basis in February 1996.

MERS awarded a contract to Electronic Data Systems (EDS) to develop the technology system. MERS owns and controls the system; EDS services the system for a set portion of the transaction fees. System development began in earnest in July 1996 and MERS officially launched in April 1997.

The MERS System is a secure network. Access levels depend on a member's relationship to a particular mortgage loan. For instance, servicers and investors

33

can update only their own loan files. Other members and the general public can see certain information about the servicer, such as its name, address and telephone number, but cannot access information about the investor or other proprietary data. The software is easy to use. It is Windows-based and designed to run on a 386 computer. On-line access through a modem is available using MERS proprietary desktop software. Batch transactions can be processed using EDI data format ANSI ASC X12 or a flat file format.

MERS currently charges a registration fee of between $3.20 and $3.50 to register a loan on the system and a transfer fee of between $8.20 and $8.50 to transfer servicing electronically. There is a substantial discount if a member prepays the transfer fee at the time a loan is registered. The annual membership fees currently range from $500 to $7,500, depending on a member's size and types of business. These fees are more than offset by the document preparation and filing costs that MERS eliminates. At present, the MERS System is limited to single-family first mortgage loans.

### Why the Need for MERS?

A mortgage note is normally a negotiable instrument under UCC Article 3. One holder can thus sell a mortgage note to another in what has become a gigantic secondary market. The holder of the note is either the beneficial owner of the mortgage loan or a designee who holds the note on behalf of that beneficial owner. These beneficial owners and their representatives are sometimes called investors.

Under UCC § 3-203, the right to receive payments under a note is legally transferred when one holder negotiates the note to another by endorsement and delivery. As security for the payment obligation, the mortgage follows the note without the need for further documentation. See, e.g., *In Re Ivy Properties*, 109 B.R. 10 (Bankr. D. Mass. 1989); *W.C. Early Co. v. Williams*, 186 S.W. 102, 103 (Tenn. 1916); *Spencer v. Alki Point Transp. Co.*, 101 P. 509, 514 (Wash. 1909); *Hillard v. Taylor*, 38 So. 594, 598 (La. 1905). The negotiability of notes under the UCC is the foundation for the secondary market for mortgage loans. As a result, the U.S. housing market is the envy of the entire world. Home ownership in most other countries is far less attainable, largely because financing is not as readily available. The ability of lenders to replenish their capital by selling loans in the secondary market is what makes money accessible for home ownership.

As investors bought more and more loans in the secondary market, many of them began to contract with servicing companies to handle loan servicing obligations. A servicer is a company that a mortgage loan investor hires to handle payment processing, tax and insurance escrows, foreclosure and other matters related to the loan or the property. Often, the servicer is the same lender that originated the loan, sold the beneficial ownership in the secondary market and agreed to continue servicing the loan for the new beneficial owner.

For these servicing companies to perform their duties satisfactorily, the note and mortgage were bifurcated. The investor or its designee held the note and named the servicing company as mortgagee, a structure that became standard. Some servicing companies have grown quite large, and a very active secondary market in servicing contracts has developed as well. Now more than $400 billion in servicing contracts trade annually.

A servicing contract is not an interest in real estate. Unlike a mortgage, it has nothing to do with legal title to the property and is personal property under UCC § 9-106. Even before MERS, servicers had no reason to appear in the public land records, except to receive the legal process they need to service loans properly.

The bifurcated structure worked fine for a long time, but the sheer volume of transfers between servicing companies and the resulting need to record assignments caused a heavy drag on the secondary market. The burden affected lenders, title companies, consumers and even local recorders. Assignment processing for the sale of a relatively modest loan portfolio can take up to six months to complete. Error rates as high as 33% are common. With the active secondary market in servicing contracts, more than four million loans are affected annually. Loan servicing can trade several times before even the first assignment in a chain is recorded, leaving the public land records clogged with unnecessary assignments. Sometimes these assignments are recorded in the wrong sequence, clouding title to the property.

### How Does MERS Work?

When a mortgage loan is registered on the MERS System, it receives a mortgage identification number (MIN). The borrower executes a traditional paper mortgage naming the lender as mortgagee, and the lender executes an assignment of the mortgage to MERS. Both documents are executed according to state law and recorded in the public land records, making MERS the mortgagee of record. From that point on, no additional mortgage assignments will be recorded because MERS will remain the mortgagee of record throughout the life of the loan. In states where deeds of trust are used instead of mortgages, MERS is typically named as beneficiary of the deed of trust.

The MIN is unique and will not change during the life of the loan. That innovation alone is a tremendous improvement for the mortgage industry. Each time a loan not registered on MERS is sold on the secondary market, it receives a new loan number. Those multiple loan numbers can cause considerable confusion and additional record keeping over the life of a 30 year loan. The MIN is never used again for another loan. That reduces the risk of multiple funding of the same loan by different lenders, which is a significant cause of fraud loss for the mortgage industry. As a

result of these advantages, many lenders may eventually abandon their own proprietary loan numbering systems in favor of the MIN.

As mortgagee of record or beneficiary of the deed of trust, MERS receives service of all legal process related to the property. One of the most important things MERS does is operate a state-of-the-art electronic mailroom. When mail is physically received in the MERS mailroom, it is imaged and forwarded electronically to the company shown as servicer for that loan on the MERS System. The servicer then responds as required under its servicing contract with the investor.

Once a member registers a mortgage loan on the MERS System, later transfers of the servicing contract are executed electronically through MERS. When one servicer trades servicing rights to another, the transfer is initiated by the old servicer. After the new servicer confirms the transfer, the MERS System is updated to reflect the new servicer as the proper recipient of future legal process. The Real Estate Settlement Procedures Act (RESPA) requires both the old servicer and the new servicer to notify the homeowner in writing when loan servicing is traded—the so-called "hello/goodbye letters." 12 U.S.C. §§ 2601 et seq. Servicing can change hands often, in some cases several times a year for the same loan, and homeowners have become quite familiar with these letters.

MERS keeps track of the new servicer electronically and acts as nominee for the servicing companies and investors. Because MERS remains the mortgagee of record in the public land records throughout the life of a loan, it eliminates the need to record later assignments in the public land records. Usually, legal title to the property is not affected again until the loan is paid and the mortgage is released. Foreclosures can be done in the name of MERS without the need to reassign the mortgage. Estimates are that MERS will save the mortgage industry $200 million a year by eliminating the need for many assignments. Because MERS should decrease the cost of servicing transfers, mortgage loan portfolios may begin to reflect a price difference if the loans are MERS-registered.

The corporate securities industry created its own book-entry system with the formation of the Depository Trust Company in the 1970s. Another company, the Participant's Trust Company, did the same thing for mortgage-backed securities in the 1980s. These systems revolutionized the way securities are traded. MERS will now play a similar role for mortgage loans.

As a result, consumers will benefit from MERS. The instant accuracy and 1-800 telephone access make it possible for homeowners to verify the validity of hello/goodbye letters. The public land records do not offer that capability because of the lag time between a servicing transfer and recordation of an assignment in the land records. Even more important, title agents can use MERS to find the correct servicer for a particular mortgage loan. That information will allow title agents to obtain accurate payoff information more easily, making loan closings more efficient. In fact, the title industry may benefit from MERS as much as the mortgage industry. MERS will simplify the chain of title because there will be no subsequent assignments to contend with after MERS becomes the mortgagee.

### Why Does MERS Work?

MERS was designed to operate within the existing legal framework in all U.S. jurisdictions. No change in state or federal law is necessary. Activity on the MERS System does not affect legal title to land. MERS does not create electronic assignments; it eliminates the need for subsequent assignments altogether. After MERS becomes mortgagee, there are no more assignments, except on the rare occasion when a member wants an assignment from MERS. In that case, the assignment from MERS would be recorded in the public land records and would have the effect of de-registering the loan.

> "MERS was designed to operate within the existing legal framework in all U.S. jurisdictions. No change in state or federal law is necessary. Activity on the MERS System does not affect legal title to land. MERS does not create electronic assignments; it eliminates the need for subsequent assignments altogether."

The MERS concept involves three basic legal principles already in use in countless transactions all over the country. MERS simply applies these basic principles in combination to create an electronic book-entry system for mortgage servicing rights.

First, every state provides a mechanism for lenders to secure loans by taking an interest in real estate—most commonly, mortgages and deeds of trust.

Second, every state designates certain places where mortgages or deeds of trust must be recorded to be valid against a bona fide purchaser (BFP). That place is typically with the county recorder or clerk, although sometimes other local officials play this role. Under the U.S. Bankruptcy Code, a bankruptcy trustee occupies the position of a hypothetical BFP. Lenders therefore must perfect their interest properly according to state law or risk losing to the trustee if the homeowner files bankruptcy. 11 U.S.C. § 544(a)(3).

Third, every state permits a person or entity to hold legal title in the public land records as nominee for another person or entity that is the true party in interest. See, e.g., *American Bank &*

**Zane invites you to attend a Free Conference on Automating your Trust and Estate practice.**

| | |
|---|---|
| 7/8 | New York NY |
| 7/8 | Newark NJ |
| 7/9 | Stamford CT |
| 7/9 | Hartford CT |
| 7/10 | Boston MA |
| 7/10 | Providence RI |
| 9/15 | Milwaukee WI |
| 9/16 | Minneapolis MN |
| 9/16 | St. Paul MN |
| 9/17 | Chicago IL |

**Call: 1-800-331-2533**

To Register or Receive Additional Information



The Leader In Trust and Estate Administration & Tax Software

*Trust Co. v. Louisiana Savings Ass'n*, 386 So. 2d 96 (La. Ct. App. 1980). Without that important similarity, the secondary mortgage market might never have grown to its present size. Without nominees, investors could be forced to service loans themselves directly, a highly specialized activity best done by servicing companies, or at least to operate their own mailrooms to forward legal process to the servicers.

Of course, many state laws are dissimilar. Nevertheless, even those laws generally tend to fall into major categories that can be addressed in about the same way. For example, although every state provides for some type of foreclosure if a mortgage is not paid, each has its own procedures. MERS will operate within those local procedural requirements. MERS members presumably already comply with the law in those states where they do business. Those same members are responsible to MERS for ensuring that they continue to comply with those laws after a loan is registered. The important point is that MERS is bound by the laws of the state where the property is located, just as any mortgagee would be; MERS will comply with those laws through its members.

### What About County Recorders?

Representatives of the two principal county recorder trade organizations, the National Association of County Recorders and Clerks and the International Association of County Recorders, Election Officials and Treasurers, have served on the MERS Advisory Council since its inception. Generally, county recorders have been far more supportive than some would believe. Most run automated operations, and many are keenly interested in new technology.

Although many are comfortable with MERS, some oppose it. Some recorders have expressed concerns that MERS will eliminate their offices nationwide or destroy the public land records by breaking the chain of title. As implemented, MERS will not create a break in the chain of title, and, because MERS is premised on an assignment recorded in the public land records, MERS cannot work without county recorders. MERS members are satisfied that it works and are trusting MERS to act as the mortgagee for their loan portfolios. The county recorders' real concern appears to be loss of assignment revenues. Whether their assignment revenues will drop remains an open question.

### Conclusion

Change defines the future. Advancements in technology have made MERS possible. MERS presents a dramatic change in mortgage loan practices. Adjusting to that change may not be as difficult as it first appears. Moreover, this change should ultimately benefit lenders, title insurers, consumers and their counsel.

How will MERS evolve as it explores the new world of electronic mortgage registration? In whatever direction its members want it to go. MERS is owned and operated by and for the mortgage industry. Right now, the focus is on single-family first mortgages. The next step could be second mortgages. Multi-family or commercial mortgage loans might follow in the future. Almost any secured real estate transaction is a candidate for life on MERS.

---

*R. K. Arnold is Senior Vice President, General Counsel and Secretary of Mortgage Electronic Registration Systems, Inc. in McLean, Virginia.*